UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
DENISE PAYNE,                                                    Index No. 18-cv-1442

                                    Plaintiff,

                                                                 COMPLAINT

                    -against -

CORNELL UNIVERSITY,

                                    Defendant.
-----------------------------------------------------------------------X

Plaintiff, DENISE PAYNE, by and through her attorneys, NESENOFF & MILTENBERG,

LLP, whose offices are located at 363 Seventh Avenue – Fifth Floor, New York, New York 10001,

respectfully alleges, upon knowledge as to herself and her own actions, and upon information and

belief as to all other matters, as follows:

## PRELIMINARY STATEMENT

1.      This action is brought on behalf of Plaintiff Denise Payne ("Plaintiff" or "Ms.

Payne") against Defendant Cornell University ("Defendant" or the "University") for disability

discrimination and retaliation in violation of the New York State Human Rights Law (N.Y. Exec.

Law 290 et. seq.) ("SHRL") and the Americans with Disabilities Act of 1990 ("ADA").

## JURISDICTION AND VENUE

2.      This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28

U.S.C. §§ 1331 and 1343.

3.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant

to 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form a part

of the same case or controversy between Plaintiff and Defendant.

4.      Venue is proper in this case pursuant to 28 U.S.C. § 1391 because (1) a substantial part of the events which give rise to Plaintiff's claims took place in Ithaca, New York which is in the Northern District of New York.

5.      All conditions precedent to suit have been fulfilled.  On or about March 19, 2018, Plaintiff filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") for violations of her civil rights by virtue of discrimination and retaliation, which was cross filed with the New York State Division of Human Rights.

6.      On or about August 13, 2018, the EEOC issued Plaintiff a Notice of Right to Sue letter.

7.      This action was commenced by Summons with Notice in the Supreme Court of the State of New York, Tompkins County within 90 days of Plaintiff's receipt of her Notice of Right to Sue letter.

**PARTIES**

8.      Plaintiff is a resident and domiciliary of Cortland County, New York.

9.      At all times relevant, Plaintiff was an "employee" and/or prospective employee of Defendant as that term is defined by all applicable federal, state, and local laws, including, but not limited to, the SHRL and the ADA.

10.      Upon information and belief, Defendant is a private Ivy League institution and federal land-grant doctoral university located in Ithaca, New York.

11.      At all times relevant, Defendant was Plaintiff's "employer" and/or prospective employer as that term is defined by all applicable federal, state, and local laws, including, but not limited to, the SHRL and the ADA.

2

## FACTUAL ALLEGATIONS

**Plaintiff Commences Employment as an IRB Administrator**
**And Complains of Discrimination and Unfair Employment Practices**

12.     In or around November of 2013, Ms. Payne began to work for Defendant as an IRB Administrator in the University's Office of Research, Integrity, and Assurance. At such time, Plaintiff's supervisor was Amita Verma ("Director Verma").

13.     While employed by Defendant, Ms. Payne always performed her job duties in a satisfactory manner, and proved herself as a hard-working and dependable asset to the University. Indeed, Ms. Payne always received positive performance evaluations throughout her long career with the University.

14.     While under the supervision of Director Verma, and later Assistant Director Guilaine Senecal, Plaintiff worked tirelessly to not only perform her own job duties and tasks, but to also learn the job and responsibilities of her senior administrator in an effort to take pressure off of him in the workplace.

15.     In addition, Plaintiff trained new employees and provided assistance for employees undertaking more junior roles at the University. In this capacity, in or around 2014, Plaintiff began to train a new employee Myles Gideon ("Mr. Gideon"), a junior compliance associate.

16.     Notably, Mr. Gideon had far less impressive skills and qualifications than Ms. Payne and had been employed by the University for only a short amount of time. Nonetheless, after just a few short months at the University, Defendant purposefully chose to promote Mr. Gideon over Ms. Payne to the role of Senior IRB Administrator – a position above Plaintiff.

17.     Plaintiff, shocked that the University would overlook her for such a prestigious promotion and perplexed as to why the University promoted an employee still in training with far

less experience, asked her manager why she was not considered for the Senior IRB Administrator position.

18.    Without any basis, Plaintiff's manager simply stated that "we did not think you would want to work the fifty-plus hours a week." In addition, Plaintiff's manager told her that Defendant wanted "him", meaning Mr. Gideon, to be "the face" of the department.

19.    In response, Plaintiff complained to Defendant's Human Resources ("HR") department and higher-ranking managers that she believed the promotion decision had been unfair and that Director Verma had made the decision based on impermissible motivations.

20.    Plaintiff's complaints fell on deaf ears and only served to sour her relationship with Director Verma, who, upon information and belief, was incensed at Plaintiff for making a complaint against her and accusing her of potential unlawful conduct.

21.    Plaintiff was forced to continue training Mr. Gideon after he assumed his new role as the Senior IRB Administrator knowing that she was equally, if not more, qualified for the position and unfairly earning a lower salary than him. Plaintiff was further frustrated that it was evident Defendant had failed to follow its own policies and procedures to her detriment.

22.    Unfortunately, Defendant's act of unfairly treating and compensating Plaintiff would not be a singular event, and, indeed, would define the remainder of Plaintiff's employment at the University and beyond.

**Defendant Induces Plaintiff into Accepting a Lower Paying Position**

23.    In or around August of 2015, Plaintiff went on to accept a temporary part-time position with Defendant as a BSL (Business Simulation Lab) Administrator, incurring a significant deduction in her hourly wages from approximately $33.00 per hour to approximately $23.00 per hour.

4

24.     Plaintiff agreed to take the lower paying position due to Defendant's verbal promise that within one year, Plaintiff would be promoted to a full-time employee and be placed at a higher pay-level approximating what she had been previously earning.

25.     Indeed, Plaintiff explicitly told Defendant's hiring manager, Margaret Shackell that she was accepting position solely due to Defendant's promise that she would be promoted in a year's time, which Defendant acknowledged and again reassured Plaintiff would come to fruition.

26.     Plaintiff trusted that Defendant would keep to its word and was excited to start in this new position, face new challenges, and help build the Business Simulation Lab unit.

27.     Notably, some time later, after Plaintiff had vacated the BSL Administrator role, Defendant changed the role to a much higher pay scale and paid the next employee at a significantly higher rate that Plaintiff had earned.

28.     Defendant has never given an explanation as to why Ms. Payne was not properly compensated as opposed to her subsequent colleagues who assumed the position.

**Plaintiff is Diagnosed with Breast Cancer and**
**Immediately Notifies the University of Her Disability**

29.     In or around June of 2016, Ms. Payne was unfortunately diagnosed with breast cancer. Accordingly, Ms. Payne was disabled within the meaning of the SHRL and ADA.

30.     After discussions with her treating doctor, Ms. Payne was set to begin a treatment plan consisting of surgery in July of 2016 to remove the tumor, as well as chemotherapy and radiation treatment beginning in August of 2016 and extending through October 2017.

31.     Ms. Payne immediately notified Defendant of her diagnosis.

32.     Specifically, on or about June 13, 2016, Ms. Payne notified Defendant's HR representative, Katherine Doxey ("HR Rep. Doxey") that she had been diagnosed with cancer and

would need to use some of her accrued health and personal ("HAP") time to process her recent diagnosis and meet with the necessary doctors.

33.     Plaintiff also notified HR Rep. Doxey that she would not be able to work on-site for a short time while she processed her diagnosis and coordinated with her physicians but was able and willing to work from home.

34.     In addition, Ms. Payne shared her full 15-month treatment plan with Defendant.

35.     In response, HR Rep. Doxey asked Plaintiff to meet in person to go over the necessary procedures and processes for taking the requested time off and her benefits as they applied to Plaintiff's situation.

**Plaintiff Interviews For and Accepts a New Position While Undergoing Treatment**

36.     Throughout July and August of 2016, while undergoing treatment for her cancer diagnosis, Plaintiff interviewed with Lucinda Allen ("Ms. Allen") for a new position with Defendant as a Data Analyst II. Shortly thereafter, Defendant verbally offered Plaintiff the position.

37.     At the time Plaintiff received the verbal offer from Ms. Allen, Ms. Payne was told that the role would "likely" be an exempt position, meaning Plaintiff would not be eligible to earn premium overtime compensation, and would be set at one of two pay-levels, either E-level or F-level.

38.     Ms. Allen also explained to Plaintiff that it could take up to six months for the position to be fully defined.

39.     Plaintiff verbally agreed to take the position on a part-time basis while maintaining her part-time position as a BSL Administrator for the following six-month period, i.e. from August

2016 through December 2016. After December 2016, Plaintiff was to work in solely the Data Analyst II role.

40.     While in this dual role, Plaintiff was to report to Ms. Allen and be daily overseen by Sarah Miller with respect to the Data Analyst II position.

41.     Plaintiff began training for the Data Analyst II role in August of 2016.

42.     On or about September 26, 2016, while on short-term disability recovering from a round of chemotherapy, Plaintiff received a formal offer letter from Defendant with respect to the Data Analyst II position.

43.     Notably, the formal offer letter set the position at the lowest possible pay-level. Plaintiff was extremely confused and disappointed that there had not been any prior substantive discussion regarding her salary in the Data Analyst II position, and that Defendant had chosen to offer her the lowest possible compensation despite her years of experience and qualifications.

44.     Upon information and belief, Defendant intentionally set Plaintiff's pay at the lowest possible level because it did not want to pay Plaintiff a higher salary knowing that she would need time away from work for her cancer treatments and medical health.

45.     Plaintiff accepted the position and continued to undergo training until October of 2016, when she began a 12-week medical leave to attend chemotherapy treatments.

46.     Plaintiff was on disability leave from October 2016 through December 2016.

**Plaintiff Returns to the University**
**And Enters into a New Work Agreement with Defendant**

47.     In or around January of 2017, Plaintiff returned to work at the University on a part-time basis as a Data Analyst II.

48.     When Plaintiff returned to work, she was unfortunately out of HAP time, having used all of her available and accrued time to attend her prior chemotherapy and medical appointments.

49.     At the time Plaintiff returned from medical leave, Plaintiff signed a flex work agreement (the "Agreement") with the University which, in theory, would have allowed her more flexibility to attend and recover from her chemotherapy and cancer related medical appointments while working for the duration of her disability.

50.     Ms. Payne entered the Agreement expressly to establish a way in which she could continue to work for Defendant while undergoing her cancer treatments.

51.     The Agreement had a natural termination date of May 1, 2017.

**Defendant Breaches the Agreement with Plaintiff**
**And Denies Her Reasonable Accommodations for Her Disability**

52.     Plaintiff continued to work for Defendant under the Agreement with little to no issues. However, this would soon change as Defendant, upon information and belief, lost patience with having to accommodate Plaintiff's ongoing disability.

53.     On or about February 20, 2017, Ms. Payne reached out to her then manager, Tammy Lindsay ("Manager Lindsay") and requested to work from home for 3-4 hours due to the side effects of her chemotherapy treatments. Such a request would not have caused Defendant any hardship and would, in fact, have been permitted under the Agreement.

54.     However, instead of accommodating Plaintiff and abiding by the Agreement, Manager Lindsay admonished Plaintiff for alleged not keeping her updated regarding Ms. Payne's ongoing treatment schedule.

8

55.     In response, Ms. Payne politely corrected Manager Lindsay and advised that she had in fact alerted Manager Lindsay of her treatment schedule and same was noted on the office calendar which Manager Lindsay had neglected to look at.

56.     This only served to incense Manager Lindsay further as she continued to berate Plaintiff about her need for flexible hours, and accuse Plaintiff of failing to properly follow procedure and communicate effectively with her.

57.     Following this altercation, Plaintiff reached out to Defendant's Medical Leave representative, Jillian Tubbs ("ML Rep. Tubbs") to ask for advice.

58.     Ms. Payne advised ML Rep. Tubbs of her conversation with Manager Lindsay and inquired if she should file for a formal accommodation through the University's medical leave board.

59.     ML Rep. Tubbs simply advised Plaintiff to go back and try to work it out with Manager Lindsay.

**Defendant Prohibits Plaintiff from Accruing Necessary and Vital HAP Time**

60.     In or around May of 2017, Plaintiff realized that since her return to work five months prior, she had still not accrued any additional HAP time and had continued to be forced to use her vacation time to cover her medical appointments and chemotherapy treatments.

61.     In addition, Plaintiff had accrued donated catastrophic leave which Defendant had also failed to properly administer to her.

62.     Plaintiff found this very odd and reached out to Defendant's HR and payroll departments to understand why the University was not allowing her to accrue HAP time since her return back in January of 2017, and how she could access the donated catastrophic leave time.

63.     In response to her inquiries, Defendant acknowledged that there had been an error and the payroll department fixed the issue, thus allowing Plaintiff to once again earn and accrue HAP time.

64.     In addition, Defendant admitted to withholding Plaintiff's donated leave and was finally forced to allow her access to it.

**Defendant Uses Plaintiff's Time Off for Medical Treatments Against Her**

65.     On or about May 9, 2017, Plaintiff contacted Manager Lindsay and asked if she could be allowed to take a one hour, as opposed to half hour, lunch break in order to meet with a former colleague.

66.     In response, Manager Lindsay curiously asked Plaintiff if she intended to make up the time for a longer, unpaid, lunch break.

67.     Manager Lindsay told Plaintiff that she was missing too much time at work, would have to review her time records, and accused Plaintiff of taking too much time off for not-medically related reasons.

68.     This accusation was extremely inflammatory and entirely baseless as Plaintiff had never abused her time off.  On the contrary, Plaintiff was desperate to accrue more HAP time simply to keep up with her medically necessary appointments.

69.     Plaintiff, feeling attacked, reached out to Ms. Allen, Manager Lindsay's superior, to discuss some issues that were affecting Plaintiff's continued health.

70.     Plaintiff met with Ms. Allen and complained that Manager Lindsay was not allowing her the required flex time as per the Agreement, and was instead being very restrictive and scrutinizing Plaintiff's timecard, going so far as to accuse her of improperly requesting time off.

71.     Ms. Payne told Ms. Allen that this was causing her additional stress and negatively affecting her health.

72.     Ms. Payne asked Ms. Allen for help but Ms. Allen refused to talk about the subject.

73.     Just a few short days later, Ms. Payne met with Manager Lindsay in person. During this meeting, Manager Lindsay attempted to pressure Ms. Payne to working a full-time schedule and to slow down her use of vacation and HAP time. Manager Lindsay again accused Plaintiff of using her accrued time for improper reasons unrelated to her ongoing health complications.

74.     Plaintiff dutifully stood up for herself but to no avail.

**Defendant Renews the Agreement on the University's Terms Only**

75.     In or around mid-May of 2016, Plaintiff discussed the renewal of the Agreement with Manager Lindsay.

76.     At such time, Plaintiff advised that she needed to have flexibility wherein she would work from home two days a week, and as needed through the end of her chemotherapy treatments which Defendant had previously been advised would end in October of 2017.

77.     Defendant agreed to the "as needed" language only, and renewed the Agreement.

**Manager Lindsay Continues to Micro-Manage Plaintiff's Time Off**

78.     Manager Lindsay continued to berate and criticize Ms. Payne for her time off and her use of her accrued HAP and vacation time.

79.     Indeed, Manager Lindsay went so far as to alter Plaintiff's timecard on more than one occasion and take away what little HAP time Plaintiff had accrued, upon information and belief, in violation of Defendant's policies.

80.     Manager Lindsay further used Plaintiff's necessary time off against her as a point of criticism in Plaintiff's performance evaluation.

11

81.     By way of example, on or about June 7, 2017, Plaintiff met with Manager Lindsay one on one to discuss her performance. At such time, Manager Lindsay again admonished Plaintiff for taking too much time off and for using her HAP time and vacation time too quickly.

82.     Plaintiff was shocked that the need for accommodations was once again being used against her. Plaintiff vehemently demanded that Manager Lindsay give her concrete examples to support her criticisms. Unsurprisingly, Manager Lindsay was unable to do so.

83.     In that same meeting, Ms. Payne attempted to discuss her compensation with Manager Lindsay and requested that her position be correctly classified as "exempt" based on an accurate job description, and that her salary be adjusted based on her experience and skills.

84.     Manager Lindsay refused to make such changes because, as Manager Lindsay explained, Plaintiff "needed to get her timecard under control" and Ms. Payne "had a lot going on right now."

85.     Upon information and belief, Manager Lindsay was referring to Plaintiff's health issues and was once again, using Plaintiff's cancer diagnosis as a means to target Ms. Payne.

86.     Upset after the meeting, Plaintiff began to experience heart palpitations and requested of Manager Lindsay that she be allowed to work from home for the rest of the day.

87.     Appallingly, Manager Lindsay refused to allow Plaintiff to work from home until Plaintiff gave a detailed description of why she would not remain at work.

88.     After Plaintiff explained that she was experiencing heart palpitations, Manager Lindsay looked exasperated and told Plaintiff to just go home.

89.     Upset, Plaintiff immediately went to Defendant's HR Department and met with Julie Weaver ("HR Rep. Weaver") to try to address and alleviate the harassment and unfair treatment coming from Manager Lindsay.

90.     Ms. Payne complained again to HR Rep. Weaver that Manager Lindsay was not allowing her reasonable accommodations, was harassing her based on her need for reasonable accommodations, and was causing Plaintiff additional stress which was having a negative effect on Ms. Payne's already vulnerable health.

91.     In response, HR Rep. Weaver seemed empathetic but did not institute any action or investigation into Plaintiff's complaints.

**Manager Lindsay Strikes Back at Plaintiff**

92.     Following Plaintiff's complaint to HR Rep. Weaver, Manager Lindsay continued to target Ms. Payne and, in fact, become much worse.

93.     By way of example only, despite having earlier inferred that Plaintiff needed to make up the time she was taking for her medical treatments, Manager Lindsay used Plaintiff's hard work ethic against her as a means to discipline Ms. Payne.

94.     Indeed, on occasion, out of fear, Ms. Payne forced herself to work extra-long hours in an attempt to make up some of the time she had missed at work due to her health.

95.     Manager Lindsay was not satisfied though; she frequently berated Plaintiff and accused Ms. Payne of doing something improper when she worked extra hours and unfairly criticized Plaintiff's job performance.

96.     By way of further example, Manager Lindsay went so far as to retroactively deny Plaintiff's earlier requests to work from home, which had previously been approved, and dock Plaintiff's work hours.

97.     In addition, Manager Lindsay continued to refuse to allow Plaintiff to work from home, despite the longstanding Agreement and Plaintiff's legally and medically necessary right to reasonable accommodations.

13

98.     By way of yet further example, Manager Lindsay steadfastly refused to remove sensitive medical information from Plaintiff's records at Plaintiff's request.

99.     Specifically, upon realizing that documented medical information would "follow" her employment at the University, Plaintiff sought to have sensitive medical information removed from her performance review. Plaintiff requested that Manager Lindsay remove any and all direct and indirect mentions of her medical information from Ms. Payne's electronic performance review.

100.    However, Manager Lindsay refused to remove the information, which was wholly unrelated to Plaintiff's performance, for many months and only removed it after Plaintiff sought help from Defendant's Office of Workforce Policy and Labor Relations.

**Ms. Payne Files a Formal Accommodation Request**

101.    Following months of discrimination and retaliation at the hands of Manager Lindsay, Plaintiff went back to ML Rep. Tubbs and requested to file a formal request for accommodations.

102.    ML Rep. Tubbs provided Plaintiff with instructions on how to file a formal request for accommodations and Plaintiff submitted her formal request.

**Ms. Payne Realizes her Managers have Been Plotting Against Her**

103.    In or around July of 2017, Plaintiff received an email from Ms. Allen which harshly and unfairly criticized her work performance. It was clear to Ms. Payne that the email was not meant for her but, likely, was meant to go to Manager Lindsay.

104.    It became evident to Plaintiff that the management team at the University were speaking about her performance behind her back and, upon information and belief, gathering ammunition to use against her. Plaintiff was shocked and confused.

14

105.    Notably, there had never been any intimation that Plaintiff was under-performing prior to her cancer diagnosis and need for reasonable accommodations.

106.    Upon realizing her mistake, Ms. Allen approached Plaintiff and apologized but then stated that she thought Ms. Payne was making a lot of mistakes due to her accommodations.

107.    Ms. Payne requested examples and a meeting with Ms. Allen to discuss her alleged performance deficiencies, and was assured by Ms. Allen (both in-person and by email) that she would provide the requested information.

108.    Despite Ms. Allen's assurances, however, no constructive follow-up happened.

109.    In a subsequent meeting with HR Rep. Weaver, Plaintiff was instructed on being less "defensive" with her management. Although Ms. Payne disagreed that she had been anything less than professional with her superiors, she politely and professionally accepted the constructive criticism.

110.    As of that meeting, upon information and belief, nothing had been done to address Plaintiff's complaints of discrimination with Manager Lindsay or Ms. Allen.

**Plaintiff Submits a Formal Written Complaint of Discrimination**

111.    On or about July 13, 2017, Plaintiff sent Defendant's HR department a formal written timeline and complaint of discrimination accusing her managers of denying her reasonable accommodations for her disability.

112.    In response, HR thanked Plaintiff for the information and advised that they would meet with Ms. Allen and Manager Lindsay the following week to discuss the issue.

113.    Upon information and belief, Plaintiff's complaint was not shared with the University's Office of Workplace Policy and Labor Relations, a violation of the University's own policies and procedures.

**Manager Lindsay Continues to Ignore Plaintiff's Need for Reasonable Accommodations**

114.    On or about July 18, 2017, Plaintiff was notified via email that her formal request for accommodations had been approved.

115.    Despite this fact, Manager Lindsay continued to ignore Plaintiff's requested accommodations.

116.    Plaintiff again brought this matter to HR's attention and filed yet another complaint with HR Rep. Weaver.

117.    Plaintiff advised HR Rep. Weaver that Manager Lindsay was ignoring her requests for accommodation.

118.    HR Rep. Weaver again advised Plaintiff that she would look into the matter and scheduled a follow up meeting with Plaintiff in August.

**Manager Lindsay Questions Plaintiff's Approved Accommodations**

119.    On or about August of 2017, Plaintiff had a meeting with HR, Manager Lindsay and Ms. Allen regarding her complaints of discrimination and Manager Lindsay's refusal to allow her reasonable accommodations.

120.    During the meeting, Manager Lindsay looked annoyed at having to participate, acted hostilely, and questioned Plaintiff's need for accommodations at all, asking "do we really need to do this??"

121.    In addition, Manager Lindsay declared that Defendant had given Plaintiff "enough accommodation" already but they were "running a business", seemingly implying that Plaintiff was the bad guy and should be grateful for what little accommodations she had already received.

16

122.     Seemingly giving into Manager Lindsay, HR asked Manager Lindsay if she would like HR to reach out to the Medical Leave board to reevaluate Plaintiff's request for reasonable accommodations, which had already been approved.

123.     Thereafter, HR and management agreed that the University would reevaluate Plaintiff's previously approved request for accommodations.

124.     Moreover, Defendant allowed Ms. Allen to interrogate Plaintiff as to her need for the accommodations, forcing Plaintiff to disclose personal details about her medical condition.

125.     Adding insult to injury, after one detailed medical explanation, Ms. Allen turned to HR Rep. Doxey and rolled her eyes at Plaintiff's statements.

126.     Plaintiff left the meeting feeling very defeated and nervous that Defendant would give into Manager Lindsay's and Ms. Allen's demands that Plaintiff stop receiving any accommodations for her cancer diagnosis.

**Plaintiff Notifies Defendant that She Filed an EEOC Complaint**

127.     On or about September 12, 2017, Plaintiff notified Defendant's HR that she had filed an inquiry with the EEOC related to disability discrimination and Defendant's refusal to provide her with reasonable accommodations.

128.     The very next day, Plaintiff received a meeting invitation from Defendant's Associate Dean of HR and Finance, Laura Syer ("Associate Dean Syer"), but was not told of the reason for the meeting or what was to be discussed.

129.     Plaintiff reached out to HR and advised that she was very uncomfortable walking into a meeting without knowing its purpose.

130.     Thereafter, on or about September 15, 2017, Plaintiff met with HR Rep. Doxey in an effort to gain some insight into what was happening regarding her accommodations and her ongoing relationship with Ms. Allen and Manager Lindsay who, at this point, barely spoke to her.

131.     During the meeting, HR Rep. Doxey informed Ms. Payne that the meeting she had been invited to was to discuss ongoing changes to the department, including upcoming tasks/projects.

132.     In response to Plaintiff's comments that Manager Lindsay was not speaking to her, HR Rep. Doxey informed Ms. Payne that Manager Lindsay had been removed as her manager a few weeks prior. HR Rep. Doxey appeared shocked that nobody had told Plaintiff of her new reporting structure.

133.     At the meeting, HR Rep. Doxey also mentioned Plaintiff's EEOC complaint and asked Plaintiff "what she wanted" out of it.

134.     In response, Ms. Payne truthfully stated that she wanted to be treated fairly, which included being paid fairly, and that she did not want anybody else to be subjected to similar treatment.

135.     Thereafter, Plaintiff participated in an Organizational Structure Meeting (the "Org Meeting") led by Associate Dean Syer.

136.     At the Org Meeting, Associate Dean Syer was enthusiastic about the changes to the department and stated that the department was growing and they would be hiring additional data analysts.

137.     Thereafter, following changes to the department, Plaintiff noticed a marked change in Manager Lindsay's behavior, as Manager Lindsay began to speak to Plaintiff again and began,

once again, to micromanage Plaintiff's performance, despite the fact that she was no longer Plaintiff's superior.

**Defendant Pulls the Rug Out from Under Plaintiff**

138.    Following the Org Meeting, and in response to the ongoing micromanagement by Manager Lindsay, Plaintiff repeatedly asked for follow-up information related to the current roles and responsibilities within the department, Plaintiff's job classification and pay level, and her job location. However, Plaintiff was kept woefully in the dark.

139.    Thereafter, on or about December 1, 2017, Plaintiff was notified, shockingly, that her department was being eliminated and she and Manager Lindsay were being laid off as of January 1, 2018.

140.    In reality, however, Plaintiff's position was simply moved to a new department, was assigned to a higher pay-level than Plaintiff received, and was then considered an exempt position. Upon learning this, Plaintiff advised that she would be applying for the transferred position.

141.    A few weeks later, Manager Lindsay was subsequently rehired in a temporary position under Associate Dean Syer.

**Defendant Refuses to Re-Hire Plaintiff as a Disabled Employee**

142.    Following the elimination of the Business Analytics Department, Plaintiff applied for numerous new positions with Defendant.

143.    Plaintiff was highly qualified for each position she applied for and performed well at each interview, responding professionally even to inquiries regarding her former relationship with Ms. Allen.

144.   Curiously though, Plaintiff was never offered any subsequent position with Defendant and was passed up for other candidates who, upon information and belief, did not have a disability.

145.   Plaintiff was never rehired by Defendant.

## CLAIMS FOR RELIEF
## AS AND FOR THE FIRST CAUSE OF ACTION
*(Disability Discrimination – Disparate Treatment in violation of the New York State Human Rights Law)*

146.   Plaintiff repeats and re-alleges each and every fact above as if fully set forth herein.

147.   Plaintiff is a disabled individual as defined by the SHRL, and is therefore a member of a protected class.

148.   Plaintiff was qualified to work as an employee for Defendant and she satisfactorily performed the duties required by the position she held at the University.

149.   As set forth in detail above and herein, Defendant subjected Plaintiff to disparate treatment on the basis of her disability.

150.   The discrimination that Plaintiff suffered while employed by Defendant severely affected the terms and conditions of her employment and culminated in Plaintiff's unwarranted discharge.

151.   By reason of Defendant's repeated violations of Plaintiff's statutory rights, Plaintiff has suffered a loss of monetary and other benefits associated with her employment.

152.   As a direct and proximate result of Defendant's unlawful employment practices, Plaintiff has suffered extreme mental anguish, and emotional distress.

153.    Accordingly, Defendant discriminated against Plaintiff by virtue of treating Plaintiff less well than her similarly situated colleagues outside her protected class in violation of her statutory rights as guaranteed by the SHRL.

## AS AND FOR THE SECOND CAUSE OF ACTION

*(Disability Discrimination – Hostile Work Environment in violation of the New York State Human Rights Law)*

154.    Plaintiff repeats and re-alleges each and every fact above as if fully set forth herein.

155.    Plaintiff is a disabled individual as defined by the SHRL, and is therefore a member of a protected class.

156.    Plaintiff was qualified to work as an employee for Defendant and she satisfactorily performed the duties required by the position she held at Defendant.

157.    As set forth herein and above, Defendant subjected Plaintiff to a hostile work environment on the basis of her disability.

158.    The discrimination Plaintiff suffered while employed with Defendant was severe and pervasive, unwelcome by Plaintiff, and would be offensive to a reasonable person.

159.    The discrimination that Plaintiff suffered while employed by Defendant severely affected the terms and conditions of her employment and culminated in her unwarranted discharge.

160.    By reason of Defendant's repeated violations of Plaintiff's statutory rights, Plaintiff has suffered a loss of monetary and other benefits associated with her employment.

161.    As a direct and proximate result of Defendant's unlawful employment practices, Plaintiff has suffered extreme mental anguish and emotional distress.

162.    Accordingly, Defendant discriminated against Plaintiff by virtue of subjecting Plaintiff to a hostile work environment on the basis of her disability in violation of her statutory rights as guaranteed by the SHRL.

## AS AND FOR THE THIRD CAUSE OF ACTION
*(Failure to Accommodate in violation of the New York State Human Rights Law)*

163.    Plaintiff repeats and re-alleges each and every fact above as if fully set forth herein.

164.    As set forth in detail above and herein, Plaintiff suffered (and continues to suffer) from cancer, and is therefore "disabled" under the SHRL.

165.    Defendant was aware and on notice of Plaintiff's disability and the symptoms thereof.

166.    Plaintiff requested a reasonable accommodation from Defendant which would not have posed any undue hardship on Defendant and which would have enabled Plaintiff to continue to perform the essential functions of her position with Defendant.

167.    In response, Defendant repeatedly refused to provide Plaintiff with a reasonable accommodation and refused to participate in any interactive discussion or process to determine a different accommodation to assist Plaintiff and address her disability in the workplace.

168.    Accordingly, Defendant discriminated against Plaintiff by virtue of failing to accommodate her known disability and failing to engage in an interactive process in violation of the SHRL.

## AS AND FOR THE FOURTH CAUSE OF ACTION
*(Retaliation in violation of the New York State Human Rights Law)*

169.    Plaintiff repeats and re-alleges each and every fact above as if fully set forth herein.

170.    As set forth in detail above, Defendant subjected Plaintiff to discrimination, a hostile work environment, a failure to accommodate her disability, and an atmosphere of adverse employment actions and decisions because of her disability in violation of Plaintiff's statutory rights.

171.    Plaintiff complained to Defendant multiple times regarding the discrimination she was subjected to during her employment at the University.

172.    Defendant failed to carry out an unbiased and thorough investigation into the merits of Plaintiff's reports of discrimination and failure to accommodate.

173.    In response to Plaintiff's complaints, Defendant, unlawfully and without cause, retaliated against Plaintiff as a direct result of Plaintiff complaint of discrimination and a failure to accommodate.

174.    By reason of Defendant's repeated violations of Plaintiff's statutory rights, Plaintiff has suffered a loss of monetary and other benefits associated with her employment.

175.    As a direct and proximate result of Defendant's unlawful employment practices, Plaintiff has suffered extreme mental anguish and emotional distress.

*176.*    Accordingly, Defendant retaliated against Plaintiff in violation of her statutory rights as guaranteed by the SHRL.

## AS AND FOR THE FIFTH CAUSE OF ACTION
*(Disability Discrimination – Disparate Treatment in violation of the Americans with Disabilities Act)*

177.    Plaintiff repeats and re-alleges each and every fact above as if fully set forth herein.

178.    Plaintiff is a disabled individual as defined by the ADA, and is therefore a member of a protected class.

179.    Plaintiff was qualified to work as an employee for Defendant and she satisfactorily performed the duties required by the position she held at the University.

180.    As set forth in detail above and herein, Defendant subjected Plaintiff to disparate treatment on the basis of her disability.

23

181.    The discrimination that Plaintiff suffered while employed by Defendant severely affected the terms and conditions of her employment and culminated in Plaintiff's unwarranted discharge.

182.    By reason of Defendant's repeated violations of Plaintiff's statutory rights, Plaintiff has suffered a loss of monetary and other benefits associated with her employment.

183.    As a direct and proximate result of Defendant's unlawful employment practices, Plaintiff has suffered extreme mental anguish, and emotional distress.

184.    Accordingly, Defendant discriminated against Plaintiff by virtue of treating Plaintiff less well than her similarly situated colleagues outside her protected class in violation of her statutory rights as guaranteed by the ADA.

## AS AND FOR THE SIXTH CAUSE OF ACTION
*(Disability Discrimination – Hostile Work Environment in violation of the Americans with Disabilities Act)*

185.    Plaintiff repeats and re-alleges each and every fact above as if fully set forth herein.

186.    Plaintiff is a disabled individual as defined by the ADA, and is therefore a member of a protected class.

187.    Plaintiff was qualified to work as an employee for Defendant and she satisfactorily performed the duties required by the position she held at Defendant.

188.    As set forth herein and above, Defendant subjected Plaintiff to a hostile work environment on the basis of her disability.

189.    The discrimination Plaintiff suffered while employed with Defendant was severe and pervasive, unwelcome by Plaintiff, and would be offensive to a reasonable person.

190.    The discrimination that Plaintiff suffered while employed by Defendant severely affected the terms and conditions of her employment and culminated in her unwarranted discharge.

191.     By reason of Defendant's repeated violations of Plaintiff's statutory rights, Plaintiff has suffered a loss of monetary and other benefits associated with her employment.

192.     As a direct and proximate result of Defendant's unlawful employment practices, Plaintiff has suffered extreme mental anguish and emotional distress.

193.     Accordingly, Defendant discriminated against Plaintiff by virtue of subjecting Plaintiff to a hostile work environment on the basis of her disability in violation of her statutory rights as guaranteed by the ADA.

### AS AND FOR THE SEVENTH CAUSE OF ACTION
*(Failure to Accommodate in violation of the Americans with Disabilities Act)*

194.     Plaintiff repeats and re-alleges each and every fact above as if fully set forth herein.

195.     As set forth in detail above and herein, Plaintiff suffered (and continues to suffer) from cancer, and is therefore "disabled" under the ADA.

196.     Defendant was aware and on notice of Plaintiff's disability and the symptoms thereof.

197.     Plaintiff requested a reasonable accommodation from Defendant which would not have posed any undue hardship on Defendant and which would have enabled Plaintiff to continue to perform the essential functions of her position with Defendant.

198.     In response, Defendant repeatedly refused to provide Plaintiff with a reasonable accommodation and refused to participate in any interactive discussion or process to determine a different accommodation to assist Plaintiff and address her disability in the workplace.

199.     Accordingly, Defendant discriminated against Plaintiff by virtue of failing to accommodate her known disability and failing to engage in an interactive process in violation of the ADA.

## AS AND FOR THE EIGHTH CAUSE OF ACTION
*(Retaliation in violation of the Americans with Disabilities Act)*

200.    Plaintiff repeats and re-alleges each and every fact above as if fully set forth herein.

201.    As set forth in detail above, Defendant subjected Plaintiff to discrimination, a hostile work environment, a failure to accommodate her disability, and an atmosphere of adverse employment actions and decisions because of her disability in violation of Plaintiff's statutory rights.

202.    Plaintiff complained to Defendant multiple times regarding the discrimination she was subjected to during her employment at the University.

203.    Defendant failed to carry out an unbiased and thorough investigation into the merits of Plaintiff's reports of discrimination and failure to accommodate.

204.    In response to Plaintiff's complaints, Defendant, unlawfully and without cause, retaliated against Plaintiff as a direct result of Plaintiff complaint of discrimination and a failure to accommodate.

205.    By reason of Defendant's repeated violations of Plaintiff's statutory rights, Plaintiff has suffered a loss of monetary and other benefits associated with her employment.

206.    As a direct and proximate result of Defendant's unlawful employment practices, Plaintiff has suffered extreme mental anguish and emotional distress.

207.    Accordingly, Defendant retaliated against Plaintiff in violation of her statutory rights as guaranteed by the ADA.

## DEMAND FOR A JURY TRIAL

208.    Pursuant to FRCP 38(b), Plaintiff hereby demands a trial by jury on all claims.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, it is specifically requested that this Court grant Plaintiff judgment as follows:

a.      (i)      A judgment declaring that the practices complained of herein are unlawful and in violation of the aforementioned United States and New York State laws;

b.      Preliminary and permanent injunctions against Defendant and its officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with the University, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

c.      An order restraining Defendant from any retaliation against Plaintiff for participation in any form in this litigation;

d.      All compensatory damages that Plaintiff has sustained as a result of the Defendant's unlawful discriminatory and retaliatory conduct, including back pay, front pay, damages to compensate Plaintiff for harm to her professional and personal reputation and loss of career fulfillment, emotional distress damages, general and special damages for lost compensation and employee benefits that she would have received but for the Defendant's conduct, punitive damages, and any other out-of-pocket losses that Plaintiff has incurred or will incur;

e.      Awarding Plaintiff her costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees and other costs;

f.      Pre-judgment and post-judgment interest, as provided by law; and

g.     Any other and further relief as this Court finds just, necessary and proper.

Dated: New York, New York
      January 2, 2019

                          **NESENOFF & MILTENBERG, LLP.**
                          **363 Seventh Avenue, Fifth Floor**
                          **New York, New York 10001**
                          **(212) 736-4500**

                          */s/ Andrew T. Miltenberg*
                          **ANDREW T. MILTENBERG**
                          **GABRIELLE M. VINCI**

                          ***Attorneys for Plaintiff***