**EXHIBIT H**

In the Matter of:

# DENISE PAYNE

v

# CORNELL UNIVERSITY

## DENISE PAYNE

*September 04, 2019*

1

2                UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF NEW YORK
3       - - - - - - - - - - - - - - - - - - - - - - -
        DENISE PAYNE,
4
             Plaintiff,
5
                        Case No. 3:18-cv-01442
6       v.

7       CORNELL UNIVERSITY,

8            Defendant.
        - - - - - - - - - - - - - - - - - - - - - - -
9

10      Video-recorded Deposition Upon Oral Examination of:

11              Denise Payne

12

13      Location:     Cornell University
                The Office of University Counsel
14              300 CCC Building, Garden Avenue
                Ithaca, New York 14853
15

16
        Date:        September 4, 2019
17

18
        Time:        10:00 a.m.
19

20

21

22      Reported By:   MICHELLE MUNDT ROCHA

23              Alliance Court Reporting, Inc.

24              120 East Avenue, Suite 200

25              Rochester, New York 14604

1            A P P E A R A N C E S

2   Appearing on Behalf of Plaintiff:

3   Gabrielle M. Vinci, Esq.
    Nesenoff & Miltenberg LLP

4     363 Seventh Avenue, 5th Floor
    New York, New York 10001-3904

5     gvinci@nmllplaw.com

6

7

  Appearing on Behalf of Defendant:

8

  Conrad Wolan, Esq.

9     Cornell University
    The Office of University Counsel

10     300 CCC Building, Garden Avenue
    Ithaca, New York 14853

11     crw6@cornell.edu

12

  Also Present:

13

  Kathy Doxey

14   Kristin Davis

15

16

  Appearing as the Videographer:

17

  Peter Colucci

18     Alliance Court Reporting, Inc.
    120 East Avenue, Suite 200

19     Rochester, New York 14604

20            *   *   *

21

22

23

24

25

1          S T I P U L A T I O N S

2     WEDNESDAY, SEPTEMBER 4, 2019;

3          (Proceedings in the above-titled matter

4          commencing at 10:12 a.m.)

5               *    *    *

6          IT IS HEREBY STIPULATED by and between the

7     attorneys for the respective parties that this

8     deposition may be taken by the Defendant at this time

9     pursuant to subpoena;

10         IT IS FURTHER STIPULATED, that all

11    objections except as to the form of the questions and

12    responsiveness of the answers, be reserved until the

13    time of the trial;

14         IT IS FURTHER STIPULATED, that pursuant to

15    Federal Rules of Civil Procedure 30(e)(1) the witness

16    requests to review the transcript and make any

17    corrections to same before any Notary Public;

18         IT IS FURTHER STIPULATED, that if the

19    original deposition has not been duly signed by the

20    witness and returned to the attorney taking the

21    deposition by the time of trial or any hearing in this

22    cause, a certified transcript of the deposition may be

23    used as though it were the original;

24         IT IS FURTHER STIPULATED, that the

25    noticing party bears the recording costs in accordance

4

|       |    | PROCEEDINGS |
|-------|----|-------------|
|       | 1  | P R O C E E D I N G S |
|       | 2  | to Federal Rule 30(b)(3)(A); |
|       | 3  | AND IT IS FURTHER STIPULATED, that the |
|       | 4  | Notary Public, MICHELLE MUNDT ROCHA, may administer |
|       | 5  | the oath to the witness. |
| 10:12 | 6  | *   *   * |
| 10:12 | 7  | THE VIDEOGRAPHER:  Good morning.  We are |
| 10:12 | 8  | on the record at 10:12 a.m.  Today is Wednesday, |
| 10:12 | 9  | September 4, 2019.  My name is Peter Colucci of |
| 10:12 | 10 | Alliance Court Reporting, located at 120 East Avenue, |
| 10:12 | 11 | Suite 200, in Rochester, New York. |
| 10:12 | 12 | We are at Cornell University in Ithaca, |
| 10:13 | 13 | New York.  We are about to begin the video-recorded |
| 10:13 | 14 | deposition of Denise Payne in the matter of Denise |
| 10:13 | 15 | Payne versus Cornell University. |
| 10:13 | 16 | Would the attorneys please announce their |
| 10:13 | 17 | appearances for the record. |
| 10:13 | 18 | MR. WOLAN:  Conrad Wolan, University |
| 10:13 | 19 | Counsel's office. |
| 10:13 | 20 | MS. VINCI:  And Gabrielle Vinci, |
| 10:13 | 21 | Nesenoff & Miltenberg LLP, for Ms. Payne. |
| 10:13 | 22 | THE VIDEOGRAPHER:  The court reporter |
| 10:13 | 23 | today is Michelle Rocha of Alliance Court Reporting. |
| 10:13 | 24 | The witness may be sworn in. |
| 10:13 | 25 | DENISE PAYNE, |

5

|       |    |                                                  |
|-------|----|--------------------------------------------------|
|       | 1  | DENISE PAYNE - BY MR. WOLAN                       |
| 10:13 | 2  | called herein as a witness, first being sworn,   |
| 10:13 | 3  | testified as follows:                            |
| 10:13 | 4  | EXAMINATION BY MR. WOLAN:                         |
| 10:13 | 5  | Q.  Good morning, Ms. Payne.                      |
| 10:13 | 6  | A.  Good morning.                                 |
| 10:13 | 7  | Q.  My name is Conrad Wolan.  I'm an attorney     |
| 10:13 | 8  | for the University, and I'll be asking you questions |
| 10:13 | 9  | today.  First some ground rules.                 |
| 10:13 | 10 | Just to let me know, we will need you to          |
| 10:13 | 11 | give verbal answers to questions.  Head nods, grunts, |
| 10:13 | 12 | gestures will not be good for the written transcript. |
| 10:14 | 13 | So I will need you to say "yes" or "no" or make some |
| 10:14 | 14 | other verbalization while you're answering questions. |
| 10:14 | 15 | While we're proceeding today, we will take        |
| 10:14 | 16 | some breaks as appropriate.  However, if you feel at |
| 10:14 | 17 | any given time that you need to take a break, you can |
| 10:14 | 18 | certainly ask.  However, if a question is on the |
| 10:14 | 19 | table, I will need you to finish answering it before |
| 10:14 | 20 | we take a break.                                  |
| 10:14 | 21 | But otherwise we'll be able to do that at         |
| 10:14 | 22 | any reasonable time during the day for you.       |
| 10:14 | 23 | Understand so far?                                |
| 10:14 | 24 | A.  Yes, I understand.                            |
| 10:14 | 25 | Q.  Thank you.                                    |

1          DENISE PAYNE - BY MR. WOLAN

10:14  2          I will be asking you a series of questions

10:14  3   during the day about the claims in your suit.

10:14  4          I will be presenting you with some

10:14  5   documents as the day goes on.  We will explain as

10:14  6   we're going how to deal with each of those.  But I

10:14  7   will get in with first some easy questions for you.

10:14  8          First, for the official record, please

10:14  9   state and spell your name.

10:14  10         A.  Denise Payne.  D-E-N-I-S-E, P-A-Y-N-E.

10:15  11         Q.  What's your current home address?

10:15  12         A.  ███████████████████████  New York

10:15  13   13045.

10:15  14         Q.  And what's your date of birth?

10:15  15         A.  ███71.

10:15  16         Q.  Please tell me about your educational

10:15  17   history post high school.

10:15  18         A.  Post high school I attended SUNY Cortland,

10:15  19   and I got a Bachelor's degree in biology in the year

10:15  20   1994.

10:15  21         Q.  Any other certificates or trainings?

10:15  22         A.  I am currently halfway through an MBA.

10:15  23         Q.  At what institution?

10:15  24         A.  Ball State University online.

10:15  25         Q.  Have you ever served in the Armed Forces?

|   |   |
|---|---|
| 1 | DENISE PAYNE - BY MR. WOLAN |
| 10:15 2 | A.  No. |
| 10:15 3 | Q.  Are you currently employed? |
| 10:15 4 | A.  Yes. |
| 10:15 5 | Q.  Where? |
| 10:15 6 | A.  Cortland Biomedical. |
| 10:15 7 | Q.  Where is that located? |
| 10:15 8 | A.  Cortland, New York. |
| 10:15 9 | Q.  And what's your position there? |
| 10:15 10 | A.  I am a validation engineer. |
| 10:16 11 | Q.  What does that job entail? |
| 10:16 12 | A.  Essentially it's a quality assurance |
| 10:16 13 | engineer assuring that the facility's equipment |
| 10:16 14 | processes are appropriate for manufacturing medical |
| 10:16 15 | devices. |
| 10:16 16 | Q.  When were you hired there? |
| 10:16 17 | A.  July 25, 2018. |
| 10:16 18 | Q.  Have you worked there continuously since |
| 10:16 19 | July 25, 2018? |
| 10:16 20 | A.  Yes. |
| 10:16 21 | Q.  What was your starting pay there? |
| 10:16 22 | A.  75,000. |
| 10:16 23 | Q.  Have you had any raises since then? |
| 10:16 24 | A.  I'm at 79,000 now. |
| 10:16 25 | Q.  Was that in one raise? |

1        DENISE PAYNE - BY MR. WOLAN

10:16  2        A.  I don't recall.

10:16  3        Q.  What other benefits are provided at that

10:16  4   job?

10:17  5        A.  They provide a retirement plan, health

10:17  6   insurance plan -- which I did not use -- and I believe

10:17  7   long-term care insurance and life insurance.

10:17  8        Q.  Are you covered by health insurance in

10:17  9   some other fashion?

10:17  10       A.  Yes.

10:17  11       Q.  Where?

10:17  12       A.  Cornell.  My husband is an employee at

10:17  13  Cornell University.

10:17  14       Q.  When was the last date that you worked for

10:17  15  Cornell?

10:17  16       A.  The end of December 2018 -- or, excuse me,

10:17  17  2017.  I don't remember the exact date.

10:17  18       Q.  Did you have any other employment between

10:18  19  leaving Cornell and your current job?

10:18  20       A.  No.

10:18  21       Q.  And do you have any employment other than

10:18  22  the job you've already described for me today?

10:18  23       A.  No.

10:18  24       Q.  Do you recall when it was that you first

10:18  25  disclosed your cancer diagnosis to Cornell University?

1          DENISE PAYNE - BY MR. WOLAN

10:18   2          A.  Yes.  I recall telling my manager,

10:18   3   Margaret Shackell, either the day I was diagnosed or a

10:18   4   few days later.

10:18   5          Q.  And what position were you in at that

10:18   6   time?

10:18   7          A.  BSL administrator.

10:18   8          Q.  What's a BSL administrator?

10:18   9          A.  Essentially I would run social science

10:18   10   surveys, studies at the lab, the business school, as

10:18   11   well as online studies.

10:18   12          Q.  What does the abbreviation "BSL" stand

10:19   13   for?

10:19   14          A.  Business Simulation Laboratory.

10:19   15          Q.  And what college is that in?

10:19   16          A.  It was the Johnson College of Business.

10:19   17   At the time it had not merged.

10:19   18          Q.  Can you describe more for me the duties

10:19   19   you performed as a BSL administrator?

10:19   20          A.  Yes.  I would take faculty and student

10:19   21   protocols and run the studies for them, report the

10:19   22   data back to them.  Either in-person studies or online

10:19   23   studies.

10:19   24              In addition, I was developing new

10:19   25   platforms for studies.  For example, Amazon Mechanical

1        DENISE PAYNE - BY MR. WOLAN

10:19   2  Turk was a good source for subjects that we were

10:19   3  using.  So i was getting up to speed with that.

10:19   4        Q.  And what hours were you working at that

10:19   5  time?

10:19   6        A.  It varied.  It was a part-time role for

10:19   7  one year.  It was intended to be a part-time role.

10:20   8            My hours would vary depending on when the

10:20   9  faculty or students would want me to launch studies.

10:20   10  They would have certain time requirements.

10:20   11            So I might launch them from home early in

10:20   12  the morning, or I might come in and work a few hours

10:20   13  on-site.

10:20   14        Q.  Do you recall when you started the job as

10:20   15  a BSL administrator, what the date was?

10:20   16        A.  I don't recall the exact date.  It was in

10:20   17  August of 2015.

10:20   18        Q.  Was Margaret Shackell always your

10:20   19  supervisor in that job?

10:20   20        A.  Yes.

10:20   21        Q.  In referencing your Complaint in this

10:20   22  case -- I'm looking at paragraph 32 -- it states that

10:20   23  on or about June 13, 2016 you notified Katherine Doxey

10:21   24  that you had been diagnosed with cancer and would need

10:21   25  to use some health and personal time to deal with that

DENISE PAYNE - BY MR. WOLAN

10:21  2   situation.

10:21  3          You said right now you told Margaret

10:21  4   Shackell.  Did you tell Kathy Doxey about your

10:21  5   diagnosis early on?

10:21  6          A.  I did.

10:21  7          Q.  In relation to your conversation with

10:21  8   Margaret, when did you talk to Kathy?

10:21  9          A.  After.  After I discussed with Margaret.

10:21  10         Q.  How quickly after?

10:21  11         A.  I don't recall if it was the same day or a

10:21  12  few days later.

10:21  13         Q.  So would you still agree, then, that June

10:21  14  13, 2016 is on or about the date that you first

10:21  15  disclosed to Cornell your diagnose?

10:21  16         A.  It could have been June 10th, the actual

10:21  17  day of the diagnosis.

10:21  18         Q.  In paragraph 33 of your Complaint you

10:22  19  stated at the time of your notification of your

10:22  20  diagnosis to Ms. Doxey that you would not be able to

10:22  21  work on-site for a short time, but you were able and

10:22  22  willing to work from home.

10:22  23         First of all, is that still a true

10:22  24  statement?

10:22  25         A.  Yes.

1          DENISE PAYNE - BY MR. WOLAN

10:22   2          Q.  At that time, in terms of your approach to

10:22   3   combining work with dealing with your personal needs,

10:22   4   what were you envisioning you needed to do in the near

10:22   5   future after the diagnosis?

10:22   6          A.  Related to work?

10:22   7          Q.  Combining work while addressing your

10:22   8   personal needs?

10:22   9          A.  I was launching studies online using

10:22   10  Amazon Mechanical Turk, which was the primary method

10:22   11  during that time period.

10:22   12          Also, there were no students on campus, so

10:22   13  we were not launching in-person studies.

10:22   14          So I was launching the studies, responding

10:23   15  to emails, while I was also dealing with the emotional

10:23   16  impact of a cancer diagnosis and calling physicians,

10:23   17  people that had had the disease that I knew and

10:23   18  getting information.

10:23   19          Q.  In paragraph 34 of the Complaint you

10:23   20  mentioned also in connection with your disclosure to

10:23   21  Ms. Doxey that you shared your full 15-month treatment

10:23   22  plan.

10:23   23          To your recollection right now, what were

10:23   24  the larger components of your 15-month treatment plan?

10:23   25          MS. VINCI:  Object to form.

1        DENISE PAYNE - BY MR. WOLAN

10:23  2        You can answer.

10:23  3        A.  The initial plan was surgery to remove the

10:23  4   cancer and lymph nodes near the cancer followed by

10:23  5   chemotherapy, radiation and targeted therapy.

10:24  6        Q.  And that was to proceed across an entire

10:24  7   15-month time frame?

10:24  8        A.  Based on the pathology of my cancer, yes.

10:24  9        Q.  To your recollection, how did you first

10:24  10  reach out to Kathy Doxey about your diagnosis and

10:24  11  treatment plans?

10:24  12       A.  I believe initially it was an email

10:24  13  disclosing the diagnosis.  We then had an in-person

10:24  14  discussion.

10:24  15       Q.  What did you discuss at that in-person

10:24  16  meeting?

10:24  17       A.  We discussed my diagnosis, how to proceed

10:24  18  with the disability paperwork, medical leaves.

10:24  19       Q.  Do you remember what Ms. Doxey told you

10:24  20  specifically about accessing benefits and leaves?

10:24  21       A.  I believe Julie Weaver was present, and we

10:25  22  discussed that Julie would be my contact, and she

10:25  23  would reach out to me and let me know what she needed

10:25  24  for that.

10:25  25       Q.  And after the meeting we've been

DENISE PAYNE - BY MR. WOLAN

10:25  2   discussing, did Julie Weaver reach out to you to

10:25  3   discuss all of those topics?

10:25  4       A.  She did.

10:25  5       Q.  Do you recall when?

10:25  6       A.  I do not recall.

10:25  7       Q.  Do you recall roughly how long it was

10:25  8   after that initial conversation that you were talking

10:25  9   to Julie about those topics?

10:25  10      A.  I do not recall.

10:25  11      Q.  Did you have conversations with Julie

10:25  12  Weaver about those topics after the initial

10:25  13  conversation with Kathy Doxey?

10:25  14      MS. VINCI:  Objection.

10:25  15      You can answer.

10:25  16      A.  As I was approaching my surgery, we would

10:25  17  discuss how that would be handled, and I would submit

10:25  18  the documentation as needed, likely via email.

10:25  19      Q.  Okay.  So at that same time, in reading

10:26  20  your Complaint -- I'm reading paragraph 36 -- you also

10:26  21  in summer of 2016 were applying for a new job at

10:26  22  Cornell?

10:26  23      A.  The summer of 2016?  One week after my

10:26  24  diagnosis when I returned, I was notified that I was

10:26  25  being removed from the BSL administrator position, and

| | 1 | DENISE PAYNE - BY MR. WOLAN |
|---|---|---|
| 10:26 | 2 | I was offered one of two other open positions. |
| 10:26 | 3 | Q. What were those two positions? |
| 10:26 | 4 | A. One was in faculty support working as an |
| 10:26 | 5 | administrator in faculty support.  The other was as a |
| 10:26 | 6 | data analyst for a newly forming department of |
| 10:26 | 7 | business analytics. |
| 10:26 | 8 | Q. Do you remember what the faculty support |
| 10:26 | 9 | position entailed by way of job duties? |
| 10:26 | 10 | A. I do not recall. |
| 10:27 | 11 | Q. Did you ever take that job? |
| 10:27 | 12 | A. No. |
| 10:27 | 13 | Q. Did you investigate the analyst job in the |
| 10:27 | 14 | business analytics unit? |
| 10:27 | 15 | A. I did. |
| 10:27 | 16 | Q. And what was -- in July and August of |
| 10:27 | 17 | 2016, what was your understanding about the scope of |
| 10:27 | 18 | work in that job? |
| 10:27 | 19 | A. The scope of work would be analyzing data, |
| 10:27 | 20 | creating dashboards and utilizing metrics to help |
| 10:27 | 21 | management make decisions. |
| 10:27 | 22 | Q. Which management? |
| 10:27 | 23 | A. Executive management in the combined |
| 10:27 | 24 | school management. |
| 10:27 | 25 | Q. And the combined school, could you |

1        DENISE PAYNE - BY MR. WOLAN

10:27  2    describe what you mean by that?

10:27  3        A. The Johnson School of Business when they

10:28  4    merged with the hotel school and Dyson.

10:28  5        Q. In paragraph 36 of your Complaint it says

10:28  6    that you interviewed with a Lucinda Allen --

10:28  7        A. I did.

10:28  8        Q. -- for the position as a Data Analyst II.

10:28  9    Is the Data Analyst II the business analytics position

10:28  10   you've just been talking about?

10:28  11       A. It is.

10:28  12       Q. And do you remember interviewing with

10:28  13   Lucinda Allen?

10:28  14       A. Yes.

10:28  15       Q. You don't recall, though, right now

10:28  16   exactly when you did that?

10:28  17       A. It was in July 2016.

10:28  18       Q. At that time what were you told about when

10:28  19   that position would be available?

10:28  20       A. It would be available very shortly in the

10:28  21   upcoming months, within a month or two.

10:29  22       Q. Okay. And at the time you were discussing

10:29  23   the Data Analyst II position, what was your

10:29  24   understanding about compensation?

10:29  25       A. Cindy said that it would be a likely

DENISE PAYNE - BY MR. WOLAN

10:29 2    exempt position in an E or F band, but that it would

10:29 3    take about six months for that job description to be

10:29 4    formed and written.

10:29 5         Q.  So was it the case that even though it was

10:29 6    going to be six months before the job was fully

10:29 7    formed, you were going to be able to occupy that

10:29 8    position earlier?

10:29 9         A.  Yes.

10:29 10        Q.  What compensation were you told you'd be

10:29 11   receiving before the -- or up until the time the job

10:29 12   was fully formed?

10:29 13        A.  I received a notification letter in

10:30 14   September after I had assumed the position and started

10:30 15   training with a compensation amount of, I believe, $25

10:30 16   an hour.

10:30 17        Q.  Do you recall at the outset of that job

10:30 18   how many hours you were scheduled to work?

10:30 19        A.  Somewhere in the range of 10 to 20 hours a

10:30 20   week.

10:30 21        Q.  When did you end your work as the BSL

10:30 22   administrator?

10:30 23        A.  I was asked to stay in that role through

10:30 24   December 2016.

10:30 25        Q.  So did you do both the BSL administrator

1          DENISE PAYNE - BY MR. WOLAN

10:30   2   and the Data Analyst II position at the same time?

10:30   3          A.   Yes.   I had two time cards.

10:30   4          Q.   Did you report to different supervisors?

10:31   5          A.   For the time being I recall they had me

10:31   6   report to Margaret; but I was also receiving

10:31   7   direction, functional supervision, from Sarah Miller.

10:31   8          Q.   What was Sarah Miller's title?

10:31   9          A.   I do not recall.

10:31   10         Q.   Do you recall generally what her role was?

10:31   11         A.   I know she was in research

10:31   12   administration -- not research.   Excuse me.   I do not

10:31   13   recall.

10:31   14         Q.   With respect to the two roles, were you

10:31   15   able to do them in the same physical location, or did

10:31   16   you have to switch offices or something like that?

10:31   17         A.   I was able to do them in the same physical

10:32   18   location.

10:32   19         Q.   Did you have in both roles -- could you

10:32   20   describe for me on a daily basis what kinds of tasks

10:32   21   you would be performing in those two roles and how you

10:32   22   would combine your day?

10:32   23         A.   As a BSL administrator, I may be launching

10:32   24   studies remotely, from home or whatever office setup I

10:32   25   had at the time.   I don't recall.

1          DENISE PAYNE - BY MR. WOLAN

10:32  2          In the newly formed data analyst role, I

10:32  3   was in the building downtown training with Sarah.

10:32  4          Initially i was training on the databases

10:32  5   that we used for data analysis, repositories of data

10:32  6   and getting up to speed with respect to the software.

10:33  7          Q.  And when you say "getting up to speed,"

10:33  8   what do you mean?

10:33  9          A.  Sarah would assign me projects within

10:33  10  those databases, pulling reports, understanding

10:33  11  reports.

10:33  12          She assigned me a project to come up with

10:33  13  a method to combine reports, because we had too many

10:33  14  reports within the system.

10:33  15          Q.  What data sets were you working from?

10:33  16          A.  I don't recall the name of the software.

10:33  17  It was likely faculty data sets.

10:33  18          Q.  Were these data sets that you were

10:33  19  required to produce?

10:33  20          A.  No.

10:33  21          Q.  These were data sets taken from

10:33  22  researchers in the university?

10:33  23          A.  Correct.  Data sets that contained data on

10:33  24  faculty that we were analyzing and collating and

10:33  25  etcetera.

1          DENISE PAYNE - BY MR. WOLAN

10:34   2          Q.  How long was your training period for the

10:34   3   Data Analyst II role?

10:34   4          A.  I trained from September through October,

10:34   5   I believe.  Until I left on disability, I was

10:34   6   training.

10:34   7          Q.  Do you remember when your disability leave

10:34   8   started?

10:34   9          A.  Either the first or second week of October

10:34   10  2016.

10:34   11         Q.  And how long did your disability leave

10:34   12  last in 2016?

10:35   13         A.  12 weeks, perhaps 13.

10:35   14         Q.  Was it continuous leave?

10:35   15         A.  Yes.

10:35   16         Q.  So once you were out, you didn't do any

10:35   17  work until you were done with your leave period?

10:35   18         A.  Correct.

10:35   19         Q.  In reading your Complaint, I'm looking at

10:35   20  paragraph 43 -- well, let me back up.

10:35   21         Paragraph 42 you mention that on September

10:35   22  26, 2016 you received a formal offer letter with

10:35   23  respect to the Data Analyst II position.

10:35   24         To your knowledge today, that's still a

10:35   25  true statement?

|  | 1 | DENISE PAYNE - BY MR. WOLAN |
|---|---|---|

10:35 2   A.  Yes.

10:35 3   Q.  In the next paragraph, paragraph 43, you

10:35 4   state that the formal letter -- formal offer letter,

10:35 5   excuse me, set the position at the lowest possible pay

10:35 6   level.

10:36 7   First, let me ask you this question:  How

10:36 8   did you know that it was set at the lowest possible

10:36 9   pay level?

10:36 10   A.  I had access to that information on

10:36 11   Cornell websites, and I knew what the pay band levels

10:36 12   were.

10:36 13   Q.  And when you say "lowest possible pay

10:36 14   level," do you mean to say at the lowest possible

10:36 15   band?

10:36 16   A.  I mean to say the lowest possible pay

10:36 17   level within the band.

10:36 18   Q.  Okay.  You then go on to say in paragraph

10:36 19   43 that you were confused and disappointed that there

10:36 20   had not been prior substantive discussion regarding

10:36 21   salary in the Data Analyst II position.

10:36 22   To your recollection, what discussion did

10:36 23   you have with anybody, whether that was Lucinda Allen

10:36 24   or someone else, about the compensation for the Data

10:36 25   Analyst II position?

|       |    |                                                        |
|-------|----|--------------------------------------------------------|
|       | 1  | DENISE PAYNE - BY MR. WOLAN                             |
| 10:36 | 2  | MS. VINCI:  Objection.                                  |
| 10:36 | 3  | You can answer.                                         |
| 10:36 | 4  | A.  I discussed with Lucinda that it would be           |
| 10:36 | 5  | an exempt position either in an E or F band.  And       |
| 10:37 | 6  | based on that, the pay would have been substantially    |
| 10:37 | 7  | higher than they were offering me.                      |
| 10:37 | 8  | Q.  What band were you offered?                         |
| 10:37 | 9  | A.  E nonexempt.  The lowest pay grade.                 |
| 10:37 | 10 | Q.  But had Lucinda Allen made any promise              |
| 10:37 | 11 | that it would be anything other than an E level or E    |
| 10:37 | 12 | band?                                                   |
| 10:37 | 13 | A.  Potentially an F band.                              |
| 10:37 | 14 | Q.  But did she explain to you what the                 |
| 10:37 | 15 | criteria would be to reach the F band?                  |
| 10:37 | 16 | A.  She did not.                                         |
| 10:37 | 17 | Q.  Now, in paragraph 44 of your Complaint --           |
| 10:37 | 18 | I'll quote -- "Upon information and belief, Defendant    |
| 10:37 | 19 | intentionally set Plaintiff's pay at the lowest          |
| 10:38 | 20 | possible level, because it did not want to pay          |
| 10:38 | 21 | Plaintiff a higher salary, knowing that she would need  |
| 10:38 | 22 | time away from work for her cancer treatments and       |
| 10:38 | 23 | medical health."                                        |
| 10:38 | 24 | Why did you believe that?                                |
| 10:38 | 25 | A.  It was not based on my skills, experience,          |

1          DENISE PAYNE - BY MR. WOLAN

10:38   2    abilities.  I had no other reference point for what it

10:38   3    would be based on.

10:38   4          Q.  What about -- what is it about your skills

10:38   5    that made you believe at that time you should be

10:38   6    compensated at a higher level?

10:38   7          A.  I had roughly 15 to 18 years of

10:38   8    experience, did a lot of data analysis, a lot of

10:38   9    preparation of data for management review at Welch

10:38  10    Allyn.

10:38  11          I had significant experience that I could

10:39  12    apply to this position.  I was a manager for nine

10:39  13    years at Cornell.

10:39  14          Q.  Are you aware of the criteria that would

10:39  15    allow an employee to be paid in the F band?

10:39  16          A.  I have reviewed that criteria before.  I

10:39  17    do not recall specifics.

10:39  18          Q.  Do you believe that your skills and

10:39  19    experience met the criteria for F band?

10:39  20          A.  Yes.

10:39  21          Q.  But sitting here today, you couldn't tell

10:39  22    me specifically why?  You couldn't correlate for me F

10:39  23    band with your skills, because you don't remember --

10:39  24          A.  I don't remember the specific attributes

10:39  25    of F band at this time.

1      DENISE PAYNE - BY MR. WOLAN

10:39   2        Q.  What is it that led you to believe that

10:39   3   the reason you were put in the E band was because

10:40   4   Defendant Cornell University did not want to pay a

10:40   5   higher salary at the time of your cancer treatments?

10:40   6        A.  In all my other jobs at Cornell where I

10:40   7   had been hired, I was given an opportunity to

10:40   8   negotiate for my salary.  And I had never been paid at

10:40   9   the minimum in any band.

10:40   10         And I had been employed in an F band and

10:40   11   an E band prior to this.

10:40   12        Q.  And when you talked to Lucinda Allen about

10:40   13   the Data Analyst II position, you did not do any

10:40   14   negotiating regarding your salary?

10:40   15        A.  Not at that time.

10:40   16        Q.  If not at that time, when did you?

10:40   17        A.  I did not have an opportunity to

10:40   18   negotiate.  I received the letter when I was on

10:40   19   disability from chemo.

10:40   20         I remember distinctly the day I got the

10:41   21   letter.  I had not eaten for days, I was lying in bed,

10:41   22   and I did not have the strength to essentially fight

10:41   23   for myself.

10:41   24        Q.  When you returned from your disability

10:41   25   leave, did you have any discussions with anybody at

1          DENISE PAYNE - BY MR. WOLAN

10:41  2   Cornell then about the salary being paid for the Data

10:41  3   Analyst II position?

10:41  4          A.  Yes.

10:41  5          Q.  With whom?

10:41  6          A.  With my new manager, Tammy Lindsay.

10:41  7          Q.  And do you recall when that conversation

10:41  8   happened?

10:41  9          A.  I do not recall.

10:41  10         Q.  Do you recall when that conversation

10:41  11  happened relative to your return?

10:41  12         A.  It was early upon my return in one of our

10:41  13  one-on-one meetings when I asked about progress on my

10:41  14  job description and when I would essentially be

10:41  15  reclassified.

10:41  16         Q.  And what was Tammy Lindsay's response at

10:41  17  that time?

10:41  18         A.  "We are still working on your job

10:41  19  description."

10:41  20         Q.  Did she share with you any drafts at that

10:41  21  point in time?

10:42  22         A.  No.

10:42  23         Q.  Up until that conversation with Tammy

10:42  24  Lindsay, had you seen any drafts of the position

10:42  25  description?

1          DENISE PAYNE - BY MR. WOLAN

10:42   2          A.  No.

10:42   3          Q.  After the meeting with Tammy Lindsay, did

10:42   4   you see any drafts of the position description?

10:42   5          A.  Yes.

10:42   6          Q.  When?

10:42   7          A.  I brought the matter to Julie Weaver at

10:42   8   some point later.  She supplied me with a draft job

10:42   9   description, and she asked me to rewrite it, to edit

10:42  10   it.

10:42  11          Q.  When you say sometime later, when is that

10:42  12   relative to your Tammy Lindsay meeting that you were

10:42  13   just describing?

10:42  14          A.  Months later.

10:43  15          Q.  Taking you back to paragraph 44 of your

10:43  16   Complaint and your allegation that your pay level was

10:43  17   intentionally set at the lowest possible level, was

10:43  18   there anything specific that Lucinda Allen ever said

10:43  19   to you that led you to believe that the salary level

10:43  20   being set for Data Analyst II was related to your

10:43  21   condition or leave?

10:43  22          A.  I do not recall.

10:43  23          Q.  Is there anyone other than Lucinda Allen

10:43  24   in 2016 with whom you discussed the compensation level

10:44  25   of the Data Analyst II position?

DENISE PAYNE - BY MR. WOLAN

10:44 2      A.  I may have discussed with Julie Weaver.  I

10:44 3  do not recall.

10:44 4      Q.  Do you recall Julie Weaver ever saying

10:44 5  anything to you to lead you to believe that your pay

10:44 6  level was intentionally being set at the lowest point

10:44 7  due to your diagnosis or treatment or leave?

10:44 8      A.  No.

10:44 9      Q.  So you were able to return to work after

10:44 10  your leave in January of 2017; correct?

10:44 11      A.  Yes.

10:44 12      Q.  And I will come back to the details, but

10:44 13  you had a flexible work arrangement put into place

10:45 14  probably in February of 2017; is that correct?

10:45 15      A.  Either January or February.

10:45 16      Q.  Do you recall what precipitated creating

10:45 17  the flexible work arrangement?

10:45 18      A.  Yes.

10:45 19      Q.  What was that?

10:45 20      A.  I would be entering into radiation

10:45 21  treatment.  Once I was healed from chemotherapy and my

10:45 22  body was strong enough, I would start radiation daily

10:45 23  for 35 treatments in Syracuse; and I would not be able

10:45 24  to drive to Syracuse and Ithaca the same day.

10:45 25          So I was allowed to work from home for

1          DENISE PAYNE - BY MR. WOLAN

10:45   2    that period of time.

10:45   3          Q. And you were able to work from home on the

10:45   4    Data Analyst II position, because you could access the

10:45   5    data you needed from home remotely?

10:45   6          A. Correct.

10:45   7          Q. And you had all the tools that you needed

10:45   8    to do that job available to you at home?

10:46   9          A. Yes.

10:46   10         Q. How was that set up?

10:46   11         A. I was given a monitor, keyboard, computer.

10:46   12   And I had internet access at home, so I could remotely

10:46   13   log into the Cornell systems.

10:46   14         (The following exhibit was marked for

10:46   15         identification:  EXH Number 1.)

10:46   16         Q. All right.  I am showing you what's been

10:46   17   marked for identification as Exhibit 1.  Please take a

10:46   18   look at that, every page, and let me know when you're

10:46   19   done looking at it.

10:46   20         MS. VINCI:  I'd just advise the witness to

10:46   21   review the document in full before she proceeds with

10:46   22   any questioning.

10:47   23         A. I can't read the last page.

10:47   24         Q. I'll take that into account when I ask you

10:47   25   questions.  I will concede that this is not the best

DENISE PAYNE - BY MR. WOLAN

10:47 2  possible copy, but I think we'll be able to get around

10:47 3  that.

10:47 4          First of all, do you recognize the

10:47 5  document as a whole?

10:47 6          A.  Yes.

10:47 7          Q.  What is it?

10:47 8          A.  It's a Flexible Work Arrangement --

10:47 9  Agreement Form.

10:47 10         Q.  Is that your signature on the first page

10:47 11  at the bottom?

10:47 12         A.  Yes.

10:47 13         Q.  Is your signature also on the third page

10:47 14  at the bottom?

10:48 15         A.  Yes.

10:48 16         Q.  And I see that it's got an effective date

10:48 17  of February 6, 2017, with a signature date of February

10:48 18  2, 2017 for you.

10:48 19         So do you recall executing this document

10:48 20  in February of 2017?

10:48 21         A.  Yes.

10:48 22         Q.  And when you -- did you have any role in

10:48 23  creating the content of the document?

10:48 24         A.  I wrote the entire thing.

10:48 25         Q.  And in writing it, who did you have

1          DENISE PAYNE - BY MR. WOLAN

10:48  2    discussions with?

10:48  3          A.  Tammy Lindsay.

10:48  4          MS. VINCI:  Objection.

10:48  5          Q.  And I see, I believe, Tammy Lindsay's

10:48  6    signature also on the first and third page.

10:48  7          Does that look familiar to you?

10:48  8          A.  Yes.

10:48  9          Q.  In discussing it -- in discussing your

10:48  10   flexible work arrangement, how did you come to the

10:48  11   particular schedule that we see represented on the

10:48  12   first page?

10:49  13         A.  There may have been a discussion with

10:49  14   Tammy, but in general those were my hours.

10:49  15         Q.  8 a.m. to 2:30 p.m. would have been your

10:49  16   workday coming to campus?

10:49  17         A.  Prior to this arrangement, yes.

10:49  18         Q.  And I see in the column marked new hours,

10:49  19   can you read that for me?

10:49  20         A.  (As read):  Six hours a day between 7 a.m.

10:49  21   to 6 p.m.

10:49  22         Q.  Okay.  So what was your intention with

10:49  23   setting that up that way?

10:49  24         A.  The flexibility to work whatever hours I

10:49  25   was available.  My radiation schedule changed every

DENISE PAYNE - BY MR. WOLAN

10:49  2   day.

10:49  3            In addition, I was having sleep issues, so

10:49  4   I might get up early or later.

10:49  5            Q.  And how long was it that you had to work

10:49  6   remotely in order to get your treatments in terms of,

10:50  7   you know, calendar weeks?

10:50  8            A.  I believe it was seven.

10:50  9            Q.  And do you recall now which months those

10:50  10  seven weeks fell in in 2017?

10:50  11           A.  Between February and April.

10:50  12           Q.  Was it seven continuous weeks, or were

10:50  13  they broken up?

10:50  14           A.  Continuous.

10:50  15           Q.  In terms of the functionality of working

10:50  16  from home, did everything work for you by way of the

10:50  17  technology and such?

10:50  18           A.  Yes.

10:50  19           Q.  Now, I do see something here.  If you look

10:51  20  at the third page with me, I'm looking at the third

10:51  21  box from the top that has handwriting in it.

10:51  22           A.  Yes.

10:51  23           Q.  Can you make any of that out right now

10:51  24  while you're sitting there?

10:51  25           A.  I cannot.

|  |  |  |
|---|---|---|
| | 1 | DENISE PAYNE - BY MR. WOLAN |
| 10:51 | 2 | Q. I see something about checking messages |
| 10:51 | 3 | two times a day when off-site. Do you have a |
| 10:51 | 4 | recollection of that being a term of your flexible |
| 10:51 | 5 | work arrangement? |
| 10:51 | 6 | A. Yes. |
| 10:51 | 7 | Q. And about two more boxes down what I see |
| 10:51 | 8 | suggests remote work two to five days per week |
| 10:51 | 9 | February through mid-April. |
| 10:51 | 10 | First of all, do you see that same writing |
| 10:51 | 11 | in that box that I do? |
| 10:51 | 12 | A. Yes. |
| 10:51 | 13 | Q. And to your recollection right now, was |
| 10:52 | 14 | that the time period that you were engaged in remote |
| 10:52 | 15 | work? |
| 10:52 | 16 | A. Yes. |
| 10:52 | 17 | Q. I'll take that back from you. |
| 10:52 | 18 | Now, you state in your Complaint -- I'm |
| 10:52 | 19 | looking at paragraph 52 -- that you had continued to |
| 10:52 | 20 | work under the agreement -- and I'll just state for |
| 10:52 | 21 | purposes of this question that previously in the |
| 10:52 | 22 | Complaint you had cited January of '17. So it's the |
| 10:53 | 23 | agreement we talked about. |
| 10:53 | 24 | You state in the Complaint paragraph 52 |
| 10:53 | 25 | that you continued to work under the agreement with |

|       |    | DENISE PAYNE - BY MR. WOLAN |
|-------|----|-----|
| 10:53 | 2  | little to no issues; however, this would soon change. |
| 10:53 | 3  | What changed? |
| 10:53 | 4  | A.  When I returned in April and May, I was |
| 10:53 | 5  | still healing, still requiring remote work |
| 10:53 | 6  | occasionally. |
| 10:53 | 7  | Q.  So you were able to come to campus on some |
| 10:53 | 8  | days? |
| 10:53 | 9  | A.  Correct. |
| 10:53 | 10 | Q.  Did you have the ability to predict those |
| 10:53 | 11 | days ahead of time? |
| 10:53 | 12 | A.  In some cases, yes, but not always. |
| 10:53 | 13 | Q.  Can you characterize for me the proportion |
| 10:53 | 14 | of days that were predictable versus not predictable? |
| 10:53 | 15 | A.  I always knew that I would feel ill one to |
| 10:54 | 16 | four days after a treatment, but in between there it |
| 10:54 | 17 | was hit or miss.  The side effects just kept coming |
| 10:54 | 18 | whenever they wanted to. |
| 10:54 | 19 | Q.  You've continued to state in paragraph 52 |
| 10:54 | 20 | that upon information and belief, things changed |
| 10:54 | 21 | because Defendant -- that would be Cornell |
| 10:54 | 22 | University -- lost patience with having to accommodate |
| 10:54 | 23 | your ongoing disability. |
| 10:54 | 24 | What led you to believe that? |
| 10:54 | 25 | A.  The behavior of my manager, Tammy Lindsay. |

DENISE PAYNE - BY MR. WOLAN

10:54  Q.  What were her behaviors?

10:54  A.  She was frequently annoyed with my requests, acted hostilely, repeatedly told me I had to get my time card under control, stop using so much time off, do not use my HAP time as soon as I accrue it.

10:54  Q.  Would these be face-to-face conversations?

10:55  A.  In general, they would be emails. Occasionally face to face.

10:55  Q.  On a day when you could come to campus, would you necessarily see Tammy Lindsay?

10:55  A.  Not necessarily.

10:55  Q.  So when you did come to campus, how often would you see her?  Just as an incidental matter of doing your work.

10:55  A.  Perhaps one to two days a week.

10:55  Q.  Was she not working in the same space you were?

10:55  A.  She was working remotely three to four days a week.

10:55  Q.  And her remote work didn't always match with your remote work?

10:55  A.  Correct.

10:55  Q.  You state in paragraph 54 that Lindsay

DENISE PAYNE - BY MR. WOLAN

10:56   2    admonished you for not keeping her updated regarding

10:56   3    your treatment schedule.

10:56   4           A.  Correct.

10:56   5           Q.  What do you mean by "admonished"?

10:56   6           A.  I sent an email requesting some time off

10:56   7    and the ability to work from home on a specific day

10:56   8    when I was ill.

10:56   9           And her response was, by email, that I was

10:56   10   not keeping her up to date; she was my manager; I

10:56   11   needed to tell her when I was not going to be in.  To

10:56   12   which I replied that I had.

10:56   13          Q.  You had?

10:56   14          A.  I had kept her up to date.  All of my

10:56   15   schedule was on my calendar, which I shared with her.

10:56   16   The very emails I would send her were an update to my

10:56   17   condition.

10:56   18          Q.  Well, I'll note that in paragraph 55 of

10:56   19   your Complaint you say that you corrected Lindsay and

10:56   20   advised her that you had, in fact, alerted her of your

10:56   21   treatment schedule and that the same was noted on the

10:57   22   office calendar.  So tell me about this office

10:57   23   calendar.  How did that work?

10:57   24          A.  I believe the office calendar was my

10:57   25   calendar, which was shared with Lindsay.  You have the

1          DENISE PAYNE - BY MR. WOLAN

10:57  2   ability in Outlook to share a calendar, where they can

10:57  3   see all your details.

10:57  4        Q.  So you had your treatment schedule in your

10:57  5   calendar; correct?

10:57  6        A.  Correct.

10:57  7        Q.  And it was your understanding that Lindsay

10:57  8   had access to your calendar?

10:57  9        A.  She did.

10:57  10       Q.  According to your allegation in paragraph

10:57  11  55 where you pointed out the fact that the treatment

10:57  12  schedule was there, how did Ms. Lindsay respond?

10:57  13       A.  She continued to admonish me by email.

10:57  14  And refused to acknowledge what I was saying.

10:57  15       Q.  So she did not acknowledge that your

10:57  16  calendar showed your treatment schedule?

10:57  17       A.  Correct.

10:58  18       Q.  In paragraph 56 you mention that Lindsay

10:58  19  further -- sorry.  Lindsay continued to berate you

10:58  20  about your need for flexible hours.

10:58  21            Can you describe her berating behavior?

10:58  22       A.  Specific to that date -- specific to a

10:58  23  date or in general?

10:58  24       Q.  Well, in your paragraph 56 you're speaking

10:58  25  at that point about the conversation about the

| | 1 | DENISE PAYNE - BY MR. WOLAN |
|---|---|---|
| 10:58 | 2 | calendar.  So I'm asking about that point in time |
| 10:58 | 3 | right now. |
| 10:58 | 4 | A.  In that email I told her that I was |
| 10:58 | 5 | seriously ill and I would not be able to work that |
| 10:58 | 6 | morning.  I was waiting for a call from my |
| 10:58 | 7 | cardiologist. |
| 10:58 | 8 | She continued to reach out to me that |
| 10:58 | 9 | morning, essentially directing me to continue working |
| 10:58 | 10 | when I was asking for time off. |
| 10:58 | 11 | So in effect, I kept working, I kept |
| 10:58 | 12 | responding to her emails. |
| 10:59 | 13 | And the tone of those emails was I was |
| 10:59 | 14 | doing something wrong.  I wasn't doing it to her |
| 10:59 | 15 | liking.  She refused to acknowledge my responses. |
| 10:59 | 16 | Q.  Do you recall specifics about what she |
| 10:59 | 17 | didn't like? |
| 10:59 | 18 | A.  Apparently she wanted my time off to be |
| 10:59 | 19 | put on her calendar.  She didn't want to look at my |
| 10:59 | 20 | calendar. |
| 10:59 | 21 | Q.  Would that have been possible? |
| 10:59 | 22 | A.  Possible, yes. |
| 10:59 | 23 | Q.  Did the two of you discuss actually |
| 10:59 | 24 | changing to doing that, having you put the time |
| 10:59 | 25 | entries on her calendar? |

1          DENISE PAYNE - BY MR. WOLAN

10:59    2      A.  I was told to.  I was directed to do that.

10:59    3      Q.  By whom?

10:59    4      A.  By Tammy.

10:59    5      Q.  And did you start doing that?

10:59    6      A.  I did.

10:59    7      Q.  After you started putting your schedule on

10:59    8  her calendar, did you have any more discussions about

10:59    9  calendaring your treatment schedule?

10:59   10      A.  I recall a time when she did not accept a

10:59   11  calendar invitation, and then it wouldn't show up on

10:59   12  her calendar.  And if she didn't do that, she wouldn't

11:00   13  have access to know my schedule.

11:00   14          So I believe there was a time or two where

11:00   15  she admonished me for not telling her when I had sent

11:00   16  her the schedule and she did not accept the schedule.

11:00   17      Q.  In response to a question I asked you just

11:00   18  a little bit ago, you suggested that Ms. Lindsay's

11:00   19  berating of you continued in time longer than the

11:00   20  initial calendar discussion.

11:00   21          Can you tell me about more instances of

11:00   22  her behavior that you call berating?

11:00   23      A.  If I requested accommodation for the

11:00   24  ability to work remotely when I was not feeling well,

11:00   25  she would respond with "You cannot do that.  You did

DENISE PAYNE - BY MR. WOLAN

11:00  2  not get pre-approval for that.  You need to seek

11:00  3  pre-approval in order to work from home."

11:01  4        In general, the tone of those emails were

11:01  5  that I, again, was doing something wrong.

11:01  6        Q.  Well, let me ask you about that, because

11:01  7  you said "the tone" a couple of times.  What you're

11:01  8  describing to me sounds like Lindsay correcting you on

11:01  9  how to go about asking for time off.

11:01  10        So what is it about the tone that made you

11:01  11  think she was berating you?

11:01  12        MS. VINCI:  Object to the characterization

11:01  13  of her testimony.  But she can answer if she's able.

11:01  14        A.  For that particular instance in February

11:01  15  that I asked for some time off to heal, she followed

11:01  16  it up with a one-on-one meeting and told me that I was

11:01  17  never to include my co-workers on those exchanges; I

11:02  18  was only to discuss my time off with her; I had

11:02  19  improperly requested it.  She followed it up with a

11:02  20  one-on-one.

11:02  21        So my goal that morning, when I was

11:02  22  feeling extremely ill, was to get a message out to my

11:02  23  entire team regarding a project we were working on and

11:02  24  to notify them that I would not be in that day; I was

11:02  25  not feeling well.

1    DENISE PAYNE - BY MR. WOLAN

11:02  2         So in return for that, I was admonished by

11:02  3    Tammy Lindsay for communicating that way.

11:02  4         Q.  In your Data Analyst II position, how much

11:02  5    interaction did you have with co-workers?

11:02  6         A.  It depended on the projects.  However, the

11:02  7    January to May time frame we were --

11:02  8         Q.  Of 2017?

11:02  9         A.  Of 2017.  We were working on projects

11:02  10   together.  So I had frequent interactions with them.

11:02  11        Q.  Would it be standard operating procedure

11:03  12   for you to communicate with your entire team by email?

11:03  13        A.  If we had a meeting scheduled that I was

11:03  14   not able to attend or if we had a project submission

11:03  15   due that particular day, I always tended to include

11:03  16   the people who needed to know when I was going to be

11:03  17   out.

11:03  18        However, once Tammy asked me to stop doing

11:03  19   that, I stopped doing that.

11:03  20        Q.  When you were working remotely on a

11:03  21   project, how would you report your progress on that

11:03  22   project?

11:03  23        A.  I would have frequent phone calls with

11:03  24   Tammy or emails.

11:03  25        Q.  So as a general matter, you were always

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | DENISE PAYNE - BY MR. WOLAN                                 |
| 11:03 | 2  | reporting your work progress to Tammy?                     |
| 11:03 | 3  | A.  Correct.                                               |
| 11:03 | 4  | MS. VINCI:  Counsel, can we just take a                    |
| 11:04 | 5  | bathroom break.                                            |
| 11:04 | 6  | MR. WOLAN:  Yes, let's take a break.                       |
| 11:04 | 7  | THE VIDEOGRAPHER:  The time is 11:04.                      |
| 11:04 | 8  | We're off the record.                                      |
| 11:04 | 9  | (The proceeding recessed at 11:04 a.m.)                    |
| 11:08 | 10 | (The proceeding reconvened at 11:08 a.m.;                  |
| 11:08 | 11 | appearances as before noted.)                              |
| 11:08 | 12 | THE VIDEOGRAPHER:  The time is 11:08.                      |
| 11:08 | 13 | We're back on the record.                                  |
| 11:08 | 14 | DENISE PAYNE, resumes;                                     |
| 11:08 | 15 | CONTINUING EXAMINATION BY MR. WOLAN:                       |
| 11:08 | 16 | Q.  Ms. Payne, in paragraph 57 of your                     |
| 11:08 | 17 | Complaint you write following this altercation -- and      |
| 11:08 | 18 | the altercation regarding the calendar situation we've     |
| 11:09 | 19 | been talking about -- you reached out to medical leave     |
| 11:09 | 20 | representative Jillian Tubbs to ask for advice.            |
| 11:09 | 21 | Do you recall doing that?                                  |
| 11:09 | 22 | A.  Yes.                                                   |
| 11:09 | 23 | Q.  Tell me about that.                                    |
| 11:09 | 24 | A.  So I reached out to Jill.  I think I asked             |
| 11:09 | 25 | if I could call her, and I had a phone call with her.      |

| | | |
|---|---|---|
| | 1 | DENISE PAYNE – BY MR. WOLAN |
| 11:09 | 2 | And I explained the situation. |
| 11:09 | 3 | I felt like I was being denied some |
| 11:09 | 4 | accommodation and asked if I should file a formal |
| 11:09 | 5 | request. |
| 11:09 | 6 | Q.  And what was her response to you? |
| 11:09 | 7 | A.  Her response was that it's likely a |
| 11:09 | 8 | misunderstanding.  I should reach back out to my |
| 11:09 | 9 | management and HR and try to work it out. |
| 11:09 | 10 | Q.  During that conversation, did Ms. Tubbs |
| 11:09 | 11 | otherwise explain to you how you could formally |
| 11:09 | 12 | request an accommodation? |
| 11:09 | 13 | A.  She did.  She said if I needed to, I could |
| 11:09 | 14 | reach back out and she would submit the forms to me. |
| 11:10 | 15 | Q.  Prior to this date, had you ever requested |
| 11:10 | 16 | any accommodations at Cornell before? |
| 11:10 | 17 | A.  No. |
| 11:10 | 18 | Q.  At the point in time that you're having |
| 11:10 | 19 | the conversation you just described with Ms. Tubbs, |
| 11:10 | 20 | were you aware of Cornell's policy regarding |
| 11:10 | 21 | accommodations? |
| 11:10 | 22 | A.  Yes. |
| 11:10 | 23 | Q.  Had you read it? |
| 11:10 | 24 | A.  Yes. |
| 11:10 | 25 | Q.  In response to Ms. Tubbs' advice to you, |

1          DENISE PAYNE - BY MR. WOLAN

11:10  2    what did you do?

11:10  3         A.  I tried to work it out with management and

11:10  4    HR.

11:10  5         Q.  And how did you go about doing that?

11:10  6         A.  I asked for more flexibility.  I had a

11:10  7    discussion with Tammy's manager, Cindy Allen,

11:10  8    explained how I felt about the lack of accommodation

11:10  9    and asked for help.

11:10  10        Q.  And how did she respond to you?

11:10  11        A.  Cindy didn't acknowledge it.

11:11  12        Q.  Didn't acknowledge what?

11:11  13        A.  My statements regarding what I was

11:11  14   experiencing.  She didn't acknowledge them.

11:11  15        Q.  Did you have an in-person meeting with

11:11  16   her?

11:11  17        A.  I did.

11:11  18        Q.  Do you remember where?

11:11  19        A.  In her office.

11:11  20        Q.  And where was her office?

11:11  21        A.  On the first floor of Statler.  Or second

11:11  22   floor.  I can't recall.

11:11  23        Q.  If she didn't acknowledge your statements,

11:11  24   how did your conversation continue?

11:11  25        A.  I mentioned that Tammy seemed to be more

1          DENISE PAYNE - BY MR. WOLAN

11:11  2   interested in controlling my time card than mentoring

11:11  3   or providing me leadership.

11:11  4          And Cindy said, "I'm sorry to hear that

11:11  5   she's not mentoring you.  I will discuss that with

11:12  6   her."

11:12  7          However, she didn't even acknowledge the

11:12  8   other aspect of our conversation regarding my time

11:12  9   card and my request for time off.

11:12  10         Q.  Do you recall how long that conversation

11:12  11  with Ms. Allen was?

11:12  12         A.  Perhaps 15 minutes.

11:12  13         Q.  Were you ever aware of Ms. Allen following

11:12  14  up with Ms. Lindsay?

11:12  15         A.  Yes.

11:12  16         Q.  What do you know about it?

11:12  17         A.  Shortly after, Tammy Lindsay scheduled a

11:12  18  one-on-one meeting with me and specifically discussed

11:12  19  it with me.

11:12  20         Q.  Did she -- did Ms. Lindsay show any signs

11:12  21  of improving her mentorship of you?

11:12  22         A.  Not that I recall.

11:12  23         Q.  In paragraph 60 of your Complaint you

11:13  24  mention that in or around May of 2017 you realized

11:13  25  that since you returned to work earlier in 2017, you

1          DENISE PAYNE - BY MR. WOLAN

11:13   2   had not accrued any additional health and person, or

11:13   3   HAP, time and that you were using vacation time to

11:13   4   cover appointments.

11:13   5          First of all, do you recall that?

11:13   6          A.  I recall that.  However, I realized long

11:13   7   before that that I wasn't accruing HAP time.

11:13   8          Q.  When did you first realize it?

11:13   9          A.  When I started back in January.

11:13  10          Q.  How -- at that point in time how was HAP

11:13  11   time accrued?

11:13  12          A.  Every paycheck I would get a certain

11:13  13   percentage of my time as HAP time.

11:13  14          Q.  What do you mean certain percentage of

11:14  15   your time?

11:14  16          A.  There's a formula that's used to calculate

11:14  17   your HAP time.

11:14  18          Q.  Do you know how much health and personal

11:14  19   time your position entitled you to?

11:14  20          A.  I do not recall.

11:14  21          Q.  So when you first realized you weren't

11:14  22   accruing HAP time, you mean to say zero hours of HAP

11:14  23   time showed up?  There was nothing there?

11:14  24          A.  I was actually in the negative.

11:14  25          Q.  In paragraph 62 you mention you reached

1          DENISE PAYNE - BY MR. WOLAN

11:14  2   out to HR and payroll to understand why you weren't

11:14  3   accruing HAP.  Tell me about that.

11:14  4        A.  So prior to that I had asked Tammy in

11:14  5   person to look into the matter.  By May I had noticed

11:14  6   that I still wasn't accruing, so I contacted the

11:14  7   payroll representative and --

11:15  8        Q.  Do you recall that person?

11:15  9        A.  Judy.  I do not remember her last name.

11:15  10       Q.  Okay.

11:15  11       A.  And she, I believe, set up a meeting where

11:15  12  we could discuss it in person.

11:15  13       Q.  Did you attend that meeting?

11:15  14       A.  Yes.

11:15  15       Q.  What did you discuss at that meeting?

11:15  16       A.  She mentioned that there seemed to be some

11:15  17  sort of glitch with my payroll and asked me how I was

11:15  18  using time for my medical time off.

11:15  19            She asked me to send her a list of every

11:15  20  time I had used vacation for medical purposes and said

11:15  21  she would be working on the issue.

11:16  22       Q.  After your conversation with payroll, were

11:16  23  you satisfied that everything was resolved?

11:16  24       A.  Yes.  She shortly resolved everything.

11:16  25       Q.  And did you get HAP time retroactive to

DENISE PAYNE - BY MR. WOLAN

11:16  2   the start of your job in 2017?

11:16  3       A.  I can't recall how she fixed it.  However,

11:16  4   it's likely that she gave me the HAP time and then

11:16  5   reversed and gave me back some vacation time that I

11:16  6   had used for my medical.

11:16  7         In addition, she alerted me that there was

11:16  8   additional catastrophic leave donations that had been

11:16  9   donated to me and withheld and was now going to be

11:16  10  applied.

11:16  11      Q.  Tell me about the donation process at

11:17  12  Cornell, to your understanding.

11:17  13      A.  To my understanding is if you meet the

11:17  14  qualifications, they can reach out to within your

11:17  15  department and ask for catastrophic leave donations.

11:17  16        Employees have to meet certain criteria in

11:17  17  order to be able to donate, and then donations are

11:17  18  collected and administered.

11:17  19      Q.  So to your knowledge, such a request for

11:17  20  donations was made on your behalf?

11:17  21      A.  Yes.  I saw the email.

11:17  22      Q.  And were you told how many donations were

11:17  23  made to you?

11:17  24      A.  I was not.

11:17  25      Q.  Do you have a recollection while you're

1       DENISE PAYNE - BY MR. WOLAN

11:17  2   sitting here how much donation time you ultimately

11:17  3   received?

11:17  4       A.  No.

11:17  5       Q.  In paragraph 61 of your Complaint you

11:17  6   stated that you had accrued donated catastrophic

11:17  7   leave, which Defendant had failed to properly

11:18  8   administer.

11:18  9           So if you didn't know how much had been

11:18  10  donated for your use, how were you aware of it not

11:18  11  being properly administered?

11:18  12      A.  I became aware in Cornell's response to

11:18  13  the EEOC where they identified how much time I had

11:18  14  been given.

11:18  15      Q.  When was your EEOC complaint?

11:18  16      A.  I don't recall when --

11:18  17      Q.  Was it in the first six months of 2017?

11:18  18      A.  I don't remember.

11:18  19      Q.  Do you remember your EEOC complaint being

11:18  20  filed contemporaneously with your conversations with

11:18  21  payroll?

11:18  22      A.  Initially I filed an inquiry in August of

11:18  23  2017 with the EEOC.  That was the first filing.

11:19  24      Q.  Do you believe that the glitch, as you

11:19  25  described it, was intentional?

1          DENISE PAYNE - BY MR. WOLAN

11:19  2      A.  I do not know.

11:19  3      Q.  Do you have any opinion of that as you sit

11:19  4  here today?

11:19  5      A.  I did repeatedly ask for help from my

11:19  6  manager to resolve the issue.  I went five months

11:19  7  without HAP time, and during that time they withheld

11:19  8  catastrophic leave donation from me when I needed it.

11:19  9      Q.  Did anybody say to you whether that's

11:20  10  Lindsay or HR or anybody -- say to you that the

11:20  11  University was deliberately not giving you access to

11:20  12  either HAP time or the donated catastrophic leave

11:20  13  time?

11:20  14      A.  Nobody directly said that to me.

11:20  15      Q.  Did anybody imply it to you?

11:20  16      A.  It was implied in the EEOC response from

11:20  17  Cornell.

11:20  18      Q.  You made a specific allegation in

11:20  19  paragraph 65 about an incident on or about May 9,

11:20  20  2017, where you contacted Lindsay and asked if you

11:20  21  could be allowed to take a one-hour as opposed to a

11:20  22  half-an-hour lunch break to meet with a former

11:20  23  colleague.

11:20  24       Do you remember that incident?

11:20  25      A.  Yes.

|       | 1  | DENISE PAYNE - BY MR. WOLAN |
|-------|----|-----------------------------|
| 11:20 | 2  | Q.  Tell me about it. |
| 11:20 | 3  | A.  I asked for additional time to meet with a |
| 11:21 | 4  | former colleague. |
| 11:21 | 5  | Tammy's response was, "You're requesting |
| 11:21 | 6  | too much time off.  Are you going to make it up?" |
| 11:21 | 7  | And out of frustration I just canceled the |
| 11:21 | 8  | lunch and didn't go. |
| 11:21 | 9  | Q.  Did you ever respond to Lindsay |
| 11:21 | 10 | specifically about her complaints to you about taking |
| 11:21 | 11 | so much leave time? |
| 11:21 | 12 | A.  No.  But I escalated to her manager, and I |
| 11:21 | 13 | had a meeting with Cindy Allen about it. |
| 11:21 | 14 | Q.  Was Cindy Allen Tammy Lindsay's direct |
| 11:21 | 15 | supervisor? |
| 11:21 | 16 | A.  Yes. |
| 11:21 | 17 | Q.  You state in your Complaint that Tammy |
| 11:21 | 18 | Lindsay had accused you of taking too much time off |
| 11:21 | 19 | for not medically related reasons. |
| 11:21 | 20 | So in your conversation with Tammy Lindsay |
| 11:22 | 21 | did she distinguish between different kinds of time |
| 11:22 | 22 | off, medical and nonmedical? |
| 11:22 | 23 | A.  She attempted to. |
| 11:22 | 24 | Q.  Describe for me how she relayed her |
| 11:22 | 25 | concerns to you. |

1          DENISE PAYNE - BY MR. WOLAN

11:22  2          A.  She would say, "You're taking too much

11:22  3    time off."  "We need to get your time card under

11:22  4    control."  And I can't recall how she worded it, but

11:22  5    she may have followed up with, "And I'm not talking

11:22  6    about your medical time off."

11:22  7          To which I asked for specific examples,

11:22  8    but I was never given those.

11:22  9          Q.  In addition to your medical time off, were

11:22  10   you taking other time off for any reasons?

11:22  11         A.  Yes.

11:22  12         Q.  What for?  And I should focus you.  From

11:22  13   January to May of 2017.

11:22  14         A.  I recall requesting a few hours to go to

11:22  15   the bank to sign paperwork to purchase a home.  I did

11:22  16   that during my lunch hour.  It may have taken me a

11:23  17   little bit of extra time to do that.

11:23  18         I have children.  I may have taken some

11:23  19   time off to take them to a doctor appointment.  But in

11:23  20   general, nothing excessive.

11:23  21         Q.  Do you have a recollection of how many

11:23  22   times you might have taken nonmedical time off in the

11:23  23   first five months of 2017?

11:23  24         A.  Perhaps three to five times I requested a

11:23  25   few hours here and there.

DENISE PAYNE - BY MR. WOLAN

11:23   2      Q.  And were you permitted to use those hours?

11:23   3      A.  Yes.

11:23   4      Q.  In your conversation with Lucinda Allen --

11:23   5  as you said, you escalated over Ms. Lindsay's head --

11:24   6  how did that conversation go in terms of Ms. Allen's

11:24   7  response to your concerns?

11:24   8      A.  I believe it's the same discussion that we

11:24   9  talked about earlier where I discussed my issues and

11:24  10  concerns with her being more concerned with

11:24  11  controlling my time card than mentoring and developing

11:24  12  me.

11:24  13      Q.  When you were taking your time off in

11:24  14  those first five months of 2017 for nonmedical

11:24  15  reasons, were you using any kind of accrued paid time

11:24  16  off?

11:24  17      A.  Yes, I believe I would have to.

11:24  18      Q.  Well, I was wondering whether you were

11:24  19  also simultaneously flexing your schedule for any of

11:25  20  those events, since you had a flex agreement in place?

11:25  21      A.  I don't recall.

11:25  22      Q.  You were -- strike that.

11:25  23          You said in paragraph 73 of your Complaint

11:25  24  that after your Allen discussion, which you just

11:25  25  mentioned, you met with Tammy Lindsay in person; and

1          DENISE PAYNE - BY MR. WOLAN

11:25  2   during that meeting, she attempted to pressure you to

11:25  3   work a full-time schedule.

11:25  4          Do you remember that meeting?

11:25  5          A.  I do.

11:25  6          Q.  And tell me about it.

11:25  7          A.  It took place in a conference room at

11:25  8   Statler.  She wanted to discuss my concerns with her

11:25  9   not mentoring me.

11:26  10         She claimed that she was always interested

11:26  11  in mentoring and developing people, and many people

11:26  12  had gotten promotions because of her.

11:26  13         She then pressured me to work full-time,

11:26  14  asked me if I had ever needed this much time off in a

11:26  15  previous job.

11:26  16         In other words, she asked me if this was

11:26  17  normal for me to constantly need time off in a

11:26  18  position; to which I responded, "No.  I clearly have

11:26  19  health issues that I'm going through right now."

11:26  20         That's all I recall about that

11:26  21  conversation.

11:26  22         Q.  Well, you also say in paragraph 73 that

11:26  23  Lindsay accused you of using your accrued time for

11:26  24  improper reasons unrelated to health.

11:26  25         Do you remember her talking about improper

|       |    |                                              |
|-------|----|----------------------------------------------|
|       | 1  | DENISE PAYNE - BY MR. WOLAN                   |
| 11:26 | 2  | reasons for using your time?                 |
| 11:26 | 3  | A. She claimed I was using my time too much  |
| 11:26 | 4  | for nonmedical reasons, and I asked for examples. |
| 11:27 | 5  | Q. And did she give you any?                  |
| 11:27 | 6  | A. She did not.                               |
| 11:27 | 7  | Q. At that point in time was it your          |
| 11:27 | 8  | understanding that Ms. Lindsay was, as your   |
| 11:27 | 9  | supervisor, supposed to be monitoring your time? |
| 11:27 | 10 | A. Yes.                                       |
| 11:27 | 11 | Q. In previous jobs with Cornell had you been |
| 11:27 | 12 | an hourly employee?                           |
| 11:27 | 13 | A. Yes.                                       |
| 11:27 | 14 | Q. And how long total had you been with       |
| 11:27 | 15 | Cornell?                                      |
| 11:27 | 16 | A. 13 years.                                  |
| 11:27 | 17 | Q. So in that time how did you keep time      |
| 11:27 | 18 | records as an hourly employee?                |
| 11:27 | 19 | A. Using the same system that Cornell --      |
| 11:27 | 20 | yeah.                                         |
| 11:27 | 21 | Q. Describe that for me, though.              |
| 11:27 | 22 | A. So I believe my IRB position was           |
| 11:28 | 23 | nonexempt, and I would log in in the morning and log |
| 11:28 | 24 | in and out.                                   |
| 11:28 | 25 | As long as I had 39 hours in per week, I      |

DENISE PAYNE - BY MR. WOLAN

11:28  2    had absolutely zero issues with my -- I never had a

11:28  3    manager change or tell me that I was incorrectly

11:28  4    entering my time.

11:28  5              In addition, I was allowed certain amounts

11:28  6    of overtime as needed.

11:28  7         Q.  Had you ever been in a position in an

11:28  8    hourly role where you had to assign categories to your

11:28  9    time off, such as whether, you know, you're using

11:28  10   vacation or something?

11:28  11        A.  Yes.

11:28  12        Q.  And how did you do that prior to your Data

11:28  13   Analyst II position?  How did you go about designating

11:28  14   something as vacation, for example?

11:28  15        A.  If I was taking time off to travel or just

11:29  16   time off, I would classify that as vacation.  I know I

11:29  17   was entitled to, I believe, three personal days per

11:29  18   year.

11:29  19             And then if I had medical appointments or

11:29  20   I was ill, I would use my HAP time.

11:29  21        Q.  I'm asking you, though, on a more

11:29  22   mechanical level.  How would you go about designating

11:29  23   the time?

11:29  24        A.  I don't understand the question.

11:29  25        Q.  Well, for example, you already said you, I

DENISE PAYNE - BY MR. WOLAN

11:29  2    believe, entered it into a computer as opposed to

11:29  3    filled it out on a piece of paper.

11:29  4         A.  Correct.

11:29  5         Q.  But in the process of entering that in the

11:29  6    computer, was your designation the final word on

11:29  7    whether you were using a vacation day on a particular

11:29  8    day?

11:29  9         A.  Yes.

11:29  10        Q.  You never had a supervisor who needed to

11:29  11   sign off on such things?

11:29  12        A.  Oh, I think the system requires sign off.

11:29  13   But I didn't need to seek approval prior to entering

11:29  14   it into the system.

11:29  15        Q.  And you don't recall as you're sitting

11:29  16   here whether there was or wasn't specific supervisor

11:30  17   approval in each usage of paid time off?

11:30  18        A.  There was supervisor approval, yes.

11:30  19        Q.  Did Tammy Lindsay have that role for you,

11:30  20   supervisor approval of paid time off, in your Data

11:30  21   Analyst II position?

11:30  22        A.  Yes.

11:30  23        (The following exhibit was marked for

11:30  24        identification:  EXH Number 2.)

11:30  25        Q.  I'm showing you what's been marked as

|       |    | DENISE PAYNE - BY MR. WOLAN |
|-------|----|------------------------------|

1      DENISE PAYNE - BY MR. WOLAN

11:30  2  Exhibit 2 for identification.  Go ahead and take a

11:30  3  look at the entire document all the way through, and

11:30  4  tell me when you're done looking at it.

11:33  5       A.  Okay.

11:33  6       Q.  Do you recognize that document?

11:33  7       A.  Yes.

11:33  8       Q.  What is it?

11:33  9       A.  It is a policy on flexibility in the

11:33  10  workplace at Cornell.

11:33  11       Q.  When you first entered into your flex

11:33  12  agreement that we discussed earlier, were you aware of

11:33  13  this policy?

11:33  14       A.  Yes.

11:33  15       Q.  Had you read it by that time?

11:34  16       A.  Yes.

11:34  17       Q.  Let me draw your attention, then, over to

11:34  18  page 7.  And I'm going to start you at the bottom of

11:34  19  page 7, that last bolded heading to the left,

11:34  20  "Time-Keeping During Flexible Arrangements."

11:34  21       I will now flip the page with you, as I'm

11:34  22  actually looking at the second paragraph of that

11:34  23  section.  Go ahead and read that paragraph at the top

11:34  24  of page 8.

11:34  25       MS. VINCI:  Do you want her to read it

DENISE PAYNE - BY MR. WOLAN

11:34  2   into the record or just to herself?

11:34  3        MR. WOLAN:  I want her to read it to

11:34  4   herself.

11:34  5        A.  Okay.

11:34  6        Q.  Now, let me ask you, as a general matter,

11:34  7   what's your understanding of being an exempt and a

11:35  8   nonexempt employee?

11:35  9        MS. VINCI:  Object to the extent that it

11:35 10   calls for a legal analysis or conclusion.  But she can

11:35 11   answer if she's able.

11:35 12        A.  In general, an exempt employee would be

11:35 13   salaried and not have the same record-keeping

11:35 14   requirements as a nonexempt individual.

11:35 15        Q.  Are you aware of what attributes a

11:35 16   position has to have in order to be able to be

11:35 17   classified as exempt?

11:35 18        MS. VINCI:  Same objection.  But she may

11:35 19   answer if she's able.

11:35 20        A.  I believe it is related to their level of

11:35 21   decision making and impact within a role.

11:35 22        Q.  Are you personally aware of there also

11:35 23   being a salary level requirement in order to define

11:35 24   something as exempt?

11:35 25        MS. VINCI:  Same objection, but she can

1          DENISE PAYNE - BY MR. WOLAN

11:36  2   answer.

11:35  3          A.  I'm aware, but I don't recall what that

11:35  4   level is.

11:36  5          Q.  As a nonexempt employee when you were the

11:36  6   Data Analyst II, had you been instructed to keep

11:36  7   records of your time --

11:36  8          A.  On a time --

11:36  9          Q.  -- by your employer?

11:36  10         A.  Yes, on a time card.

11:36  11         Q.  Was it a physical time card?

11:36  12         A.  Yes.  Excuse me.  It was an electronic

11:36  13  time card.

11:36  14         Q.  Electronic time card?  How much detail did

11:36  15  you put into your time cards on a weekly basis?

11:36  16         A.  Extensive detail related to my time off

11:36  17  when I was attending appointments, specific times when

11:36  18  I would come and go.

11:36  19         Q.  Were you -- during the time of your

11:36  20  treatment, were you able to work continuous hour

11:37  21  schedules, so the 8 to 2:30 straight through?

11:37  22         A.  No.

11:37  23         Q.  If you had to break up your day into

11:37  24  smaller chunks but still work six hours in a day, how

11:37  25  would you record that on a time card?  Or I should say

1          DENISE PAYNE - BY MR. WOLAN

11:37  2    in the computer system.

11:37  3          A.  I would record the exact time I started my

11:37  4    work and the time when I ended.

11:37  5          Q.  And repeatedly for a day, like if you

11:37  6    worked two hours and then took time off?

11:37  7          A.  Yes.

11:37  8          Q.  And would you indicate what you were doing

11:37  9    in the gaps when you weren't working?

11:37  10          MS. VINCI:  I'm sorry.  When she was

11:37  11    working or was not working?

11:37  12          MR. WOLAN:  Was not working.

11:37  13          A.  Not on the time card.

11:37  14          Q.  Would you record it somewhere else?

11:37  15          A.  Yes.  Tammy had asked me to record my

11:37  16    working hours and projects within the calendar

11:37  17    invitations I was sending her.

11:37  18          Q.  Let me ask you this, to be more specific,

11:37  19    because I'm not sure if I'm asking the question well.

11:37  20          If you had a day where you did not work

11:37  21    continuous hours because of your health, you know, say

11:38  22    the effects of treatment, would you note that after

11:38  23    working two hours, you were taking flex for two hours

11:38  24    because you needed to take a break?  Would it be that

11:38  25    level of detail?

| | | DENISE PAYNE - BY MR. WOLAN |
|---|---|---|
| | 1 | |
| 11:38 | 2 | A. No. |
| 11:38 | 3 | Q. So on a day where you were flexing your |
| 11:38 | 4 | time you would just show your work intervals? |
| 11:38 | 5 | A. Correct. |
| 11:38 | 6 | Q. I'm just trying to understand how much |
| 11:38 | 7 | detail you might have recorded at the time. |
| 11:38 | 8 | Now, I will note for you on page 8 of |
| 11:38 | 9 | Policy 6.6.13, which is the Exhibit 2, that first |
| 11:38 | 10 | paragraph at the top regarding nonexempt employees |
| 11:38 | 11 | doing the record keeping.  In the middle, looks like |
| 11:38 | 12 | second sentence (as read):  Therefore, supervisors |
| 11:38 | 13 | must ensure accurate recording of hours worked. |
| 11:38 | 14 | So were you aware of the fact that the |
| 11:39 | 15 | time that you were working as a Data Analyst II that |
| 11:39 | 16 | your supervisor was required in your supervisor's role |
| 11:39 | 17 | to ensure accurate recording of hours worked? |
| 11:39 | 18 | A. Yes. |
| 11:39 | 19 | Q. And if I can draw your attention to what |
| 11:39 | 20 | you said in paragraph 70 of your Complaint, that you |
| 11:39 | 21 | had gone to Ms. Allen to complain that Lindsay was |
| 11:39 | 22 | being very restrictive and scrutinizing your time |
| 11:39 | 23 | card. |
| 11:39 | 24 | Do you remember doing that? |
| 11:39 | 25 | A. I do. |

1        DENISE PAYNE - BY MR. WOLAN

11:39   2        Q.  You used the word "scrutinizing."  Would

11:39   3    you agree with me that it was the job of a supervisor

11:39   4    to scrutinize a time card?

11:39   5        A.  I agree that it was her job, but she was

11:39   6    improperly scrutinizing.

11:39   7        Q.  What was improper about it?

11:39   8        A.  She would remove time from my time card

11:39   9    that I actually had taken.

11:39  10        As an example, I remember attending a

11:40  11    doctor's appointment, let's say from 12 p.m. to

11:40  12    2 p.m., and I entered into my time card that I was

11:40  13    using HAP time during those hours.  Tammy removed that

11:40  14    time from my time card.

11:40  15        And I explained to her, "But I was

11:40  16    actually physically at the doctor during those hours."

11:40  17        She said, "It doesn't matter.  You don't

11:40  18    have that time to use.  You're not allowed to use it."

11:40  19        Q.  I think you said earlier while we were

11:40  20    talking today -- well, no.  Let me rephrase that.

11:40  21        You at some point learned that you were

11:40  22    not incurring new HAP time in early 2017; correct?

11:40  23        A.  Yes.

11:40  24        Q.  Prior to learning that, do you recall what

11:40  25    your HAP balance was as you entered 2017?

1          DENISE PAYNE - BY MR. WOLAN

11:40  2          A.  It was in the negative.

11:40  3          Q.  So you had already used all of your HAP

11:40  4   time in 2016 during your leave?

11:40  5          A.  I used it prior to my leave.  When I was

11:41  6   getting surgery and starting my chemotherapy, I used

11:41  7   all of my HAP time.

11:41  8          Q.  So when you started 2017, do you remember

11:41  9   how negative your balance was?

11:41  10         A.  It was like negative seven, approximately,

11:41  11  hours.

11:41  12         Q.  And was it your experience that a Cornell

11:41  13  employee could run negative accruals?

11:41  14         A.  I did not know that.

11:41  15         Q.  Did you expect to be able to do that in

11:41  16  your Data Analyst II position?

11:41  17         A.  No.

11:41  18         Q.  If you did not have a balance -- a

11:41  19  positive balance of HAP time, why do you think it was

11:42  20  improper for Ms. Lindsay to deny your use of it?

11:42  21         A.  That denial came later when I did have HAP

11:42  22  time.

11:42  23         Q.  Did Ms. Lindsay ask you to provide any

11:42  24  information regarding your doctor's appointment, such

11:42  25  as a slip from the doctor?

DENISE PAYNE - BY MR. WOLAN

11:42  2      A.  No.

11:42  3      Q.  You mentioned that that was one time.  Did

11:42  4  she do it any other times?

11:42  5      A.  She frequently would alter my time card to

11:42  6  her liking, remove time here and there, change it from

11:42  7  HAP to vacation.  She did that frequently.

11:42  8      Q.  Can you be more specific while we're

11:42  9  sitting here of incidents that that occurred on?  You

11:42  10  remember now this one particular doctor's appointment.

11:42  11  And I'm not going to ask you to do dates.  I

11:42  12  understand that that would be a little too specific.

11:42  13      But can you remember specific events and

11:42  14  context, like you were taking a particular amount of

11:42  15  vacation time or something like that?

11:42  16      A.  I remember a specific event where my time

11:42  17  had come to 39.2 hours in a week, and she asked me to

11:43  18  go in and remove the .2, because I was not allowed to

11:43  19  be over.  Even though I had worked it, I was not

11:43  20  allowed to be over on my time card.

11:43  21      Q.  Okay.  Any other examples?

11:43  22      A.  I don't recall.

11:43  23      Q.  But you do think there were more?

11:43  24      A.  Yes.

11:43  25      Q.  If you recall any while we're here today,

|       |    |                                                        |
|-------|----|--------------------------------------------------------|
|       | 1  | DENISE PAYNE - BY MR. WOLAN                             |
| 11:43 | 2  | I'll ask you again in a while about that.              |
| 11:43 | 3  | A.  Okay.                                              |
| 11:43 | 4  | Q.  All right.  I'll take 6.6.13 back from             |
| 11:43 | 5  | you.  Thank you.                                       |
| 11:44 | 6  | (The following exhibit was marked for                  |
| 11:44 | 7  | identification:  EXH Number 3.)                        |
| 11:44 | 8  | Q.  I'm showing you what's been marked for             |
| 11:44 | 9  | identification as Exhibit 3.  Please take a look at    |
| 11:44 | 10 | that.  Look through all the pages and let me know when |
| 11:44 | 11 | you're done.                                           |
| 11:46 | 12 | A.  Okay.                                              |
| 11:46 | 13 | Q.  Do you recognize Exhibit 3?                        |
| 11:46 | 14 | A.  Yes.                                               |
| 11:46 | 15 | Q.  Can you tell me what it is?                        |
| 11:47 | 16 | A.  It's the disability accommodation process         |
| 11:47 | 17 | policy for Cornell.                                    |
| 11:47 | 18 | Q.  And identified as Policy 6.13 on the first        |
| 11:47 | 19 | page.  Are you familiar with that policy?              |
| 11:47 | 20 | A.  I am.                                              |
| 11:47 | 21 | Q.  And to your recollection, when was the            |
| 11:47 | 22 | first time you became familiar with that policy?      |
| 11:47 | 23 | A.  I read the policy shortly after I was             |
| 11:47 | 24 | diagnosed in June or July of 2016.                    |
| 11:47 | 25 | Q.  And when you first had your diagnosis, did       |

1      DENISE PAYNE - BY MR. WOLAN

11:47  2  you discuss with Cornell employees the types of

11:47  3  accommodation you could have to deal with your

11:47  4  treatment?

11:47  5        A.  Not at that time.  I wasn't --

11:47  6        Q.  When was the first time you discussed it

11:47  7  with any Cornell personnel?

11:47  8        A.  After my surgery, when I knew I would need

11:47  9  time off to heal from my chemotherapy treatments, I

11:47  10  discussed it with HR.

11:47  11       Q.  So prior to that, what had you been doing

11:48  12  to deal with your time off for the treatment?

11:48  13       A.  I don't recall.

11:48  14       Q.  Were you using HAP time at that point?

11:48  15       A.  I may have been.

11:48  16       Q.  And when you finally discussed

11:48  17  accommodations for your treatment and recovery, what

11:48  18  was the plan that was worked out between you and human

11:48  19  resources?

11:48  20       A.  Well, there were ongoing discussions

11:48  21  throughout my entire treatment.  I was to use my time

11:48  22  off if I needed to heal from a treatment until I ran

11:48  23  out of my time, and then I used disability for 12

11:48  24  weeks.

11:48  25            And then when I returned, you know, I

DENISE PAYNE - BY MR. WOLAN

11:48 would request time to either flex my schedule or time

11:48 off to heal, etcetera.

11:49 Q. And who were you dealing with across that

11:49 stretch in the HR office?

11:49 A. Primarily Julie Weaver.

11:49 Q. Do you remember her title?

11:49 A. I do not.

11:49 Q. That's okay.

11:49 Did you have any discussion in 2016 with

11:49 the medical leaves office?

11:49 A. Yes. I believe I was assigned a

11:49 caseworker.

11:49 Q. Do you remember who that was?

11:50 A. Jill Tubbs.

11:50 Q. And we did talk earlier today about you

11:50 having a conversation with Jill later.

11:50 Do you remember the first time that you

11:50 interacted with Jill?

11:50 A. We corresponded by email in the fourth

11:50 quarter of 2016, and she would check in with me when I

11:50 was on disability to see how I was feeling.

11:50 Q. Did she check in by email, phone or some

11:50 other way?

11:50 A. Email.

1          DENISE PAYNE - BY MR. WOLAN

11:50  2          Q.  Okay.  I'll take that back from you right

11:50  3   now.  Thanks.

11:50  4                So you had your flex agreement start in

11:50  5   February.  Did you ever amend that flex agreement?

11:50  6          A.  Yes.

11:50  7          Q.  When?

11:50  8          A.  In May 2017.

11:51  9          (The following exhibit was marked for

11:51  10         identification:  EXH Number 4.)

11:51  11         Q.  We're presenting you with what's been

11:51  12  marked Exhibit 4 for identification.  Go ahead and

11:51  13  take a look at the entire document, and let me know

11:51  14  when you're done.

11:51  15         A.  Okay.

11:51  16         Q.  Do you recognize this document?

11:51  17         A.  Yes.

11:51  18         Q.  What is it?

11:51  19         A.  It's a flex work arrangement with Cornell.

11:51  20         Q.  And is it your flex work arrangement from

11:51  21  May of 2017?

11:51  22         A.  Yes.

11:51  23         Q.  Do you recognize your signature at the

11:51  24  bottom of pages 1 and 3?

11:51  25         A.  Yes.

|  |  |  |
|---|---|---|
| | 1 | DENISE PAYNE - BY MR. WOLAN |
| 11:52 | 2 | Q. And to your recollection, is that Tammy |
| 11:52 | 3 | Lindsay's signature also at those same spots? |
| 11:52 | 4 | A. Yes. |
| 11:52 | 5 | Q. What precipitated the discussion that led |
| 11:52 | 6 | to having this effective date 5/1/2017 Flexible Work |
| 11:52 | 7 | Arrangement? |
| 11:52 | 8 | MS. VINCI: Objection. |
| 11:52 | 9 | You can answer. |
| 11:52 | 10 | A. I was still in treatment for cancer, and I |
| 11:52 | 11 | needed a flexible work arrangement to receive targeted |
| 11:52 | 12 | therapy, infusions, and to heal from those. |
| 11:52 | 13 | Q. And your first flex work arrangement was |
| 11:52 | 14 | scheduled to expire when? |
| 11:52 | 15 | A. I believe it was May. |
| 11:52 | 16 | Q. So this is a continuation? |
| 11:52 | 17 | A. This is version two, yep. |
| 11:52 | 18 | Q. Now, just looking at the first page, I see |
| 11:52 | 19 | that you've got approval for Work Remotely. And then |
| 11:52 | 20 | in the work hours it's as needed. |
| 11:53 | 21 | So what did as needed mean? |
| 11:53 | 22 | A. It meant whenever I needed to flex my time |
| 11:53 | 23 | to attend a medical appointment or a treatment or heal |
| 11:53 | 24 | or recover from those treatments or time off in a way |
| 11:53 | 25 | from side effects from cancer treatment. |

1       DENISE PAYNE - BY MR. WOLAN

11:53  2       Q.  And how was need going to be determined?

11:53  3       A.  That was not defined; however, in general,

11:53  4   I would know when I was well enough to work versus not

11:53  5   well enough.

11:53  6       Q.  So the as needed would -- the

11:53  7   determination would first come from your decision

11:53  8   about whether you could work or not?

11:53  9       A.  Correct.

11:53  10      Q.  And would you have to report that to

11:53  11  anybody?

11:53  12      A.  Yes.

11:53  13      Q.  To who?

11:54  14      A.  To my manager.

11:54  15      Q.  And who was your manager in February of

11:54  16  2017?

11:54  17      A.  Tammy Lindsay.

11:54  18      Q.  Did you have to give Tammy Lindsay any

11:54  19  advance notice under this 5/1/2017 flexible work

11:54  20  arrangement?

11:54  21      A.  Yes.  I would need to let her know when I

11:54  22  planned to work remotely.

11:54  23      Q.  How much notice did you have to give her

11:54  24  timewise?

11:54  25      A.  There wasn't a time limit that I'm aware

1     DENISE PAYNE - BY MR. WOLAN

11:54 2 of.  As soon as I knew.  As soon as I knew.

11:54 3   Q.  Let me ask you more specifically.

11:54 4    Could you wake up in the morning, feel

11:54 5 unwell unexpectedly and be able to call in and work

11:54 6 from home?  Would that be permissible?

11:54 7   A.  Yes.

11:54 8   Q.  And did you ever have to do that?

11:54 9   A.  Yes.

11:54 10   Q.  And I'm specifically talking of the time

11:54 11 under Flexible Work Arrangement number two from May,

11:54 12 1, 2017.

11:55 13   A.  Yes.

11:55 14   Q.  Now, in paragraph 76 of your Complaint you

11:55 15 mention that you needed flexibility to work from home

11:55 16 two days a week, but then in paragraph 77 you say that

11:55 17 Cornell agreed to the as needed language only.

11:55 18   First regarding your two days a week, how

11:55 19 did you come to the conclusion that you needed two

11:55 20 days a week?

11:55 21   A.  I estimated that based on how I was

11:55 22 feeling and understanding that I had already been in

11:55 23 treatment and I knew how I was responding to the

11:55 24 medicine.

11:55 25   I told Tammy that I thought it could be

|       | 1  | DENISE PAYNE - BY MR. WOLAN |
|-------|----|-----------------------------|
| 11:55 | 2  | one to two days a week where I would need to flex my |
| 11:56 | 3  | time through October while I was still in treatment. |
| 11:56 | 4  | Q.  And I'll note that this flex work |
| 11:56 | 5  | arrangement has a review date of October -- |
| 11:56 | 6  | A.  Yes. |
| 11:56 | 7  | Q.  -- 2017.  Did you agree to that at that |
| 11:56 | 8  | time?  You thought that was reasonable? |
| 11:56 | 9  | A.  Yes. |
| 11:56 | 10 | Q.  What conversation did you have with Tammy |
| 11:56 | 11 | Lindsay that led from your thought about two days a |
| 11:56 | 12 | week to ending up with an agreement that merely said |
| 11:56 | 13 | as needed? |
| 11:56 | 14 | A.  There was an email wherein she stated that |
| 11:56 | 15 | I should not put two days a week, only write as |
| 11:56 | 16 | needed. |
| 11:56 | 17 | Q.  So it was at her direction? |
| 11:56 | 18 | A.  That was her direction. |
| 11:56 | 19 | Q.  At the time did you find that to be an |
| 11:56 | 20 | adequate solution for your needs? |
| 11:56 | 21 | A.  At the time I thought it was. |
| 11:56 | 22 | Q.  Did it end up being adequate for your |
| 11:56 | 23 | needs? |
| 11:56 | 24 | A.  No. |
| 11:56 | 25 | Q.  Why not? |

1       DENISE PAYNE - BY MR. WOLAN

11:57   2        A.  Because she would deny me the flexibility

11:57   3    to work from home as needed.

11:57   4        Q.  How would she deny you?

11:57   5        A.  I would reach out to her in an email,

11:57   6    request some time off.  She would respond that I was

11:57   7    doing something improper, I had not gotten

11:57   8    pre-approval to do that; and she would deny me the

11:57   9    right to work from home.

11:57   10       Q.  If she denied you the right to work from

11:57   11   home, would you come into work on those days?

11:57   12       A.  No.  I couldn't.  I was not well enough.

11:57   13       Q.  So you just took those days off?

11:57   14       A.  Yeah.  I was forced to use vacation time.

11:57   15       Q.  Do you recall how many times that happened

11:57   16   in May of 2017?

11:57   17       A.  In May I do not recall.

11:57   18       Q.  Do you recall June 2017?

11:57   19       A.  Not specifically.  I do recall it

11:57   20   happening in June, July and beyond.

11:58   21       Q.  Okay.  Well, do you have a recollection of

11:58   22   how many times it happened across all of those months?

11:58   23       A.  I would say roughly three to six times,

11:58   24   somewhere in that range.

11:58   25       Q.  And would these be email conversations

1          DENISE PAYNE - BY MR. WOLAN

11:58  2    between the two of you?

11:58  3          A.  Yes.

11:58  4          Q.  Were any of them in person?

11:58  5          A.  One was in person.

11:58  6          Q.  Do you recall when the in-person meeting

11:58  7    took place?

11:58  8          A.  Yes.  It was in June of 2017.

11:58  9          Q.  And do you recall the conversation?

11:58  10         A.  Yes.  It was my performance review.

11:58  11         Q.  And what was discussed about your flex

11:58  12   time at that point?

11:58  13         A.  I had requested at the end of that review

11:58  14   to spend the remainder of the day working from home,

11:58  15   because I was not feeling well.

11:58  16             And Tammy demanded to know why, specific

11:59  17   medical reasons, what I was experiencing and feeling,

11:59  18   and then denied me the right to work from home.

11:59  19         Q.  Did she give you a reason for denying you

11:59  20   the right to work from home?

11:59  21         A.  Not verbally.  She seemed disgusted.  She

11:59  22   told me to just leave, just go.  "Just go home if

11:59  23   you're sick."

12:00  24         Q.  In addition to that in-person meeting, you

12:00  25   said that the remainder would have been by email --

|     |    | DENISE PAYNE - BY MR. WOLAN |
| --- | --- | --- |

1                 DENISE PAYNE - BY MR. WOLAN

12:00  2    the remainder of communications about denying your

12:00  3    time off would have been by email.

12:00  4                Do you recall specifics regarding any of

12:00  5    those other incidents?

12:00  6                A.  I believe there was an email around July

12:00  7    15, 2017 where I requested some time off and again was

12:00  8    denied the right to work from home and forced to use

12:00  9    vacation time.

12:00  10                Q.  Were you given a reason why?

12:00  11                A.  Because I did not get pre-approval to do

12:00  12    so.

12:00  13                Q.  What was your understanding regarding the

12:00  14    need for pre-approval?

12:00  15                A.  That I should seek approval when I knew I

12:00  16    needed to work remotely.

12:01  17                Q.  Were there any terms that you and

12:01  18    Ms. Lindsay discussed regarding the timing of that

12:01  19    notice, as in a minimum number of hours or days?

12:01  20                A.  I seem to recall that if I wasn't going to

12:01  21    be in by 8, I would have to let her know within a half

12:01  22    an hour or something like that.  I don't recall the

12:01  23    specifics.

12:01  24                Q.  So you and Ms. Lindsay did have an

12:01  25    arrangement in place where if you decided

1          DENISE PAYNE - BY MR. WOLAN

12:01  2    spontaneously on a particular day that you could not

12:01  3    come in, you could report to her and use your flex

12:01  4    time that way?

12:01  5          A.  In theory.

12:01  6          Q.  How many times did you need to do that

12:01  7    over the summer of 2017?

12:01  8          A.  How many times did I need to?

12:01  9          Q.  Stay home that you realized only in the

12:02 10    morning.

12:02 11          A.  I don't recall.  I knew -- I know of one

12:02 12    instance where I had gotten blood work in Cortland and

12:02 13    felt very weak.  So I had emailed Tammy and asked the

12:02 14    right to rest in the morning and work in the

12:02 15    afternoon, and I was denied.

12:02 16          Q.  Were you given a reason why?

12:02 17          A.  Because I didn't get pre-approval.

12:02 18          Q.  Were there any times that Tammy Lindsay

12:02 19    did approve of your time off even if it came as late

12:02 20    as the very morning that you were supposed to be

12:02 21    reporting to work?

12:02 22          A.  There were times when she would approve my

12:02 23    time off, but she would not approve my right to work

12:02 24    from home, to flex my schedule and actually work.

12:02 25          Q.  Oh, I see.  So she was allowing you to

DENISE PAYNE - BY MR. WOLAN

12:02  2  stay home, but she was not allowing you to do work

12:02  3  from home?

12:02  4      A.  Right.

12:02  5      Q.  I see.  Do you have a sense of how many

12:02  6  times that occurred in the summer of 2017?

12:03  7      A.  Again, I would say a handful, from three

12:03  8  to six.

12:03  9      Q.  Were there any times that she did approve

12:03  10  you to work flexibly from home with a same-morning

12:03  11  communication?

12:03  12      A.  No, I don't recall that.

12:03  13      Q.  Never?

12:03  14      A.  If it was for a medical appointment, yes.

12:03  15          If I said, "I have to go to the doctor,"

12:03  16  yes.

12:03  17          However, if I said, "I'm not feeling well,

12:03  18  I need to, you know, work from home today," I was

12:03  19  generally denied.

12:03  20      Q.  Did you have any discussion with

12:03  21  Ms. Lindsay at any point regarding what you were

12:03  22  supposed to be doing with your flex time in terms of

12:03  23  level of effort of work?

12:04  24      A.  In general, the level of effort of work

12:04  25  flex time was the same as the level of work on-site.

1       DENISE PAYNE - BY MR. WOLAN

12:04   2       I would perform the tasks she gave me,

12:04   3    work on projects, submit anything I needed to to her

12:04   4    for approval.  It was the same, essentially.

12:04   5       Q.  Okay.  So you would get the same work

12:04   6    done, you would just do it at different times?

12:04   7       A.  Yes.

12:04   8       Q.  That's a fair characterization?

12:04   9       A.  Yes.

12:04   10      MR. WOLAN:  Let's go ahead and stop for

12:04   11   the recording right now.

12:04   12      THE VIDEOGRAPHER:  The time is 12:04.

12:04   13   We're off the record.

12:04   14      (The proceeding recessed at 12:04 p.m.)

12:05   15      (The proceeding reconvened at 12:05 p.m.;

12:05   16      appearances as before noted.)

12:05   17      THE VIDEOGRAPHER:  The time is 12:05.

12:05   18   We're back on the record.

12:05   19   DENISE PAYNE, resumes;

12:05   20      CONTINUING EXAMINATION BY MR. WOLAN:

12:05   21      Q.  Was there ever a time that you had a

12:05   22   conversation with Ms. Lindsay about the need to not

12:05   23   work if you were actually sick in the moment?  Did the

12:05   24   two of you ever have a conversation about that?

12:06   25      MS. VINCI:  I'm sorry.  Can you just read

1        DENISE PAYNE - BY MR. WOLAN

12:06  2    back that question?

12:06  3        (The reporter read the requested material.)

12:06  4        A.  I don't recall a conversation, but in

12:06  5    general that would be implied.  If you're too ill to

12:06  6    work, you're too ill to work.

12:06  7        Q.  So when you were calling in and asking to

12:06  8    flex, did you communicate to Ms. Lindsay that you

12:06  9    expected to feel well later in the day and wanted to

12:06 10    move your hours?

12:06 11        A.  I may have stated if I feel well in the

12:06 12    afternoon, I'd like to work X number of hours on this

12:06 13    project.

12:06 14        Q.  But you wouldn't try to work while feeling

12:06 15    ill?

12:06 16        A.  No.

12:07 17        Q.  But to your recollection, in the summer of

12:07 18    2017 the two of you never had an express conversation

12:07 19    about the distinction between working while sick

12:07 20    versus delaying work time until you didn't feel sick

12:07 21    anymore?

12:07 22        A.  Not that I recall.

12:07 23        Q.  And so to be clear, then, it was in the

12:07 24    instances where you, for lack of a better phrase, may

12:07 25    have been able to work later in the day, those were

1       DENISE PAYNE - BY MR. WOLAN

12:07   2   the instances where Tammy would deny your flex time at

12:07   3   all for that day?

12:07   4       A.  In general, yes.

12:07   5       Q.  Did you ever find yourself -- in spite of

12:07   6   her -- in spite of Ms. Lindsay's disagreement, did you

12:08   7   ever find that you did work on some days anyways --

12:08   8       A.  No.

12:08   9       Q.  -- because you knew you needed to get

12:08   10  something done?

12:08   11      A.  I would not, because I knew she would

12:08   12  admonish me for that.

12:08   13      Q.  So if she relayed to you the fact that she

12:08   14  didn't want you to work, you didn't work?

12:08   15      A.  Correct.

12:08   16      Q.  In July of 2017 did you communicate with

12:08   17  anybody else about Ms. Lindsay's denial of your time

12:08   18  to flex on the days you thought you might be able to

12:08   19  work later?

12:08   20      A.  I recall escalating to HR.

12:08   21      Q.  Do you recall with whom you spoke?

12:08   22      A.  Definitely Julie Weaver.  I may have

12:09   23  copied Kathy Doxey.

12:09   24      Q.  Do you recall the earliest date on which

12:09   25  you would have escalated it to HR?

|        | 1  | DENISE PAYNE - BY MR. WOLAN |
|--------|----|------------------------------|
| 12:09  | 2  | A. I do not recall. |
| 12:09  | 3  | Q. You state in -- well, let me back up. |
| 12:09  | 4  | You state in paragraph 81 of your |
| 12:09  | 5  | Complaint that it was June 7, 2017 in which you met |
| 12:09  | 6  | with Lindsay to discuss your performance. |
| 12:09  | 7  | Do you recall that? |
| 12:09  | 8  | A. June 7th? |
| 12:09  | 9  | Q. June 7, 2017. |
| 12:10  | 10 | A. Yes. |
| 12:10  | 11 | Q. And you recall having a meeting, because |
| 12:10  | 12 | you talked about it earlier; correct? |
| 12:10  | 13 | A. Yes. |
| 12:10  | 14 | Q. And you say in paragraph 84 that she told |
| 12:10  | 15 | you that you, quote, "needed to get her" -- your -- |
| 12:10  | 16 | "time card under control." |
| 12:10  | 17 | A. Yes. |
| 12:10  | 18 | Q. You say in paragraph 85 upon information |
| 12:10  | 19 | and belief, Lindsay was referring to your health |
| 12:10  | 20 | issues. |
| 12:10  | 21 | What about Lindsay's behavior led you to |
| 12:10  | 22 | believe that it was about your health issues? |
| 12:10  | 23 | A. Her behavior in response to my request for |
| 12:10  | 24 | accommodation. |
| 12:10  | 25 | Q. During that particular conversation on |

1          DENISE PAYNE - BY MR. WOLAN

12:10  2    June 7, 2017.  What in her --

12:10  3         A.  That's what I'm saying.  I'm saying in

12:10  4    general the way she responded to me when I requested

12:11  5    an accommodation.  And -- I'm sorry -- can you repeat

12:11  6    the question.

12:11  7         Q.  I don't think I can, so I'll ask it

12:11  8    slightly differently.

12:11  9             During the June 7, 2017 conversation, what

12:11  10   is it about what Ms. Lindsay did or how she acted that

12:11  11   led you to believe that her complaints were related to

12:11  12   your cancer diagnosis?

12:11  13        A.  There was no other point of reference.  I

12:11  14   was not taking excessive time off except for my

12:11  15   health.  And I asked for specific examples and was

12:11  16   given none.

12:11  17        Q.  Now, you say in paragraph 86 that after

12:11  18   that meeting, you were upset; you began to experience

12:11  19   heart palpitations.

12:12  20            Do you remember that?

12:12  21        A.  I do.

12:12  22        Q.  First let me ask you, independent of your

12:12  23   cancer diagnosis and treatment, have you had

12:12  24   experience with heart palpitation issues?

12:12  25        A.  I have in the past, yes.

DENISE PAYNE - BY MR. WOLAN

12:12   Q. And were your health palpitation issues
12:12 exacerbated at all during the course of your cancer
12:12 treatment?

12:12   A. They were.

12:12   Q. Can you describe the pre-cancer treatment
12:12 and post-cancer treatment difference in your heart
12:12 palpitation issues?

12:12   A. It was more extreme post treatment. I
12:12 would get a sensation that I might pass out. Or if I
12:12 climbed a series of stairs, I might get light-headed
12:12 and then have more severe heart palpitations.

12:12   Q. At any time were they actually
12:12 debilitating? Did you find you ever d did lose
12:13 consciousness?

12:13   A. I never lost consciousness, but there were
12:13 times when I would have to stop what I was doing and
12:13 sit down to recover.

12:13   Q. And how long would your recovery periods
12:13 be?

12:13   A. Five to ten minutes.

12:13   Q. And this is true during your cancer
12:13 treatment, or is this pre-cancer treatment? The five
12:13 to ten minutes.

12:13   A. Pre-cancer treatment as well. I would,

1          DENISE PAYNE - BY MR. WOLAN

12:13  2    you know, frequently get them.

12:13  3          Q.  So you could recover from an incident the

12:13  4    same, but the incident would be more extreme during

12:13  5    your cancer treatment?

12:13  6          A.  It was more extreme.  It was more

12:13  7    frequent.  And because I was also ill, that seemed to

12:13  8    exacerbate it.  I was weaker.

12:13  9          Q.  So after you reported to Ms. Lindsay that

12:13  10   you were experiencing heart palpitations and you

12:13  11   requested to work from home the rest of the day, how

12:14  12   did she respond to that?

12:14  13         A.  She seemed disgusted.  She told me to just

12:14  14   go home.

12:14  15         Q.  When you say "seemed disgusted," how was

12:14  16   she behaving that would lead you to believe that?

12:14  17         A.  Her tone of voice.  She raised her voice.

12:14  18   She shook her head as if in disbelief of what I was

12:14  19   saying and told me to just go home.

12:14  20         Q.  Did you have any discussion with her at

12:14  21   that point in time about how you -- well, let me ask

12:14  22   you this:  At that point in time did you anticipate

12:14  23   being able to drive home?

12:14  24         A.  I was very upset, so I would have needed

12:14  25   some time to recover from that.

DENISE PAYNE - BY MR. WOLAN

12:14   Q.  Where would you have done that?

12:14   A.  I went to the bathroom.  Actually, that
12:14   was prior to talking to Tammy.  I went to the bathroom
12:14   to collect myself.  I came back and calmly asked her
12:15   the chance to work from home for the rest of the
12:15   afternoon.

12:15   Q.  Had your palpitations subsided by the time
12:15   you were talking to Tammy again?

12:15   A.  No, not yet.

12:15   Q.  Did you anticipate being able to drive at
12:15   that point?

12:15   A.  It was likely that I would have to rest.
12:15   Sometimes I would rest in my car.  But in general, I
12:15   knew when I could drive and when I couldn't.

12:15   Q.  Well, she told you to go home.  What did
12:15   you do in response to that?

12:15   A.  I went to see Julie Weaver.

12:15   Q.  And in the gap between meeting with Tammy
12:15   and meeting with Julie Weaver, did your heart
12:15   palpitations subside?

12:15   A.  They may have, although I do remember
12:15   still being very upset when I was discussing with
12:15   Julie.

12:15   Q.  Okay.  So --

1         DENISE PAYNE - BY MR. WOLAN

12:16   2         A.  By the time I left Julie's office, I felt

12:16   3    fine.

12:16   4         Q.  Well, let me ask you this:  You asked to

12:16   5    go home --

12:16   6         A.  I asked to work from home.

12:16   7         Q.  To work from home because of your heart

12:16   8    palpitations.  And you've just testified that it might

12:16   9    take you five to ten minutes for them to subside if

12:16  10    you could lay down, for example.

12:16  11             Why didn't you just stay at work that day,

12:16  12    wait for them to subside and get back to work?

12:16  13         A.  I was working literally five feet from

12:16  14    Tammy, and the toxic environment was also exacerbating

12:16  15    my heart palpitations.

12:16  16         Q.  Toxic being what?

12:16  17         A.  Her response to me.  Her treatment of me.

12:16  18         Q.  Did you feel the toxic environment

12:16  19    involved anybody else in your workplace?  Or was Tammy

12:17  20    the cause of it singly?

12:17  21         A.  At that -- on that day it was Tammy only.

12:17  22         Q.  Do you believe other people in your

12:17  23    workplace led to a toxic environment for you?

12:17  24         A.  Yes.

12:17  25         Q.  Who else?

1          DENISE PAYNE - BY MR. WOLAN

12:17   2       A.   Cindy Allen, Laura Syer.

12:17   3       Q.   Although you didn't work with them in

12:17   4   direct proximity on a daily basis; right?

12:17   5       A.   No.   But I subsequently reported to both

12:17   6   of them.

12:17   7       Q.   But I'm thinking about this point in time

12:17   8   you're having this conversation with Tammy Lindsay --

12:17   9       A.   Right.

12:17   10       Q.   -- on or about June 7, 2017.   At that

12:17   11   point in time you're working in proximity with Tammy

12:17   12   Lindsay; correct?

12:17   13       A.   Correct.

12:17   14       Q.   And she's the one leading to your toxic

12:17   15   environment; correct?

12:17   16       A.   Yes.

12:17   17       Q.   So you said you went to talk to Julie

12:17   18   Weaver?

12:17   19       A.   Yes.

12:17   20       Q.   Tell me about that conversation.

12:18   21       A.   I discussed my performance review and a

12:18   22   number of false statements that Tammy had made during

12:18   23   my performance review, how they had upset me, how I

12:18   24   had inquired about my job description and if it was

12:18   25   ready and when I was going to be reclassified.

|  | 1 | DENISE PAYNE - BY MR. WOLAN |

12:18  2        And Tammy had made the statement that she

12:18  3  would not promote me or reclassify me until I got my

12:18  4  time card under control.

12:18  5        Julie, in response, was receptive to what

12:18  6  I was saying and said Tammy would not have the power

12:18  7  to deny me that particular promotion.  And that's all

12:18  8  I recall.  I remember her being nice, but I don't

12:18  9  remember any substantial help.

12:18  10      Q.  Did she say she was going to talk to

12:18  11  anybody?

12:18  12      A.  She may have.

12:19  13      Q.  Where was Julie Weaver's office relative

12:19  14  to yours?

12:19  15      A.  It was across the street in Sage Hall.

12:19  16      Q.  So getting to her, it was not a physically

12:19  17  difficult activity?

12:19  18      A.  No.  But a co-worker offered to go with

12:19  19  me.

12:19  20      Q.  But what I'm asking is Julie would have

12:19  21  been reasonably accessible to you on any given day?

12:19  22      A.  Yes.

12:19  23      Q.  When you walked out of the meeting with

12:19  24  Julie on June 7, 2017, what were you experiencing at

12:19  25  that time?

1          DENISE PAYNE - BY MR. WOLAN

12:19   2          MS. VINCI:  Objection.  What do you mean

12:19   3   by what was she experiencing?  Physically, mentally?

12:20   4          MR. WOLAN:  I'll be a little bit more

12:20   5   specific.

12:20   6          Q.  You had an encounter with Tammy Lindsay

12:20   7   that was upsetting.  You went to see Julie Weaver.

12:20   8   But other than being empathetic, she doesn't seem to

12:20   9   have done anything for you.

12:20   10          So when you left that meeting, what were

12:20   11   you thinking about your prospects for dealing with

12:20   12   Tammy Lindsay as a manager?

12:20   13          A.  I set up an appointment at FSAP that same

12:20   14   day.  So I actually got counseling on campus and --

12:20   15          Q.  And for the record, could you tell me what

12:20   16   FSAP is?

12:20   17          A.  I don't recall what it stands for.

12:20   18          Q.  Would you agree that it's Faculty Staff

12:20   19   Assistance Program?

12:20   20          A.  Yes.  So I was upset still.  I was feeling

12:20   21   a lack of validation, a lack of support.  So I did go

12:20   22   to attend a counseling session.

12:20   23          Q.  Who did you meet with?

12:20   24          A.  I don't recall his name.

12:20   25          Q.  How long was that counseling session?

|        |    | DENISE PAYNE - BY MR. WOLAN |
|--------|----|-----------------------------|

1        DENISE PAYNE - BY MR. WOLAN

12:20  2        A. Roughly an hour.

12:21  3        Q. What did you relay during that counseling

12:21  4   session?

12:21  5        A. I relayed my cancer diagnosis and what I

12:21  6   had been experiencing at Cornell.

12:21  7        Q. During the counseling session did the

12:21  8   counselor give you any advice on avenues you could

12:21  9   take to resolve your issues?

12:21  10       A. I do not recall.

12:21  11       Q. Did you get any recommendations for any

12:21  12  further counseling?

12:21  13       A. Not that I recall.

12:21  14       Q. Were you invited to come back to FSAP if

12:21  15  you needed it?

12:21  16       A. Yes.

12:21  17       Q. After that meeting with the FSAP

12:21  18  counselor, what did you do?  And I mean on that same

12:22  19  day.

12:22  20       A. I went home and rested.

12:22  21       Q. Do you remember what day of the week that

12:22  22  was?

12:22  23       A. I do not.

12:22  24       Q. I was just wondering whether -- did you

12:22  25  have to come back to work the very next day?

1                    DENISE PAYNE – BY MR. WOLAN

12:22   2        A.  I did.

12:22   3        Q.  And did you see Tammy on that day?

12:22   4        A.  I don't recall seeing Tammy.  I recall

12:22   5    getting an email from her that I was required to make

12:22   6    up the time that I had lost the day before, the time

12:22   7    that she denied me.

12:22   8        Q.  Did you ultimately make that up?

12:22   9        A.  I did.

12:22   10       Q.  Did that remain on your time card without

12:22   11   alteration?

12:22   12       A.  I believe it did.

12:22   13       MR. WOLAN:  This is a good place to stop

12:22   14   for right now.

12:22   15       THE VIDEOGRAPHER:  The time is 12:22.

12:22   16   We're off the record.

12:22   17       (The proceeding recessed at 12:22 p.m.)

01:24   18       (The proceeding reconvened at 1:24 p.m.;

01:24   19       appearances as before noted.)

01:24   20       THE VIDEOGRAPHER:  The time is 1:24.

01:24   21   We're back on the record.

01:24   22   DENISE PAYNE, resumes;

01:24   23       CONTINUING EXAMINATION BY MR. WOLAN:

01:24   24       Q.  Ms. Payne, I want to go back to something

01:24   25   we were talking about before we took the break before

1          DENISE PAYNE - BY MR. WOLAN

01:24  2    we proceed on to some follow-ups.

01:24  3          When you were first -- when you first

01:24  4    discussed the Data Analyst II position with Lucinda

01:24  5    Allen late summer to early fall of '16, did she

01:24  6    describe a long-term plan for the job?  Because I know

01:24  7    that the position description wasn't available at the

01:24  8    time that they made the offer to you.

01:24  9          Did she describe what the long-term plan

01:25  10   was for the position?

01:25  11       A.  Not using the terminology "long-term";

01:25  12   however, it was expected that it would end up being

01:25  13   the exempt E-F position with various duties.

01:25  14       Q.  But you took it as a part-time.  Was it

01:25  15   envisioned to be full-time?

01:25  16       A.  Yes.

01:25  17       Q.  Did she give you a timetable of when they

01:25  18   expected it to go to full-time and have the job

01:25  19   description done, etcetera?

01:25  20       A.  As soon as I was ready to go full-time, I

01:25  21   was encouraged to do so.

01:25  22       Q.  Okay.  So in 2017 while you were holding

01:25  23   the position of Data Analyst II, did you ever broach

01:25  24   with Ms. Lindsay that you were ready to go full-time?

01:25  25       A.  I believe we reached an agreement that it

1          DENISE PAYNE - BY MR. WOLAN

01:25   2   would be after my radiation treatments were done.  And

01:25   3   by that time the hard chemo was done.

01:26   4          We broached the idea that that would be a

01:26   5   good time for me to come back full-time.

01:26   6          Q.  And when in the year would that have been

01:26   7   in 2017?

01:26   8          A.  April.

01:26   9          Q.  Did you ever come back full-time?

01:26   10         A.  Yes.

01:26   11         Q.  I'm sorry.  Did you ever go to full-time

01:26   12   in the Data Analyst II position?

01:26   13         A.  Yes.

01:26   14         Q.  When?

01:26   15         A.  I don't recall the exact time, but it

01:26   16   would have been around April 2017.

01:26   17         Q.  And so when you had your flex plan number

01:26   18   two in place, the May 1, 2017, that was applicable to

01:26   19   your full-time position?

01:26   20         A.  Yes.

01:26   21         Q.  And your full-time position allowed you to

01:26   22   have -- as I'm recalling off the top of my head,

01:26   23   please correct me -- a six-hour workday; is that the

01:26   24   full-time definition?

01:26   25         A.  No.  That was the part-time definition.

|       |    | DENISE PAYNE - BY MR. WOLAN |
|-------|----|------------------------------|

1       DENISE PAYNE - BY MR. WOLAN

01:26  2       Q.  Okay.  What's the full-time definition for

01:27  3   you?

01:27  4       A.  In general, I was expected to work 39

01:27  5   hours a week.

01:27  6       Q.  Okay.  So when you reached the

01:27  7   39-hour-a-week schedule in April 2017, I think you

01:27  8   just said, did your pay change?

01:27  9       A.  If I was working more hours, I would have

01:27  10  received more money.

01:27  11      Q.  Sorry.  Rate of pay.

01:27  12      A.  I don't recall it changing, no.

01:27  13      Q.  And was there any reason you expected the

01:27  14  position to be classified as exempt beyond Lucinda

01:27  15  Allen's representations at the beginning of the

01:27  16  discussion about the job?

01:27  17      A.  Yes.

01:27  18      Q.  What else?

01:27  19      A.  In June I took over a project called

01:28  20  Rankings and Surveys from Sarah Miller, and I was

01:28  21  leading that program.  And I knew Sarah Miller to be

01:28  22  an exempt salaried employee.

01:28  23      Q.  So you assumed with taking over an exempt

01:28  24  employee's responsibilities your job would be exempt?

01:28  25      A.  Right.

1          DENISE PAYNE - BY MR. WOLAN

01:28   2          Q.  Before we took the break, we were

01:28   3    discussing your June 7th, on or about, 2017 meeting

01:28   4    with Lindsay regarding your performance evaluation.

01:28   5    And I know that we had discussed in that context your

01:28   6    conversation with her about time keeping and use of

01:28   7    paid time off.

01:28   8          But you had also alleged in paragraph 83

01:28   9    of your Complaint that you had requested of

01:29   10   Ms. Lindsay to classify your position exempt and to

01:29   11   adjust your salary based on your experience and

01:29   12   skills.

01:29   13         Did those things occur during your meeting

01:29   14   with Tammy Lindsay on or about June 7, 2017?

01:29   15         A.  Yes.

01:29   16         Q.  Describe that portion of the conversation

01:29   17   to me.

01:29   18         A.  So I asked about my job description yet

01:29   19   again.  I mentioned to her that I was frustrated that

01:29   20   it was taking so long, that I felt that I was

01:29   21   misclassified.

01:29   22         And some of my benefits were based on my

01:29   23   classification and my salary, and I was, you know,

01:29   24   really anxious to be classified appropriately.

01:29   25         Q.  How did she respond to your request?

1           DENISE PAYNE - BY MR. WOLAN

01:29   2           A.  She made the statement that I had a lot

01:29   3   going on, and at this time she wasn't going to

01:29   4   reclassify me until I got my time card under control,

01:30   5   and they were continuing to work on the job

01:30   6   description.

01:30   7           Q.  You state in paragraph 85 of the Complaint

01:30   8   that upon information and belief, you thought Lindsay

01:30   9   was using your cancer diagnosis as a means to target

01:30   10  you.  And the word "target" I'm quoting out of your

01:30   11  Complaint.

01:30   12          What do you mean by target?

01:30   13          A.  She seemed to manage essentially by

01:30   14  control.  That was her main interest as a manager.

01:30   15  And she wanted to control my accommodations, my

01:30   16  requests for time off, etcetera.

01:30   17          Q.  To your recollection, how large of a group

01:30   18  did Ms. Lindsay supervise?

01:31   19          A.  At the time it was small, three or four

01:31   20  people.  But I knew at one point she was the head of

01:31   21  all the administrators in the hotel school.

01:31   22          Q.  Your Data Analyst II position was part of

01:31   23  a data analytics team?  Am I correct on that?

01:31   24          A.  Yes.

01:31   25          Q.  How big was that data analytics team?

1          DENISE PAYNE - BY MR. WOLAN

01:31   2        A.  Initially when we formed, we had five

01:31   3   employees plus Cindy Allen, who managed us.

01:31   4        Q.  And is that the same group that

01:31   5   essentially Tammy Lindsay was supervising?

01:31   6        A.  She only supervised part of that group.

01:31   7   Another -- one individual reported directly to Cindy,

01:31   8   I believe.

01:32   9        Q.  Do you feel that Lindsay was treating you

01:32  10   differently than the other people in your group with

01:32  11   respect to management of time?

01:32  12        A.  Yes.

01:32  13        Q.  Do you have any specific incidents in mind

01:32  14   about how other staff were treated differently?

01:32  15        A.  I specifically asked the other girls in

01:32  16   the office one day if they were getting excessive

01:32  17   scrutinization on their time cards and if they were

01:32  18   repeatedly asked to change them or update them, and

01:32  19   they said no.

01:32  20        Q.  Do you remember who that was you were

01:32  21   talking to?

01:32  22        A.  At the time it was Jeanine Oshaben and

01:32  23   Meghan Hellwitz-Karandeyev.

01:32  24        Q.  We'll go phonetically with those.  Thank

01:32  25   you.

1          DENISE PAYNE - BY MR. WOLAN

01:33   2          Did both of them agree they weren't being

01:33   3   scrutinized like you were?

01:33   4          A.  Yes.

01:33   5          Q.  Continuing on in your Complaint -- because

01:33   6   I take it to be chronological, although it's not clear

01:33   7   here -- you say in paragraph 92 following your

01:33   8   Complaint to Weaver, which we established earlier in

01:33   9   your testimony was probably June 7, 2017, that

01:33   10   Ms. Lindsay continued to target you; and in fact, it

01:34   11   became worse.

01:34   12          What's worse?  What happened?

01:34   13          A.  There seemed to be extra scrutinization of

01:34   14   my work.  Any time she could try to find something

01:34   15   wrong she would.  I didn't get a lot of positive

01:34   16   feedback after that.

01:34   17          It was only -- in fact, she wouldn't speak

01:34   18   to me after that unless it was negative feedback.

01:34   19          Q.  How often -- in your day-to-day job as a

01:34   20   Data Analyst II come June of 2017, how often would you

01:34   21   have opportunity to interact with Tammy Lindsay?

01:34   22          A.  By email daily, by phone once or twice a

01:34   23   week, occasionally in person.  Maybe once or twice a

01:34   24   week in person.

01:34   25          Q.  And you would say that of those usual

|       |    | DENISE PAYNE - BY MR. WOLAN |
|-------|----|-----------------------------|
| 01:34 | 2  | communications, they were all negative? |
| 01:34 | 3  | A.  In general, in person she didn't speak to |
| 01:35 | 4  | me unless there was something she wanted to discuss |
| 01:35 | 5  | about how I was doing something or reprimand me. |
| 01:35 | 6  | Emails may have been more in general, not |
| 01:35 | 7  | negative, just simply describing what work I needed to |
| 01:35 | 8  | do.  Although there were certainly enough negative |
| 01:35 | 9  | emails as well. |
| 01:35 | 10 | Q.  You say in paragraph 93 of your Complaint |
| 01:35 | 11 | that Lindsay used your hard work ethic against you and |
| 01:35 | 12 | a means to discipline you. |
| 01:35 | 13 | What do you mean by that? |
| 01:35 | 14 | A.  After denying me the right to work from |
| 01:35 | 15 | home, she would force me to work extra hours |
| 01:35 | 16 | essentially.  I would feel compelled to work extra |
| 01:35 | 17 | hours to make up the time, or she would specifically |
| 01:35 | 18 | say, "You need to make up this time." |
| 01:35 | 19 | Q.  Were you still working within a |
| 01:35 | 20 | 39-hour-a-week schedule? |
| 01:35 | 21 | A.  Yes. |
| 01:36 | 22 | Q.  You say, though, in paragraph 94 you |
| 01:36 | 23 | forced yourself to work extra-long hours. |
| 01:36 | 24 | If you're at 39 hours in a week, how are |
| 01:36 | 25 | they extra-long? |

DENISE PAYNE - BY MR. WOLAN

01:36   A.  So if I'm denied to work a day and I'm
01:36   forced to use vacation time, the next day I would have
01:36   to work nine to ten hours to make it up.  Or more.  I
01:36   mean, I think approximately nine to ten.

01:36   Q.  So for the day you took off, would you
01:36   have any accrued paid time off applied to that?

01:36   A.  At times I would apply accrued paid time
01:36   off.  Other times, depending on the workload, I would
01:36   make up the time, or I was instructed to make up the
01:36   time.

01:37   Q.  So in June of 2017 you had a flex
01:37   agreement that allowed you to flex your schedule as
01:37   needed; correct?

01:37   A.  Correct.

01:37   Q.  Wouldn't working extra hours on one day so
01:37   you didn't have to work another day be flexing?

01:37   MS. VINCI:  Objection.

01:37   You can answer.

01:37   A.  It would be flexing my time, right.
01:37   Correct.  Yes.  But, I mean, I was denied the right to
01:37   work from home one day and then the next day required
01:37   to work extra hours to make up for it.

01:37   Q.  To your recollection, did you ever work
01:37   more than 39 hours in a week?

DENISE PAYNE - BY MR. WOLAN

01:37  2     A.  I may have occasionally gone over that.

01:37  3     Q.  And when you did so, were you paid

01:37  4  overtime for any hours that were overtime appropriate?

01:37  5     A.  If Ms. Lindsay did not remove my overtime

01:38  6  from my time card, I would be paid overtime.

01:38  7     Q.  Do you have a recollection of how many

01:38  8  times she removed overtime from your pay card?

01:38  9     A.  I would say one to three times.

01:38  10     Q.  And I want to be clear about removed from

01:38  11  your time card.  Do you mean to say that you were

01:38  12  never paid for those particular hours of work?

01:38  13     A.  Correct.  There were a few times where she

01:38  14  reduced my overall hours and removed time.

01:38  15     Q.  For any of those overtime situations that

01:38  16  you've just mentioned, did you have pre-approval to

01:38  17  work the overtime?

01:38  18     A.  In that instance it wasn't considered

01:38  19  overtime.  I think it was -- you don't hit overtime

01:38  20  until over 40 hours a week.  So it was somewhere in

01:38  21  that range.

01:39  22          So it may have been regular pay is what

01:39  23  I'm saying.  It may not have been overtime.

01:39  24     Q.  Well, let me ask you more specifically.

01:39  25  Do you recall -- let's be specific to June 2017.  Do

DENISE PAYNE - BY MR. WOLAN

01:39   2   you recall working any weeks that were more than 40

01:39   3   hours?

01:39   4        A.  I don't recall; but it's possible, because

01:39   5   I started the project of Rankings and Surveys, and I

01:39   6   was training a lot.  And there was a lot to take on.

01:39   7        Q.  But to your recollection sitting here

01:39   8   right now, you were never paid for more than 39?

01:39   9        A.  I don't recall.

01:39   10       Q.  So getting back to your paragraph 93, you

01:39   11  state there that Lindsay used your hard work ethic

01:39   12  against you as a means to discipline.

01:39   13           How was that disciplining you?

01:39   14       A.  She knew we had certain timelines or

01:40   15  certain projects, and I did not like to go over the

01:40   16  timelines.  I don't like to be late with my work.

01:40   17           So if I was denied the right to work from

01:40   18  home, I would essentially have to work overtime in

01:40   19  order to meet her deadline.

01:40   20       Q.  And you're characterizing the need to get

01:40   21  that work done as discipline?

01:40   22       A.  I'm not sure I understand.  Can you --

01:40   23       Q.  I'm clarifying your use of the word

01:40   24  "discipline" in paragraph 93.  "Hard work ethic as a

01:40   25  means to discipline."

1          DENISE PAYNE - BY MR. WOLAN

01:40   2          Do you feel like she was disciplining you

01:40   3   through your work assignments?

01:40   4          A.  I feel like her lack of understanding,

01:40   5   lack of accommodations, was her form of disciplining

01:40   6   me.

01:40   7          Q.  And disciplining you for what?

01:40   8          A.  Requesting accommodations.

01:41   9          Q.  You state in paragraph 95 as what appears

01:41  10   to be a continuation in time that she frequently --

01:41  11   Tammy Lindsay frequently berated and accused you of

01:41  12   doing something improper when you worked extra hours.

01:41  13          Can you describe any incidents that fit

01:41  14   that description?

01:41  15          A.  I don't recall the specific incident or

01:41  16   incidences.

01:41  17          Q.  You state in paragraph 96, following that

01:41  18   same line, that Lindsay retroactively denied your

01:41  19   request to work from home which had previously been

01:41  20   approved and docked your pay.

01:42  21          Do you have any incidents that fit that

01:42  22   description?

01:42  23          A.  I think there was a situation where I

01:42  24   requested flex time or I had an appointment, so I

01:42  25   worked from home.  And later she removed some of that

DENISE PAYNE - BY MR. WOLAN

01:42  2   time, saying that I entered it improperly or I had

01:42  3   gone over a specified amount and I was not going to be

01:42  4   paid for that.

01:42  5       Q.  In that situation did she substitute some

01:42  6   form of paid time off?

01:42  7       A.  There were times when she used my vacation

01:42  8   time without my consent, and she applied my vacation

01:42  9   time to those -- to the time card.

01:43  10      Q.  So -- well, hold on.

01:43  11      (The following exhibit was marked for

01:43  12      identification:  EXH Number 5.)

01:43  13      Q.  So we're showing you now what has been

01:43  14   marked for identification as Exhibit 5.  Please take a

01:43  15   look at the whole document, and let me know when

01:43  16   you're done.

01:44  17      A.  Okay.

01:44  18      Q.  Do you recognize Exhibit 5?

01:44  19      A.  Yes.

01:44  20      Q.  Can you tell me what it is?

01:44  21      A.  It is a flex work arrangement with

01:44  22   Cornell.

01:44  23      Q.  What's the -- well, did you sign it on

01:44  24   page 1?

01:44  25      A.  Yes.

| | 1 | DENISE PAYNE - BY MR. WOLAN |
|---|---|---|
| 01:44 | 2 | Q. What's the date of your signature? |
| 01:44 | 3 | A. 8/28/17. |
| 01:44 | 4 | Q. And did you also sign it on page 4? |
| 01:45 | 5 | A. Yes. |
| 01:45 | 6 | Q. And that's also 8/28/17? |
| 01:45 | 7 | A. Yes. |
| 01:45 | 8 | Q. And also on page 4 I'll draw your |
| 01:45 | 9 | attention to the very last items. Could you read |
| 01:45 | 10 | those for me, the very last line? |
| 01:45 | 11 | A. The begin date? |
| 01:45 | 12 | Q. Yeah. |
| 01:45 | 13 | A. Begin date: 5/1/2017, Review date: |
| 01:45 | 14 | 10/30/2017. |
| 01:45 | 15 | Q. So since that seems to be -- 5/1/17 -- |
| 01:45 | 16 | retroactive to the prior flex work arrangement we were |
| 01:45 | 17 | already talking about, what led to this particular |
| 01:45 | 18 | Flexible Work Arrangement? |
| 01:45 | 19 | A. They were trying to restrict flexibility |
| 01:45 | 20 | for my accommodations. |
| 01:45 | 21 | Q. Who is they? |
| 01:45 | 22 | A. Tammy Lindsay, perhaps Cindy Allen. |
| 01:45 | 23 | Q. When was the first time -- well, let me |
| 01:46 | 24 | back up. |
| 01:46 | 25 | Did you request any modification in your |

1          DENISE PAYNE - BY MR. WOLAN

01:46   2   prior 5/1/2017 Flexible Work Arrangement?

01:46   3          A.  I did not.

01:46   4          Q.  So did someone reach out to you to tell

01:46   5   you that they wanted to discuss a new Flexible Work

01:46   6   Arrangement?

01:46   7          A.  Yes.

01:46   8          Q.  Who was that?

01:46   9          A.  Tammy Lindsay.

01:46  10          Q.  Do you remember when?

01:46  11          A.  After I was granted formal accommodations

01:46  12   at Cornell University and we had a meeting about it.

01:46  13          Q.  What did Tammy tell you about why she

01:46  14   wanted to have a discussion about this new Flexible

01:46  15   Work Arrangement?  I want to hear how your first

01:46  16   communications with her went.

01:46  17          A.  I don't recall those first communications.

01:46  18   I recall the meeting very well.

01:46  19          Q.  Okay.  Tell me about the meeting.

01:46  20          A.  So the meeting was in August -- earlier

01:47  21   August of 2017, and we were to discuss my recently

01:47  22   approved formal accommodations.

01:47  23              And Tammy sort of immediately rejected

01:47  24   them at the meeting and stated that those

01:47  25   accommodations were not going to work for her, she was

|   | 1 | DENISE PAYNE - BY MR. WOLAN |
|---|---|---|
| 01:47 | 2 | trying to run a business. |
| 01:47 | 3 | Q. Who else was at the meeting? |
| 01:47 | 4 | A. Kathy Doxey, Julie Weaver and Cindy Allen. |
| 01:47 | 5 | Q. What was the response in the room, |
| 01:47 | 6 | anybody's, to Tammy's comment that it wouldn't work |
| 01:47 | 7 | for her? |
| 01:47 | 8 | A. Cindy agreed.  And Kathy and Julie didn't |
| 01:47 | 9 | say anything that I recall. |
| 01:47 | 10 | Q. I see on this Exhibit 5, page 1, that it |
| 01:47 | 11 | shows in the column New Hours 7:30 to 4.  And it seems |
| 01:48 | 12 | to suggest that that's true on three days of the week. |
| 01:48 | 13 | Was that your understanding of it? |
| 01:48 | 14 | A. Yes. |
| 01:48 | 15 | Q. What was the explanation for why you went |
| 01:48 | 16 | from as needed throughout the week to three days a |
| 01:48 | 17 | week with specific hours? |
| 01:48 | 18 | A. I requested flexibility in my time to |
| 01:48 | 19 | attend a doctor appointment three times a week with a |
| 01:48 | 20 | chiropractor in Ithaca. |
| 01:48 | 21 | This individual was helping me with my |
| 01:48 | 22 | side effects.  And I needed to get out of work on |
| 01:48 | 23 | those days a bit earlier to attend my appointments. |
| 01:48 | 24 | Q. Who suggested 7:30 to 4 on those days? |
| 01:48 | 25 | A. I believe I told them when I would need to |

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | DENISE PAYNE - BY MR. WOLAN                                 |
| 01:48 | 2  | leave by in order to attend my appointments.               |
| 01:49 | 3  | Q.  But did you suggest that moving your day a              |
| 01:49 | 4  | half an hour earlier would work for you?                    |
| 01:49 | 5  | A.  Yes.                                                    |
| 01:49 | 6  | Q.  I see also that the boxes for Work                      |
| 01:49 | 7  | Remotely are still checked.                                 |
| 01:49 | 8  | A.  Yes.                                                    |
| 01:49 | 9  | Q.  Monday through Friday, anyways.  So was it              |
| 01:49 | 10 | your understanding at the time this Flexible Work           |
| 01:49 | 11 | Arrangement went into place, Exhibit 5, that you still      |
| 01:49 | 12 | had the ability to work remotely on the days that you       |
| 01:49 | 13 | felt it appropriate?                                        |
| 01:49 | 14 | A.  Yes.                                                    |
| 01:49 | 15 | Q.  Was there any discussion at your meeting                |
| 01:49 | 16 | about the remote work structure?                            |
| 01:49 | 17 | A.  I don't recall.                                         |
| 01:49 | 18 | Q.  Let me take you to the third page.  I see               |
| 01:50 | 19 | that this one is now typed as opposed to the other          |
| 01:50 | 20 | ones being handwritten.                                     |
| 01:50 | 21 | Do you know who did the typing of this                      |
| 01:50 | 22 | document?                                                   |
| 01:50 | 23 | A.  I typed the document.                                   |
| 01:50 | 24 | Q.  Did you type it during the meeting or at                |
| 01:50 | 25 | some point after?                                           |

1          DENISE PAYNE - BY MR. WOLAN

01:50  2     A.  At some point after.

01:50  3     Q.  I see under Hardware that it says,

01:50  4  "Cornell University issued laptop, monitor, docking

01:50  5  station."

01:50  6       That had been true before; correct?

01:50  7     A.  Yes.

01:50  8     Q.  And then I see under Software preloaded

01:50  9  onto the laptop, browsers, Tableau, Microsoft Office,

01:50  10  XLSTAT and Adobe Pro.

01:50  11       Had that been true before?

01:50  12     A.  Yes.

01:50  13     Q.  Under Communications Resources I see that

01:50  14  the middle sentence, check voicemail at least twice

01:51  15  while working from home, I believe that was the same

01:51  16  as before also?

01:51  17     A.  Yes.

01:51  18     Q.  Was any of the rest of communications

01:51  19  different on this form as compared to the earlier

01:51  20  ones?

01:51  21     A.  Yeah, the additional comments were added

01:51  22  on this form.

01:51  23     Q.  Well, I understand that there may have

01:51  24  been additions, but I'm looking in Communications

01:51  25  Resources specifically, just that box for the moment.

1    DENISE PAYNE - BY MR. WOLAN

01:51   2    And while I mentioned this middle sentence

01:51   3    to you, i was wondering if the first and third

01:51   4    sentences -- I know that they're new to the typed

01:51   5    document, but were those your understanding before?

01:51   6    A.  They were my understanding, yeah.  There

01:51   7    was nothing new there.

01:51   8    Q.  So moving down into the Additional

01:51   9    Comments box, the first paragraph, is any of that

01:51   10   different from what your understanding had been in the

01:51   11   prior flex agreements?  And I'm just talking about the

01:51   12   first paragraph.

01:52   13   A.  No.  I understood that to be true for my

01:52   14   other agreements as well.

01:52   15   Q.  And was the addition of that specific

01:52   16   language, the first paragraph of the Additional

01:52   17   Comments box, discussed at the meeting that you had

01:52   18   about this document?

01:52   19   A.  We didn't have a meeting about this

01:52   20   document.  We had a meeting about my accommodations.

01:52   21   Q.  What led to you typing up this new

01:52   22   Flexible Work Arrangement document?

01:52   23   A.  Tammy Lindsay requested that I rewrite

01:52   24   this.

01:52   25   Q.  At what time did she make that request?

DENISE PAYNE - BY MR. WOLAN

01:52   A. I don't recall.

01:52   Q. Was it at that meeting?

01:52   A. It may have been, but I don't recall.

01:52   Q. Did you have any discussion with Tammy or

01:53   Cindy or anyone else about that first paragraph at the

01:53   time you were -- at or about the time you were typing

01:53   up this version of the agreement?

01:53   A. Yes. These were stated to me as needing

01:53   to be written in the agreement. Even though they were

01:53   implied before, I was asked to write them this time.

01:53   Q. Did you have any disagreement with that at

01:53   the time?

01:53   A. I don't recall having a disagreement.

01:53   Q. The next paragraph, that says, "Other

01:53   Comments DP." Does that mean that those are your

01:53   comments --

01:53   A. Those are mine.

01:53   Q. -- personally?

01:53   A. Yes, those are my comments.

01:53   Q. At whose impetus did that paragraph go

01:53   into the document?

01:53   A. That was at mine.

01:54   Q. You wanted that in there?

01:54   A. I did.

DENISE PAYNE - BY MR. WOLAN

01:54   2      Q.  What was your purpose for adding that

01:54   3  paragraph?

01:54   4      A.  There seemed to be some confusion about

01:54   5  what would require -- or what I would be allowed to

01:54   6  take my accommodation for.  I was adding

01:54   7  clarification.

01:54   8      Q.  Going to the next page, the fourth page of

01:54   9  the document, there's just one box up there.  What was

01:54  10  the impetus for adding that paragraph?  Let me back

01:54  11  up.

01:54  12          Who was the impetus for writing that

01:54  13  paragraph?

01:54  14      A.  That would be Tammy Lindsay.

01:54  15      Q.  And why did she ask for that?

01:54  16          MS. VINCI:  Objection.

01:54  17          You can answer.

01:54  18      Q.  What's your understanding for why she

01:55  19  asked for that?

01:55  20      A.  I'm not exactly sure why; but this was all

01:55  21  implied before, and I'm assuming she wanted it in

01:55  22  writing.

01:55  23      Q.  Do you agree that this was all implied

01:55  24  before?

01:55  25      A.  In my mind it was implied.  I was

DENISE PAYNE - BY MR. WOLAN

01:55  2  following this.

01:55  3      Q.  And just for clarification, on the first

01:55  4  and fourth pages do you recognize those as Tammy

01:55  5  Lindsay's signature also?

01:55  6      A.  Yes.

01:55  7      Q.  So as of 8/28/2017, is this the Flexible

01:55  8  Work Arrangement you were following?

01:55  9      A.  Yes.

01:55 10      Q.  And did you ever have another one with

01:55 11  Cornell?

01:55 12      A.  I don't recall.

01:55 13      Q.  If you happen to recall later, I'd love to

01:56 14  know, because I believe it's your last one.  So you

01:56 15  can correct me if it comes to you.

01:56 16          Related, then, in time, I'm going to mark

01:56 17  another document for you.

01:56 18          (The following exhibit was marked for

01:56 19          identification:  EXH Number 6.)

01:56 20      Q.  You've been provided with what's

01:56 21  identified as Exhibit 6.  Please take a look at it,

01:56 22  and let me know when you're done reading.

01:56 23      A.  Okay.

01:57 24      Q.  Do you recognize this document?

01:57 25      A.  Yes.

| | 1 | DENISE PAYNE - BY MR. WOLAN |
|---|---|---|
| 01:57 | 2 | Q. What is it? |
| 01:57 | 3 | A. This is my approved request for reasonable |
| 01:57 | 4 | accommodations. |
| 01:57 | 5 | Q. And it is dated what? |
| 01:57 | 6 | A. August 2, 2017. |
| 01:57 | 7 | Q. And would you agree this appears to be a |
| 01:57 | 8 | letter to you from Jill Tubbs? |
| 01:57 | 9 | A. Yes. |
| 01:57 | 10 | Q. Do you remember receiving it about August |
| 01:57 | 11 | 2, 2017? |
| 01:57 | 12 | A. Yes. |
| 01:57 | 13 | Q. I see there are three specific |
| 01:57 | 14 | accommodations listed. |
| 01:57 | 15 | Would you agree that it was three? |
| 01:57 | 16 | A. Yes. |
| 01:57 | 17 | Q. Could you read those three lines? |
| 01:57 | 18 | A. (As read): Flexible working hours, |
| 01:57 | 19 | flexible work space, work from home as needed, and |
| 01:58 | 20 | reduced hours when necessary. |
| 01:58 | 21 | Q. So flexible working hours I think we've |
| 01:58 | 22 | discussed quite a bit of. You've already talked about |
| 01:58 | 23 | it. |
| 01:58 | 24 | Did flexible work space mean anything |
| 01:58 | 25 | other than work from home as needed? |

1          DENISE PAYNE - BY MR. WOLAN

01:58  2          A.  No.

01:58  3          Q.  You didn't need any other flexible space

01:58  4  at Cornell's facility?

01:58  5          A.  No, I did not.

01:58  6          Q.  Reduced hours when necessary.  What does

01:58  7  that mean to you?

01:58  8          A.  If I was scheduled to work eight hours and

01:58  9  I could only put in six hours on a given day, I would

01:58  10  consider that reduced hours.

01:58  11          Q.  And would that mean that in a particular

01:58  12  week you wouldn't be required to make up those hours?

01:58  13          A.  It depended on the workload and the

01:58  14  projects.  Or if I supplemented with HAP or vacation

01:58  15  time.

01:58  16          Q.  Well, I'm thinking about work hours.

01:58  17  Let's put HAP and vacation time aside.

01:59  18          A.  Okay.

01:59  19          Q.  In terms of your work hours, you had a

01:59  20  39-hour workweek.  And reduced hours when necessary, I

01:59  21  think you've described in a day six instead of eight.

01:59  22          But does that mean for you -- did you

01:59  23  understand it to mean that in a week that you might

01:59  24  not work 39?

01:59  25          A.  There was a chance, yes, that I might not

1          DENISE PAYNE - BY MR. WOLAN

01:59   2    reach 39.

01:59   3          Q.  And that was agreeable to you at the time?

01:59   4          A.  Yes.

01:59   5          Q.  At August 2, 2017?

01:59   6          A.  Yes.

01:59   7          Q.  The next paragraph right under that --

01:59   8    right under the list of three, I should say, that sets

01:59   9    up a communication plan.

01:59   10          Would you say that that's consistent with

01:59   11   your flexible work agreement document?

01:59   12          A.  Yes.

01:59   13          Q.  And you were comfortable with that

01:59   14   arrangement at that point in time?

01:59   15          A.  I had already been doing that arrangement,

01:59   16   so yes.

01:59   17          Q.  All right.  I'll take that -- actually,

01:59   18   I'll take both of those back from you.

02:00   19          You signed that document on 8 -- that

02:00   20   document, sorry.  You signed your last flex agreement

02:00   21   on August 28, if I'm remembering correctly.

02:00   22          A.  Yes.

02:01   23          Q.  Did you work on any other documentation

02:01   24   regarding your accommodations in the time frame of

02:01   25   July or August 2017?

| | | |
|---|---|---|
| | 1 | DENISE PAYNE - BY MR. WOLAN |
| 02:01 | 2 | A. I do not recall that. |
| 02:01 | 3 | Q. Do you remember receiving feedback from |
| 02:01 | 4 | Julie Weaver on what the contents of the third flex |
| 02:01 | 5 | work agreement would be? |
| 02:01 | 6 | A. I do not recall. |
| 02:02 | 7 | (The following exhibit was marked for |
| 02:02 | 8 | identification:  EXH Number 7.) |
| 02:02 | 9 | Q. So we're showing you what's been |
| 02:02 | 10 | identified as Exhibit 7.  Please take a look at it, |
| 02:02 | 11 | and let me know when you're done. |
| 02:02 | 12 | A. Okay. |
| 02:02 | 13 | Q. Do you recognize what that is? |
| 02:03 | 14 | A. Yes. |
| 02:03 | 15 | Q. Can you tell me? |
| 02:03 | 16 | A. It's an email correspondence with Julie |
| 02:03 | 17 | Weaver regarding my flex work agreement draft. |
| 02:03 | 18 | Q. Is there more than one email on that page? |
| 02:03 | 19 | A. There is. |
| 02:03 | 20 | Q. How many would you say are there? |
| 02:03 | 21 | A. Three. |
| 02:03 | 22 | Q. Do you remember having that exchange? |
| 02:03 | 23 | A. Yes. |
| 02:03 | 24 | Q. And what's the date of your email at the |
| 02:03 | 25 | top, the last one in the sequence? |

1      DENISE PAYNE - BY MR. WOLAN

02:03   2      A.  July 13, 2017.

02:03   3      Q.  So do you have a recollection of doing the

02:03   4    drafting of that agreement around that time?

02:03   5      A.  Yes.

02:03   6      Q.  I'm asking you just because of the fact

02:03   7    that you didn't sign it until August 28th, and I want

02:03   8    to make sure that that discussion in July was -- led

02:03   9    to your August 28th signing.

02:03  10          Would you agree with me that that's part

02:04  11    of the same process?

02:04  12      A.  Yes.

02:04  13      Q.  Okay.  That's just what I wanted to

02:04  14    clarify.  Thank you.

02:04  15          Before I move forward chronologically, I

02:04  16    just wanted to step back.

02:04  17          In paragraph 98 of your Complaint, talking

02:04  18    about Lindsay, you said that she steadfastly refused

02:04  19    to remove sensitive medical information from your

02:04  20    records at your request.

02:04  21          What did you mean by that?

02:04  22      A.  As part of my documented peer review, she

02:04  23    included sensitive medical information.

02:04  24      Q.  What was that medical information?

02:04  25      A.  Denise has had a lot going on this year,

1          DENISE PAYNE - BY MR. WOLAN

02:04  2    Denise has specific challenges and etcetera.  It was

02:04  3    wording referencing and alluding to my medical

02:05  4    condition.

02:05  5          Q.  Did she name your medical condition?

02:05  6          A.  She did not name it.

02:05  7          Q.  According to paragraph 100 of your

02:05  8    Complaint, that information was ultimately removed?

02:05  9          A.  Several months later.

02:05  10         Q.  Who at Cornell processed its removal?

02:05  11         A.  I sought the help of the office of

02:05  12   workforce labor and policy relations.

02:05  13         Q.  Do you remember a person there

02:05  14   particularly that helped you?

02:05  15         A.  Yes.  Shan Varma.

02:06  16         Q.  By the way, going back to your

02:06  17   accommodations for a moment, we talked about on

02:06  18   Exhibit 6 there were three items:  Flexible hours,

02:06  19   flexible space, reduced hours.

02:06  20             Was there anything else you had requested

02:06  21   that didn't end up being granted to you by way of

02:06  22   accommodation?

02:06  23         A.  Not that I recall.

02:06  24         Q.  In paragraph 103 of your Complaint you

02:06  25   report that you received an email from Ms. Allen which

DENISE PAYNE - BY MR. WOLAN

1

02:06  2  harshly and unfairly criticized your work performance,

02:06  3  and you thought that it wasn't an email that was meant

02:07  4  for you.

02:07  5        What in it was an unfair criticism of your

02:07  6  work performance?

02:07  7        A.  Cindy had sent an email to Tammy

02:07  8  accidentally including me and stated that I was not

02:07  9  thinking about what I was doing.  And I think she was

02:07  10  attempting to give an example.

02:07  11        Q.  So in that email she gave an example of a

02:07  12  specific project?

02:07  13        A.  It was a specific data point that I used

02:07  14  in a submission for a ranking or survey.

02:07  15        Q.  Did you disagree with her assessment?

02:07  16        A.  Yes.

02:07  17        Q.  Did you think you had made the right

02:07  18  choice regarding the project?

02:07  19        A.  Yes.

02:07  20        Q.  You say in paragraph 104 of your Complaint

02:07  21  that it became evident to you that the management team

02:08  22  was speaking about your performance behind your back.

02:08  23        A.  Yes.

02:08  24        Q.  Why is that remarkable to you?

02:08  25        A.  It's remarkable to me because I had

DENISE PAYNE - BY MR. WOLAN

02:08  2  repeatedly asked for feedback in person to myself but

02:08  3  was not granted that opportunity.

02:08  4       And it seemed to ramp up after I told them

02:08  5  I was going to be filing for a formal accommodation.

02:08  6       Q.  You did have a performance evaluation

02:08  7  meeting with Ms. Lindsay earlier that summer; right?

02:08  8       A.  Yes.

02:08  9       Q.  Did she relay at that performance

02:08  10  evaluation meeting criticisms of your performance?

02:08  11       A.  Yes.

02:09  12       Q.  What were the criticisms then?

02:09  13       A.  In general, they were very general

02:09  14  criticisms that I was taking too many personal phone

02:09  15  calls, and I forget the other statements.

02:09  16       Q.  Were there any criticisms about your work

02:09  17  on specific projects?

02:09  18       A.  No, not that I recall.

02:09  19       Q.  Paragraph 106 of the Complaint you've

02:09  20  stated that after, I guess, realizing the email went

02:09  21  to you, Ms. Allen approached you and apologized.

02:10  22       Do you remember that?

02:10  23       A.  Yes.

02:10  24       Q.  Where were you at the time?

02:10  25       A.  In my office in Statler Hall.

1          DENISE PAYNE - BY MR. WOLAN

02:10   2          Q.  How did Ms. Allen broach that conversation

02:10   3   with you?

02:10   4          A.  She came in.  She approached me.  She

02:10   5   admitted that that email was not meant for me, and she

02:10   6   apologized.  And we continued the discussion.

02:10   7          Q.  Did you discuss her perception of your

02:10   8   deficiencies?

02:10   9          A.  Yes.

02:10   10         Q.  And did she give you specific examples of

02:10   11  what she was concerned about?

02:10   12         A.  She did not, but I requested them.

02:10   13         Q.  After you requested, did she provide them?

02:10   14         A.  She did not.

02:10   15         Q.  How long was that discussion?

02:10   16         A.  It was about a 10-to-15-minute discussion,

02:10   17  because I had to leave for an appointment.

02:11   18         Q.  But you spoke 10 to 15 minutes; and yet,

02:11   19  she never explained her criticisms of your work?

02:11   20         A.  Yeah.  No, there was no work-related

02:11   21  conversation specifically in that conversation.

02:11   22         Q.  What did you talk about for 10 or 15

02:11   23  minutes?  After she apologized -- you said she did

02:11   24  that at the outset -- what's the rest of that

02:11   25  conversation?

124

1          DENISE PAYNE - BY MR. WOLAN

02:12  2          A.  I had a co-worker reach out to her and ask

02:12  3   her for help, essentially.

02:12  4          Q.  Who was the co-worker?

02:12  5          A.  Sarah Miller.

02:12  6          Q.  And did Sarah reach out to Amanda?

02:12  7          A.  Yes.

02:12  8          Q.  What was Amanda's response to Sarah

02:12  9   reaching out?

02:12  10         A.  I believe the response was there was

02:12  11  nothing she could do.

02:12  12         Q.  To your recollection, in a hierarchical

02:13  13  sense where was Amanda relative to, say, Tammy or

02:13  14  Cindy?  Was she their superior?  Was she parallel?

02:13  15  Was she lower than them?

02:13  16         A.  It was either parallel or higher.

02:13  17         Q.  But not necessarily -- like, Lucinda or

02:13  18  Tammy wouldn't have been direct reports to Amanda?

02:13  19         A.  No.

02:13  20         Q.  Would not have been?

02:13  21         A.  No.  Different department.  Different

02:13  22  reporting lines.

02:13  23         Q.  You also say in paragraph 106 that you say

02:13  24  you were -- I'm sorry.  You say that Ms. Allen said to

02:13  25  you that she thought you were making a lot of mistakes

125

|       |    | DENISE PAYNE - BY MR. WOLAN |
|-------|----|------|
| 02:13 | 2  | due to your accommodations. |
| 02:13 | 3  | A.  Yes. |
| 02:13 | 4  | Q.  Did that come up in that 10-to-15-minute |
| 02:13 | 5  | conversation? |
| 02:13 | 6  | A.  It did. |
| 02:13 | 7  | Q.  How did she phrase that to you? |
| 02:13 | 8  | A.  When I asked her if she thought it was |
| 02:13 | 9  | fair that Tammy was denying my accommodations, she |
| 02:13 | 10 | claimed that she disagreed with that, Tammy was not |
| 02:14 | 11 | denying me anything.  "And besides, I think you're |
| 02:14 | 12 | making a lot of mistakes because of your |
| 02:14 | 13 | accommodations." |
| 02:14 | 14 | Q.  Did she explain what that means? |
| 02:14 | 15 | A.  No. |
| 02:14 | 16 | Q.  During your 10-to-15-minute conversation |
| 02:14 | 17 | with Lucinda Allen, did she agree to provide more |
| 02:14 | 18 | information about performance deficiencies at a future |
| 02:14 | 19 | date? |
| 02:14 | 20 | A.  Yes. |
| 02:14 | 21 | Q.  Did she ever do that? |
| 02:14 | 22 | A.  She did not. |
| 02:14 | 23 | Q.  I'm sorry.  Let me rephrase that. |
| 02:14 | 24 | Did she ever provide that information? |
| 02:14 | 25 | A.  She did not. |

1       DENISE PAYNE - BY MR. WOLAN

02:14  2     Q.  In paragraph 109 of your Complaint you

02:14  3  then talk about a subsequent meeting with Weaver,

02:15  4  which appears to be you going to complain about how

02:15  5  Allen and Lindsay are treating you.

02:15  6      Do you remember that meeting?

02:15  7     A.  Yes.  I think that's why I had to abruptly

02:15  8  end the conversation with Cindy and go to the meeting

02:15  9  with Julie.

02:15 10     Q.  It was scheduled already?

02:15 11     A.  It was scheduled already, yep.

02:15 12     Q.  So what was discussed during that meeting?

02:15 13     A.  I gave her an update on, for example, what

02:15 14  Cindy had just claimed, that I was making mistakes due

02:15 15  to my accommodations.  In general, the failure for

02:15 16  them to accept and allow me to use accommodations.

02:15 17     Q.  And that had been scheduled even before

02:15 18  your conversation with Allen?

02:15 19     A.  I believe, yes.  Yeah, I know it was on my

02:15 20  calendar, and I had to leave, yep.

02:15 21     Q.  So you were prepared to complain to Weaver

02:15 22  even before Allen came in to have that discussion --

02:15 23     A.  Yes.

02:16 24     Q.  -- with her apology?

02:16 25     A.  Yes.

1          DENISE PAYNE - BY MR. WOLAN

02:16   2          MS. VINCI:  Just allow him to get his full

02:16   3   question out for the transcript's sake.

02:16   4          Q.  In your conversation with Weaver, did she

02:16   5   really tell you to be less defensive with management?

02:16   6          A.  Yes, she did.

02:16   7          Q.  What was the context for her telling you

02:16   8   that?

02:16   9          A.  She thought my response to that email and

02:16   10   copying Amanda was defensive.

02:16   11          Q.  Jumping over to another document, but same

02:17   12   topic.  I'm looking at the responses that you gave to

02:17   13   the interrogatories that we served a while back

02:17   14   through your attorney.

02:17   15          And one of the things you describe

02:17   16   regarding Allen after she mistakenly sent you an

02:17   17   email -- this is in that context -- upon information

02:17   18   and belief, you believe that Lindsay and Allen were

02:17   19   attempting to create performance issues to discredit

02:17   20   you and cause you reputational harm.

02:17   21          What leads you to believe that they were

02:17   22   doing it to -- first of all, that they were attempting

02:17   23   to create performance issues?

02:17   24          A.  In my performance review Tammy had made

02:17   25   false statements about my performance.

DENISE PAYNE - BY MR. WOLAN

02:18  2    Q.  Why were they false?

02:18  3    A.  They were untrue.

02:18  4    Q.  I mean that less rhetorically.  What about

02:18  5  them was untrue?

02:18  6    A.  She claimed that I was making too many

02:18  7  personal phone calls.  I was not.  She claimed that I

02:18  8  was using too much HAP time outside of my medical.  I

02:18  9  was not.

02:18  10    Q.  And why is it that you believe she was

02:18  11  doing it for the purpose of discrediting you?

02:18  12    A.  I don't know that.  That was just my

02:18  13  feeling.

02:18  14    Q.  Did Allen or Lindsay ever say anything to

02:18  15  you about their intention to discredit you?

02:19  16    A.  There was intent to discredit my

02:19  17  promotion.

02:19  18    Q.  But I'm asking if they specifically said

02:19  19  things that identified that they were pointing out

02:19  20  criticisms of you for the purposes of discrediting

02:19  21  you.  Did they say anything to that effect?

02:19  22    A.  No.

02:19  23    Q.  Also in July of 2017, based on your

02:19  24  paragraph 111 of the Complaint, you filed a

02:20  25  discrimination complaint; is that a fair way to phrase

DENISE PAYNE - BY MR. WOLAN

02:20    1

02:20    2    it?

02:20    3        A.  Internally at Cornell?

02:20    4        Q.  Internally at Cornell.

02:20    5        A.  Yes.  Around July 13th I sent an email to

02:20    6    HR outlining chronologically all of the behavior to

02:20    7    date, and I gave them email examples.

02:20    8        Q.  Who did you send it to?

02:20    9        A.  Julie Weaver, and I believe I copied Kathy

02:20   10    Doxey.

02:20   11        Q.  Did they ever follow up with you on that

02:20   12    complaint?

02:20   13        A.  I don't recall.

02:20   14        Q.  Based on the timeline for your discussions

02:20   15    on your third flex agreement, were any of the

02:21   16    conversations about the flex agreement -- I'm sorry.

02:21   17            In any of these conversations was there

02:21   18    any discussion about your complaint of discrimination?

02:21   19        A.  I don't recall having discussions about my

02:21   20    flex agreement other than those emails with Julie.

02:21   21        Q.  Well, you said at some point in the

02:21   22    summer -- and I'll let you correct me on the date --

02:21   23    that you had a meeting with four people -- four other

02:21   24    people.  And I thought that was about the flex

02:21   25    agreement we were talking about.

1          DENISE PAYNE - BY MR. WOLAN

02:21   2          A.  That was in August, and it was the

02:21   3   accommodations that we met about.

02:21   4          Q.  But in none of those communications was

02:21   5   there any additional communication about your

02:21   6   discrimination complaint?

02:21   7          A.  I did have a meeting with Kathy Doxey at

02:21   8   some point.  I don't recall the date.

02:21   9          Q.  Well, right now I'm focusing still in that

02:22  10   July to August time frame.

02:22  11          A.  Okay.

02:22  12          Q.  Continuing chronologically through your

02:22  13   Complaint, you state that even after you had been

02:22  14   approved for accommodations in July, which came on the

02:22  15   August 2nd letter formally, that Lindsay continued to

02:22  16   ignore your requested accommodations.

02:22  17          So what was she doing in, let's say, the

02:22  18   latter part of July and into August that was denying

02:22  19   you use of your accommodations?

02:22  20          A.  I would send her a request for

02:23  21   accommodation by email, and she would not respond.

02:23  22          Q.  What kind of request would come by email?

02:23  23   Just give me an example.

02:23  24          A.  Example, I need to take a few hours off

02:23  25   this morning, not feeling well.  Or I have to leave at

1          DENISE PAYNE - BY MR. WOLAN

02:23  2   2 p.m. for a doctor's appointment.  That sort of

02:23  3   thing.

02:23  4         Q.  If she gave you no response, how did you

02:23  5   react?

02:23  6         A.  I took that time anyway.

02:23  7         Q.  And did your taking of that time get

02:23  8   reflected in your time card for the week?

02:23  9         A.  Yes.

02:23  10        Q.  Were those approved?

02:23  11        A.  Yes.

02:23  12        Q.  But she wouldn't talk to you about it?

02:23  13        A.  Correct.

02:23  14        Q.  And by "she," I mean Lindsay.

02:23  15        A.  Yes.

02:23  16        Q.  Now, in paragraph 119 you state on or

02:23  17  about August of 2017 -- so I don't have a day here --

02:24  18  you had a meeting with HR, Lindsay and Allen regarding

02:24  19  the complaints of discrimination.

02:24  20        Do you remember doing that in August?

02:24  21        A.  It would have been part of the same

02:24  22  meeting where we discussed my accommodations.

02:24  23        Q.  You state in paragraph 120 of your

02:24  24  Complaint that Lindsay looked annoyed at having to

02:24  25  participate.

1        DENISE PAYNE - BY MR. WOLAN
02:24  2        A.  Yes.
02:24  3        Q.  Would you recall that being the same
02:24  4   meeting as you were talking about accommodations?
02:24  5        A.  Yes, it was.
02:24  6        Q.  And you quote her saying here, "Do we
02:24  7   really need to do this?"
02:24  8            Do you remember that?
02:24  9        A.  Yes.
02:24  10       Q.  So I also want to clarify with you in
02:24  11  paragraph 121 you state that Lindsay said, quote,
02:24  12  "enough accommodation," unquote, had already been
02:25  13  given and that they were, quote, "running a business,"
02:25  14  unquote.
02:25  15           Those are specifically the words you heard
02:25  16  out of Lindsay's mouth?
02:25  17       A.  Yes.
02:25  18       Q.  Now, you say here, paragraph 122, that HR
02:25  19  then asked a question.  This had to do with reaching
02:25  20  out to medical leave.  But who's HR in this context?
02:25  21  What representatives of HR were in your August 2017
02:25  22  meeting?
02:25  23       A.  Kathy Doxey and Julie Weaver.
02:25  24       Q.  So when you say, "HR asked Lindsay if she
02:25  25  would like HR to reach out to medical leave," do you

|  | 1 | DENISE PAYNE - BY MR. WOLAN |
|---|---|---|

02:25  2  remember what human being did that?

02:25  3      A.  I believe it was Kathy Doxey.

02:26  4      Q.  And in response to that discussion, did

02:26  5  medical leaves get involved again in your situation?

02:26  6      A.  I do not know.

02:26  7      Q.  You state in paragraph 124 of your

02:26  8  Complaint that Defendant -- unclear who you're really

02:26  9  talking about here -- allowed Ms. Allen to interrogate

02:26  10  you as to your need for medical accommodations,

02:26  11  forcing you to disclose personal details about your

02:26  12  medical condition.

02:26  13      Describe that for me.  Did that take place

02:26  14  during the August meeting we've been talking about?

02:26  15      A.  Yes.

02:26  16      Q.  So how did Ms. Allen interrogate you?

02:26  17      A.  Ms. Allen said, "Why would anyone need to

02:26  18  start that early in the morning?"

02:26  19      I had tried to flex my time anywhere from

02:26  20  6, maybe, or earlier.  And she was pushing back on

02:27  21  that, saying, "Why would anyone need to start that

02:27  22  early in the morning?"

02:27  23      So I explained my medical reasons for

02:27  24  needing to start that early in the morning.  I would

02:27  25  sometimes return home from work around 5 p.m. and go

1        DENISE PAYNE - BY MR. WOLAN

02:27   2   straight to bed from exhaustion and fatigue and then

02:27   3   wake up early in the morning and want to get some work

02:27   4   done.

02:27   5        Q.  Would that be work that you wanted to get

02:27   6   done at home, or would you want to come to your campus

02:27   7   workplace early?

02:27   8        A.  It would have been remote work at home.

02:27   9        Q.  And in paragraph 125 you mention at that

02:27   10  same meeting Allen rolled her eyes at your statement.

02:27   11       Do you remember that?

02:27   12       A.  Yes.

02:27   13       Q.  Do you happen to remember specifically

02:27   14  what it was you said right before she rolled her eyes?

02:28   15       A.  I had just described why I needed to start

02:28   16  work early.

02:28   17       MR. WOLAN:  Five-minute break?

02:28   18       MS. VINCI:  Sure.

02:28   19       THE VIDEOGRAPHER:  The time is 2:28.

02:28   20  We're off the record.

02:28   21       (The proceeding recessed at 2:28 p.m.)

02:33   22       (The proceeding reconvened at 2:33 p.m.;

02:33   23       appearances as before noted.)

02:33   24       THE VIDEOGRAPHER:  The time is 2:33.

02:33   25  We're back on the record.

|        | 1  | DENISE PAYNE - BY MR. WOLAN |
|--------|----|------------------------------|
| 02:33  | 2  | DENISE PAYNE, resumes; |
| 02:33  | 3  | CONTINUING EXAMINATION BY MR. WOLAN: |
| 02:33  | 4  | Q.  Ms. Payne, you state in 127 of your |
| 02:34  | 5  | Complaint that on or about September 12, 2017 you |
| 02:34  | 6  | notified HR that you had filed an inquiry with the |
| 02:34  | 7  | EEOC related to disability discrimination. |
| 02:34  | 8  | First, what do you mean by "filed an |
| 02:34  | 9  | inquiry with the EEOC"? |
| 02:34  | 10 | A.  It's a specific filing with the EEOC. |
| 02:34  | 11 | Rather than filing a complaint, you check the box for |
| 02:34  | 12 | inquiry, where you are allowed to discuss the matter |
| 02:34  | 13 | with a representative to determine if it is a |
| 02:34  | 14 | complaint. |
| 02:34  | 15 | Q.  Did you have the opportunity to do that? |
| 02:34  | 16 | A.  Yes. |
| 02:34  | 17 | Q.  When did you have that conversation? |
| 02:34  | 18 | A.  I believe it was in September of 2017. |
| 02:34  | 19 | Q.  Well, you state that you notified HR on |
| 02:34  | 20 | September 12th.  When did you file that inquiry?  Also |
| 02:34  | 21 | in September? |
| 02:34  | 22 | A.  No, in August of 2017. |
| 02:35  | 23 | Q.  Did that inquiry turn into your EEOC |
| 02:35  | 24 | complaint? |
| 02:35  | 25 | A.  I don't recall if we used the same |

1           DENISE PAYNE - BY MR. WOLAN

02:35  2    complaint number or if I had to generate a new one.  I

02:35  3    don't remember.

02:35  4           Q.  In your August 2017 inquiry, what facts do

02:35  5    you remember laying out for the EEOC so that you could

02:35  6    discuss them?

02:35  7           A.  Failure to accommodate; in general,

02:35  8    hostile treatment and behavior, retaliation.  That's

02:35  9    what I recall.

02:35  10          Q.  All right.  And I understand your use of

02:35  11   all those general terms, but I'm really looking for

02:35  12   specific actions or omissions on the part of Cornell

02:35  13   employees that would have been the basis of your

02:36  14   inquiry.

02:36  15          Do you remember what you put in?

02:36  16          A.  It's along the lines of what we've been

02:36  17   discussing already.  Requests for accommodation that

02:36  18   were denied, forced to use vacation time and not

02:36  19   allowed to work when I wanted to work.  Issues with my

02:36  20   time card being adjusted and withholding of

02:36  21   catastrophic leave donation.  I don't recall what

02:36  22   else.

02:36  23          Q.  So when you say you notified -- I'm

02:36  24   looking at paragraph 127 again.

02:36  25          When you say you notified HR that you had

|       | 1  | DENISE PAYNE - BY MR. WOLAN |
|-------|----|------------------------------|
| 02:36 | 2  | filed this inquiry, who at HR were you communicating |
| 02:36 | 3  | with? |
| 02:36 | 4  | A.  I believe that was Julie Weaver. |
| 02:36 | 5  | Q.  Now, you say in paragraph 128 that on the |
| 02:36 | 6  | very next day you received a meeting invitation from |
| 02:36 | 7  | the Associate Dean of HR. |
| 02:37 | 8  | Do you remember receiving that invitation? |
| 02:37 | 9  | A.  Yes. |
| 02:37 | 10 | Q.  Prior to that, had you ever met with the |
| 02:37 | 11 | Associate Dean of HR and Finance? |
| 02:37 | 12 | A.  Yes. |
| 02:37 | 13 | Q.  In what context did you meet with her? |
| 02:37 | 14 | A.  When I accepted the position as a data |
| 02:37 | 15 | analyst for the business analytics team, we had a |
| 02:37 | 16 | kickoff meeting at some yacht club or something in |
| 02:37 | 17 | Ithaca. |
| 02:37 | 18 | And Laura Syer made an appearance that |
| 02:37 | 19 | day, and she discussed what she wanted for the team, |
| 02:37 | 20 | what her goals and essentially dreams were for this |
| 02:37 | 21 | department. |
| 02:37 | 22 | Q.  Do you have a recollection of what she |
| 02:37 | 23 | said? |
| 02:37 | 24 | A.  Not specifically. |
| 02:37 | 25 | Q.  Did anything that Ms. Syer said during |

DENISE PAYNE - BY MR. WOLAN

02:37  2  that kickoff touch on what you were going to be doing

02:38  3  specifically?

02:38  4       A.  Yes.

02:38  5       Q.  So to the extent that it might have spoken

02:38  6  to you, do you remember any of the context -- or any

02:38  7  of the content of what she was saying?

02:38  8       A.  In general, I was interested in being able

02:38  9  to utilize the data to make business decisions, create

02:38  10  dashboards, analyze data statistically.  Those were

02:38  11  all my interests, and that's the basis of the team,

02:38  12  essentially.

02:38  13       Q.  By the way, and this will step way back

02:38  14  into -- you've mentioned it a few times now, but I

02:38  15  think I understand what you mean when you say

02:38  16  dashboard.  But could you explain what you mean by

02:38  17  that for the record?

02:38  18       A.  Yes.  A dashboard is generally a place

02:38  19  where an individual can go to see data represented in

02:38  20  various ways and perhaps manipulate the data, see

02:39  21  graphs and visual representations differently.

02:39  22       Q.  And we're talking about data that would

02:39  23  have been provided by the person viewing the

02:39  24  dashboard?

02:39  25       A.  Not necessarily.  It would be collected

|   | 1 | DENISE PAYNE - BY MR. WOLAN |
|---|---|---|
| 02:39 | 2 | from a number of different sources. |
| 02:39 | 3 | Q. So after you received your meeting |
| 02:39 | 4 | invitation from Dean Syer -- that's S-Y-E-R -- what |
| 02:39 | 5 | did you do? |
| 02:39 | 6 | A. I believe I denied the meeting request. |
| 02:39 | 7 | Q. Why? |
| 02:39 | 8 | A. I wasn't comfortable with the timing of |
| 02:39 | 9 | it. I didn't -- and I wanted to understand what the |
| 02:39 | 10 | meeting was about before I walked into it. |
| 02:39 | 11 | Q. So did you take any steps to find out what |
| 02:39 | 12 | it was going to be about? |
| 02:39 | 13 | A. I did. |
| 02:39 | 14 | Q. What did you do? |
| 02:39 | 15 | A. I emailed Kathy Doxey and set up a meeting |
| 02:40 | 16 | with her. |
| 02:40 | 17 | Q. Did that meeting take place? |
| 02:40 | 18 | A. Yes. |
| 02:40 | 19 | Q. Who was at that meeting? |
| 02:40 | 20 | A. Myself and Kathy Doxey. |
| 02:40 | 21 | Q. What did you learn at that meeting about |
| 02:40 | 22 | the proposed meeting with Dean Syer? |
| 02:40 | 23 | A. Kathy explained that it would be a summary |
| 02:40 | 24 | of the upcoming projects, update on the structure of |
| 02:40 | 25 | the team, roles, responsibilities. |

|       | 1  | DENISE PAYNE - BY MR. WOLAN |
|-------|----|------------------------------|
| 02:40 | 2  | Q. You state in your Complaint at paragraph |
| 02:40 | 3  | 130 that at the point of having the meeting with |
| 02:40 | 4  | Ms. Doxey around September 15, 2017, that Lindsay was |
| 02:41 | 5  | barely speaking to you. |
| 02:41 | 6  | Do you remember that? |
| 02:41 | 7  | A. Yes. |
| 02:41 | 8  | Q. How would you characterize barely speaking |
| 02:41 | 9  | to you?  Because you've really testified that there |
| 02:41 | 10 | were routine exchanges of emails and such.  So I want |
| 02:41 | 11 | to understand what you mean now by it having dropped |
| 02:41 | 12 | off to barely speaking to you. |
| 02:41 | 13 | A. She would arrive in the morning and mumble |
| 02:41 | 14 | "good morning" to me and then likely not speak to me |
| 02:41 | 15 | for the rest of the day. |
| 02:41 | 16 | Q. What about discussions of projects? |
| 02:41 | 17 | A. If I had a question, I would ask her.  If |
| 02:41 | 18 | she had a question for me, she would ask me or email |
| 02:41 | 19 | me. |
| 02:41 | 20 | Q. Were those email communications about |
| 02:41 | 21 | projects less frequent than they had been previously? |
| 02:41 | 22 | A. Seemed to be more frequent. |
| 02:41 | 23 | Q. So what dropped off were in-person |
| 02:41 | 24 | conversations? |
| 02:41 | 25 | A. Yes. |

DENISE PAYNE - BY MR. WOLAN

02:42  2     Q.  Now, you pointed out the reduced speaking

02:42  3  by Ms. Lindsay to Ms. Doxey; right?

02:42  4     A.  I did.

02:42  5     Q.  How did she respond to that observation?

02:42  6     A.  Ms. Doxey alerted me that I was no longer

02:42  7  reporting to Tammy Lindsay, and that could explain why

02:42  8  she had dropped off communication with me.

02:42  9     Q.  Did you know at the time that that was

02:42  10  disclosed to you that you weren't reporting to Tammy

02:42  11  Lindsay anymore?

02:42  12     A.  No.

02:42  13     Q.  Do you know how long it had been that you

02:42  14  officially weren't reporting to Tammy Lindsay?

02:42  15     A.  No.

02:42  16     Q.  All the way up to today, have you ever had

02:42  17  a date told to you about when Lindsay's status as your

02:42  18  supervisor ceased?

02:42  19     A.  No, but I believe it was several weeks

02:43  20  prior to that meeting.

02:43  21     Q.  What makes you believe it was several

02:43  22  weeks?

02:43  23     A.  It may have coincided with Ms. Lindsay not

02:43  24  responding to my request for accommodation.

02:43  25     Q.  So you're personally drawing that

1          DENISE PAYNE - BY MR. WOLAN

02:43  2    conclusion?

02:43  3        A.  Yes.

02:43  4        Q.  Did you discuss at your September 15, 2017

02:43  5    meeting with Ms. Doxey your EEOC complaint?

02:43  6        A.  Yes.

02:43  7        Q.  Did you tell her anything about it?

02:43  8        A.  Yes.

02:43  9        Q.  What did you tell her?

02:43  10       A.  I can't remember who brought it up; but we

02:43  11   discussed that it existed, that it was ongoing.  And

02:43  12   she asked me what I wanted out of it.

02:44  13       Q.  What was your response to that?

02:44  14       A.  I stated that I wanted to be treated

02:44  15   fairly, paid fairly, and I didn't want this to happen

02:44  16   to anybody else.

02:44  17       Q.  Do you recall how long your September 15,

02:44  18   2017 meeting was with Ms. Doxey?

02:44  19       A.  I would say half an hour.

02:44  20       Q.  What else did you discuss in that time

02:44  21   besides what you've already told us about?

02:44  22       A.  We discussed my salary, lack of a job

02:44  23   description.  I asked her specific questions on how

02:44  24   salaries are determined, if it was based on prior

02:44  25   experience and skills, which she confirmed it was.

1       DENISE PAYNE - BY MR. WOLAN

02:45  2        She stated that I could be receiving back

02:45  3   pay once they did adjust my salary to the appropriate

02:45  4   place.

02:45  5        Q.  Did the two of you discuss why your salary

02:45  6   was inappropriate?

02:45  7        A.  I don't recall.

02:45  8        Q.  To your recollection right now, did you

02:45  9   ever get any kind of retroactive pay?

02:45  10       A.  No, I did not.

02:45  11       Q.  In that meeting on September 15, 2017 with

02:45  12  Ms. Doxey, did you discuss a specific pay level that

02:45  13  you thought you should be at?

02:45  14       A.  I do not recall.

02:46  15       Q.  Did you discuss why it was Dean Syer

02:46  16  wanted to have a meeting with you?

02:46  17       MS. VINCI:  Objection.

02:46  18       You can answer.

02:46  19       A.  I'm sorry.  Can you restate that?

02:46  20       Q.  At your meeting with Ms. Doxey on

02:46  21  September 15, 2017, did she provide you with

02:46  22  information about why Dean Syer had sent you a meeting

02:46  23  invitation?

02:46  24       A.  Yes.

02:46  25       Q.  And what was that?

1          DENISE PAYNE - BY MR. WOLAN

02:46   2          A.  To discuss the upcoming projects for

02:46   3     business analytics, roles and responsibilities,

02:46   4     etcetera.

02:46   5          Q.  Did she specify anything regarding your

02:46   6     particular role at that point in time?

02:46   7          A.  She did not.

02:46   8          Q.  Did you ultimately meet with Dean Syer?

02:46   9          A.  Yes.

02:46   10         Q.  Do you recall when?

02:46   11         A.  Sometime shortly thereafter in September.

02:46   12         Q.  Was anybody at that meeting besides you

02:47   13    and Dean Syer?

02:47   14         A.  Yes.

02:47   15         Q.  Who else?

02:47   16         A.  Julie Weaver was there, Cindy Allen and

02:47   17    Tammy Lindsay.

02:47   18         Q.  What was discussed during that meeting

02:47   19    with Dean Syer?

02:47   20         A.  Dean Syer gave a presentation of the

02:47   21    upcoming projects that we would be taking on as a team

02:47   22    and the additional staff that she wanted to add to the

02:47   23    team and -- yeah, that's what I recall.

02:47   24         Q.  You state in paragraph 137 of your

02:47   25    Complaint that after the meeting with Dean Syer,

|          |    | DENISE PAYNE - BY MR. WOLAN |
|----------|----|------------------------------|

1          DENISE PAYNE - BY MR. WOLAN

02:47   2   Lindsay began to speak with you again.

02:47   3          How did her interactions with you change

02:47   4   at that point in time?

02:48   5          A.  She seemed to want to be involved in

02:48   6   micromanaging my day-to-day work again.

02:48   7          Q.  Were you told that she was resuming her

02:48   8   role as your supervisor?

02:48   9          A.  I was told that she was expressly not my

02:48   10  supervisor.

02:48   11         Q.  But yet, you perceived her as attempting

02:48   12  to manage your work more?

02:48   13         A.  Correct.

02:48   14         Q.  If she wasn't your supervisor, what would

02:48   15  her role have been in working with you?

02:48   16         A.  I was told that her role was to confirm

02:48   17  and verify the data that I collected prior to

02:48   18  submission for Rankings and Surveys.

02:48   19         Q.  Who was your supervisor after Ms. Lindsay

02:48   20  ceased in that role?

02:48   21         A.  First it was Cindy Allen, and then Cindy

02:48   22  Allen gave notice and left in October.

02:49   23         Q.  Of 2017?

02:49   24         A.  Of 2017.  And then i reported directly to

02:49   25  Laura Syer.

| | | |
|---|---|---|
| | 1 | DENISE PAYNE - BY MR. WOLAN |
| 02:49 | 2 | Q.  Did the meeting with Dean Syer take place |
| 02:49 | 3 | in September of 2017? |
| 02:49 | 4 | A.  I believe it was, yes. |
| 02:49 | 5 | Q.  So by October of 2017, Lindsay is not |
| 02:50 | 6 | supervising you, and Allen sometime in October ceases |
| 02:50 | 7 | supervising you; correct? |
| 02:50 | 8 | A.  Correct. |
| 02:50 | 9 | Q.  From October until the end of 2017, what, |
| 02:50 | 10 | if any, accommodations are you making use of? |
| 02:50 | 11 | A.  I was likely still requiring time for |
| 02:50 | 12 | doctor appointments, checkups, follow-ups. |
| 02:50 | 13 | I was being treated for side effects and |
| 02:50 | 14 | still experiencing fatigue, so there was probably time |
| 02:50 | 15 | that I required off from work. |
| 02:50 | 16 | Q.  Do you remember making requests, for |
| 02:50 | 17 | example, to flex a day and stay home rather than come |
| 02:50 | 18 | in -- |
| 02:50 | 19 | A.  Yes. |
| 02:50 | 20 | Q.  -- in the October to December of 2017 time |
| 02:50 | 21 | frame? |
| 02:50 | 22 | A.  Yes. |
| 02:50 | 23 | Q.  Can you give me a number of how many times |
| 02:50 | 24 | that might have come up in that last quarter of 2017? |
| 02:51 | 25 | A.  Five or less. |

|       | 1  | DENISE PAYNE - BY MR. WOLAN |
| 02:51 | 2  | Q.  In October to December of 2017, who was |
| 02:51 | 3  | responsible then for signing off on your time cards? |
| 02:51 | 4  | A.  That was Laura Syer. |
| 02:51 | 5  | Q.  Did you and Laura Syer ever have |
| 02:51 | 6  | conversations about your use of time in the last |
| 02:51 | 7  | quarter of 2017? |
| 02:51 | 8  | A.  Not conversations per se.  She approved |
| 02:51 | 9  | all of my requests. |
| 02:51 | 10 | Q.  Right.  But she did so without having any |
| 02:51 | 11 | conversations with you about it? |
| 02:51 | 12 | A.  In one instance she requested that if I |
| 02:51 | 13 | was working from home, to not use that as a time for |
| 02:51 | 14 | essentially child care or taking care of my children. |
| 02:51 | 15 | And I responded that my children were well |
| 02:51 | 16 | into the teenage years and didn't need me to take care |
| 02:51 | 17 | of them, so... |
| 02:52 | 18 | Q.  Was that an in-person conversation? |
| 02:52 | 19 | A.  No.  That was an email. |
| 02:52 | 20 | Q.  And to your recollection now, Laura Syer's |
| 02:52 | 21 | observations about child care were her only |
| 02:52 | 22 | communications with you about your accommodations? |
| 02:52 | 23 | A.  That I recall, yes. |
| 02:52 | 24 | Q.  So when was it that you learned that the |
| 02:52 | 25 | analytics department was being eliminated? |

1       DENISE PAYNE - BY MR. WOLAN

02:52   2       A.  I believe it was December 1, 2017.

02:52   3       Q.  How did you learn about it?

02:52   4       A.  I was called into a meeting with Kathy

02:52   5   Doxey and Laura Syer.

02:52   6       Q.  Before that meeting did you have any

02:52   7   inclination that the department was in any kind of

02:52   8   trouble?

02:53   9       A.  No inclination.

02:53   10      Q.  Had you noticed any changes in your

02:53   11  workload prior to that December 1 meeting?

02:53   12      A.  My workload was very steady.  So no.

02:53   13      Q.  Describe for me the meeting in which you

02:53   14  were told.

02:53   15      A.  So I met with Kathy and Laura.  I don't

02:53   16  recall which one of them explained to me that the

02:53   17  department was being eliminated and I was being laid

02:53   18  off and my position was being moved to another

02:53   19  department.

02:53   20      Q.  As of December 1, 2017, how many other

02:53   21  people were on your team?

02:53   22      A.  Just myself and Tammy Lindsay.

02:54   23      Q.  When -- as you describe it -- your

02:54   24  position was moved to another department, did you

02:54   25  discuss with anybody at Cornell your opportunity to

1          DENISE PAYNE - BY MR. WOLAN

02:54   2   fill that position?

02:54   3          A.  I told them that I was interested in that

02:54   4   position because I had been doing it already and I

02:54   5   would be applying.

02:54   6          Q.  Did you ultimately apply for it?

02:54   7          A.  Yes.

02:54   8          Q.  When you applied for it, did you read a

02:54   9   position description for this new version of your job?

02:54   10         A.  Yes.

02:55   11         Q.  Was it identical to the job you were

02:55   12   doing?

02:55   13         A.  It was identical to the work I had done

02:55   14   over the course of that year, but at that exact moment

02:55   15   I was only working on Rankings and Surveys.

02:55   16         Q.  And the new job that you applied for had

02:55   17   more than Rankings and Surveys in its job description?

02:55   18         A.  Yes.

02:55   19         Q.  Can you recall right now how much more?

02:55   20         A.  Likely 50 percent other projects.

02:55   21         Q.  Regarding those other projects, were they

02:55   22   the type of work that you had done previously?

02:55   23         A.  Yes.

02:55   24         Q.  So you felt you had experience in all

02:55   25   aspects of the newly designed job description?

|  |  | DENISE PAYNE - BY MR. WOLAN |
|--|--|--|

1        DENISE PAYNE - BY MR. WOLAN

02:55  2        A.  Yes.

02:56  3        Q.  You stated also in your Complaint at

02:56  4    paragraph 142 that you applied for numerous new

02:56  5    positions with Cornell.

02:56  6            What other positions did you apply for?

02:56  7        A.  I applied for roughly 10 to 12 other

02:56  8    positions.

02:56  9            There was a project manager role that I

02:56  10   applied for and interviewed for within the business

02:56  11   department as well right around the same time.  I

02:56  12   applied for a position in the engineering school.  I

02:56  13   applied for an assistant director position with Alumni

02:56  14   Affairs and Development and interviewed for that as

02:57  15   well.

02:57  16           That's -- I recall there being more, but I

02:57  17   can't remember specifics.

02:57  18       Q.  Do you recall any others that you had

02:57  19   interviews for?

02:57  20       A.  Yes.  I do not remember the department,

02:57  21   but there were two others that I interviewed for --

02:57  22   actually, one was an interview that I had had the

02:57  23   exact same day that I was notified of the layoff, so

02:57  24   that was prior to this happening.  And then another

02:57  25   one occurred during my layoff.

DENISE PAYNE - BY MR. WOLAN

1

02:57 2    Q.  So how many total interviews did you have

02:57 3    post December 1, 2017?

02:57 4    A.  Five.

02:57 5    Q.  And you applied for ten or more jobs as

02:57 6    you recall?

02:57 7    A.  Mm-hmm.

02:57 8        MS. VINCI:  Was that a yes?

02:57 9        THE WITNESS:  Yes.

02:57 10    Q.  You state in your Complaint paragraph 144

02:58 11    that you were passed up for other candidates who upon

02:58 12    information and belief did not have a disability.

02:58 13        So question number one is do you believe

02:58 14    that you were passed up for all those other jobs

02:58 15    because you had a disability?

02:58 16    A.  Yes.

02:58 17    Q.  For every job that you interviewed for do

02:58 18    you feel like you had the qualifications to do the

02:58 19    job?

02:58 20    A.  Yes.

02:58 21    Q.  For any of the jobs that you applied

02:58 22    for -- and that's not just the interviews -- any job

02:58 23    you applied for are you aware of the qualifications of

02:58 24    the ultimately successful candidates, if there were

02:58 25    any?

DENISE PAYNE - BY MR. WOLAN

02:58  2      A.  I don't recall.

02:59  3      Q.  Let me ask you specifically about the job

02:59  4   that was arguably like your Data Analyst II in the

02:59  5   Johnson School.

02:59  6          Did you do an interview for that?

02:59  7      A.  I did.

02:59  8      Q.  And do you know who the ultimate

02:59  9   successful candidate was?

02:59  10     A.  I believe her name is Kate.  I do not

02:59  11  recall her last name.

02:59  12     Q.  Are you familiar with Kate's

02:59  13  qualifications for that job?

02:59  14     A.  No.

02:59  15     Q.  So sitting here now, you don't know

02:59  16  whether she is or isn't more qualified than you?

02:59  17     A.  Not at this time.  I don't recall.

02:59  18     Q.  Did anyone from Cornell in response to any

03:00  19  of your applications or interviews where you had them

03:00  20  tell you that you were being denied a position because

03:00  21  of your disability?

03:00  22     A.  No.

03:00  23     Q.  Why do you believe that is true, that you

03:00  24  were overlooked for any of these positions because of

03:00  25  your disability?

DENISE PAYNE - BY MR. WOLAN

03:00  A.  Cornell has many policies for inclusion,
03:00  diversity, policies that would have allowed me to
03:00  transfer with that role; yet, they chose not to.
03:00       I was qualified, I was doing the job well,
03:00  yet, they did not choose me.
03:01       Q.  And I don't think that I asked this of
03:01  you, and I apologize if I did.  Of any of the other
03:01  candidates -- I should say successful candidates for
03:01  any of the jobs you applied for at Cornell, are you
03:01  aware of the disability status of any of them?
03:01       A.  I am not aware.
03:01       Q.  You stated in your responses to our
03:01  interrogatories, page 8, the paragraph indicated as C
03:02  under Laura Syer, you stated that, quote, "Ms. Syer
03:02  continued to subject Plaintiff to discrimination by
03:02  specifically telling Plaintiff that Tammy Lindsay was
03:02  not her manager," unquote.
03:02       A.  Yes.
03:02       Q.  How was the act of Ms. Syer to tell you
03:02  that Lindsay was not your manager an act of
03:02  discrimination?
03:02       A.  That act was not an act of discrimination,
03:02  but she was telling Tammy Lindsay that she was my
03:02  manager.  Because I specifically asked Tammy Lindsay

1          DENISE PAYNE - BY MR. WOLAN

03:02  2   what her role was and what she was being told.

03:02  3        Q.  So at what point did you become aware that

03:02  4   Tammy Lindsay thought she was your supervisor even

03:02  5   though you had been told she wasn't?

03:03  6        A.  Around the time that Cindy left and Laura

03:03  7   Syer assumed the role as my manager.

03:03  8        Q.  So that would be about October of 2017?

03:03  9        A.  Yes.

03:03  10       Q.  So Laura Syer's discriminatory act is

03:03  11  allowing Lindsay to supervise you without telling you;

03:03  12  is that correct?

03:03  13       A.  She effectively lied to me and said Tammy

03:03  14  Lindsay was not my supervisor.  Right?  But then told

03:03  15  Tammy that she was to supervise my day-to-day work.

03:04  16       Q.  You stated on page 7, paragraph 2A, again

03:04  17  about Laura Syer in your response to our

03:04  18  interrogatories, that your pay rate fell below the

03:04  19  stated minimum for your job band.

03:04  20         Do you recall that?

03:04  21       A.  Yes.

03:04  22       Q.  When was that?

03:04  23       A.  I don't recall the specific date.

03:04  24       Q.  Do you remember where it was with respect

03:04  25  to your position?  I assume it was sometime in 2017?

|       |    | DENISE PAYNE - BY MR. WOLAN |
|-------|----|-----------------------------|

```
         1         DENISE PAYNE - BY MR. WOLAN
03:04    2      A.  Yes.
03:04    3      Q.  Is there a particular time of the year
03:04    4   when salaries change at Cornell?
03:04    5      A.  I was not aware of that.
03:04    6      Q.  In your years of working at Cornell, how
03:05    7   often would you have any kind of salary increase?
03:05    8      A.  As part of my annual performance review
03:05    9   process.
03:05   10      Q.  And when during the year did that occur?
03:05   11      A.  It varied depending on the manager.  It
03:05   12   could be anywhere from April to June, perhaps.
03:05   13      Q.  Do you recall by how much your pay rate
03:05   14   fell below the stated minimum for the job band?
03:05   15      A.  88 cents per hour.
03:05   16      Q.  And do you recall for how long it was
03:05   17   below the stated minimum?
03:05   18      A.  No.
03:06   19      Q.  You also state in your answers to the
03:06   20   interrogatories at page 8, I'm looking at paragraph
03:06   21   indicated D, again talking about Laura Syer, that in
03:06   22   or around January 18, 2018, you were -- as it says
03:06   23   here -- subjected to a four-hour interview regarding
03:06   24   the position that was apparently the transfer of your
03:06   25   2017 position.
```

1          DENISE PAYNE - BY MR. WOLAN

03:06   2          Did you do a four-hour interview for that

03:06   3   job?

03:06   4          A.  It was a long interview.  I don't remember

03:06   5   the exact time.

03:06   6          Q.  Who did you meet with during that

03:06   7   interview?

03:06   8          A.  I initially met with a team of

03:06   9   individuals, some of whom I had worked with prior and

03:06   10   all of whom had no idea that I was on layoff status.

03:07   11   And that would be Andrew Armitage, Kim Sperry, a few

03:07   12   other people that someone had called in as well.  So

03:07   13   there were five or six people in that initial

03:07   14   interview.

03:07   15          And then after that hour or so, I went to

03:07   16   another room, and I interviewed with Amanda Shaw; and

03:07   17   Julie Weaver was there.

03:07   18          Q.  Did that take up your full four hours,

03:07   19   give or take --

03:07   20          A.  Yes.

03:07   21          Q.  -- or were there other meetings?

03:07   22          A.  That was all.

03:07   23          Q.  You say here right after mentioning your

03:07   24   interview on or about January 18th that Defendant,

03:07   25   Cornell, had no intention of hiring you.

|       | 1  | DENISE PAYNE - BY MR. WOLAN |
|-------|----|------|
| 03:07 | 2  | Why do you believe that? |
| 03:07 | 3  | A. If they intended to hire me, they would |
| 03:07 | 4  | have moved me with the position under their policies |
| 03:07 | 5  | for diversity and inclusion. |
| 03:07 | 6  | Q. What aspect of the diversity and inclusion |
| 03:08 | 7  | policy would be triggered by transferring you to the |
| 03:08 | 8  | new position? |
| 03:08 | 9  | A. There was an administrative policy where |
| 03:08 | 10 | you can move individuals into certain roles based on |
| 03:08 | 11 | their diversity profile. |
| 03:08 | 12 | Q. What about your diversity profile would |
| 03:08 | 13 | trigger that policy? |
| 03:08 | 14 | A. My disability. |
| 03:08 | 15 | Q. And you state further down in that |
| 03:08 | 16 | paragraph D on page 8 of your responses to the |
| 03:08 | 17 | interrogatories that you were denied the data analyst |
| 03:08 | 18 | position for retaliation for your complaints to the |
| 03:08 | 19 | EEOC. |
| 03:08 | 20 | Why do you believe that? Why do you |
| 03:08 | 21 | believe it was retaliation? |
| 03:09 | 22 | A. I don't have any other frame of reference |
| 03:09 | 23 | for why they removed me from the position and didn't |
| 03:09 | 24 | hire me back. I was performing the job well, I was |
| 03:09 | 25 | qualified and enjoyed the work as well. |

1    DENISE PAYNE - BY MR. WOLAN

03:09 2    MR. WOLAN:  We can break right there.

03:09 3    THE ViDEOGRAPHER:  The time is 3:09.

03:09 4 We're off the record.

5   (The proceeding recessed at 3:09 p.m.)

6   (The proceeding reconvened at 3:10 p.m.;

7   appearances as before noted.)

8    THE VIDEOGRAPHER:  The time is 3:10.

9 We're back on the record.

10 DENISE PAYNE, resumes;

03:10 11   CONTINUING EXAMINATION BY MR. WOLAN:

03:10 12   Q.  You mention -- and we only talked around

03:11 13 this so far today, but you mention in your

03:11 14 interrogatory answers, it's the paragraph indicated as

03:11 15 F on page 7, Tammy Lindsay failed to adjust and/or

03:11 16 reassign your workload and corresponding deadlines to

03:11 17 accommodate your time off related to your illness.

03:11 18   Can you explain to me when that occurred?

03:11 19   A.  I don't have specific dates.  However, in

03:11 20 general, if I required, say, five or six hours off a

03:11 21 given week, any of my projects or deadlines were not

03:11 22 extended to accommodate that time away.

03:11 23   Q.  If your deadlines were not extended, were

03:11 24 you still able to get the work done?

03:11 25   A.  At times, yes.

1          DENISE PAYNE - BY MR. WOLAN

03:11  2          Q.  If you were able to get it done, how did

03:11  3     you get it done, then?

03:11  4          A.  I would have to put in extra hours,

03:12  5     request to work a weekend, etcetera.

03:12  6          Q.  And were there times when you couldn't

03:12  7     finish a project timely because of the lack of

03:12  8     adjustment?

03:12  9          A.  There was a few times, yes.

03:12  10         Q.  Describe those for me.

03:12  11         A.  Again, I don't have specifics, but there

03:12  12    may have been reports or projects where I had to

03:12  13    extend the deadline.

03:12  14         Q.  Well, do you remember ever being

03:12  15    criticized for not meeting a particular deadline?

03:12  16         A.  Yes.

03:12  17         Q.  By whom?

03:12  18         A.  Tammy Lindsay.

03:12  19         Q.  Since I phrased it that way, does that

03:12  20    allow you to remember any particular incident that you

03:12  21    could describe for me?

03:12  22         A.  I don't have a particular incident in

03:12  23    mind, but I do recall as part of the performance

03:13  24    review now she stated that I was missing deadlines.

03:13  25              And I had asked for specific examples for

DENISE PAYNE - BY MR. WOLAN

03:13   2    that as well, and she did not give them to me.

03:13   3       Q.  And as you sit here now, you don't recall

03:13   4    any particular deadlines you missed?

03:13   5       A.  No.

03:13   6       Q.  The paragraph H on page 7 of your

03:13   7    interrogatory answers, again talking about Tammy

03:13   8    Lindsay, you state that she would not approve your

03:13   9    promotion until you got your time card under control.

03:13 10       What promotion was that?  When you say the

03:13 11    word "promotion," what were you being promoted from

03:13 12    to?

03:13 13       A.  It would have taken me from the level I

03:13 14    was at to the level I should have been at,

03:14 15    essentially.  It was a reclassification instead of a

03:14 16    promotion.

03:14 17       Q.  At what point in time?

03:14 18       A.  I'm sorry.  Restate.

03:14 19       Q.  When in time are we talking about?  She

03:14 20    said she wouldn't approve your promotion.  When did

03:14 21    she tell you she wouldn't approve your promotion?

03:14 22       A.  Specifically she told me during my

03:14 23    performance review in June that she would not approve

03:14 24    the reclassification.

03:14 25       Q.  And the reclassification of your Data

1          DENISE PAYNE - BY MR. WOLAN

03:14  2   Analyst II position as a different band, it was?  Is

03:14  3   that what you're telling me?

03:14  4          A.  Yes.  And a different classification from

03:14  5   nonexempt to exempt and then a higher pay rate above

03:14  6   the minimum.

03:14  7          Q.  Sitting here now, do you remember your

03:14  8   salary -- well, I'm sorry -- your rate of pay for the

03:15  9   Data Analyst II position as you were ending 2017?

03:15  10         A.  25.88 per hour.

03:15  11         Q.  Do you remember your annual salary at that

03:15  12  point in time?

03:15  13         A.  Around 52,000.

03:15  14         Q.  You state on page 9 of your interrogatory

03:16  15  answers, paragraph 4A -- this is about Lucinda

03:16  16  Allen -- that she provided false information to a

03:16  17  hiring manager about your performance when you

03:16  18  interviewed for a position in the College of

03:16  19  Engineering around April 2018.

03:16  20             Can you tell me about that?

03:16  21         A.  I believe I state that it's possible she

03:16  22  did that.  I interviewed for the position in her

03:16  23  department and was repeatedly asked about Cindy Allen.

03:16  24  During the interview the one over hiring manager

03:16  25  asked, "What would Cindy Allen say about you?"

1      DENISE PAYNE - BY MR. WOLAN

03:16   2      Q.  But as you sit here, you don't know of any

03:16   3   specific communications from Allen to the College of

03:17   4   Engineering about you in April of 2018?

03:17   5      A.  Correct.

03:17   6      Q.  You state on page 10 of your interrogatory

03:17   7   answers -- this is paragraph 5B about Julie Tubbs in

03:17   8   medical leaves -- you say that she told you that there

03:17   9   was, quote, "likely a misunderstanding," end quote,

03:17   10   when it came to your request for formal accommodation.

03:17   11          Do you remember Julie Tubbs saying that to

03:17   12   you?

03:17   13      A.  It was Jill Tubbs.

03:17   14      Q.  Oh, sorry.  Jill.  It says Julie on the

03:17   15   page, though.

03:17   16      A.  And I recall her saying that in one of my

03:18   17   very first meetings with her in February of 2017.  She

03:18   18   was in disbelief that it could be happening to me,

03:18   19   that sort of treatment.

03:18   20      Q.  You stated on page 10 of your

03:18   21   interrogatory answers, paragraph 6B regarding Julie

03:18   22   Weaver, that she refused to follow policy and

03:18   23   procedures related to your complaint of hostile

03:18   24   environment, failure to accommodate and retaliation.

03:18   25          What do you mean by that?

| | 1 | DENISE PAYNE - BY MR. WOLAN |
|---|---|---|
| 03:18 | 2 | A.  She did not report it to the office of |
| 03:18 | 3 | workforce labor and policy. |
| 03:19 | 4 | Q.  And you believe she should have why? |
| 03:19 | 5 | A.  According to the policy, she was required |
| 03:19 | 6 | to.  And I assumed it was happening. |
| 03:19 | 7 | Q.  You have stated in your Complaint in |
| 03:19 | 8 | addition to your potential economic damages, back pay |
| 03:19 | 9 | and whatnot, also that you've experienced emotional |
| 03:19 | 10 | distress.  So with that in mind -- and actually, I |
| 03:19 | 11 | believe in other places in your Complaint you mention |
| 03:19 | 12 | mental anguish and emotional distress. |
| 03:20 | 13 | So let me ask what effects on your mental |
| 03:20 | 14 | or physical health have you experienced that you think |
| 03:20 | 15 | just arose out of your diagnosis and treatment for |
| 03:20 | 16 | cancer? |
| 03:20 | 17 | A.  Could you restate that question? |
| 03:20 | 18 | Q.  Yes.  After having your diagnosis of |
| 03:20 | 19 | cancer and getting treatment, I'm asking you what |
| 03:20 | 20 | effects on your mental or physical health you've |
| 03:20 | 21 | experienced that it's your understanding arose out of |
| 03:20 | 22 | the cancer and its treatment. |
| 03:20 | 23 | A.  Only physical effects. |
| 03:20 | 24 | Q.  Physical and mental. |
| 03:20 | 25 | A.  There were no mental effects at that |

| | | DENISE PAYNE - BY MR. WOLAN |
|---|---|---|

03:20  2   point.  I was done with treatment, I was moving on

03:20  3   with my life.  I was happy to be done with treatment

03:20  4   and regaining strength.

03:20  5         We had bought a new house, and I was

03:21  6   remodeling it from top to bottom.  And at that point I

03:21  7   was happy to move on and emotionally heal from cancer.

03:21  8       Q.  I was speaking more broadly going back to

03:21  9   your diagnosis time.

03:21 10       A.  Okay.

03:21 11       Q.  So if we go back to June of 2016, what

03:21 12   effects did you have on your mental and physical

03:21 13   health just from the cancer diagnosis and treatment,

03:21 14   ignoring other factors at the moment?

03:21 15       A.  I would say anxiety, depression, fear,

03:21 16   worry, trauma.

03:21 17       Q.  How did that progress during your

03:21 18   treatment?

03:21 19       A.  I believe it got better during my

03:21 20   treatment.

03:21 21        I think at times people are more concerned

03:21 22   about the diagnosis and what it means, and you come to

03:22 23   terms with it over time.

03:22 24       Q.  Were you having any physical effects on a

03:22 25   daily basis?  Sleeplessness, inability to concentrate,

DENISE PAYNE - BY MR. WOLAN

03:22  2  things like that?  Again, focused during your

03:22  3  treatment period.

03:22  4        A.  Yes.

03:22  5        Q.  What were you experiencing?

03:22  6        A.  Insomnia, fatigue, joint pain, other

03:22  7  gastrointestinal side effects, hair loss, that sort of

03:22  8  thing.

03:22  9        Q.  By the time you were done with your

03:22  10  primary course of treatment for your cancer, did any

03:22  11  of those effects ease up?

03:22  12        A.  Yes, some of them.

03:22  13        Q.  Which ones haven't?

03:23  14        A.  Joint pain, fatigue.

03:23  15        Q.  What kind of fatigue and joint pain do you

03:23  16  experience on a daily basis?

03:23  17        A.  I have constant joint pain.  I have

03:23  18  peripheral neuropathy in my feet.  I have never

03:23  19  regained the energy level that I had prior to cancer.

03:23  20        Q.  So different question, then.

03:23  21            What effects on your mental or physical

03:23  22  health have you experienced that you think arise out

03:23  23  of your experience with Cornell from your employment

03:23  24  or your separation from employment?

03:23  25        A.  Trauma, anxiety, depression.

|  | 1 | DENISE PAYNE - BY MR. WOLAN |

03:23 2  Q.  How do those manifest themselves on a

03:24 3  daily basis?

03:24 4  A.  I had a hard time functioning on a daily

03:24 5  basis.  I would pull myself together for my children,

03:24 6  but that's about it.

03:24 7  Q.  When you say you had a hard time

03:24 8  functioning, what do you mean by that, though?

03:24 9  A.  Spent a lot of time in bed.  I stopped

03:24 10  taking my cancer pills, because I just didn't care.

03:24 11  Q.  Did you seek treatment --

03:24 12  A.  Yes.

03:24 13  Q.  -- for how you felt?

03:24 14  A.  I did.

03:24 15  Q.  With whom?

03:24 16  A.  With a therapist in Ithaca.

03:24 17  Q.  Who was that?

03:24 18  A.  I don't recall her name, but she did a

03:24 19  specific type of therapy called EMDR.

03:24 20  Q.  Was it Mary Lauppe?

03:24 21  A.  Yes.

03:25 22  Q.  When did you first go to visit her?

03:25 23  A.  Spring of 2018.  A few months after my

03:25 24  layoff.

03:25 25  Q.  And when you first went to see her, what

|   | 1 | DENISE PAYNE - BY MR. WOLAN |
|---|---|---|

03:25  2  did you tell her was the reason for seeking her out?

03:25  3      A.  My layoff, the loss of my job.

03:25  4      Q.  Did you discuss with her the physical

03:25  5  symptoms you were experiencing?

03:25  6      A.  Yes.

03:25  7      Q.  Did you undergo treatment with her?

03:25  8      A.  Yes.

03:25  9      Q.  Did she make any kind of diagnosis?

03:25  10      A.  I don't recall a specific diagnosis.

03:25  11      Q.  Do you remember saying that you had

03:25  12  depression or anxiety of any particular type?

03:26  13      A.  Yes.

03:26  14      Q.  Can you recall what that was?

03:26  15      A.  Depression and anxiety.  I'm not familiar

03:26  16  with different types.

03:26  17      Q.  And I believe you said that you saw her

03:26  18  for treatment for a while.  How did she treat you?

03:26  19      A.  She uses a method that involves electrical

03:26  20  stimulation while you undergo talk therapy.

03:26  21      Q.  Can you describe how that works for us?

03:26  22      A.  You basically hold two electrical devices,

03:26  23  one in each hand, and the devices continually

03:26  24  alternate while you're talking.  And it's apparently a

03:26  25  way to reset the brain and reduce trauma, that sort of

|   | 1 | DENISE PAYNE - BY MR. WOLAN |
|---|---|---|

03:26  2  thing.

03:26  3      Q.  How many times did you see Ms. Lauppe for

03:27  4  treatment?

03:27  5      A.  I don't know exactly how many times; but I

03:27  6  saw her until July of 2018, when I accepted my new

03:27  7  position and I could no longer attend treatment with

03:27  8  her.

03:27  9      Q.  The treatment you were receiving, was it

03:27  10  called EMDR?

03:27  11      A.  Yes.

03:27  12      Q.  Do you happen to remember what that stands

03:27  13  for?

03:27  14      A.  No.

03:27  15      Q.  Did her treatment have any effect?

03:27  16      A.  Yes.

03:27  17      Q.  How so?

03:27  18      A.  It helped.

03:28  19      Q.  To what degree?

03:28  20      A.  It reduced my symptoms and depression and

03:28  21  anxiety by approximately 40, 50 percent.

03:28  22      Q.  Have you also taken medication for

03:28  23  depression and anxiety?

03:28  24      A.  I have, but not at that time.

03:28  25      Q.  When have you?

|  |  |  |
|---|---|---|
| | 1 | DENISE PAYNE - BY MR. WOLAN |
| 03:28 | 2 | A. Upon diagnosis of cancer I was prescribed |
| 03:28 | 3 | an antidepressant. |
| 03:28 | 4 | Q. Do you remember what? |
| 03:28 | 5 | A. Effexor. |
| 03:28 | 6 | Q. How long were you on it? |
| 03:28 | 7 | A. Six to eight months. |
| 03:28 | 8 | Q. Anything since then? |
| 03:28 | 9 | A. No. |
| 03:28 | 10 | Q. Anything prior to that? |
| 03:28 | 11 | A. Yes. |
| 03:28 | 12 | Q. For depression and anxiety? |
| 03:28 | 13 | A. Yes, several years ago. Postpartum |
| 03:28 | 14 | depression. |
| 03:28 | 15 | Q. How long were you treated for that? |
| 03:28 | 16 | A. Roughly a year. |
| 03:28 | 17 | Q. How many children do you have? |
| 03:28 | 18 | A. Two. |
| 03:29 | 19 | Q. And they're teenagers now? |
| 03:29 | 20 | A. Yes. |
| 03:29 | 21 | Q. Let me be specific to the year. In 2017 |
| 03:29 | 22 | did you experience any events in your life other than |
| 03:29 | 23 | your ongoing cancer treatment and your employment |
| 03:29 | 24 | situation that you believe had any effect on your |
| 03:29 | 25 | mental or physical health? |

1          DENISE PAYNE - BY MR. WOLAN

03:29  2          A.  Yes.

03:29  3          Q.  What?

03:29  4          A.  My family was experiencing trauma from the

03:29  5    cancer.  I wanted to move out of the house that I was

03:29  6    in, because I equated it with the cancer; and I wanted

03:29  7    a fresh new beginning, and my husband did not.

03:29  8              And he had taken care of me for 15 months

03:29  9    and was emotionally spent.  So we did experience some

03:30 10    trauma as a family.

03:30 11          Q.  Did you seek any treatment regarding that

03:30 12    situation?

03:30 13          A.  Yes.

03:30 14          Q.  How so?

03:30 15          A.  I believe we sought out counseling,

03:30 16    marriage counseling for that.

03:30 17          Q.  Did you talk to any physicians about the

03:30 18    family situation impacting your cancer situation?

03:30 19          A.  No.  It was a very short-lived situation.

03:30 20    We recovered quickly.

03:30 21          Q.  Do you have a recollection, then, of how

03:30 22    much counseling you sought out, marriage counseling?

03:31 23          A.  My husband and I attended three or four

03:31 24    sessions.

03:31 25          Q.  And do you happen to remember what time of

DENISE PAYNE - BY MR. WOLAN

03:31  2   year, the month?

03:31  3       A.  I don't recall.

03:31  4       Q.  Now, let me ask you the same question now

03:31  5   in 2018.  Did you experience any events in your life

03:31  6   other than your cancer treatment or your employment

03:31  7   with Cornell that you believe had an effect on your

03:31  8   mental or physical health?

03:31  9       A.  No.

03:31  10      Q.  How would you describe your physical

03:31  11  health before you had your cancer diagnosis?

03:31  12      A.  My physical health was good before cancer.

03:31  13  I was very active, very healthy.

03:31  14      Q.  Were you being treated for anything?

03:31  15      A.  Hypothyroidism.  That's about it.

03:31  16      Q.  And prior to the cancer -- let me rephrase

03:32  17  that.

03:32  18          Other than the postpartum depression,

03:32  19  prior to the cancer did you have any other treatment

03:32  20  for depression, anxiety or similar illnesses?

03:32  21      A.  No.

03:32  22      Q.  You officially stated in your answer to

03:32  23  our interrogatories, page 11 -- it's the answer to

03:32  24  question 6 regarding mental health professionals --

03:32  25  you identified five dates of counseling with Mary

|       |    | DENISE PAYNE - BY MR. WOLAN |
|-------|----|-----|
| 03:32 | 1  | DENISE PAYNE - BY MR. WOLAN |
| 03:32 | 2  | Lauppe, and that corresponds with the medical record |
| 03:32 | 3  | that was disclosed through your counsel.  And then you |
| 03:32 | 4  | have one reference to visiting the FSAP counselor. |
| 03:32 | 5  | Do you have any reason to believe that you |
| 03:33 | 6  | should be indicating more dates than the six total |
| 03:33 | 7  | that we have here in your interrogatory answer? |
| 03:33 | 8  | Between Lauppe and FSAP.  Any other counselors you've |
| 03:33 | 9  | sought out? |
| 03:33 | 10 | A.  No. |
| 03:33 | 11 | Q.  What was your understanding of the merger |
| 03:33 | 12 | that led to the Johnson School -- or Johnson College |
| 03:33 | 13 | being formed?  What was your understanding what was |
| 03:33 | 14 | going on regarding that merger? |
| 03:33 | 15 | A.  There were three schools that they were |
| 03:33 | 16 | merging in order to, in their view, make the school |
| 03:34 | 17 | more competitive, bring different diverse education |
| 03:34 | 18 | levels to the program.  That was my understanding. |
| 03:34 | 19 | Q.  And do you understand the cessation of the |
| 03:34 | 20 | data analytics program to be part of that merger? |
| 03:34 | 21 | A.  No. |
| 03:34 | 22 | Q.  What do you think the motive for the |
| 03:34 | 23 | cessation of the data analytics program was? |
| 03:34 | 24 | A.  You mean the ending of the program; |
| 03:34 | 25 | correct? |

1          DENISE PAYNE - BY MR. WOLAN

03:34  2          Q.  Yes.  You had stated earlier that in

03:34  3   December of 2017 you and Tammy Lindsay were the last

03:34  4   employed on that team.  And clearly they told you in

03:34  5   December that they were ending that program.

03:34  6          Is it your understanding that that was or

03:34  7   wasn't part of the larger merger activity?

03:35  8          A.  It was well after the merger.

03:35  9          Q.  Do you believe that the cessation of the

03:35  10  program had anything to do with you being an employee

03:35  11  in it?

03:35  12         A.  Yes.

03:35  13         Q.  What role do you think you being an

03:35  14  employee had in the decision to cease the program?

03:35  15         A.  I repeatedly asked for help from the

03:35  16  individuals.  I filed an EEOC complaint and told them.

03:35  17  I repeatedly reached out to Laura Syer for help with

03:35  18  how I was being treated.  That was my understanding

03:35  19  and experience.

03:35  20         Q.  Do you believe that the data analytics

03:36  21  team such as it was in December of 2017 was ended

03:36  22  specifically to get rid of you as an employee?

03:36  23         A.  I believe it was an interesting

03:36  24  coincidence that may have been to target me and get

03:36  25  rid of me.

DENISE PAYNE - BY MR. WOLAN

03:36  2      Q.  Do you have any reason to believe that

03:36  3  other than the coincidence of time?

03:36  4      A.  I believe in one of the EEOC responses it

03:36  5  was related to Cindy Allen's departure; however, it

03:36  6  was well known for months, I believe, that Cindy Allen

03:36  7  was leaving that team or seeking other employment.

03:36  8  She had told me personally.

03:36  9      Q.  Do you know where she went after October

03:37  10  2018 when she left your team?

03:37  11      A.  She went to the College of Engineering.

03:37  12      Q.  I have got a --

03:37  13      (There was a discussion off the record.)

03:37  14      Q.  I now have the distinct pleasure of

03:37  15  running you through a few documents that we just need

03:37  16  to authenticate, but we don't need to spend much time

03:37  17  talking about them.  So bear with us in the process.

03:37  18      (The following exhibit was marked for

03:38  19      identification:  EXH Number 8.)

03:38  20      Q.  I'm showing you what's been marked for

03:38  21  identification as Exhibit 8.  When you're done taking

03:38  22  a look at it, let me know.

03:38  23      A.  Okay.

03:38  24      Q.  Do you recognize that document?

03:38  25      A.  Yes.

|  | 1 | DENISE PAYNE - BY MR. WOLAN |
|---|---|---|

03:38　2　　Q.  What is it?

03:38　3　　A.  It's an email correspondence with my

03:38　4　management and HR.

03:38　5　　Q.  Do you remember receiving this on or about

03:38　6　September 26, 2016?

03:38　7　　　MS. VINCI:  Do you mean September 22,

03:39　8　2016?

03:39　9　　　MR. WOLAN:  No, I don't.  Am I looking at

03:39　10　the wrong --

03:39　11　　　MS. VINCI:  Neither of these are dated

03:39　12　September 26th.  What you just handed us -- or handed

03:39　13　me, at least.

03:39　14　　　MR. WOLAN:  I know why.  Because I'm

03:39　15　looking at the wrong email on my page.

03:39　16　　　(The following exhibit was marked for

03:39　17　　　identification:  EXH Number 9.)

03:39　18　　Q.  So I'll mark the correct one in front of

03:39　19　me as Exhibit 8 and now ask you the question again.

03:40　20　　　You had testified earlier that you

03:40　21　remember seeing the solicitation going to the college

03:40　22　to provide catastrophic leave.  And I believe you had

03:40　23　said that you knew that was for you, but I believe it

03:40　24　was confidential.  Do you recall?

03:40　25　　A.  Yes.

1          DENISE PAYNE - BY MR. WOLAN

03:40   2          Q.  Was it confidential to the college?

03:40   3          A.  No.  It was -- it was a call for

03:40   4   catastrophic leave donation that was sent to the

03:40   5   entire department, including me.

03:40   6          Q.  Right.  But it didn't identify you as the

03:40   7   recipient?

03:40   8          A.  Correct.  It would not identify me.

03:40   9          Q.  And so do you remember receiving this

03:40  10   email now that I've marked as Exhibit 8, Julie Weaver

03:40  11   to you, September 22, 2016?

03:40  12          A.  Yes.

03:40  13          Q.  She says in that more information will be

03:40  14   forthcoming.  Julie does in the top email.

03:41  15              Do you remember after September 22, 2016,

03:41  16   the next time you had discussions with her about the

03:41  17   leave?

03:41  18          A.  I remember having one other discussion

03:41  19   with her, and that was that they had collected enough

03:41  20   leave to essentially pay my full salary during my

03:41  21   entire three-month -- 12 weeks -- disability.

03:41  22          Q.  Okay.  I'll take that one back from you.

03:41  23   Thanks.

03:41  24          (The following exhibit was marked for

03:42  25          identification:  EXH Number 10.)

DENISE PAYNE - BY MR. WOLAN

03:42  2  Q.  I'm showing you what's been marked for

03:42  3  identification as Exhibit 9.  Take a look at it, and

03:42  4  let me know when you're done.

03:42  5  MS. VINCI:  Do you have an extra copy,

03:42  6  Counsel?

03:42  7  A.  Okay.

03:42  8  Q.  Do you recognize that document?

03:42  9  A.  Yes.

03:42  10  Q.  What is it?

03:42  11  A.  This is essentially an offer letter from

03:42  12  Cornell University for the position of data analyst.

03:42  13  Q.  And so is this for your position of data

03:42  14  analyst?

03:42  15  A.  Yes.

03:43  16  Q.  The copy I have today doesn't have your

03:43  17  signature.  But do you remember signing this document?

03:43  18  A.  I recall signing it sometime after it was

03:43  19  emailed to me when I returned from disability.

03:43  20  Q.  Right.  And you would have been on leave

03:43  21  at the time this got to you?

03:43  22  A.  Yes.

03:43  23  Q.  And I'm showing you what's been marked as

03:43  24  Exhibit 10.  And keep 9 with you for the moment.  Take

03:43  25  a look at 10 for a moment, and then tell me when

1          DENISE PAYNE - BY MR. WOLAN

03:43   2    you're ready.

03:43   3          A.  Yes.

03:43   4          Q.  Do you recognize that document?

03:43   5          A.  Yes.

03:43   6          Q.  What is it?

03:43   7          A.  It's the email that accompanied my offer

03:44   8    letter from Julie Weaver.

03:44   9          Q.  Do you remember receiving it on or about

03:44   10   September 26, 2016?

03:44   11         A.  Yes.

03:44   12         Q.  That's it.  Thank you.

03:44   13             MR. WOLAN:  Why don't we take five, and

03:44   14   I'll get these marked, so we can do them in quick

03:44   15   succession.

03:44   16             MS. VINCI:  Sure.

03:44   17             THE VIDEOGRAPHER:  The time is 3:44.

03:44   18   We're off the record.

03:44   19         (The proceeding recessed at 3:44 p.m.)

03:49   20         (The proceeding reconvened at 3:49 p.m.;

21         appearances as before noted.)

22         (The following exhibits were marked for

23         identification:  EXH Numbers 11 through 16.)

24             THE VIDEOGRAPHER:  The time is 3:49.

25   We're back on the record.

|   |   |
|---|---|
| | 1 |
| | 2 |
| 03:49 | 3 |
| 03:49 | 4 |
| 03:49 | 5 |
| 03:49 | 6 |
| 03:50 | 7 |
| 03:50 | 8 |
| 03:50 | 9 |
| 03:50 | 10 |
| 03:50 | 11 |
| 03:50 | 12 |
| 03:50 | 13 |
| 03:50 | 14 |
| 03:50 | 15 |
| 03:50 | 16 |
| 03:50 | 17 |
| 03:50 | 18 |
| 03:51 | 19 |
| 03:51 | 20 |
| 03:51 | 21 |
| 03:51 | 22 |
| 03:51 | 23 |
| 03:51 | 24 |
| 03:51 | 25 |

1          DENISE PAYNE - BY MR. WOLAN

2     DENISE PAYNE, resumes;

3          CONTINUING EXAMINATION BY MR. WOLAN:

4          Q.  Ms. Payne, I wanted to circle back to

5     something momentarily before we continue with the

6     document identification.

7               After Cindy left in October of 2017, who

8     else was left in your department?

9          A.  I believe just myself and Tammy Lindsay.

10          Q.  Prior to Cindy's departure, did you have

11     any involvement with -- and I should say immediately

12     before -- any involvement with Tammy in terms of your

13     work projects, or were the two of you able to work

14     independently of each other?

15          A.  We were working independently at that

16     time.

17          Q.  When did it start to become apparent to

18     you that Tammy was doing some sort of supervising

19     after Cindy's departure?

20          A.  Immediately after Laura Syer was named as

21     our manager.

22          Q.  Did you immediately detect a difference in

23     how Tammy Lindsay was working with you?

24          A.  Yes.

25          Q.  Did you reach out to Laura Syer to

| | | DENISE PAYNE - BY MR. WOLAN |
|---|---|---|
| | 1 | |
| 03:51 | 2 | expressly ask her what Tammy's role was? |
| 03:51 | 3 | A.  Several times. |
| 03:51 | 4 | Q.  Did you get any responses from Laura Syer? |
| 03:51 | 5 | A.  We discussed it at a one-on-one meeting, |
| 03:51 | 6 | and I believe I got an email response as well. |
| 03:51 | 7 | Q.  Okay.  And what was the substance of |
| 03:51 | 8 | Laura's responses? |
| 03:51 | 9 | A.  That Tammy Lindsay was not my manager; |
| 03:52 | 10 | however, she needed someone in the position of data |
| 03:52 | 11 | validation and verification, and that was the role |
| 03:52 | 12 | Tammy was assuming. |
| 03:52 | 13 | Q.  I'm not going to go through identification |
| 03:52 | 14 | of this email with you.  I don't think we need to do |
| 03:52 | 15 | that.  But this is -- actually, it's page 103 of the |
| 03:52 | 16 | disclosure that you gave to us through your attorney. |
| 03:52 | 17 | You had reached out to Laura Syer at least |
| 03:52 | 18 | once on October 31 by email, according to the... |
| 03:52 | 19 | And you say (as read):  I have a lot on my |
| 03:52 | 20 | plate at the moment, and trying to respond to |
| 03:52 | 21 | her --Tammy Lindsay's -- micromanagement of my job is |
| 03:52 | 22 | going to be very time consuming. |
| 03:52 | 23 | And you say later in the same |
| 03:52 | 24 | two-paragraph email (as read):  Just a note, Cindy |
| 03:52 | 25 | trusted that I had the process under control, did not |

1          DENISE PAYNE - BY MR. WOLAN

03:52   2   micromanage me.

03:53   3          So that context, what's the distinction?

03:53   4   What does Cindy's lack of micromanagement mean

03:53   5   compared to Tammy's micromanagement?  What do you mean

03:53   6   when you describe their two roles that way?

03:53   7          A.  Cindy had oversight of my role; but she

03:53   8   allowed me to do my job, and she trusted that I was

03:53   9   doing it well.  We checked in occasionally.

03:53   10          However, with Tammy it was completely

03:53   11   different.  She was micromanaging every aspect of my

03:53   12   role, asking me why I wasn't doing it her way or

03:53   13   another specific way.  And it was constant, day after

03:53   14   day barrage of questions from her.

03:53   15          I was also training her on this process

03:53   16   while she was attempting to micromanage me.

03:53   17          Q.  And by micromanage, was she annoying you

03:53   18   with questions, or was she directing you on what had

03:53   19   previously been within your discretion or both?

03:54   20          A.  Both.

03:54   21          Q.  Can you give me examples?

03:54   22          A.  She would interrupt me several times

03:54   23   throughout the day to ask questions about a specific

03:54   24   aspect of a ranking or survey submission.

03:54   25          At one point I said, "Tammy, why don't you

|       |    | DENISE PAYNE - BY MR. WOLAN |
|-------|----|------------------------------|
| 03:54 | 2  | save up all your questions, and we'll have a meeting." |
| 03:54 | 3  | In addition, she was saying that I was |
| 03:54 | 4  | doing it improperly, I should be requesting data |
| 03:54 | 5  | sooner.  And I defended myself and explained to her |
| 03:54 | 6  | why we waited to a certain point to collect data, so |
| 03:54 | 7  | we make sure we had the most recent data. |
| 03:54 | 8  | And I was consistently asked questions of |
| 03:54 | 9  | that type. |
| 03:54 | 10 | Q.  And what kind of directives would she give |
| 03:54 | 11 | you? |
| 03:54 | 12 | A.  She might give me a directive to -- she |
| 03:54 | 13 | would send me an email and say, "I need you to do this |
| 03:55 | 14 | today." |
| 03:55 | 15 | And I'd say, "I had already planned to do |
| 03:55 | 16 | that.  It's part of my job, and it's on my schedule." |
| 03:55 | 17 | So she would give me directives like that. |
| 03:55 | 18 | At times I would say to her, "Tammy, |
| 03:55 | 19 | you're not my supervisor.  I understand this process. |
| 03:55 | 20 | I'm actually redesigning the process." |
| 03:55 | 21 | To which she would claim, "Well, I was |
| 03:55 | 22 | told to do this."  "I was told to oversee you." |
| 03:55 | 23 | (The following exhibit was identified for the |
| 03:55 | 24 | record:  EXH Number 11.) |
| 03:55 | 25 | Q.  All right.  I'm showing you what's been |

DENISE PAYNE - BY MR. WOLAN

03:55 2  marked as Exhibit 11.  Go ahead and take a look at it,

03:55 3  and let me know when you're done.

03:56 4      A.  Okay.

03:56 5      Q.  First of all, do you recognize this

03:56 6  document?

03:56 7      A.  Yes.

03:56 8      Q.  Can you tell me what it is?

03:56 9      A.  It's an email from my medical leave's

03:56 10  disability caseworker introducing herself and asking

03:56 11  me a few questions.

03:56 12      Q.  And I see that her first email to you and

03:56 13  the To in the train is October 3, 2016.

03:56 14          To your recollection, is that the first

03:56 15  time that Jill Tubbs reached out to you?

03:56 16      A.  Yes.

03:56 17      Q.  Okay.  That's it for that one.

03:56 18      (The following exhibit was identified for the

03:56 19      record:  EXH Number 12.)

03:57 20      Q.  Showing you number 12.  Take a look at it.

03:57 21  Let me know when you're done.

03:57 22      A.  Okay.

03:57 23      Q.  Do you recognize this document?

03:57 24      A.  Yes.

03:57 25      Q.  What is it?

1    DENISE PAYNE - BY MR. WOLAN

03:57  2    A.  It's an email exchange that I had with

03:57  3  Jill Tubbs in medical leaves administration.

03:57  4    Q.  I note that the chain on -- well, what's

03:57  5  been marked in your disclosure as P248, it begins with

03:58  6  what appears to be your note to Tammy saying you were

03:58  7  getting blood work in Cortland.  I believe earlier

03:58  8  today you described the incident that now is reflected

03:58  9  in this document.

03:58  10    Do you agree with me that this was the

03:58  11  discussion you had with Tammy about being able to work

03:58  12  from home after the blood work in Cortland?

03:58  13    A.  Yes, this was the discussion.

03:58  14    Q.  And to clarify, then, that discussion did

03:58  15  take place on July 5, 2017?  You don't have any reason

03:58  16  to disbelieve that date?

03:58  17    A.  Right.  Correct.

03:58  18    Q.  And then I see that in the second email

03:58  19  down on the first page, page P245, that appears to be

03:59  20  your request for information about formal

03:59  21  compensation?

03:59  22    A.  Yes.

03:59  23    Q.  So to your recollection, is this the

03:59  24  impetus for the accommodation discussion in summer

03:59  25  2017 that ultimately led to your accommodation letter

|  | 1 | DENISE PAYNE - BY MR. WOLAN |
|---|---|---|
| 03:59 | 2 | of August 2? |
| 03:59 | 3 | A. Yes. |
| 03:59 | 4 | Q. I'll take that one back. Thank you. |
| 03:59 | 5 | (The following exhibit was identified for the |
| 03:59 | 6 | record: EXH Number 13.) |
| 03:59 | 7 | Q. Showing you what's been marked as 13. Go |
| 03:59 | 8 | ahead and take a look at it, and let me know when |
| 03:59 | 9 | you're done. |
| 04:00 | 10 | And while I usually wouldn't do this, I |
| 04:00 | 11 | will volunteer at this point that it should look |
| 04:00 | 12 | extremely familiar other than the most recent email in |
| 04:00 | 13 | the chain. |
| 04:00 | 14 | A. Okay. |
| 04:00 | 15 | Q. Do you recognize the document? |
| 04:00 | 16 | A. I do. |
| 04:00 | 17 | Q. What is it? |
| 04:00 | 18 | A. It's a correspondence from Julie Weaver |
| 04:00 | 19 | regarding my request for formal accommodation. |
| 04:00 | 20 | Q. In July of 2017? |
| 04:00 | 21 | A. Yes. |
| 04:00 | 22 | Q. Would you agree with me that the -- other |
| 04:00 | 23 | than Julie's top email, the rest of it is the same as |
| 04:00 | 24 | the chain in Exhibit 12 that we were just discussing? |
| 04:00 | 25 | A. Yes. |

|        |    | DENISE PAYNE - BY MR. WOLAN |
|--------|----|-----------------------------|
|        | 1  |                             |
| 04:00  | 2  | Q.  I believe it starts with your request |
| 04:00  | 3  | for -- not your request -- your notice about blood |
| 04:00  | 4  | work in the morning at Cortland. |
| 04:00  | 5  | A.  That is correct. |
| 04:00  | 6  | Q.  And I will note that when you sent your |
| 04:01  | 7  | email of July 5, 2017, it went to Julie and Jill; and |
| 04:01  | 8  | this, it's my understanding, is Julie's response. |
| 04:01  | 9  | A.  Correct. |
| 04:01  | 10 | Q.  And the other one was Jill's. |
| 04:01  | 11 | Do you have any reason to believe that 12 |
| 04:01  | 12 | and 13 aren't the initial responses from Julie and |
| 04:01  | 13 | Jill to your request? |
| 04:01  | 14 | A.  No reason to believe that. |
| 04:01  | 15 | Q.  Thank you.  I'll take that back. |
| 04:01  | 16 | (The following exhibit was identified for the |
| 04:01  | 17 | record:  EXH Number 14.) |
| 04:01  | 18 | Q.  Showing you what's been marked 14 for |
| 04:01  | 19 | identification.  Go ahead and take a look at it.  Let |
| 04:01  | 20 | me know when you're done. |
| 04:02  | 21 | A.  Okay. |
| 04:02  | 22 | Q.  Do you recognize this document? |
| 04:02  | 23 | A.  Yes. |
| 04:02  | 24 | Q.  What is it? |
| 04:02  | 25 | A.  It's an email from Jill Tubbs to Julie |

| | | |
|---|---|---|
| | 1 | DENISE PAYNE - BY MR. WOLAN |
| 04:02 | 2 | Weaver describing my accommodations. |
| 04:02 | 3 | Q.  And would you agree that you appear to be |
| 04:02 | 4 | cc'd on this email? |
| 04:02 | 5 | A.  Yes, I was copied. |
| 04:02 | 6 | Q.  And do you remember receiving the email on |
| 04:02 | 7 | or about July 18, 2017? |
| 04:02 | 8 | A.  Yes. |
| 04:02 | 9 | Q.  And to your recollection sitting here |
| 04:02 | 10 | right now looking at this, does this reflect what you |
| 04:02 | 11 | were discussing at that time with Jill and Julie? |
| 04:02 | 12 | A.  Yes. |
| 04:02 | 13 | Q.  Okay.  Thank you. |
| 04:02 | 14 | (The following exhibit was identified for the |
| 04:02 | 15 | record:  EXH Number 15.) |
| 04:02 | 16 | Q.  Showing you what's been marked for |
| 04:02 | 17 | identification as Exhibit 15.  Please take a look at |
| 04:02 | 18 | it, and let me know when you're done. |
| 04:03 | 19 | A.  Okay. |
| 04:03 | 20 | Q.  Do you recognize it? |
| 04:03 | 21 | A.  Yes. |
| 04:03 | 22 | Q.  Can you tell me what it is? |
| 04:03 | 23 | A.  It's an email exchange between myself and |
| 04:03 | 24 | Jill Tubbs. |
| 04:03 | 25 | Q.  And do you recall this email exchange |

1          DENISE PAYNE - BY MR. WOLAN

04:03  2    happening around late January into February 2018?

04:03  3          A.  Yes.

04:03  4          Q.  Would you read for me the second and third

04:03  5    sentences of the second paragraph of the top email?

04:04  6    It starts with I just...

04:04  7          A.  (As read):  I just want you to know that

04:04  8    your department and you personally did an excellent

04:04  9    job of supporting me in my time of need.  Thank you so

04:04  10   much for being a bright spot in a dark situation.

04:04  11         Q.  So would you still agree today with that

04:04  12   sentiment regarding Jill Tubbs and how she assisted

04:04  13   with your accommodations issues?

04:04  14         A.  To my knowledge, yes.

04:04  15         Q.  Okay.  Thank you.

04:04  16         (The following exhibit was identified for the

04:04  17         record:  EXH Number 16.)

04:04  18         Q.  And what I believe is lastly, I'm showing

04:04  19   you what has been marked Exhibit 16 for

04:04  20   identification.  Please take a look at it.  Let me

04:04  21   know when you're done.

04:04  22         A.  Okay.

04:04  23         Q.  Do you recognize this document?

04:04  24         A.  Yes.

04:04  25         Q.  What is it?

1            DENISE PAYNE - BY MR. WOLAN

04:04   2       A. It's a correspondence letter from Kathy

04:05   3   Doxey explaining that my pay had been increased back

04:05   4   to the minimum.

04:05   5       Q. So I see here that it states (as read):

04:05   6   Effective July 1, 2017, your hourly wage will increase

04:05   7   to 25.88.

04:05   8         So is that the 88 cents that you mentioned

04:05   9   earlier today?

04:05   10       A. Yes.

04:05   11       Q. Since you didn't have a recollection, I

04:05   12   thought we could clarify that it was July 1, 2017 that

04:05   13   that kicked in.

04:05   14         Do you have any reason to disagree with

04:05   15   that?

04:05   16       A. No.

04:05   17       Q. Okay.  Thank you.  That's it.  All right.

04:05   18   So let me just ask a few final questions here.

04:05   19         Other than what we discussed so far today,

04:05   20   are there any other acts or omissions by any Cornell

04:06   21   employees that you think were discriminatory on

04:06   22   account of your disability in 2016 or 2017?

04:06   23       A. Not that I recall.

04:06   24       Q. And just to touch base on something we

04:06   25   discussed just a little bit ago.  Any other mental or

1          DENISE PAYNE - BY MR. WOLAN

04:06  2   physical health effects you've experienced that you

04:06  3   believe arise out of your employment with or your

04:06  4   separation from employment with Cornell other than

04:06  5   what we've already discussed today?

04:06  6       A.  Nothing other than what we discussed.

04:06  7       MR. WOLAN:  And, Counsel, I will assume

04:06  8   that you and I can agree that if there are any damages

04:06  9   calculations to be done, that we can exchange those

04:07  10  later on paper regarding current payroll and such.

04:07  11      MS. VINCI:  Yes.

04:07  12      MR. WOLAN:  I don't need to ask your

04:07  13  client today for details that I assume she probably

04:07  14  doesn't have quite committed to memory.

04:07  15      MS. VINCI:  We can agree to that.

04:07  16      MR. WOLAN:  All right.  Thank you.

04:07  17      Q.  Oh, and a long time ago I asked you, but I

04:07  18  will ask you again -- I told you I would ask you

04:07  19  again -- are there any other examples of time card

04:07  20  changes that you can think of as we've been sitting

04:07  21  here today talking other than those we've already

04:07  22  discussed?  I'm just looking for every example of a

04:07  23  time card change that you can think of that Tammy

04:07  24  Lindsay may have done or authorized.

04:07  25      A.  I don't recall specific time card

1          DENISE PAYNE - BY MR. WOLAN

04:07   2   alterations, but there were several emails from Tammy

04:07   3   where she explained that she was altering my time

04:07   4   card.

04:07   5          Q.  And to your knowledge, those are the only

04:07   6   alterations to your time card that were done?

04:07   7          A.  To my knowledge.

04:08   8          MR. WOLAN:  Okay.  Nothing further.  We're

04:08   9   done.

04:08   10          MS. VINCI:  I don't have any questions.

04:08   11   I'll just reserve the witness' right to review and

04:08   12   correct the transcript.

04:08   13          MR. WOLAN:  Thank you.

04:08   14          THE VIDEOGRAPHER:  The time is 4:08.

04:08   15   We're off the record.  The deposition is complete.

16          (TIME: 4:08 p.m.)

17             *     *     *

18

19

20

21

22

23

24

25

```
1
2              W I T N E S S
3    Name         Examination by        Page
4    --------------------------------------------
5    Denise Payne       Mr. Wolan        5-191
6                   *     *     *
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1   |
 2   |              E X H I B I T S
 3   | Exhibit       Description           Marked ID'ed
 4   |-------------------------------------------------
 5   | EXH 1   Flexible Work Arrangement --
 6   |         Agreement Form, three pages,
     |         dated 2/2/17              28    28
 7   | EXH 2   Flexibility in the Workplace
     |         Policy 6.6.13            56    56
 8   |
 9   | EXH 3   Disability Accommodation
     |         Process for Faculty and Staff
10   |         Policy 6.13             65    65
11   | EXH 4   Flexible Work Arrangement --
     |         Agreement Form dated 5/16/17,
12   |         three pages              68    68
13   | EXH 5   Flexible Work Arrangement --
     |         Agreement Form dated 8/28/17   104   104
14   | EXH 6   Letter from Jill Tubbs to
     |         Denise Payne dated August 2,
15   |         2017                    113   113
16   | EXH 7   One page of emails       117   117
17   | EXH 8   One page of emails       174   174
18   | EXH 9   Letter from Kathy Doxey to
     |         Denise Payne dated 9/23/16, two
19   |         pages                   175   175
20   | EXH 10  Email from Julie Weaver to
     |         Denise Payne dated 9/26/16   176   176
21   | EXH 11  One page of emails       178   182
22   |
     | EXH 12  Four pages of emails     178   183
23   |
     | EXH 13  Four pages of emails     178   185
24   |
25   |         (Index to Exhibits continuing on next page)
```



1

2                E X H I B I T S
                   (Continuing)

3    Exhibit      Description         Marked ID'ed

4    ----------------------------------------------

5
     EXH 14  Email from Jill Tubbs to Julie
6            Weaver dated 7/18/17         178   186

7    EXH 15  One page of emails          178   187

8    EXH 16  Letter from Kathy Doxey to
             Denise Payne dated July 31 2017  178   188
9

10                  *     *     *

11

12

13

14             EXHIBITS PREVIOUSLY MARKED

15   Exhibit      Description              Page

16   ----------------------------------------------

17   EXH

18       (No Previously Marked Exhibits Presented)
19                  *     *     *

20

21

22

23

24

25

1
2               D O C U M E N T   R E Q U E S T S
3      Request                              Page
4      -----------------------------------------------------
5
6              (No Documents Requested)
                    *     *     *
7
8
9
10
11
12
13
14             C E R T I F I E D   Q U E S T I O N S
15     Question                             Page
16     -----------------------------------------------------
17
18              (No Certified Questions)
                    *     *     *
19
20
21
22
23
24
25

196

```
 1
 2                    A C K N O W L E D G M E N T
 3            I, Denise Payne, declare, swear and aver
 4    that I have read my testimony contained herein and
 5    that my answers are true and correct, with any
 6    exceptions noted on the errata sheet, under penalty of
 7    perjury.
 8            _____
 9                    Denise Payne
10
11
12            I certify that this transcript was signed
13    in my presence by Denise Payne on the 12th day of
14    November    , 2019.
15
16            IN WITNESS WHEREOF, I have hereunto set my
17    hand and affixed my seal of office of Rochester, New
18    York on this 12th day of November    , 2019.
19
20            _____
21                    Notary Public
22
23            August 19, 2021
24            My Commission Expires:
25
```

INGRID MERCEDES FERNANDEZ
NOTARY PUBLIC STATE OF NEW YORK
No. 01FE6287717
Qualified in Bronx County
My Commission Expires August 19, 2021



**ALLIANCE**
COURT REPORTING, INC.
Video Conferencing and Videography Center
www.alliancecourtreporting.net

585.546.4920                         800.724.0836

197

Witness: Denise Payne
Deposition Date:  September 4, 2019

| Pg # | Line # | Change | Clarification |
|------|--------|--------|---------------|
| 7 | 22 | 75,000 | 78,000 |
| 9 | 16 | College | School |
| 15 | 24 | school management | school of management |
| 21 | 17 | level | rate |
| 69 | 24 | in a way | or away |
| 69 | 24 | from (1) | for |
| 102 | 14 | or | on |
| 118 | 22 | Peer | performance |
| 121 | 2 | to | for |
| 156 | 11 | Sperry | Szpiro |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |



ALLIANCE
COURT REPORTING, INC
Video Conferencing and Videography Center
www.alliancecourtreporting.net

585.546.4920        ■        800.724.0856



ERRATA SHEET

Witness: Denise Payne
Deposition Date:  September 4, 2019

Pg #   Line #   Change          Clarification

1

2                  C E R T I F I C A T I O N

3
STATE OF NEW YORK:
4   COUNTY OF MONROE:

5              I, MICHELLE M. ROCHA, do hereby certify

6   that the foregoing testimony was duly sworn to; that I

7   reported in machine shorthand the foregoing pages of

8   the above-styled cause, and that they were produced by

9   computer-aided transcription (CAT) under my personal

10   supervision and constitute a true and accurate record

11   of the testimony in this proceeding;

12              I further certify that the witness

13   requests to review the transcript;

14              I further certify that I am not an

15   attorney or counsel of any parties, nor a relative or

16   employee of any attorney or counsel connected with the

17   action, nor financially interested in the action;

18              WITNESS my hand in the City of Rochester,

19   County of Monroe, State of New York.

20

21

     MICHELLE M. ROCHA

24   Freelance Court Reporter and

     Notary Public No. 01R05038965

25   in and for Monroe County, New York