**EXHIBIT U**

1   UNITED STATES DISTRICT COURT

2   NORTHERN DISTRICT OF NEW YORK

3   _____

4   DENISE PAYNE,

5           Plaintiff,

6                   INDEX NO.: 18-cv-1442

7       vs.

8

9   CORNELL UNIVERSITY,

10          Defendant.

11  _____

12

13      This is the Examination Before Trial of

14          KATHERINE DOXEY

15  held on the 16th day of December, 2019, held at

16  Cornell University Counsel's Office, 235 Garden

17  Avenue, Ithaca, New York.

18

19

20

21

22

23  REPORTED BY:  CAITLYN A. SHAYLOR

24  Shorthand Reporter

25

```
 1    APPEARANCES

 2

 3      NESENOFF & MILTENBERG, LLP

 4          363 Seventh Avenue, 5th Floor

 5          New York, New York 10001

 6          Attorneys for Plaintiff

 7          BY:  GABRIELLE M. VINCI, ESQUIRE

 8

 9      OFFICE OF UNIVERSITY COUNSEL

10          235 Garden Avenue, CCC Building

11          Ithaca, New York 14853

12          Attorneys for Defendant

13          BY:  ADAM G. PENCE, ESQUIRE

14    ALSO PRESENT:  VALERIE CROSS DORN, ESQUIRE

15

16

17

18

19

20

21

22

23

24

25
```

Katherine Doxey
December 16, 2019                                      3

1        S T I P U L A T I O N S

2

3        It is stipulated by and between the

4    parties hereto that the filing of the

5    deposition is waived; that the deposition

6    may be signed before any Notary Public;

7    and that all objections except as to the

8    form of the question are reserved to the

9    time of the trial.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Katherine Doxey
December 16, 2019                                                    4

1           K A T H E R I N E   D O X E Y

2           having been called as a witness,

3           having been duly sworn, was examined

4           and testified as follows:

5    EXAMINATION BY

6    MS. VINCI:

7       Q    Good morning.

8       A    Morning.

9       Q    Or good afternoon.

10      A    Afternoon, yes.

11      Q    Can you state your name for the record,

12   please?

13      A    Catherine Doxey.

14      Q    Good afternoon, Ms. Doxey.  We've met

15   previously, but --

16      A    Uh-huh.

17      Q    -- for the record, my name is Gabrielle

18   Vinci.  I'm one of the attorneys representing Ms.

19   Payne, Denise Payne.  Are you familiar with that

20   lawsuit at all?

21      A    Yes.

22      Q    Okay.  When did you first learn about

23   that lawsuit?

24      A    When -- I'm trying to think of the date.

25   It was probably March 2017, '18, I'm sorry.

Katherine Doxey
December 16, 2019                                                5

1    Q    That's okay.  And how did you become

2  aware of that lawsuit?

3    A    Informed by university counsel.

4    Q    Okay.  Have you spoken to anyone other

5  than university counsel about the lawsuit?  Well,

6  strike that.  Have you spoken to any other

7  Cornell employees besides university counsel

8  about Ms. Payne's lawsuit?

9    A    Only status of where it was.  Informing

10 my supervisors that I'd be out of office for

11 depositions, or --

12   Q    Okay.  And who did you discuss the status

13 of the lawsuit with?

14   A    Shawn Moeller is the executive director

15 of HR for the College of Business.  And Laura

16 Syer, the associate Dean.

17   Q    When's the last time you talked to Mr.

18 Moeller about the lawsuit?

19   A    This morning, just reminding him I was

20 going to be out of the office.

21   Q    Have you had any conversations with Mr.

22 Moeller substantively about the lawsuit, about

23 the allegations in it?

24   A    No.

25   Q    Okay.  And what about Ms. Syer, when's

1    the last time you spoke to her about the lawsuit?

2       A    Honestly, probably when we went to

3    mediation.

4       Q    Okay.  And have you spoken to Ms. Syer

5    about the substance of Ms. Payne's lawsuit, the

6    allegations she's brought?

7       A    Not since the mediation, no.

8       Q    Prior to the mediation had you discussed

9    that with Ms. Syer?

10      A    Probably only in counsel prep for that.

11      Q    Okay.  Have you ever spoken to Denise

12   about her lawsuit?

13      A    No.

14      Q    Have you seen any of the documents,

15   exchange and discovery in the lawsuit?

16           MR. PENCE:  Object to form, but you

17      may answer.

18      A    So I've reviewed the formal letters

19   involved in her case, so offer letters and layoff

20   letter, that kind of stuff.

21      Q    Have you ever been deposed before?

22      A    No.

23      Q    So I'll go over some ground rules.  Which

24   I will note you were at Ms. Payne's deposition.

25      A    Uh-huh.

Katherine Doxey
December 16, 2019                                                    7

1    Q    So they may seem repetitive to you, you

2    may recognize them from then.  But the first rule

3    is we do have a court reporter here, she's taking

4    down all of the questions and answers.  If you

5    can just keep all of your responses verbal so

6    that she can note it on the transcript.  Also,

7    it's difficult to take down two people speaking

8    at once, so I just ask that you allow me to

9    finish my question before you start your answer,

10   and I will also allow you to finish your answer

11   before I start my next question.  If at any point

12   in time I cut you off, just let me know.  I don't

13   mean to.  If at any point in time you don't

14   understand a question as I've posed it to you,

15   let me know and I will do my best to rephrase it

16   so that you can understand it and it is

17   meaningful to you.  If you answer a question, I'm

18   going to assume you understood it as I asked it,

19   is that okay?

20   A    That's clear, yep.

21   Q    From time to time your attorney may note

22   his or her objection to one of my questions, just

23   allow your attorney to get his or her objection

24   out and then you will have to proceed and answer

25   the question, unless instructed otherwise.  If at

Katherine Doxey
December 16, 2019                                        8

1   any point in time you need to take a break, just

2   let me know.  I don't anticipate we're going to

3   be here for an exorbitant amount of time at all,

4   but that being said, you can take as many breaks

5   as you need.  I would just ask that you -- if a

6   question is open, you answer the question before

7   taking that break; is that okay?

8        A    Yep.

9        Q    What, if anything, did you do to prepare

10  for today's deposition?

11       A    Looking through some policies, looking at

12  the formal correspondence to Denise, letters.

13       Q    Okay.  Which policies did you review, or

14  look through, I'm sorry?

15       A    Yeah.  So the flex arrangement, the

16  separations.

17       Q    The separations?

18       A    Yeah, separations from the university,

19  which covers layoffs.

20       Q    When you say you looked through them, did

21  you read them line by line, did you skim them,

22  something else?

23            MR. PENCE:  Object to form, but you

24       may answer.

25       A    I'm familiar with them, so I'd say I

Katherine Doxey
December 16, 2019                                              9

1    skimmed them.

2        Q    Okay.  And when did you skim through

3    these policies?

4        A    Last week.

5        Q    And the formal correspondence, is that

6    the offer letter you mentioned before?

7        A    Yes.  The offer letter when we originally

8    hired Denise, the offer letter to her most recent

9    general, and then the termination letter.

10       Q    And did you also review those last week?

11       A    Yes.

12       Q    Did you speak to anybody in preparation

13   for your deposition today?

14       A    Only counsel.

15       Q    I don't want to know the substance of any

16   conversations you've had with counsel.  When you

17   say counsel, who are you referring to speaking

18   to?

19       A    Adam and Val.

20       Q    Did you meet with counsel separately or

21   in -- together?

22       A    Together.

23       Q    And when did you meet with counsel to

24   prep for today's deposition?

25       A    It was several sessions since we've

Katherine Doxey
December 16, 2019                                    10

1    delayed a couple of times.

2        Q    Yes.

3        A    Most recent being last Thursday.

4        Q    Besides yourself and counsel, was anybody

5    else in the room?

6        A    No.

7        Q    Are you aware that -- well, strike that.

8    Do you know a Lucinda Allen?

9        A    I do.

10       Q    Okay.  Who is Lucinda Allen?

11       A    She was the, I'm trying to think of her

12   title, director of administrative services for

13   hotel.  So she was two layers above Denise.  So

14   she was supervisor of Tammy Lindsay who was

15   Denise Payne's immediate supervisor.

16       Q    Okay.  Are you aware that Ms. Allen was

17   previously deposed in this case?

18       A    Yes.

19       Q    Did you speak to Ms. Allen about her

20   deposition?

21       A    I did not.

22       Q    Did you speak to Ms. Allen about your

23   deposition today?

24       A    I did not.

25       Q    Okay.  Have you taken any medications,

Katherine Doxey
December 16, 2019                                                    11

1    either prescription or over the counter, in the

2    last 24 hours that would affect your ability to

3    testify today?

4        A    Nope.

5        Q    Have you taken any medications in the

6    last 24 hours, again prescription or over the

7    counter, that would affect your memory?

8        A    No.

9        Q    Sitting here today is there any reason

10   you can think of that you would not be able to

11   understand and answer my questions?

12       A    No.

13       Q    What's your highest level of education?

14       A    Master's.

15       Q    In what?

16       A    Education.

17       Q    And where did you earn your Master's?

18       A    University of Rochester.

19       Q    And when did you earn it?

20       A    '87.

21       Q    Do you hold any specialized

22   certifications or licenses?

23       A    Senior professional in human resources,

24   SPHR.

25       Q    SPHR, the acronym?

Katherine Doxey
December 16, 2019                                          12

1    A    Uh-huh.

2    Q    And when did you earn that?

3    A    2003, I believe.

4    Q    Okay.  And do you have to take a course

5    for that, or go to a special school for that?

6    How do you earn that certification?

7    A    It's an exam, but there are preparation

8    courses, which I did.

9    Q    Okay.  And where did --

10   A    And --

11   Q    Sorry, go ahead.

12   A    Then you have to have so many credit

13   hours each year, or every three years you

14   recertify.

15   Q    Where did you take the preparation

16   courses?

17   A    University of Southern Maine.

18   Q    Are you currently employed by Cornell

19   University?

20   A    I am.

21   Q    For how long have you been employed by

22   Cornell?

23   A    12 years.

24   Q    What is your current position --

25   A    Director --

Katherine Doxey
December 16, 2019                                                13

1    Q    -- title?

2    A    -- of human resources for the College of

3    Business.  Well, the branding people would not be

4    happy, the SC Johnson College of Business.

5    Q    We won't tell them.  How long have you

6    been the director of HR for the College of

7    Business?

8    A    The college was formed in July 2016.

9    Prior to that I was HR director for Johnson

10   Graduate School of Management, which is one of

11   the schools that merged into the college.

12   Q    How long have you held an HR position at

13   Cornell?

14   A    12 years.

15   Q    Okay.  How long have you been a director

16   of HR of any college of Cornell?

17   A    Well, I've been at Cornell for 12 years.

18   Q    Okay.  Let me do it this way.  Have you

19   always held a director of HR position at Cornell?

20   A    I think officially I was manager when I

21   first started, so maybe director came in 2009 or

22   '10.

23   Q    And in your role as director do you

24   supervise any employees?

25   A    I do.

Katherine Doxey
December 16, 2019                                                14

1      Q      How many employees are you currently

2    supervising?

3      A      Three.

4      Q      And is it -- do they all hold different

5    job titles, do you supervise a specific class of

6    jobs, or how does it work?

7      A      So right now I supervise two HR

8    associates and one HR assistant.

9      Q      And what are your duties as the director

10   of HR?

11     A      So the people I supervise are what's

12   referred to as the operations team, and so they

13   are the first point of contact for all of our

14   clients.  So I supervise initial interactions

15   with employees and -- and managers and I also do

16   the compensation and classification for the

17   college.

18     Q      When you say you do the compensation and

19   classification for the college, what do you mean

20   by that?  What do you do in that role?

21     A      So any of our offers to candidates come

22   through me and I make the suggestion on what the

23   manager can offer as a starting point, any

24   requests for promotion or bonuses or those kinds

25   of things.

1    Q    And when you say you suggest what can be

2    offered in an offer letter for a new position or

3    whatnot, does the manager have to accept what you

4    suggest or can he or she make a different

5    determination?

6              MR. PENCE:  Object to form, but you

7         may answer.

8    A    If they don't think the range I am

9    suggesting is reasonable, we discuss why.  If we

10   don't agree then they can escalate that to my

11   boss or his boss.

12   Q    Does HR, meaning anybody in the HR

13   department who's involved in this process, does

14   HR have the final say in what compensation is

15   offered to a new employee?

16   A    Usually.  Ultimately the dean has the

17   final authority on all decisions at the college.

18   Q    You're familiar with Denise Payne,

19   correct?

20   A    Uh-huh.

21   Q    When did you first meet Ms. Payne?

22   A    She was hired in August of 2015 as a

23   research aide in the business simulation lab.  I

24   was not involved in her hiring; although, I

25   probably did an orientation with her as a new

Katherine Doxey
December 16, 2019                                    16

1   employee.

2      Q    What sort of things go -- are -- strike

3   that.  What is involved in orientation for new

4   employees, what do they have to go through during

5   the orientation?

6      A    It's a session where we talk about

7   benefits, you know, describe the different plans,

8   the observation, personal time, sick time at that

9   point.  We review a couple of policies, we talk

10  about the history of the school at that point,

11  the structure of the school.

12     Q    And I know you said you were possibly

13  involved in Ms. Payne's orientation, who

14  generally administers the orientation?

15     A    So I did at the time.  When she was

16  hired, it was myself and a couple of assistants.

17  Shortly after Denise started I hired Julie Weaver

18  as the assistant director, and from that point

19  forward she took over the orientation of new

20  employees.

21     Q    Okay.  Ms. Weaver is no longer with

22  Cornell, correct?

23     A    No, she left.

24     Q    Do you recall when she left?

25     A    In June she moved to Virginia.

1    Q    Okay.  Do you know of 2019?

2    A    Uh-huh.

3    Q    Is that a yes?

4    A    Yes, sorry.

5    Q    It's just for the transcript.

6    A    Uh-huh.

7    Q    Sorry.  Did somebody else assume the

8    assistant director role upon her departure?

9    A    The position was filled, but we kind of

10   restructured, such that instead of having the

11   assistant directors be the initial point of

12   contact for all client groups and own -- sort of

13   speak to, you know, the school or department, the

14   assistant directors became specialists.  So I

15   took on compensation and the replacement person

16   for Julie took on all academic HR issues.

17   Somebody else had employee relations and

18   recruiting, somebody else had labor.

19   Q    So at the time that Ms. Payne was hired

20   in August of 2015 -- strike that.  At the time

21   that Ms. Weaver was hired, what were her duties

22   as assistant director?

23   A    So she was the person that employees and

24   managers would initially contact with questions

25   and she helped with some training and some

1    projects and recruitment.

2        Q    Was part of her duties at that time to --

3    to listen to or to take any employee complaints?

4        A    Yes.

5        Q    Did there come a time that you learned

6    Ms. Payne was diagnosed with cancer?

7        A    Yes.

8        Q    And how did you learn that?

9        A    She I believe told me by e-mail.

10       (EXHIBIT D MARKED FOR IDENTIFICATION.)

11       Q    Ms. Doxey, I'm handing you what has been

12   marked as Plaintiff's Exhibit D.  I'd just ask

13   that you review that and let me know when you've

14   had a chance to do so.

15       A    Okay.

16       Q    Okay.  Do you recognize this document?

17       A    I do.

18       Q    Okay.  Would you agree that the bottom,

19   the kind of starting e-mail from Denise Payne to

20   yourself copying Margaret Shackell is an e-mail

21   wherein she's telling you about her cancer

22   diagnosis?

23       A    Yes.

24       Q    Do you recall receiving this e-mail?

25       A    I do.

Katherine Doxey
December 16, 2019                                      19

1     Q    And you appear to respond that you were

2   sorry to hear that and then also ask when she may

3   be available for a quick chat, do you see that?

4     A    Uh-huh.

5          MR. PENCE:  Object to the form.  The

6       document speaks for itself.

7     Q    Do you -- following this e-mail did you

8   meet with Ms. Payne?

9     A    I did.

10    Q    Okay.  When did you meet with Ms. Payne

11  in response to this e-mail?

12    A    I believe it was a few days after.  I

13  don't recall the exact date, but --

14    Q    Okay.  All right.  So -- this e-mail is

15  dated, or the last e-mail in this chain is dated

16  June 20th, 2016, so would it be a few days after

17  that?

18    A    I don't recall specifically, but that's

19  about the time frame.

20    Q    Okay.  And where did you meet with Ms.

21  Payne at that time?

22    A    In my office in Sage Hall, which would've

23  been 221, I believe at that time.

24    Q    Was anybody else present?

25    A    Julie Weaver was.

1    Q    Did you ask Ms. Weaver to attend the

2    meeting?

3    A    I did.

4    Q    Why?

5    A    Because she's the one who would typically

6    meet with employees around their short-term

7    disability and medical leave procedures.

8    Q    And what did you, Ms. Weaver, and Ms.

9    Payne discuss during that meeting?

10    A    Certainly her expected time away needs,

11    but we also were meeting to talk about other job

12    possibilities.

13    Q    Okay.  Why were you meeting with Ms.

14    Payne to speak about other job possibilities?

15    A    She was working in the business

16    simulation lab, which was a part-time job at what

17    we call a C band.  So the pay bands go from

18    lowest A, up to the highest I.  And so Denise was

19    in a relatively entry level position, part time.

20    There were some issues with her and one of the

21    faculty members that frequently use that lab,

22    some friction there.  I think new faculty coming

23    in were more interested in using the lab, but had

24    request to use different software that Ms. Payne

25    wasn't familiar with, so they were starting to

1   realize that perhaps they hired at the wrong

2   level.  I knew there was some friction there, so

3   her supervisor Margaret Shackell-Dell (phonetic)

4   was talking to me about, you know, is there other

5   possibilities in the college, or in the school at

6   the time.  It had already been announced at that

7   point that the three schools were going to be

8   merging into the College of Business, so I knew

9   that there was a possibility that other

10  opportunities would be there, so I wanted to talk

11  to her about what her interest was, what her

12  availability would be, whether she wanted to

13  think about a different option.

14      Q    And were there specific roles or other

15  job positions, specific job positions that you

16  wanted to talk to her about, or were you trying

17  to just determine generally if she'd be

18  interested in taking another role?

19      A    Both.  So I knew that they were going to

20  form what they were calling at the time the

21  business analytics team, which had an opening.

22  This was a team that was basically dealing with

23  data for mostly academics, but also decision

24  making, kind of, support for the deans.  And I

25  knew from my discussion with Margaret Shackell

Katherine Doxey
December 16, 2019                                                22

1    that one of the reasons Denise took the part-time

2    job was she was going through school, I believe

3    she was getting her Master's in statistics, and

4    so it seemed like a possibly good fit for her,

5    that that might be a direction she wanted to go.

6    Q    Did you speak to her about any other

7    positions at that time?

8    A    I think we talked about the possibility

9    of faculty support had an opening; that's the

10   administrative pool that supports faculty needs

11   in the classroom.  As I recall she has -- was

12   less excited about that.

13   Q    Okay.  What did Ms. Payne say when you

14   brought up, I don't want to say propose, but when

15   you discussed the potential opening with the

16   business analytics team, what was her reaction?

17   A    She seemed excited about it and

18   definitely wanted to -- to continue to have

19   discussions.

20   Q    At that time that you spoke to her about

21   that possible position, was there a set

22   understanding of what that position would be?

23        MR. PENCE:  Object to form, but you

24     may answer.

25   A    There certainly was no job description,

Katherine Doxey
December 16, 2019                                          23

1    there was only a concept at the time.  So it was

2    a general discussion, it wasn't here's the

3    duties, you know?

4       Q    Okay.  But did you discuss with Ms. Payne

5    what the general concept of what she would do in

6    that role would be?

7       A    Yes.

8       Q    Did you have any discussions with her at

9    that time about what the compensation for that

10   role would be?

11      A    I don't believe at that meeting we got

12   into compensation.

13      Q    Okay.

14      A    Other than perhaps mentioning it's

15   probably a higher level role.

16      Q    At that time of that meeting was there

17   also some understanding of what the compensation

18   for that role would be?

19           MR. PENCE:  Object to form.  You may

20       answer.

21      A    Are you asking if I knew what it was, or

22   if I discussed it with Denise?

23      Q    Well, you already said you don't recall

24   discussing it with Denise.  Possibly mentioning

25   that it was a higher level, but nothing specific.

Katherine Doxey
December 16, 2019                                        24

1   So I guess my question is did you or HR generally

2   have any understanding of what the compensation

3   for that conceptualized role would be?

4            MR. PENCE:  Object to form, but you

5       may answer.

6   A    In general, yes.  From what I knew about

7   the role it sounded like a data analyst.  It

8   sounded similar to another role we had, so, you

9   know, I knew it was going to probably be an E

10  band.

11  Q    What role did it sound similar to?

12  A    There were two other people in the

13  department that did similar things, one was part

14  time and one was actually vacant at the time, but

15  it was a data analyst.

16  Q    Okay.  Can you just explain the concept

17  of the pay bands to me?

18  A    Uh-huh.

19  Q    What the -- how you determine which band

20  is -- goes to which role?

21  A    Uh-huh, sure.  So each of the pay bands

22  has what we call generics, so there's a

23  description of duties and of the characteristics

24  that go into classifying a position.  So it's

25  education, it's experience, it's decision making

Katherine Doxey
December 16, 2019                                    25

1    authority, it's impacts of -- if an error was

2    made, how wide spread is that.  It's who they

3    interact with inside the university or outside.

4    Whether they simply state the policy or they

5    interpret it or they create it, or they

6    negotiate.  And so there's various different

7    factors that go into classifying each of the

8    positions.

9        Q    Is it fair to say the more complex the

10   position, the higher the pay band?

11       A    Yes.

12       Q    Are the pay bands used for both hourly

13   and salaried employees?

14       A    Yes.

15       Q    Okay.  Is there a difference in -- is

16   there a difference in determining which pay band

17   is going to be used for a certain role dependent

18   on whether it's going to be hourly or salaried?

19            MR. PENCE:  Object to form, but you

20       may answer.

21       A    The role is classified on the

22   characteristics of the position, and part of that

23   is what kind of decision making authority the

24   position has.  So in general bands A through D

25   are all hourly; E roles are a mix, they can be

Katherine Doxey
December 16, 2019                                                26

1    either exempt or non exempt; and then F and above

2    are typically exempt if they meet the salary

3    minimums.

4        Q    All right.  So going back to the meeting

5    you had with Ms. Payne.  So you spoke about the

6    other job positions you discussed with her, and I

7    believe you also mentioned you discussed with her

8    at that time her expected time away?

9        A    Uh-huh.

10       Q    Okay.  What did she say about what she

11   expected to need in terms of being away from the

12   college?

13       A    I believe she said she'd have some

14   treatment and need to be out for a little bit.

15   She may have even had surgery that summer, but

16   would expect to -- to be back by, I believe, late

17   summer, early fall and so we had arranged for her

18   to meet with Cindy Allen once she was able to

19   come in and talk about the role.

20       Q    How did you -- in what way did you

21   arrange for her to meet with Cindy Allen?

22       A    It was virtual e-mail introduction.

23       Q    Besides discussing her anticipated time

24   away or needed time away, did Ms. Payne discuss

25   anything more about her diagnosis during that

Katherine Doxey
December 16, 2019                                                          27

1   meeting?

2      A   Not that I recall.

3      Q   Okay.  Did she -- do you recall any

4   discussion about possible accommodations at the

5   university?

6          MR. PENCE:  Object to form, asked and

7      answered, but --

8      A   Other than the time off she would need?

9   I don't recall at that point getting into

10  accommodations.

11     Q   And at that time of Ms. Payne's cancer

12  diagnosis there was a policy at Cornell for

13  requesting disability accommodations, correct?

14     A   Sure.

15     Q   I'm going to show you what's been

16  previously marked as -- by all means take as much

17  time that you need to review it.  My pretty much

18  one and only question is going to be have you

19  ever seen this before.

20     A   Okay.

21     Q   So I'll hand you what has been previously

22  marked as Defendant's Exhibit 3.  Put this to the

23  side.

24     A   Okay.

25     Q   Okay.  Have you reviewed Defendant's

Katherine Doxey
December 16, 2019                                28

1   Exhibit 3?

2      A    Yes.

3      Q    Have you ever seen this before?

4      A    Yes.

5      Q    You agree this is the disability

6   accommodation policy at Cornell?

7      A    Yes.

8      Q    Okay.  At the time of Ms. Payne's

9   diagnosis, or when you found out about her

10  diagnosis, what was the process for requesting

11  disability accommodations at Cornell?

12     A    The employee basically would need to

13  request of local HR or the medical leaves

14  administration.

15     Q    When you say local HR, would that be

16  something that an employee could do through Ms.

17  Weaver?

18     A    That's typically where it starts, yes.

19  And then there's an official form that goes to

20  the medical leaves administration.

21     Q    Does an employee -- is an employee

22  required to request a specific type of

23  accommodation?

24         MR. PENCE:  Object to form, but you

25      may answer.

Katherine Doxey
December 16, 2019                                                        29

1    A    Yeah, I'm not sure what your question is.

2    Q    So when an employee is seeking an

3    accommodation for a disability, is he or she

4    required to request I need a -- this specific

5    accommodation, or is it something other than

6    that?

7    A    Usually specific to what they need.

8    Q    Okay.  Do you know if Ms. Payne met with

9    Ms. Allen regarding the potential data analyst

10   role?

11   A    I believe they did, yeah.

12   Q    How were you aware of that meeting?

13   A    I believe I saw an e-mail exchanged

14   between them where Ms. Allen reached out to

15   Denise who said, yes, she'd like to meet.

16   Q    Did you ever speak to Ms. Payne about

17   that meeting?

18   A    I don't recall.

19   Q    Okay.  Did you ever speak to Ms. Allen

20   about that meeting?

21   A    I don't remember the specific meeting,

22   but clearly she would've had to have agreed that

23   it seemed like a good match and she'd like to

24   hire her.

25   Q    So was Ms. -- was Ms. Payne's assuming

Katherine Doxey
December 16, 2019

30

1    that role, for her to take that role the data

2    analyst position, did Ms. Allen have to approve

3    of that?

4             MR. PENCE:   Object to form.

5    A    Yeah.

6             MR. PENCE:   But you may answer.

7    A    Yeah, I mean, as a hiring manager if she

8    didn't feel like the skills were a match we

9    wouldn't have put her there.

10   Q    Okay.   So is it fair to say -- strike

11   that.   Did you and Ms. Allen speak about hiring

12   Ms. Payne before she was offered the data analyst

13   role?

14   A    Yes.

15   Q    Okay.   Tell me -- well, how many times

16   did you speak to Ms. Allen about that?

17   A    I'm not sure, one or two --

18   Q    Okay.

19   A    -- I'd say.

20   Q    And what did you discuss specific about

21   Ms. Payne when you spoke to Ms. Allen about her

22   potentially assuming the data analyst role?

23   A    What her needs were from the job, skill

24   level-wise.   Whether Denise seemed to have the

25   potential to do the job, whether she could wait

1    the required time because Denise still was

2    working for the business simulation lab and so

3    she was going to phase out of that through the

4    fall, so the timing, you know, whether that would

5    work.

6        Q    Okay.  Did you and Ms. Allen -- well,

7    strike that.  Ms. Payne was ultimately offered

8    the data analyst role, correct?

9        A    Yes.

10        Q    Did you and Ms. Allen prior to making the

11    offer to Ms. Payne discuss the compensation for

12    that role?

13            MR. PENCE:  Object to form.  You may

14        answer.

15        A    Yes.

16        Q    Okay.  And what did you and Ms. Allen

17    discuss about what the compensation would be?

18        A    In discussions with Ms. Allen and

19    separately with Laura Syer, who was ultimately

20    over this group and HR, we decided because it was

21    a two band jump, which is very unusual --

22    normally you would post these things, but because

23    we were in a reorg situation with the formation

24    of the college we had the flexibility to do some

25    of this kind of movement.  But because she had

1    been in a C level position we didn't know exactly

2    what her skills and -- and abilities were.  We

3    put her at the minimum of the band.

4        Q    Okay.  And what band was that, what was

5    the minimum?

6        A    E, I don't remember exactly what the --

7        Q    Okay.

8             MR. PENCE:  Make sure to let her

9         finish the question.

10       Q    It happens all the time.  Goes against

11   like normal conversation, but for the sake of our

12   court reporter, try and do that.  So you've

13   mentioned a couple of times today the joining or

14   merger of different schools and a reorganization,

15   can you just explain what happened, the merger of

16   the three schools?

17       A    I'll try.

18       Q    Okay.

19       A    So apparently it was a concept that's

20   been talked about for several decades, in fact,

21   to take the three different schools at the

22   university that were accredited as business

23   schools and merge them together.  So the School

24   of Hotel Administration, the Graduate School of

25   Management, and the Dyson Undergrad School of

1   Economics and Applied -- Applied Economics and

2   Management.  So those were the three schools that

3   were accredited through AACSB, which is the body.

4   They made the announcement in December of '15

5   that this college would launch in July of '16.

6   There was no plan, there was no consultant, there

7   was nobody familiar with mergers, acquisition

8   kind of stuff.  They said form some task forces

9   and figure it out.  It was a very chaotic time.

10  All three schools had staff and departments in

11  certain functions and so they were thrown

12  together and people had new managers, they were

13  moved to different locations, they were in new

14  jobs, so very few people had accurate job

15  descriptions, and we had to, you know, recreate

16  policies and procedures, and platforms, and IT

17  systems and it was a blur.

18      Q     Has the merger been completed as of

19  today's date?

20      A     It's officially merged.  There are still

21  lots of changes going on.  More and more things

22  are being combined up at the central college

23  level.  So staff are being removed from the

24  school that they used to report to, so diversity

25  inclusion and student services and some of the

Katherine Doxey
December 16, 2019                                34

1   phase II kind of work.  So initially it was your

2   administrative functions and then it's moving

3   into student services.

4        Q    Okay.  At the time that Ms. Payne was

5   offered the data analyst role, was there a set

6   job description for that role for her?

7              MR. PENCE:  Object to form, asked and

8        answered, but --

9        A    Yeah, there wasn't an official job

10  description.  It was -- I think I listed five

11  bullets, if you will, of what -- what we thought

12  the -- the role would be.  The business analytics

13  team was brand new and they were figuring out

14  what -- what the roles were going to be and what

15  the work needed.

16       Q    Okay.  At the time that the offer was

17  made to Ms. Payne what was the understanding of

18  what that role would be, what she would be doing?

19             MR. PENCE:  Object to form.

20       A    So rankings and surveys I think was one

21  of the things that I think they were hoping that

22  she would eventually learn and take on.  There

23  were a platform or an application called activity

24  insight, which captures all of the faculty

25  information on what their activity was, where

Katherine Doxey
December 16, 2019                                          35

1    they're publishing and that kind of thing.  So

2    she was helping in that software.  General

3    querying of databases and helping, you know, pull

4    reports together.

5        Q    Anything else?

6        A    That's what I remember.

7        Q    Okay.  And who would Ms. Payne be

8    reporting to?

9        A    Initially it was Cindy Allen and then

10   Cindy put Tammy Lindsay in charge of a couple

11   other people.

12       Q    For how long was Ms. Payne reporting to

13   Ms. Allen before Ms. Lindsay was put into place?

14       A    I don't recall exactly.  I want to say a

15   couple of months maybe.

16       Q    Do you recall when Ms. Lindsay assumed

17   the role of being Ms. Payne's supervisor?

18       A    Not exactly, no.

19       Q    Okay.  Was Ms. Lindsay a new hire to the

20   university at the time, or had she worked for the

21   university already?

22       A    She had worked for the university for a

23   good number of years.  I want to say ten-ish, but

24   I'm not exactly sure.

25       Q    Okay.  Okay.  I'll show you what's been

Katherine Doxey
December 16, 2019                                          36

1    previously marked as Defendant's Exhibit 9.  It's

2    just the offer letter.  I'll just have you take a

3    look at that and let me know when you've had a

4    chance to do so.

5        A    Okay.

6        Q    Okay.  Have you ever seen this before?

7        A    I have.

8        Q    Okay.  This appears to be Ms. Payne's

9    offer letter from you dated September 23rd, 2016;

10   is that correct?

11       A    That is correct.

12       Q    Okay.  And it starts with Dear, Denise,

13   on behalf of Cindy Allen, do you see that?

14       A    Uh-huh.

15       Q    Did you discuss the substance of this

16   offer letter with Ms. Allen?

17       A    Yes.

18       Q    Okay.  Did you -- did you draft this

19   offer letter, or did Ms. Allen, or someone else?

20       A    I did.

21       Q    Okay.  You testified that Ms. Payne was

22   placed in a pay band E for the data analyst role,

23   correct?

24       A    That's right, yep.

25       Q    And that was the lowest pay band for that

1  role?

2           MR. PENCE:  Object to form.  I don't

3      think that's what the witness said.

4      A    No, so she was placed at the minimum of

5  that title, which there are multiple titles in

6  each pay band and so each one has a minimum

7  market rate and a max.

8      Q    Do you know what the max pay band was for

9  that title?

10     A    I don't.

11     Q    At the time that Ms. Payne was made the

12  offer, provided the offer letter, did she discuss

13  with you the compensation arrangement?

14     A    I don't recall a lot of discussion about

15  it.

16     Q    Did she ever discuss with you her being

17  placed at the band E level?

18     A    It would've been part of the offer.  I'm

19  not sure there was much discussion.

20     Q    Are you aware of any -- strike that.  At

21  any point in time that Ms. Payne was in the data

22  analyst role did she ever complain to you about

23  being compensated at a pay level E or pay band E?

24     A    Her complaints were about being at the

25  minimum of the E band.

1    Q    How many times did she complain about

2  being at the minimum of the E band?

3            MR. PENCE:  To her?

4            MS. VINCI:  Yes.

5    A    I had one personal discussion with her a

6  year after.  I'm aware that when the pay bands

7  shifted in July she fell below the new minimum

8  and she brought that to Julie's attention and we

9  corrected that.

10    Q    Sorry.  When the pay bands shifted?

11    A    So central compensation does a market

12  analysis survey work every spring and if

13  warranted, the market has shifted, they change

14  the pay bands as of July 1.  And apparently that

15  happened in the data analyst role.

16    Q    And you said she brought that to the

17  attention of Ms. Weaver and you guys fixed that?

18    A    Uh-huh.

19    Q    What did you do to fix it?

20    A    Brought her back up to the new minimum.

21    Q    Okay.  Going back to the personal

22  discussion that she had with you.  You said it

23  was about a year after, a year after what?

24    A    After she started in the role she

25  declined a meeting that Laura Syer set up because

Katherine Doxey
December 16, 2019                                    39

1    she didn't know what the content or purpose was

2    and asked me if I knew.  And I said, yes, I can

3    tell you about that.  And so she came in and we

4    discussed a couple of things, but one of which

5    was her disappointment at the pay.

6        Q    And what did she express to you as to why

7    she was disappointed in the pay?  What was

8    disappointing her?

9        A    She felt like she had years of experience

10   at the university that we were not considering

11   and that she should not have been at the minimum.

12       Q    And what was your response to that?

13       A    I said that I would look at it again and

14   we discussed the fact that she had -- because she

15   was only working part time, she was put in an

16   hourly position when she would've been eligible

17   for exempt or salaried based on that particular

18   role and title.  And because of that she had to

19   use her HAP time, health and personal, for all

20   missed work.  And I had said I would look into

21   possibly reinstating the little bits of HAP she

22   had to use for a doctor's appointment here or

23   there.

24       Q    Do you recall how much HAP time you

25   looked into potentially reinstating for her at

1   that time?

2      A    It actually ended up being maybe four

3   hours or so of HAP and a fraction of an hour on

4   vacation.

5      Q    And were you able to reinstate any of

6   that time for her?

7      A    Unfortunately, no.  We made the proposal

8   to Laura Syer to increase her pay and to give

9   back that time and Laura felt like there was, at

10   that point, too much uncertainty about the role

11   and the future of the department, and Denise's

12   performance that she'd rather not at that point

13   make the adjustments.

14      Q    Okay.  Did Ms. Syer say to you that she

15   did not want to make those adjustments because of

16   this?

17      A    (Witness Nodded Head.)

18      Q    Did she --

19      A    She actually said it to Julie Weaver.

20   Julie was the one that talked to Laura.

21      Q    Okay.  And then did you speak to Ms.

22   Weaver about Ms. Syer's decision?

23      A    Yes.

24      Q    Okay.  Okay.

25          MS. VINCI:  If we can just take a

Katherine Doxey
December 16, 2019                                          41

1       quick five minute break.

2               MR. PENCE:  Sure.

3               (OFF THE RECORD.)

4       Q    Ms. Doxey, before the break we were

5    discussing a meeting you had with Ms. Payne, I

6    believe you said about a year after she assumed

7    the data analyst role where she discussed her

8    dissatisfaction at her pay band level; do you

9    recall that?

10      A    I do.

11      Q    Okay.  And you testified that you were

12   aware of a conversation between Ms. Weaver and

13   Ms. Syer regarding Ms. Syer's decision not to

14   change Ms. -- Ms. Payne's pay level and also not

15   to reimburse or reinstate some HAP time.

16              MR. PENCE:  Objection.  I believe

17          that mischaracterizes the testimony, but

18          that --

19              MS. CROSS DORN:  There's no question

20          pending.

21              MR. PENCE:  Okay.  Well, still, it's

22          -- mischaracterizes, but go ahead.

23      Q    All right.  So I'll rephrase.  I believe

24   before the break you had testified that Ms.

25   Weaver told you about Ms. Syer's decision related

Katherine Doxey
December 16, 2019                                    42

1    to reimbursing or reinstating some HAP time for

2    Ms. Payne; is that correct?

3        A    That is correct.

4        Q    Okay.  And at that time Ms. Syer, to your

5    understanding, was -- there was too much

6    uncertainty about the role and the department, so

7    she determined not to reinstate the HAP time; is

8    that accurate?

9        A    Denise was in an non-exempt position, an

10   hourly position, which means that you would have

11   to account for all hours of the day, so if you

12   don't work, you have to use your health and

13   personal or your vacation.  Because she was not

14   in an exempt position, which she had wanted to

15   be, but was not put in at an exempt position.  In

16   an exempt role you wouldn't have had to use tiny

17   bits of time to fill up your day, you're paid for

18   the work that you do, and the result's not your

19   time.  So Denise kept wanting to be put in an

20   exempt role, which requires, you know, a level of

21   discretion and decision making and there was, you

22   know, not the security that Denise was handling

23   all of her time off requests and communication to

24   be put in that exempt role.

25       Q    When you say there was not the security

Katherine Doxey
December 16, 2019                                    43

1   that Denise was handling her time off requests,

2   we'll start with that, what do you mean by that?

3       A   A lot of the friction, as I understand

4   it, between Denise and Tammy and Cindy was she

5   wasn't following their direction on how to record

6   or ask for time off, how to put it on the

7   calendar, how to give proper notice in advance

8   when she knew it.

9       Q   And how were you aware of this friction

10  between Denise and Tammy and Lindsay?  Or Tammy

11  and Cindy, I'm sorry.

12      A   Yeah.  Denise would frequently e-mail

13  about her happiness about how she felt Tammy was

14  treating her, and correcting her timecard, and

15  not allowing her to work from home, and --

16      Q   When you say frequently, how frequently

17  would she e-mail with, let's start with you

18  personally about that?

19      A   She I don't think ever e-mailed me alone

20  directly.  I was copied on many things.  So most

21  of her communication was with Julie and I was

22  copied.  So aware from a high level standpoint,

23  but I wasn't involved in the daily discussions

24  and e-mails and phone calls.

25      Q   Okay.  How often would she e-mail Julie

Katherine Doxey
December 16, 2019                                          44

1    copying you regarding this issue with Ms.

2    Lindsay?

3        A    I'm not sure.

4        Q    Okay.  Was -- do you know how many times

5    overall she e-mailed about this issue that you

6    were copied on?

7        A    At least several.

8        Q    What do you consider several times?

9        A    I don't know, maybe once a month over the

10   year, year and a half.

11       Q    Okay.  Did you ever discuss Ms. Payne's

12   complaints in these e-mails or concerns in these

13   e-mails with her?

14       A    I did not speak to her directly on any of

15   this until that meeting in, I think it was

16   September, when she wanted to know what the

17   meeting was about with Laura.

18       Q    Okay.

19       A    So all of her communications around her

20   frustrations were with Julie.

21       Q    Okay.  Did you ever speak to Ms. Weaver

22   about Ms. Payne's frustrations, as you've termed

23   them?

24       A    In our usual, you know, one-on-one

25   meetings.

Katherine Doxey
December 16, 2019                                                        45

1    Q    Okay.

2    A    And --

3    Q    Sorry, go ahead.

4    A    So it would be weekly meetings about all

5    of her clients and Denise, you know, and

6    everybody would come up occasionally.

7    Q    And what did you and Ms. Weaver discuss

8    regarding Denise's frustrations in these e-mails?

9    A    Julie would go back to either Tammy or

10   Cindy and/or Denise trying to get them to be on

11   the same page, if you will.  Denise and -- I

12   mean, Cindy and Tammy were managers who did

13   things by the books.  They were, you know, tough

14   managers for, you know, demanding.  They weren't

15   wrong in what they were doing as far as following

16   policy.  And Denise, I think, was looking for a

17   little more flexibility and freedom to do what

18   she wanted from a scheduling standpoint.

19   Q    When you say that Tammy and Cindy were

20   not wrong in what they were doing by the policy,

21   what were they doing that was not wrong?

22   A    One of the things that, excuse me, Denise

23   complained about was that Tammy would correct her

24   timecard.  So Denise would put more of the HAP

25   time on than she had and so Tammy would take it

Katherine Doxey
December 16, 2019                                                    46

1   off.  Or Denise wanted to, said she wanted to

2   work from home and Tammy would say that you

3   didn't get that pre-approved, or you're too ill

4   to work in the office so you're probably too ill

5   to work at home, so go home and rest and take

6   care of yourself.

7       Q    Are you aware of the concept of a

8   flexible work arrangement?

9       A    I am.

10      Q    Or work agreement.

11      A    Uh-huh.

12      Q    That is something offered to employees at

13  Cornell; is that correct?

14      A    It is, yes.

15      Q    Can you explain in your own words what

16  that is, what those arrangements are?

17      A    The employee can request to either work

18  compressed work, or work in a different location,

19  or work a different schedule and there's a

20  specific form that gets filled out once the

21  supervisor and the employee agree to what will

22  work from a business standpoint and the employee

23  standpoint and things are documented on hours and

24  location.

25      Q    And you're -- are you aware that Ms.

Katherine Doxey
December 16, 2019                                                  47

1    Payne was on a -- had a flex work arrangement

2    with Cornell?

3        A    Three different ones, I believe, yes.

4        Q    Okay.  Did you -- have you ever seen

5    those agreements?

6        A    Yes.

7        Q    Okay.  Did you see them at the time that

8    they were being negotiated and -- and signed

9    while Ms. Payne was working for Cornell?

10       A    No, I wasn't involved in the drafting of

11   them or the signing of them.

12       Q    Okay.  Is HR involved at all in the, I'll

13   call it the negotiation of those agreements

14   between the employee and their respective

15   supervisor?

16            MR. PENCE:  Object to the form.  You

17       may answer.

18       A    Not always.  If things are straight

19   forward or can be worked out between the

20   supervisor and the employee, HR doesn't need to

21   get involved, but we certainly can.

22       Q    Okay.  And you said, I believe, you were

23   not involved in negotiating or drafting Ms.

24   Payne's work agreements?

25       A    No.

1    Q    Okay.  Do you know if anyone from HR was?

2    A    Julie was.

3    Q    Do you know why Julie was involved in Ms.

4  Payne's work arrangements, or work agreements

5  rather?

6    A    I think Denise felt more comfortable

7  having somebody else involved.  Denise -- I mean,

8  Cindy and Tammy felt like they wanted people

9  available even from home on very specific hours,

10  and so Julie would help comprise on, no, I think

11  she can start earlier or work later if need be

12  with the work that she does.

13    Q    Do you know if Julie was involved in all

14  three of Ms. Payne's work agreements?

15    A    I believe so.

16    Q    Do you recall or do you know when the

17  first work arrangement was signed?

18    A    I think it was shortly after she had

19  gotten back from leave, so I want to say January,

20  but I'm not entirely sure.

21    Q    And you just mentioned a leave, she went

22  on -- she meaning Ms. Payne --

23    A    Yeah.

24    Q    -- went on a medical leave in the fall of

25  2016, do you recall that?

Katherine Doxey
December 16, 2019                                        49

1      A    Yes.

2      Q    Do you recall the span, the time span

3  that she was out?

4      A    I believe she was out for several months.

5  I want to say October, November, December.

6      Q    Okay.  So looking back to Exhibit 9,

7  which is the offer letter.  So this offer letter

8  states that the role would be effective September

9  19th, 2016; do you see that?

10     A    Uh-huh, yep.

11     Q    And that she would be in kind of this

12  traditional role in working two positions until

13  December 31st, 2016; do you see that?

14     A    Uh-huh.

15     Q    Okay.  Is that a yes?

16     A    Yes.

17     Q    Okay.

18     A    Sorry.

19     Q    For the time period that Ms. Payne was on

20  medical leave, was anybody hired to cover the two

21  roles that she was supposed to have been

22  performing?

23     A    No.

24          MR. PENCE:  Object to form, but --

25     Q    Do you know what -- what the arrangement

Katherine Doxey
December 16, 2019                                                    50

1    was that Ms. Payne ultimately came to with Ms.

2    Lindsay and Ms. Allen related to her flex work

3    agreements, what the agreement was?

4              MR. PENCE:  Sorry, which one?

5              MS. VINCi:  The first one, sorry, the

6         first one.

7      A    Originally there was just an

8    understanding that oh, sure, you can take

9    whatever time you need, but I believe the first

10   formalized one was allowing her to work earlier

11   or later.  I don't remember the details.

12     Q    Did you ever discuss with Ms. Lindsay any

13   of the arrangements in the flex work agreements

14   with Ms. Payne?

15             MR. PENCE:  All three or just --

16             MS. VINCI:  Yep.

17             MR. PENCE:  -- one in particular?

18     Q    At any point in time did you discuss the,

19   for lack of a better word, the accommodations to

20   Ms. Payne in any of her work flex agreements?

21             MR. PENCE:  Object to form, but you

22        may answer.

23     A    Not specific to the flex arrangement

24   forms themselves.  The discussion -- you know,

25   most of these again were between Julie and Tammy,

1    but the discussion I was involved in was after

2    Denise had come back from leave.  She'd worked a

3    while on Memorial Day.  She let us know that she

4    didn't get the right holiday pay, that she got

5    six hours instead of eight hours and we said,

6    well, that's correct for a 30 hour employee, and

7    she said, oh, no, I'm full time now.  So we were

8    not aware that she had moved back to full time

9    status as of April.  So we got the holiday

10   corrected and that's when we talked to Tammy

11   about now that she's back to full time, she would

12   be eligible to be exempt and they said, well, we

13   have some concerns about whether she is working

14   the hours she is supposed to be, that she's using

15   the flex arrangement appropriately versus for

16   longer lunches or bank runs or, you know,

17   personal things instead of the medical situation.

18   And they were starting to be concerned about some

19   -- her not being in the office enough to train to

20   have enough work to give her and some data entry

21   accuracy.

22       Q    Was that the first time that Ms. Lindsay

23   had brought those concerns to your attention?

24       A    Yes.

25       Q    Okay.  And was it just Ms. Lindsay or did

Katherine Doxey
December 16, 2019                                    52

1    you also speak with Ms. Allen?

2        A    It was Ms. Allen, Ms. Lindsay, Julie and

3    myself.

4        Q    Okay.  And was this in one specific

5    meeting that you had --

6        A    Yes.

7        Q    -- all together?

8        A    Uh-huh.

9        Q    When was that meeting?

10       A    I want to say June.  I don't remember the

11   exact date.

12       Q    Okay.  And how did that meeting come to

13   be?  Did they reach out to -- did someone reach

14   out to you, or did you reach out to Ms. Lindsay

15   or Ms. Allen?

16       A    Julie arranged it because she wanted to

17   talk about now that she was back to full time,

18   should we consider moving Denise to exempt.

19       Q    Where did that meeting take place?

20       A    I want to say it was in the ground floor

21   conference room at SHA, hotel school.

22       Q    How long was that meeting for?

23       A    I don't recall.  An hour maybe.

24       Q    I just want to go through one by one the

25   concerns that you mentioned being brought up to

1   you during the meeting.  So you said that there

2   was a concern expressed by Ms. Lindsay about Ms.

3   Payne misusing her time or misusing her

4   flexibility in time under the arrangement; is

5   that accurate?

6       A    Yes.

7       Q    And what did Ms. Lindsay say to you about

8   that during the meeting?

9       A    She felt like the flex arrangement was

10  sometimes perhaps being taken advantage of.  That

11  she was -- Denise was taking longer lunches with

12  colleagues, that she was doing banking on lunch

13  times, that she was moving maybe, that there were

14  things that she was doing using the flex

15  arrangement for not medical means.

16      Q    Did Ms. Lindsay indicate how often she

17  believed this was happening?

18      A    I don't recall her saying specifically.

19      Q    Did Ms. Lindsay provide any proof that

20  the times that she believed were being used for

21  non-medical use were -- or non-medical reasons

22  were actually used for non-medical reasons?

23          MR. PENCE:  Object to form.

24      A    I'm not sure how she came to that

25  conclusion.  That was just what she told us.

Katherine Doxey
December 16, 2019                                            54

1    Q   Okay.  Okay.  Did Ms. Allen say anything

2    about that?

3    A   I don't recall what her comments were, if

4    any.

5    Q   And what, if anything, was your response

6    to that to Ms. Lindsay?

7    A   We encouraged her to talk to Denise again

8    about asking in advance per the guidelines they

9    had already laid out, and what the flex

10   arrangement was for and to discuss any

11   performance or accuracy issues they had with her.

12   Q   So you just said you encouraged Ms.

13   Lindsay to speak to Ms. Payne again.  Are you

14   aware of any conversations between Ms. Lindsay

15   and Ms. Payne regarding Ms. Payne's, or the

16   perception that Ms. Payne was misusing the

17   flexibility in her time?

18   A   It was more how Tammy was very specific

19   in how she wanted Denise to let her know when she

20   was going to be taking advantage of the flex

21   arrangement.  She wanted Denise to put it on her

22   -- on Tammy's calendar and she kept neglecting to

23   do that with her.  Whether she forgot, or didn't

24   want to, or didn't know how to, I'm not sure, but

25   that was a repeated concern.

Katherine Doxey
December 16, 2019                                                    55

1      Q    I believe you also mentioned that during

2  this meeting there was also a concern about Ms.

3  Payne not being in the office?

4      A    (Witness Nodded Head.)

5      Q    is that a yes?

6      A    Yes.

7      Q    Okay.

8      A    For training purposes and so they wanted

9  her to take over surveys and rankings and to do

10 that she had to sit with another member of the

11 team.  And so by working remotely that made that

12 difficult to get the training done to transfer

13 the work.

14     Q    Who brought this concern to your

15 attention during that meeting?

16     A    Tammy would've.

17     Q    And what was your response, if any, to

18 this concern brought about by Tammy -- brought up

19 by Tammy?

20     A    I don't recall honestly.  Other than, you

21 know, we had multiple conversations about you

22 need to -- to lay out what you need from a

23 business standpoint, but you also need to be

24 reasonable in what she is able to do physically

25 and if the training can't happen in person, could

1    it be by e-mail, could it be by phone.

2        Q     Did you have any opinion as to whether

3    Ms. Lindsay's -- what she was requesting of Ms.

4    Payne was reasonable or not?

5            MR. PENCE:  Object to form.

6        A    I don't know the work well enough to know

7    whether she could have done all of it remotely.

8    We do understand that, you know, people need to

9    be available for phone calls or for questions

10   during the work hours.

11       Q     So is it fair to say you didn't -- did

12   not have an opinion on whether or not what was

13   being asked of Ms. Payne was reasonable?

14           MR. PENCE:  Object to form.

15       A    I think the letting them know in advance

16   when she had appointments, notifying them how

17   they wanted to be notified, those were all

18   reasonable.

19       Q     Did you ever discuss these concerns that

20   Ms. Lindsay and Ms. Allen brought to your

21   attention with Ms. Payne?

22       A    Not personally, no.

23       Q     Do you know if Ms. Weaver did?

24       A    I believe so.

25       Q     And what is the basis for that belief?

Katherine Doxey
December 16, 2019

57

1   A   Conversations Julie and I would have just

2   updating on issues across her clients.

3   Q   Okay.  And did she express to you during

4   these conversations that she spoke with Ms. Payne

5   regarding the concern that she was misusing the

6   flexibility in her time?

7   A   I don't recall if she had that

8   conversation directly with Denise.

9   Q   Okay.  And during your conversations with

10  Ms. Weaver did she ever indicate that she spoke

11  to Denise about the concern over her not being in

12  the office often enough?

13  A   I think most of my recollection of what

14  Julie would talk to Denise about is how to record

15  or how to communicate her time off or her

16  scheduling needs.  And that when she was too ill

17  to stay in the office because she didn't feel

18  well, that it wasn't unreasonable for us to say

19  then take some health and personal time and go

20  rest, but if you can't work in the office, I'm

21  not sure why you could work at home.  What the

22  difference would be if you have a headache or

23  heart palpitations or whatever.  So those were

24  some of the conversations she had with her.

25  Q   Okay.  And do you know what Ms. Payne's

1   response was to Ms. Weaver during those

2   conversations?

3      A    I'm not -- not being there, I don't know

4   exactly, no.

5      Q    Okay.  After the, I believe you said the

6   June 2017 meeting with Ms. Allen and Ms. Lindsay,

7   did Ms. Allen or Ms. Lindsay ever bring up these

8   concerns again to your attention regarding Ms.

9   Payne's performance?

10     A    Not in a meeting, not directly to me.

11     Q    Okay.  Do you -- sorry are you finished?

12     A    Yep.

13     Q    Okay.  Do you know if they brought these

14   concerns up again to Ms. Weaver?

15     A    By virtue of the fact that there were

16   several flex agreements, I'm assuming there was

17   some continued discussions about scheduling

18   needs.

19     Q    Okay.

20     A    But I don't know the specifics of it.

21     Q    Okay.  Did Ms. Payne ever raise concerns

22   with you regarding how Ms. Lindsay was acting in

23   light of the flex agreements?

24     A    Only by copying me on e-mails.

25     Q    And were those the e-mails that you

Katherine Doxey
December 16, 2019                                                    59

1    referred to earlier about Ms. Lindsay taking time

2    off of her timecard and --

3        A    Uh-huh.

4        Q    -- not allowing her -- or not approving

5    her requests to work from home?

6        A    Yes.

7        Q    Okay.  Did there come a time where Ms.

8    Payne advised you she believed she was not -- her

9    disability was not being accommodated or she was

10   not getting accommodations?

11       A    Yes, she had been I believe encouraged by

12   Julie several times that if she felt that way

13   after multiple versions of a flex arrangement

14   that she should file a formal request for

15   accommodations with the university.

16       Q    Okay.

17   (EXHIBIT E MARKED FOR IDENTIFICATION.)

18       Q    Ms. Doxey, I'm going to show you what's

19   been marked as Plaintiff's Exhibit E.  I'll ask

20   you to take your time to review that.  Let me

21   know when you've had a chance to do so.

22       A    Okay.

23            MR. PENCE:  Counsel, do you have the

24       attachment that is a part of this?

25            MS. VINCI:  I do not unfortunately,

Katherine Doxey
December 16, 2019                                           60

1        but I'm not going to be asking questions

2        about the attachment either.

3    Q    Okay.  Ms. Doxey, have you reviewed

4  Plaintiff's Exhibit E?

5    A    Yes.

6    Q    Have you ever seen this before?

7    A    Yes.

8    Q    Okay.  This appears to be an e-mail chain

9  between yourself, Ms. Weaver, and Ms. Payne,

10  which begins with Ms. Payne reaching out to you

11  and Ms. Weaver regarding what she believed was a,

12  quote, lack of accommodation; do you agree with

13  that?

14        MR. PENCE:  Object to form.  The

15        document speaks for itself.

16    A    Yes, that's what it says.

17    Q    And at the top e-mail Ms. Weaver

18  indicates that she and you are, quote, slated to

19  meet with Tammy and Cindy late next week, do you

20  see that?

21    A    That Julie and I --

22    Q    Yep.

23    A    -- are slated to meet, yeah.

24    Q    Did you meet with Ms. Weaver -- with Ms.

25  Allen and Ms. Lindsay following this e-mail as

Katherine Doxey
December 16, 2019                                                    61

1   referenced by this e-mail here?

2       A    I don't recall if there was a meeting

3   with the four of us.  I only remember the one.

4   There was one in August that Denise was present

5   at, but --

6       Q    Okay.  So you recall the June meeting and

7   then a meeting in August we have yet to discuss?

8       A    Right.

9       Q    But you don't recall a meeting

10  specifically following this e-mail?

11      A    Unless my timeline is off and that's the

12  one I'm thinking of, but I only remember two

13  meetings.

14      Q    Okay.

15      A    One without her and one with her.

16      Q    That's fine.  Okay.  You had mentioned

17  that Ms. Weaver had encouraged Ms. Payne to seek

18  formal accommodations from the school?

19      A    Uh-huh.

20      Q    Do you know if Ms. Payne did that?

21      A    She did eventually, yes.

22      Q    Do you know when she began the process

23  for doing that?

24      A    I believe it was July.

25      Q    Okay.  So July of '17?

Katherine Doxey
December 16, 2019

62

1    A    Yes.

2    Q    Okay.  How were you aware that she

3   started the process in July of 2017?

4    A    I believe she told us by e-mail.

5    Q    Okay.  Did you have any involvement in

6   assessing her request for accommodations?

7    A    No, that would've been done by the

8   medical leaves administration.

9    Q    Okay.  Do you know if anyone from HR

10  worked with the medical leaves administration

11  regarding her -- Ms. Payne's request for

12  accommodation?

13   A    I believe Julie was in touch with Jill

14  Tubbs was her name.

15   Q    And Ms. Payne was granted accommodations,

16  correct?

17   A    Yes.

18   Q    Do you recall what those accommodations

19  were?

20   A    That I don't remember specifically what

21  it said, but basically she can have a flexible

22  arrangement to deal with medical appointments and

23  when she's not feeling well from treatments and

24  medications that she can work from home or work

25  the flex arrangement.

Katherine Doxey
December 16, 2019                                          63

1    Q    Do you recall when her request was

2  granted?

3    A    I want to say late July maybe.

4    Q    Okay.  I might have a copy of this one.

5  I'll show you what's previously been marked as

6  Defendant's Exhibit 6.  Just ask you to review

7  that and let me know when you've had a chance to

8  do so.

9    A    Okay.

10   Q    Okay.

11   A    Uh-huh.

12   Q    Have you ever seen this before?

13   A    Yes.

14   Q    Okay.  When was the last time you saw it?

15 Well, strike that.  Did you see this letter at or

16 around the -- the August 2nd date that is at the

17 top?

18   A    Yes.

19   Q    Okay.  And this you would agree is the

20 letter to Ms. Payne approving her disability

21 accommodations at Cornell, correct?

22   A    Yes.

23   Q    You've mentioned not too long ago a

24 meeting in August that Ms. Payne was present for.

25 Was that meeting held before or after this

Katherine Doxey
December 16, 2019                                    64

1    letter, if you can recall?

2        A     After this letter, in response to this

3    letter to sit with all parties to make sure

4    everybody understood what Denise was asking for

5    and what the university approved and would

6    support.

7        Q     Okay.  Do you recall when in August that

8    meeting took place?

9        A     Not specifically.  It was very shortly

10   after this though (indicating).

11       Q     Okay.

12             MS. VINCI:  Just let the record

13         reflect the witness pointed to the exhibit.

14       Q     Who attended that meeting?

15       A     Julie Weaver, Denise Payne, Cindy Allen,

16   Tammy Lindsay and myself.

17       Q     Okay.  And correct me if I'm wrong, the

18   meeting was to understand the accommodations that

19   had been approved for Denise; is that accurate?

20       A     That is accurate.

21       Q     Okay.  Was anything else discussed at

22   that meeting?

23       A     We were getting an explanation from

24   Denise as to what her specific needs are.  This

25   letter doesn't say anything different than what

Katherine Doxey
December 16, 2019                                              65

1    some of the previous flex arrangements said, so

2    we were specifically trying to outline what are

3    the hours that she can work.  And Tammy and Cindy

4    were trying to understand the why of it.  Denise

5    wanted to be able to work from very early in the

6    morning and they were trying to say we need you

7    to work 8:00 to 4:30 and so we were trying to

8    come to a compromise, or to an understanding of

9    Denise's situation and that the medication she

10   was on would sometimes, you know, give her

11   insomnia or, you know, she slept later because

12   she couldn't sleep, or she was feeling ill or

13   whatever, so it was a conversation about the

14   specifics of why she was asking.  There was

15   discussion about she wanted to leave early a

16   couple of days to go to a chiropractor and we

17   weren't sure whether that was specific to her

18   treatment and condition, so I remember saying we

19   would touch base with Jill in medical leaves who

20   would reach out to the doctor and confirm that

21   that was part of the necessary treatment.

22       Q    During this August meeting did -- do you

23   recall Ms. Lindsay expressing that she was

24   unhappy about having to accommodate Ms. Payne?

25            MR. PENCE:  Object to form.

Katherine Doxey
December 16, 2019                                                    66

1    A   I don't think she said she was unhappy.

2  She was trying to understand why and she was

3  relaying her need for why she wants Denise to be

4  available during the business hours so that she

5  can connect with other people and answer any

6  questions and get training, et cetera.

7    Q   During this meeting did Ms. Lindsay ever

8  indicate that she believed enough accommodations

9  had been given to Ms. Payne?

10       MR. PENCE:  Same objection.

11   A   I don't recall her saying that.

12   Q   During this meeting did Ms. Lindsay

13  question why she had to be there?

14   A   Why Tammy had to be at the meeting?

15   Q   Yes.

16   A   I don't recall that, no.

17   Q   During the August meeting did Ms. Lindsay

18  ask that the accommodations be changed or revised

19  in any way?

20       MR. PENCE:  Object to form.

21   A   I mean, it was a give and take

22  conversation, so --

23   Q   I'll withdraw the question.  I'll

24  rephrase it.  During the August meeting did you

25  at any point agree to go back to the medical

Katherine Doxey
December 16, 2019                                                    67

1   leaves office to reassess whether the

2   accommodations were necessary?

3      A    The piece about the chiropractic and

4   needing to leave several days early to go to this

5   and how long that would be for.

6      Q    Did you follow up with medical leaves on

7   that?

8      A    Julie did.

9      Q    Okay.  Do you know what the decision was

10   regarding that?

11      A    I believe it was deemed part of her

12   treatment and she was allowed to leave at 3:30 I

13   think.

14      Q    Okay.  During the August meeting besides

15   discussing her need for accommodations, did Ms.

16   Payne say anything else about how -- about

17   working with Ms. Lindsay?

18      A    I'm not sure what you're asking.

19      Q    Okay.  During the August meeting did Ms.

20   Payne ever complain that Ms. Lindsay was not

21   giving her the accommodations she had been

22   approved of -- for?

23           MR. PENCE:  Object to form.

24      A    I mean, that was the purpose of the

25   meeting, is to clarify that and to make sure

Katherine Doxey
December 16, 2019                                              68

1    everybody knew this was approved, we had to

2    follow this and let's figure out what that means,

3    so I'm not sure.

4        Q    Okay.  So at the August meeting did Ms.

5    Payne ever express that prior to the meeting she

6    had, in her perception, been denied

7    accommodations by Ms. Lindsay?

8            MR. PENCE:  Object to form.  The

9        document seems to suggest that the

10       accommodations were approved August 2nd.

11       When would she have been complaining about

12       a period of time?

13           MS. VINCI:  Before August 2nd.

14           MR. PENCE:  When there were no

15       accommodations approved?

16           MS. VINCI:  When there was a flex

17       arrangement.  So I'll rephrase.

18       Q    At the August meeting did Ms. Payne ever

19   express that she -- that Ms. Lindsay had not

20   allowed her the flexibility she was granted in

21   her prior work arrangements?

22       A    I think she felt like there were times,

23   as well as Tammy feeling like there were many

24   times when Denise didn't need it or didn't follow

25   the rules, so there was some back and forth.

Katherine Doxey
December 16, 2019                                    69

1    Q    Okay.  Following the August meeting, were

2    there any changes, aside from specifying what the

3    accommodations were, rather than just the general

4    list in the letter --

5    A    Uh-huh.

6    Q    -- but determining what would work for

7    all of the parties?  Were there any other changes

8    to Ms. Payne's work structure?

9          MR. PENCE:  Object to form, vague.

10    Q    Did there come a time where Ms. Lindsay

11    stopped supervising Ms. Payne?

12    A    Yes.

13    Q    Okay.  When did that happen?

14    A    I don't remember specifically on what

15    date.  I'm thinking September-ish.

16    Q    Okay.  And why was that?

17    A    There obviously was some friction between

18    the two and it became clear that Tammy wanted to

19    work from home as well and the college was in

20    discussions with leadership about flex

21    arrangements for managers in general.  And the

22    dean at the time, and Laura Syer talked to all

23    managers and said the college's philosophy is

24    that managers may only work one day remotely,

25    that they needed to be in the office in order to

Katherine Doxey
December 16, 2019                                          70

1   properly supervise people.  And so Denise -- or

2   not Denise.  Tammy moved quite a distance away

3   and wanted a remote work arrangement herself that

4   was more than one day.  And so we gave her the

5   option, do you want to stay as a manager?  In

6   which case you have to be in the office; or do

7   you want to step out of management and keep the

8   arrangement?  And that's what she chose.

9        Q    Okay.  So is it fair to say that Ms.

10  Lindsay stopped supervising Ms. Payne because she

11  chose to step out of a manager role?

12       A    Yes.

13       Q    At the time that Ms. Lindsay stopped

14  supervising Ms. Payne who took over as Ms.

15  Payne's supervisor?

16       A    Cindy Allen.

17       Q    For how long did Ms. Allen supervise Ms.

18  Payne after Ms. Lindsay?

19       A    It wasn't very long because Cindy took

20  another job and moved to the engineering college.

21  I would guess a month, maybe a little longer.

22       Q    And who replaced Ms. Allen?

23       A    Then both Tammy and Denise would report

24  to Laura Syer.

25       Q    Do you know if Ms. Lindsay retained any

1   oversight over Ms. Payne after she stepped down

2   from the manager's role?

3            MR. PENCE:  Object to form, but you

4        may answer.

5    A    Since Denise was doing surveys and

6   rankings that are very crucial to the school,

7   Tammy was still overseeing some of her work, a

8   second set of eyes before we submitted these

9   rankings to all the parties that do these things,

10   business, financial times, et cetera.

11    Q    How was it communicated to Ms. Payne that

12   Tammy would no longer be supervising her?

13    A    Not the way I would have expected.  At

14   the meeting I referred to earlier Laura Syer had

15   scheduled a meeting to talk about the new

16   structure.  And so when I was explaining to

17   Denise what the agenda of the meeting was or what

18   my understanding of what was going to happen, I

19   told her thinking she already knew that she was

20   going to report to Cindy and not to Tammy any

21   longer.

22    Q    Okay.

23    A    So I guess I was the one that told her.

24    Q    And that was during the meeting you

25   testified earlier to, which happened about a year

Katherine Doxey
December 16, 2019                                    72

1    after --

2    A    Uh-huh.

3    Q    -- Ms. Payne assumed the data analyst

4    role; is that right?

5    A    Right, that's right.

6    Q    Okay.  Are you aware of any issues Ms.

7    Payne had with Ms. Lindsay still overseeing some

8    of her work after she had stepped down from the

9    manager's role?

10    A    I imagine she wasn't happy about it, but

11    I don't know that she had a specific concern

12    other than why is she still looking at my work, I

13    thought she wasn't my supervisor.

14    Q    Did she ever ask you why Ms. Lindsay was

15    still looking at her work?

16    A    I believe she asked Laura by e-mail who

17    said we need two sets of eyes on this stuff and

18    as associate dean she had a much broader scope

19    and lots of complicated stuff to be dealing with.

20    She couldn't supervise day-to-day details so she

21    needed somebody else to look at stuff too.

22    Q    After Ms. Lindsay stepped down from the

23    manager's role was she still reviewing Ms.

24    Payne's timecard?

25    A    I believe that she sent Laura a snap

Katherine Doxey
December 16, 2019                                            73

1   shot, a picture of the timecard because Laura

2   couldn't initially get into the system.  We

3   hadn't fixed that in Workday and so Laura asked

4   Tammy could you please send me a picture of her

5   timecard so I can approve it.

6       Q    Okay.  Do you know if Ms. Payne ever

7   complained about Ms. Lindsay doing that?

8       A    I think she did.

9       Q    And what do you base that on, that belief

10  that she did?

11      A    I think she sent Laura or -- by e-mail,

12  it was most of her communication, I believe we

13  saw it by e-mail and then I verified with Laura

14  that, you know, you've approving time cards,

15  right?  And she said yes.

16      Q    There came a time when Ms. Payne's

17  employment with the university ended, correct?

18      A    Yes.

19      Q    Okay.  Why did Ms. Payne's employment

20  with the university end?

21      A    During the summer of '17 Chris Barrett,

22  who was dean of academic affairs, was rearranging

23  his departments and wanted to take over

24  management of some of the databases that this

25  business analytics group was working on.  So some

1   of the members of the team had already shifted

2   under Chris and so some of that work shifted, and

3   so Denise and Tammy and Cindy were left in this

4   business analytics department. When Cindy said

5   she was leaving, you know, it kind of made Laura

6   stop and pause. She had been trying to work with

7   each of the deans of the three schools, was there

8   data analytics or decision making or key

9   performance indicator kind of work that they

10  could do to support the group because a lot of

11  the work shifted. And while there was

12  possibilities there, it required somebody of a

13  higher level like Cindy to oversee that and to

14  work directly with the deans on what they needed.

15  When Cindy gave her notice, Laura felt like there

16  wasn't enough work and enough of a high level

17  experienced supervisor to oversee anything that

18  might be left. So they had basically half of

19  what Denise's role was, which was the surveys and

20  rankings and half of what Tammy was doing, the

21  key performance indicators and so the thought was

22  that they would put those together into one job.

23  The university requires, has a process for

24  layoff, which is what we were moving towards and

25  so all of these kind of proposals go into a web

Katherine Doxey
December 16, 2019                                              75

1   based tool where you have to describe the team

2   and all the members and their demographics.  You

3   have to write a rationale for, you know, the

4   changes and where the work is going and what the

5   proposal is.  It then gets reviewed by workforce

6   diversity inclusion, by policy and labor

7   relations, by counsel's office and so that

8   proposal went forward to basically eliminate the

9   business analytics team, which meant, you know,

10  Cindy was already gone, but taking Denise's --

11  what was left of Denise's job and what was left

12  of Tammy's job and combining it into one role

13  that was in between the two bands at an F level

14  and shift it under Chris Barrett's role.

15      Q    Okay.  When did Ms. -- strike that.  Do

16  you know how Ms. Payne was notified that she was

17  being laid off?

18      A    It was in a meeting with Laura Syer and

19  I, I believe it was on December 1st of 2017.

20      Q    What was Ms. Payne's reaction to the news

21  that she was being laid off?

22      A    She wasn't surprised frankly.  In fact, I

23  think she said I'm not surprised.  I think she,

24  from my assumption is that, you know, there

25  wasn't a lot of work coming at them at that

Katherine Doxey
December 16, 2019                                          76

1   point.

2       Q    Okay.  Did you discuss the possibility of

3   new positions at Cornell with Ms. Payne at that

4   time?

5       A    We told her there was going to be the new

6   role created under Chris Barrett and that she was

7   welcome to apply for that, as well as anything

8   else that the college had open.

9       Q    And what was her reaction to hearing

10  about this new role under Mr. Barrett?

11      A    I think she indicated that she was going

12  to apply for it.

13      Q    Do you know if she actually did apply?

14      A    She did.

15      Q    Okay.  Do you know if she was ever

16  interviewed for that position?

17      A    She was.

18      Q    Okay.  Do you know who interviewed her?

19      A    It would be a guess at this point.  I

20  think Julie was on the panel, Amanda Shaw, who

21  would've been the hiring manager.  I don't recall

22  who else was on --

23      Q    How were you aware that Ms. Payne applied

24  for and was interviewed for this role?

25      A    All of the requisitions are in Workday,

Katherine Doxey
December 16, 2019                                                77

1    which is the university's HRIS.  So as

2    transactions and applicants come in, you know, I

3    have a queue that I see stuff, as well as

4    conversations with Julie.

5        Q     Did you have a discussion with Ms. Weaver

6    about Ms. Payne's interview for the role?

7        A     It would've been just status on where

8    it's at.  I did not get into details about, you

9    know, comments from the people who interviewed.

10       Q     Was Ms. Payne offered the role?

11       A     No.

12       Q     Do you know why not?

13       A     They had another candidate that had a

14   whole lot of experience in education doing this

15   kind of thing and was a better candidate.

16       Q     Do you recall that candidate's name?

17       A     Kate Odinacio (phonetic) I believe.

18   _____

19       Q     Do you know how to spell that last name?

20   It's okay if you don't.

21       A     No.

22       Q     Okay.  Do you know if Ms. Payne has ever

23   worked for Cornell since her layoff?

24       A     I don't believe so.

25       Q     Do you know if she applied to any other

Katherine Doxey
December 16, 2019

78

1   positions at Cornell after her layoff?

2       A    I think she applied to another one at the

3   college, which would've been under Beth Fox.

4       Q    And are you aware of that application the

5   same as you were the other application for the

6   role with --

7       A    Yeah, tangentially, yeah.

8       Q    Do you know if she was interviewed for

9   that second position?

10      A    She was.

11      Q    Do you know who sat on her interview

12  panel?

13      A    No.  Other than Beth Fox, who would be

14  the hiring manager.

15      Q    Okay.  And she was not offered that

16  position either, correct?

17      A    No.

18      Q    Do you know why she was not offered that

19  position?

20      A    Other than a more qualified candidate.

21      Q    Do you know what the title of that

22  position was?

23      A    I'm not sure what the title was.

24      Q    Okay.  Do you know who was ultimately

25  hired for that position?

Katherine Doxey
December 16, 2019                                              79

1      A    Michelle Buckholz I believe.

2      Q    Did Ms. Lindsay continue to work for

3   Cornell following her layoff?

4      A    She was hired into a part-time six month

5   role helping get ready for reaccreditation.

6   Every five years the AACSB does a huge process

7   and they send a team to visit, and there's tons

8   and tons of documentation and preparation for

9   that, and Tammy had been through that before at

10  the hotel school and so they asked her to help.

11     Q    When you say they asked her to help, do

12  you know who specifically asked her to stay on?

13     A    Cathy Enz who was the associate dean of

14  affairs at hotel initially, but all three schools

15  had to do similar work, so I think she ended up

16  helping the other schools as well.  So Vishal

17  Gaur and maybe, I don't know if it was Harry

18  Kaiser over at Dyson, but similar kind of

19  preparation that each of the schools had to do.

20     Q    Okay.  And when did that part-time six

21  month role take place; was it immediately after

22  her layoff, some time later?

23     A    A couple months later, maybe March.

24     Q    And after that part-time position ended

25  has Ms. Lindsay worked for Cornell University

Katherine Doxey
December 16, 2019                                      80

1   again, to your knowledge?

2       A    Not to my knowledge, no.

3       Q    Okay.  Have you spoken to Ms. Lindsay

4   after her employment with Cornell ended, meaning

5   after that six month period?

6       A    I have not.

7       Q    Okay.

8            MS. VINCI:  Can we take like five

9       minutes?  I think I'm pretty much wrapped

10      up but --

11           (OFF THE RECORD.)

12      Q    Just one small thing to go over.  Who is

13  Shawn Varma?

14      A    Shawn used to work in the policy and

15  labor department.  I don't believe he does

16  anymore, but he was a consultant there.

17      Q    Okay.  And would that be the office of

18  workforce policy?

19      A    Yes.

20      Q    Okay.  And what is the office of

21  workforce policy?

22      A    So they are -- deal with all of the union

23  contract negotiations.  They write and revise

24  policies and so are consultants to managers, HR

25  folks and employees on policy issues.

Katherine Doxey
December 16, 2019                                            81

1    Q    Okay.  Are you aware of any discussions

2    between Ms. Payne and Mr. Varma regarding her

3    work with Ms. Lindsay?

4    A    I believe Shawn was involved in the

5    question of her performance dialogue, which is

6    the university's term for performance evaluation,

7    documentation.  That she wanted reference to her

8    medical leave removed from her performance

9    dialogue.

10    Q    Okay.  Was any reference to Ms. Payne's

11    medical leave removed from her performance

12    dialogue?

13    A    Yes.

14    Q    Okay.

15    A    So the university's process is that the

16    employee does a self evaluation first and then

17    the manager does hers.  And Denise had mentioned

18    it herself, so the manager, Tammy at the time,

19    also made reference to it, but it was sent back

20    and both were removed.

21    Q    Okay.

22         MS. VINCI:  I have no further

23    questions.

24         MR. PENCE:  We have no redirect, but

25    we'll reserve and sign.

1          A F F I D A V I T

2    STATE OF NEW YORK

3    COUNTY OF _Tompkins_

4

5          I have read my deposition, and the

6    same is true and accurate, save and except for

7    changes and/or corrections, if any, as indicated
                  *6 pages of*
8    by me on the ^correction sheets attached hereto.

9

10   _____

11          KATHERINE DOXEY

12

13

14          SUBSCRIBED AND SWORN TO before me this

15   _23rd_ day of _January_____, 20_20_.

16

17

18   _____

19   NOTARY PUBLIC

20
                    JAMIE E. CORBETT
                    Notary Public, State of New York
21                  Qualified in Tompkins County
                    No. 01CO6228476
                    My Commission Expires 9/20/2022
22   My commission expires on _____.

23

24

25

**ERRATA SHEET**

**Page No.** 4          **Line No.** 13          **Was** Catherine

**Should Read** Katherine


**Page No.** 4          **Line No.** 25          **Was** I'm sorry

**Should Read** I'm sorry - I was thinking of the EEOC complaint

**Page No.** 5          **Line No.** 14          **Was** Shawn

**Should Read** Sean


**Page No.** 9          **Line No.** 9          **Was** general, and then the termination letter

**Should Read** job, and then the lay off letter.


**Page No.** 16          **Line No.** 8          **Was** observation

**Should Read** vacation

**Date:** 1/23/20          **Signature:** [signature]

page 1 of 6

## ERRATA SHEET

**Page No.** 17        **Line No.** 12        **Was** _Own_

**Should Read** _Support_

**Page No.** 20        **Line No.** 24        **Was** _request_

**Should Read** _requested_

**Page No.** 21        **Line No.** 3 and 25        **Was** _Shackell-Dowell and Shackell_

**Should Read** _Shackell-Dowell_

**Page No.** 25        **Line No.** 1        **Was** _its impacts of_

**Should Read** _it's impact of these decisions_

**Page No.** 29        **Line No.** 7        **Was** _Usually specific_

**Should Read** _Yes, specific_

**Date:** 1/23/20        **Signature:** _[signature]_

_page 2 of 6_

**ERRATA SHEET**

**Page No.** _30_  **Line No.** _23_  **Was** _from the job_

**Should Read**

_from the person filling the job_

**Page No.** _32-33_  **Line No.** _25 - 2_  **Was** _Dyson Ungrad School of Economics and Applied_

**Should Read**

_Dyson School of Applied ..._

**Page No.** _33_  **Line No.** _3_  **Was** _AACSB_

**Should Read**

_Association to Advance Collegiate Schools of Business_

**Page No.** _34_  **Line No.** _23_  **Was** _were_

**Should Read**

_Was_

**Page No.** _38_  **Line No.** _12_  **Was** _Survey work_

**Should Read**

_Survey_

**Date:** _1/23/20_        **Signature:** _____

_page 3 of 6_

**ERRATA SHEET**

**Page No.**   **Line No.**   **Was**
    58            13              warrented, the

**Should Read**
                                the

**Page No.**   **Line No.**   **Was**
    58            14              bands

**Should Read**
                                bands, effective

**Page No.**   **Line No.**   **Was**
    42            18              results

**Should Read**
                                results,

**Page No.**   **Line No.**   **Was**
    42            22              security

**Should Read**
                                confidence

**Page No.**   **Line No.**   **Was**
    43            13              happiness

**Should Read**
                                unhappiness

**Date:** 1/23/20        **Signature:** _____

page 4 of 6

**ERRATA SHEET**

**Page No.** 78     **Line No.** 10     **Was** _comprise_

**Should Read** _them compromise_

**Page No.** 71     **Line No.** 7     **Was** _oversecing_

**Should Read** _reviewing_

**Page No.** 72     **Line No.** 18     **Was** _scope_

**Should Read** _scope of responsibilities_

**Page No.** 73     **Line No.** 11-12     **Was** _or -- by, it was_

**Should Read** _an email as was_

**Page No.** 74     **Line No.** 11     **Was** _was_

**Should Read** _were_

**Date:** 1/23/20     **Signature:** _[signature]_

_Page 5 of 6_

**ERRATA SHEET**

**Page No.** 77  **Line No.** 1  **Was** HRIS

**Should Read** Human Resources Information System

**Page No.** 77  **Line No.** 17  **Was** Odinacio

**Should Read** Addonizio

**Page No.** 79  **Line No.** 1  **Was** BuckHolz

**Should Read** Buckholtz

**Page No.** 80  **Line No.** 14  **Was** Shawn

**Should Read** Shan

**Page No.**  **Line No.**  **Was**

**Should Read**

**Date:** 1/23/20  **Signature:** _[signature]_

page 6 of 6

1    STATE OF NEW YORK

2    COUNTY OF CHEMUNG

3            I, Caitlyn A. Shaylor, do hereby certify

4    that before the taking of the deposition, the said

5    witness was by me first duly sworn to testify

6    to the truth, the whole truth and nothing but the

7    truth and that the above deposition was recorded by

8    me in stenotype and reduced to typewriting under my

9    supervision.

10           I further certify that the said

11   deposition constitutes a true record of the

12   testimony given by said witness to the best of my

13   ability.

14           I further certify that the said

15   deposition was taken before me at the time and

16   place specified in the notice.

17           I further certify that I am not a

18   relative or employee or attorney or counsel of any

19   of the parties, or a relative or employee of such

20   attorney or counsel or financially interested

21   directly or indirectly in this action.

22

23

24   _____

25           CAITLYN A. SHAYLOR

Katherine Doxey
December 16, 2019                                                                84

1              I N D E X

2  Witness           Examination By      Pages

3  Katherine Doxey      Ms. Vinci          3-80

4

5

6

7

8

9

10

11

12

13              E X H I B I T S

14  Letter          Description       Page

15  D              E-mail           17

16  E              E-mail chain       58

17

18

19

20

21

22

23

24

25

| 1 | 6 | administers  16:14 |
|---|---|---|

**1**

**1**  38:14
**10**  13:22
**12**  12:23 13:14,17
**15**  33:4
**16**  33:5
**17**  61:25 73:21
  84:15
**18**  4:25
**19th**  49:9
**1st**  75:19

**2**

**20**  82:15
**2003**  12:3
**2009**  13:21
**2015**  15:22 17:20
**2016**  13:8 19:16
  36:9 48:25 49:9,13
**2017**  4:25 58:6 62:3
  75:19
**2019**  17:1
**20th**  19:16
**221**  19:23
**23rd**  36:9
**24**  11:2,6
**2nd**  63:16 68:10,13

**3**

**3**  27:22 28:1
**3-80**  84:3
**30**  51:6
**31st**  49:13
**3:30**  67:12

**4**

**4:30**  65:7

**5**

**58**  84:16

**6**

**6**  63:6

**8**

**87**  11:20
**8:00**  65:7

**9**

**9**  36:1 49:6

**A**

**AACSB**  33:3 79:6
**abilities**  32:2
**ability**  11:2 83:13
**academic**  17:16
  73:22
**academics**  21:23
**accept**  15:3
**accommodate**  65:24
**accommodated**  59:9
**accommodation**  28:6,
  23 29:3,5 60:12
  62:12
**accommodations**
  27:4,10,13 28:11
  50:19 59:10,15
  61:18 62:6,15,18
  63:21 64:18 66:8,18
  67:2,15,21 68:7,10,
  15 69:3
**account**  42:11
**accredited**  32:22
  33:3
**accuracy**  51:21
  54:11
**accurate**  33:14 42:8
  53:5 64:19,20 82:6
**acquisition**  33:7
**acronym**  11:25
**acting**  58:22
**action**  83:21
**activity**  34:23,25
**Adam**  9:19
**adjustments**  40:13,
  15

**administers**  16:14
**administration**
  28:14,20 32:24
  62:8,10
**administrative**
  10:12 22:10 34:2
**advance**  43:7 54:8
  56:15
**advantage**  53:10
  54:20
**advised**  59:8
**affairs**  73:22 79:14
**affect**  11:2,7
**afternoon**  4:9,10,14
**agenda**  71:17
**agree**  15:10 18:18
  28:5 46:21 60:12
  63:19 66:25
**agreed**  29:22
**agreement**  46:10
  50:3
**agreements**  47:5,13,
  24 48:4,14 50:3,13,
  20 58:16,23
**ahead**  12:11 41:22
  45:3
**aide**  15:23
**allegations**  5:23
  6:6
**Allen**  10:8,10,16,
  19,22 26:18,21
  29:9,14,19 30:2,11,
  16,21 31:6,10,16,18
  35:9,13 36:13,16,19
  50:2 52:1,2,15 54:1
  56:20 58:6,7 60:25
  64:15 70:16,17,22
**allowed**  67:12 68:20
**allowing**  43:15
  50:10 59:4
**Amanda**  76:20
**amount**  8:3
**analysis**  38:12
**analyst**  24:7,15
  29:9 30:2,12,22
  31:8 34:5 36:22
  37:22 38:15 41:7
  72:3
**analytics**  21:21
  22:16 34:12 73:25
  74:4,8 75:9

**and/or** 45:10 82:7
**announced** 21:6
**announcement** 33:4
**answers** 7:4
**anticipate** 8:2
**anticipated** 26:23
**anymore** 80:16
**apparently** 32:19
  38:14
**appears** 36:8 60:8
**applicants** 77:2
**application** 34:23
  78:4,5
**applied** 33:1 76:23
  77:25 78:2
**apply** 76:7,12,13
**appointment** 39:22
**appointments** 56:16
  62:22
**appropriately** 51:15
**approve** 30:2 73:5
**approved** 64:5,19
  67:22 68:1,10,15
**approving** 59:4
  63:20 73:14
**April** 51:9
**arrange** 26:21
**arranged** 26:17
  52:16
**arrangement** 8:15
  37:13 46:8 47:1
  48:17 49:25 50:23
  51:15 53:4,9,15
  54:10,21 59:13
  62:22,25 68:17
  70:3,8
**arrangements** 46:16
  48:4 50:13 65:1
  68:21 69:21
**assessing** 62:6
**assistant** 14:8
  16:18 17:8,11,14,22
**assistants** 16:16
**associate** 5:16
  72:18 79:13
**associates** 14:8
**assume** 7:18 17:7
**assumed** 35:16 41:6
  72:3

**assuming** 29:25
  30:22 58:16
**assumption** 75:24
**attached** 82:8
**attachment** 59:24
  60:2
**attend** 20:1
**attended** 64:14
**attention** 38:8,17
  51:23 55:15 56:21
  58:8
**attorney** 7:21,23
  83:18,20
**attorneys** 4:18
**August** 15:22 17:20
  61:4,7 63:16,24
  64:7 65:22 66:17,24
  67:14,19 68:4,10,
  13,18 69:1
**authority** 15:17
  25:1,23
**availability** 21:12
**aware** 5:2 10:7,16
  29:12 37:20 38:6
  41:12 43:9,22 46:7,
  25 51:8 54:14 62:2
  72:6 76:23 78:4
  81:1

## B

**back** 26:4,16 38:20,
  21 40:9 45:9 48:19
  49:6 51:2,8,11
  52:17 66:25 68:25
  81:19
**band** 20:17 24:10,19
  25:10,16 31:21
  32:3,4 36:22,25
  37:6,8,17,23,25
  38:2 41:8
**bands** 20:17 24:17,
  21 25:12,24 38:6,
  10,14 75:13
**bank** 51:16
**banking** 53:12
**Barrett** 73:21 76:6,
  10
**Barrett's** 75:14
**base** 65:19 73:9

**based** 39:17 75:1
**basically** 21:22
  28:12 62:21 74:18
  75:8
**basis** 56:25
**began** 61:22
**begins** 60:10
**behalf** 36:13
**belief** 56:25 73:9
**believed** 53:17,20
  59:8 60:11 66:8
**benefits** 16:7
**Beth** 78:3,13
**bit** 26:14
**bits** 39:21 42:17
**blur** 33:17
**body** 33:3
**bonuses** 14:24
**books** 45:13
**boss** 15:11
**bottom** 18:18
**brand** 34:13
**branding** 13:3
**break** 8:1,7 41:1,4,
  24
**breaks** 8:4
**bring** 58:7
**broader** 72:18
**brought** 6:6 22:14
  38:8,16,20 51:23
  52:25 55:14,18
  56:20 58:13
**Buckholz** 79:1
**bullets** 34:11
**business** 5:15 13:3,
  4,7 15:23 20:15
  21:8,21 22:16 31:2
  32:22 34:12 46:22
  55:23 66:4 71:10
  73:25 74:4 75:9

## C

**Caitlyn** 83:3,25
**calendar** 43:7 54:22
**call** 20:17 24:22
  47:13
**called** 4:2 34:23
**calling** 21:20

Katherine Doxey
December 16, 2019

3

calls  43:24 56:9
cancer  18:6,21
  27:11
candidate  77:13,15
  78:20
candidate's  77:16
candidates  14:21
captures  34:24
cards  73:14
care  46:6
case  6:19 10:17
  70:6
Catherine  4:13
Cathy  79:13
central  33:22 38:11
certification  12:6
certifications
  11:22
certify  83:3,10,14,
  17
cetera  66:6 71:10
chain  19:15 60:8
  84:16
chance  18:14 36:4
  59:21 63:7
change  38:13 41:14
changed  66:18
chaotic  33:9
characteristics
  24:23 25:22
charge  35:10
chat  19:3
CHEMUNG  83:2
chiropractic  67:3
chiropractor  65:16
chose  70:8,11
Chris  73:21 74:2
  75:14 76:6
Cindy  26:18,21
  35:9,10 36:13 43:4,
  11 45:10,12,19 48:8
  60:19 64:15 65:3
  70:16,19 71:20
  74:3,4,13,15 75:10
clarify  67:25
class  14:5
classification
  14:16,19
classified  25:21

classifying  24:24
  25:7
classroom  22:11
clear  7:20 69:18
client  17:12
clients  14:14 45:5
  57:2
colleagues  53:12
college  5:15 13:2,
  4,6,8,11,16 14:17,
  19 15:17 21:5,8
  26:12 31:24 33:5,22
  69:19 70:20 76:8
  78:3
college's  69:23
combined  33:22
combining  75:12
comfortable  48:6
comments  54:3 77:9
commission  82:22
communicate  57:15
communicated  71:11
communication  42:23
  43:21 73:12
communications
  44:19
compensated  37:23
compensation  14:16,
  18 15:14 17:15
  23:9,12,17 24:2
  31:11,17 37:13
  38:11
complain  37:22 38:1
  67:20
complained  45:23
  73:7
complaining  68:11
complaints  18:3
  37:24 44:12
completed  33:18
complex  25:9
complicated  72:19
compressed  46:18
comprise  48:10
compromise  65:8
concept  23:1,5
  24:16 32:19 46:7
conceptualized  24:3
concern  53:2 54:25
  55:2,14,18 57:5,11

72:11
concerned  51:18
concerns  44:12
  51:13,23 52:25
  56:19 58:8,14,21
conclusion  53:25
condition  65:18
conference  52:21
confirm  65:20
connect  66:5
constitutes  83:11
consultant  33:6
  80:16
consultants  80:24
contact  14:13
  17:12,24
content  39:1
continue  22:18 79:2
continued  58:17
contract  80:23
conversation  32:11
  41:12 57:8 65:13
  66:22
conversations  5:21
  9:16 54:14 55:21
  57:1,4,9,24 58:2
  77:4
copied  43:20,22
  44:6
copy  63:4
copying  18:20 44:1
  58:24
Cornell  5:7 12:18,
  22 13:13,16,17,19
  16:22 27:12 28:6,11
  46:13 47:2,9 63:21
  76:3 77:23 78:1
  79:3,25 80:4
correct  15:19 16:22
  27:13 31:8 36:10,
  11,23 42:2,3 45:23
  46:13 51:6 62:16
  63:21 64:17 73:17
  78:16
corrected  38:9
  51:10
correcting  43:14
correction  82:8
corrections  82:7
correspondence  8:12
  9:5

Katherine Doxey
December 16, 2019                                    4

counsel  5:3,5,7
  6:10 9:14,16,17,20,
  23 10:4 59:23
  83:18,20
counsel's  75:7
counter  11:1,7
COUNTY  82:3 83:2
couple  10:1 16:9,16
  32:13 35:10,15 39:4
  65:16 79:23
courses  12:8,16
court  7:3 32:12
cover  49:20
covers  8:19
create  25:5
created  76:6
credit  12:12
CROSS  41:19
crucial  71:6
current  12:24
cut  7:12


        D

daily  43:23
data  21:23 24:7,15
  29:9 30:1,12,22
  31:8 34:5 36:22
  37:21 38:15 41:7
  51:20 72:3 74:8
databases  35:3
  73:24
date  4:24 19:13
  33:19 52:11 63:16
  69:15
dated  19:15 36:9
day  42:11,17 51:3
  69:24 70:4 82:15
day-to-day  72:20
days  19:12,16 65:16
  67:4
deal  62:22 80:22
dealing  21:22 72:19
dean  5:16 15:16
  69:22 72:18 73:22
  79:13
deans  21:24 74:7,14
Dear  36:12
decades  32:20

December  33:4 49:5,
  13 75:19
decided  31:20
decision  21:23
  24:25 25:23 40:22
  41:13,25 42:21 67:9
  74:8
decisions  15:17
declined  38:25
deemed  67:11
Defendant's  27:22,
  25 36:1 63:6
delayed  10:1
demanding  45:14
demographics  75:2
denied  68:6
Denise  4:19 6:11
  8:12 9:8 10:13,15
  15:18 16:17 18:19
  20:18 22:1 23:22,24
  29:15 30:24 31:1
  36:12 42:9,19,22
  43:1,4,10,12 45:5,
  10,11,16,22,24 46:1
  48:6,7 51:2 52:18
  53:11 54:7,19,21
  57:8,11,14 61:4
  64:4,15,19,24 65:4
  66:3 68:24 70:1,2,
  23 71:5,17 74:3
  81:17
Denise's  40:11 45:8
  65:9 74:19 75:10,11
department  15:13
  17:13 24:13 40:11
  42:6 74:4 80:15
departments  33:10
  73:23
departure  17:8
dependent  25:17
deposed  6:21 10:17
deposition  6:24
  8:10 9:13,24 10:20,
  23 82:5 83:4,7,11,
  15
depositions  5:11
describe  16:7 75:1
description  22:25
  24:23 34:6,10 84:14
descriptions  33:15

details  50:11 72:20
  77:8
determination  15:5
determine  21:17
  24:19
determined  42:7
determining  25:16
  69:6
diagnosed  18:6
diagnosis  18:22
  26:25 27:12 28:9,10
dialogue  81:5,9,12
difference  25:15,16
  57:22
difficult  7:7 55:12
direction  22:5 43:5
directly  43:20
  44:14 57:8 58:10
  74:14 83:21
director  5:14 10:12
  12:25 13:6,9,15,19,
  21,23 14:9 16:18
  17:8,22
directors  17:11,14
disability  20:7
  27:13 28:5,11 29:3
  59:9 63:20
disappointed  39:7
disappointing  39:8
disappointment  39:5
discovery  6:15
discretion  42:21
discuss  5:12 15:9
  20:9 23:4 26:24
  30:20 31:11,17
  36:15 37:12,16
  44:11 45:7 50:12,18
  54:10 56:19 61:7
  76:2
discussed  6:8 22:15
  23:22 26:6,7 39:4,
  14 41:7 64:21
discussing  23:24
  26:23 41:5 67:15
discussion  21:25
  23:2 27:4 37:14,19
  38:5,22 50:24 51:1
  65:15 77:5
discussions  22:19
  23:8 31:18 43:23
  58:17 69:20 81:1

Katherine Doxey
December 16, 2019

5

dissatisfaction
  41:8
distance  70:2
diversity  33:24
  75:6
doctor  65:20
doctor's  39:22
document  18:16 19:6
  60:15 68:9
documentation  79:8
  81:7
documented  46:23
documents  6:14
DORN  41:19
Doxey  4:13,14 18:11
  41:4 59:18 60:3
  82:11 84:3
draft  36:18
drafting  47:10,23
duly  4:3 83:5
duties  14:9 17:21
  18:2 23:3 24:23
Dyson  32:25 79:18

E

e-mail  18:9,19,20,
  24 19:7,11,14,15
  26:22 29:13 43:12,
  17,25 56:1 60:8,17,
  25 61:1,10 62:4
  72:16 73:11,13
  84:15,16
e-mailed  43:19 44:5
e-mails  43:24
  44:12,13 45:8
  58:24,25
earlier  48:11 50:10
  59:1 71:14,25
early  26:17 65:5,15
  67:4
earn  11:17,19 12:2,
  6
Economics  33:1
education  11:13,16
  24:25 77:14
effective  49:8
eligible  39:16
  51:12
eliminate  75:8

employed  12:18,21
employee  15:15 16:1
  17:17 18:3 28:12,
  16,21 29:2 46:17,
  21,22 47:14,20 51:6
  81:16 83:18,19
employees  5:7 13:24
  14:1,15 16:4,20
  17:23 20:6 25:13
  46:12 80:25
employment  73:17,19
  80:4
encouraged  54:7,12
  59:11 61:17
end  73:20
ended  40:2 73:17
  79:15,24 80:4
engineering  70:20
entry  20:19 51:20
Enz  79:13
error  25:1
escalate  15:10
evaluation  81:6,16
eventually  34:22
  61:21
exact  19:13 52:11
exam  12:7
Examination  4:5
  84:2
examined  4:3
exchange  6:15
exchanged  29:13
excited  22:12,17
excuse  45:22
executive  5:14
exempt  26:1,2 39:17
  42:14,15,16,20,24
  51:12 52:18
exhibit  18:10,12
  27:22 28:1 36:1
  49:6 59:17,19 60:4
  63:6 64:13
exorbitant  8:3
expect  26:16
expected  20:10
  26:8,11 71:13
experience  24:25
  39:9 77:14
experienced  74:17
expires  82:22

explain  24:16 32:15
  46:15
explaining  71:16
explanation  64:23
express  39:6 57:3
  68:5,19
expressed  53:2
expressing  65:23
eyes  71:8 72:17

F

fact  32:20 39:14
  58:15 75:22
factors  25:7
faculty  20:21,22
  22:9,10 34:24
fair  25:9 30:10
  56:11 70:9
fall  26:17 31:4
  48:24
familiar  4:19 8:25
  15:18 20:25 33:7
feel  30:8 57:17
feeling  62:23 65:12
  68:23
fell  38:7
felt  39:9 40:9
  43:13 48:6,8 53:9
  59:12 68:22 74:15
figure  33:9 68:2
figuring  34:13
file  59:14
fill  42:17
filled  17:9 46:20
final  15:14,17
financial  71:10
financially  83:20
fine  61:16
finish  7:9,10 32:9
finished  58:11
fit  22:4
fix  38:19
fixed  38:17 73:3
flex  8:15 47:1
  50:2,13,20,23 51:15
  53:9,14 54:9,20
  58:16,23 59:13
  62:25 65:1 68:16
  69:20

flexibility 31:24
  45:17 53:4 54:17
  57:6 68:20
flexible 46:8 62:21
floor 52:20
folks 80:25
follow 67:6 68:2,24
forces 33:8
forgot 54:23
form 6:16 8:23 15:6
  19:5 21:20 22:23
  23:19 24:4 25:19
  27:6 28:19,24 30:4
  31:13 33:8 34:7,19
  37:2 46:20 47:16
  49:24 50:21 53:23
  56:5,14 60:14 65:25
  66:20 67:23 68:8
  69:9 71:3
formal 6:18 8:12
  9:5 59:14 61:18
formalized 50:10
formation 31:23
formed 13:8
forms 50:24
forward 16:19 47:19
  75:8
found 28:9
Fox 78:3,13
fraction 40:3
frame 19:19
frankly 75:22
freedom 45:17
frequently 20:21
  43:12,16
friction 20:22 21:2
  43:3,9 69:17
frustrations 44:20,
  22 45:8
full 51:7,8,11
  52:17
functions 33:11
  34:2
future 40:11

**G**

Gabrielle 4:17
Gaur 79:17

gave 70:4 74:15
general 9:9 23:2,5
  24:6 25:24 35:2
  69:3,21
generally 16:14
  21:17 24:1
generics 24:22
give 40:8 43:7
  51:20 65:10 66:21
giving 67:21
good 4:7,9,14 22:4
  29:23 35:23
Graduate 13:10
  32:24
granted 62:15 63:2
  68:20
ground 6:23 52:20
group 31:20 73:25
  74:10
groups 17:12
guess 24:1 70:21
  71:23 76:19
guidelines 54:8
guys 38:17

**H**

half 44:10 74:18,20
Hall 19:22
hand 27:21
handing 18:11
handling 42:22 43:1
HAP 39:19,21,24
  40:3 41:15 42:1,7
  45:24
happen 55:25 69:13
  71:18
happened 32:15
  38:15 71:25
happening 53:17
happiness 43:13
happy 13:4 72:10
Harry 79:17
Head 40:17 55:4
headache 57:22
health 39:19 42:12
  57:19
hear 19:2
hearing 76:9

heart 57:23
held 13:12,19 63:25
helped 17:25
helping 35:2,3
  79:5,16
hereto 82:8
high 43:22 74:16
higher 23:15,25
  25:10 74:13
highest 11:13 20:18
hire 29:24 35:19
hired 9:8 15:22
  16:16,17 17:19,21
  21:1 49:20 78:25
  79:4
hiring 15:24 30:7,
  11 76:21 78:14
history 16:10
hold 11:21 14:4
holiday 51:4,9
home 43:15 46:2,5
  48:9 57:21 59:5
  62:24 69:19
honestly 6:2 55:20
hoping 34:21
hotel 10:13 32:24
  52:21 79:10,14
hour 40:3 51:6
  52:23
hourly 25:12,18,25
  39:16 42:10
hours 11:2,6 12:13
  40:3 42:11 46:23
  48:9 51:5,14 56:10
  65:3 66:4
HR 5:15 13:6,9,12,
  16,19 14:7,8,10
  15:12,14 17:16 24:1
  28:13,15 31:20
  47:12,20 48:1 62:9
  80:24
HRIS 77:1
huge 79:6
human 11:23 13:2

**I**

IDENTIFICATION
  18:10 59:17
II 34:1

ill 46:3,4 57:16
  65:12
imagine 72:10
immediately 79:21
impacts 25:1
inclusion 33:25
  75:6
increase 40:8
indicating 64:10
indicator 74:9
indicators 74:21
indirectly 83:21
information 34:25
Informed 5:3
Informing 5:9
initial 14:14 17:11
initially 17:24
  34:1 35:9 73:2
  79:14
inside 25:3
insight 34:24
insomnia 65:11
instructed 7:25
interact 25:3
interactions 14:14
interest 21:11
interested 20:23
  21:18 83:20
interpret 25:5
interview 77:6
  78:11
interviewed 76:16,
  18,24 77:9 78:8
introduction 26:22
involved 6:19
  15:13,24 16:3,13
  43:23 47:10,12,21,
  23 48:3,7,13 51:1
  81:4
involvement 62:5
issue 44:1,5
issues 17:16 20:20
  54:11 57:2 72:6
  80:25

J

January 48:19
Jill 62:13 65:19

job 14:5 20:11,14,
  16 21:15 22:2,25
  26:6 30:23,25 33:14
  34:6,9 70:20 74:22
  75:11,12
jobs 14:6 33:14
Johnson 13:4,9
joining 32:13
Julie 16:17 17:16
  19:25 40:19,20
  43:21,25 44:20 45:9
  48:2,3,10,13 50:25
  52:2,16 57:1,14
  59:12 60:21 62:13
  64:15 67:8 76:20
  77:4
Julie's 38:8
July 13:8 33:5
  38:7,14 61:24,25
  62:3 63:3
jump 31:21
June 16:25 19:16
  52:10 58:6 61:6

K

Kaiser 79:18
Kate 77:17
Katherine 82:11
  84:3
key 74:8,21
kind 6:20 17:9
  18:19 21:24 25:23
  31:25 33:8 34:1
  35:1 49:11 74:5,9,
  25 77:15 79:18
kinds 14:24
knew 21:2,8,19,25
  23:21 24:6,9 39:2
  43:8 68:1 71:19
knowledge 80:1,2

L

lab 15:23 20:16,21,
  23 31:2
labor 17:18 75:6
  80:15
lack 50:19 60:12
laid 54:9 75:17,21

late 26:16 60:19
  63:3
launch 33:5
Laura 5:15 31:19
  38:25 40:8,9,20
  44:17 69:22 70:24
  71:14 72:16,25
  73:1,3,11,13 74:5,
  15 75:18
lawsuit 4:20,23
  5:2,5,8,13,18,22
  6:1,5,12,15
lay 55:22
layers 10:13
layoff 6:19 74:24
  77:23 78:1 79:3,22
layoffs 8:19
leadership 69:20
learn 4:22 18:8
  34:22
learned 18:5
leave 20:7 48:19,
  21,24 49:20 51:2
  65:15 67:4,12 81:8,
  11
leaves 28:13,20
  62:8,10 65:19 67:1,
  6
leaving 74:5
left 16:23,24 74:3,
  18 75:11
letter 6:20 9:6,7,
  8,9 15:2 36:2,9,16,
  19 37:12 49:7
  63:15,20 64:1,2,3,
  25 69:4 84:14
letters 6:18,19
  8:12
letting 56:15
level 11:13 20:19
  21:2 23:15,25 32:1
  33:23 37:17,23
  41:8,14 42:20 43:22
  74:13,16 75:13
level-wise 30:24
licenses 11:22
light 58:23
Lindsay 10:14
  35:10,13,16,19
  43:10 44:2 50:2,12
  51:22,25 52:2,14

53:2,7,16,19 54:6,
13,14 56:20 58:6,7,
22 59:1 60:25 64:16
65:23 66:7,12,17
67:17,20 68:7,19
69:10 70:10,13,18,
25 72:7,14,22 73:7
79:2,25 80:3 81:3
**Lindsay's** 56:3
**list** 69:4
**listed** 34:10
**listen** 18:3
**local** 28:13,15
**location** 46:18,24
**locations** 33:13
**long** 12:21 13:5,12,
15 35:12 52:22
63:23 67:5 70:17,19
**longer** 16:21 51:16
53:11 70:21 71:12,
21
**looked** 8:20 39:25
**lot** 37:14 43:3
74:10 75:25 77:14
**lots** 33:21 72:19
**lowest** 20:18 36:25
**Lucinda** 10:8,10
**lunch** 53:12
**lunches** 51:16 53:11

**M**

**made** 25:2 33:4
34:17 37:11 40:7
55:11 74:5 81:19
**Maine** 12:17
**make** 14:22 15:4
32:8 40:13,15 64:3
67:25
**making** 21:24 24:25
25:23 31:10 42:21
74:8
**management** 13:10
32:25 33:2 70:7
73:24
**manager** 13:20 14:23
15:3 30:7 70:5,11
76:21 78:14 81:17,
18
**manager's** 71:2
72:9,23

**managers** 14:15
17:24 33:12 45:12,
14 69:21,23,24
80:24
**March** 4:25 79:23
**Margaret** 18:20
21:3,25
**marked** 18:10,12
27:16,22 36:1
59:17,19 63:5
**market** 37:7 38:11,
13
**Master's** 11:14,17
22:3
**match** 29:23 30:8
**max** 37:7,8
**meaning** 15:12 48:22
80:4
**meaningful** 7:17
**means** 27:16 42:10
53:15 68:2
**meant** 75:9
**mediation** 6:3,7,8
**medical** 20:7 28:13,
20 48:24 49:20
51:17 53:15 62:8,
10,22 65:19 66:25
67:6 81:8,11
**medication** 65:9
**medications** 10:25
11:5 62:24
**meet** 9:20,23 15:21
19:8,10,20 20:6
26:2,18,21 29:15
60:19,23,24
**meeting** 20:2,9,11,
13 23:11,16 26:4
27:1 29:12,17,20,21
38:25 41:5 44:15,17
52:5,9,12,19,22
53:1,8 55:2,15
58:6,10 61:2,6,7,9
63:24,25 64:8,14,
18,22 65:22 66:7,
12,14,17,24 67:14,
19,25 68:4,5,18
69:1 71:14,15,17,24
75:18
**meetings** 44:25 45:4
61:13
**member** 55:10

**members** 20:21 74:1
75:2
**Memorial** 51:3
**memory** 11:7
**mentioned** 9:6 26:7
32:13 48:21 52:25
55:1 61:16 63:23
81:17
**mentioning** 23:14,24
**merge** 32:23
**merged** 13:11 33:20
**merger** 32:14,15
33:18
**mergers** 33:7
**merging** 21:8
**met** 4:14 29:8
**Michelle** 79:1
**minimum** 32:3,5
37:4,6,25 38:2,7,20
39:11
**minimums** 26:3
**minute** 41:1
**minutes** 80:9
**mischaracterizes**
41:17,22
**missed** 39:20
**misusing** 53:3 54:16
57:5
**mix** 25:25
**Moeller** 5:14,18,22
**month** 44:9 70:21
79:4,21 80:5
**months** 35:15 49:4
79:23
**morning** 4:7,8 5:19
65:6
**moved** 16:25 33:13
51:8 70:2,20
**movement** 31:25
**moving** 34:2 52:18
53:13 74:24
**multiple** 37:5 55:21
59:13

**N**

**needed** 26:24 34:15
69:25 72:21 74:14
**needing** 67:4

Katherine Doxey
December 16, 2019

9

neglecting  54:22
negotiate  25:6
negotiated  47:8
negotiating  47:23
negotiation  47:13
negotiations  80:23
news  75:20
Nodded  40:17 55:4
non-exempt  42:9
non-medical  53:21,
  22
normal  32:11
NOTARY  82:19
note  6:24 7:6,21
notice  43:7 74:15
  83:16
notified  56:17
  75:16
notifying  56:16
November  49:5
number  35:23

---

**O**

Object  6:16 8:23
  15:6 19:5 22:23
  23:19 24:4 25:19
  27:6 28:24 30:4
  31:13 34:7,19 37:2
  47:16 49:24 50:21
  53:23 56:5,14 60:14
  65:25 66:20 67:23
  68:8 69:9 71:3
objection  7:22,23
  41:16 66:10
observation  16:8
occasionally  45:6
October  49:5
Odinacio  77:17
offer  6:19 9:6,7,8
  14:23 15:2 31:11
  34:16 36:2,9,16,19
  37:12,18 49:7
offered  15:2,15
  30:12 31:7 34:5
  46:12 77:10 78:15,
  18
offers  14:21
office  5:10,20
  19:22 46:4 51:19

---

55:3 57:12,17,20
  67:1 69:25 70:6
  75:7 80:17,20
official  28:19 34:9
officially  13:20
  33:20
one-on-one  44:24
open  8:6 76:8
opening  21:21 22:9,
  15
operations  14:12
opinion  56:2,12
opportunities  21:10
option  21:21 70:5
order  69:25
orientation  15:25
  16:3,5,13,14,19
originally  9:7 50:7
outline  65:2
oversee  74:13,17
overseeing  71:7
  72:7
oversight  71:1

---

**P**

Pages  84:2
paid  42:17
palpitations  57:23
panel  76:20 78:12
part  18:2 20:19
  24:13 25:22 37:18
  39:15 59:24 65:21
  67:11
part-time  20:16
  22:1 79:4,20,24
parties  64:3 69:7
  71:9 83:19
pause  74:6
pay  20:17 24:17,21
  25:10,12,16 36:22,
  25 37:6,8,23 38:6,
  10,14 39:5,7 40:8
  41:8,14 51:4
Payne  4:19 15:18,21
  17:19 18:6,19 19:8,
  10,21 20:9,14,24
  22:13 23:4 26:5,24
  29:8,16 30:12,21
  31:7,11 34:4,17
  35:7,12 36:21

---

37:11,21 41:5 42:2
  47:1,9 48:22 49:19
  50:1,14,20 53:3
  54:13,15,16 55:3
  56:4,13,21 57:4
  58:21 59:8 60:9,17
  61:17,20 62:15
  63:20,24 64:15
  65:24 66:9 67:16,20
  68:5,18 69:11
  70:10,14,18 71:1,11
  72:3,7 73:6 75:16
  76:3,23 77:10,22
  81:2
Payne's  5:8 6:5,24
  10:15 16:13 27:11
  28:8 29:25 35:17
  36:8 41:14 44:11,22
  47:24 48:4,14 54:15
  57:25 58:9 62:11
  69:8 70:15 72:24
  73:16,19 75:20 77:6
  81:10
PENCE  6:16 8:23
  15:6 19:5 22:23
  23:19 24:4 25:19
  27:6 28:24 30:4,6
  31:13 32:8 34:7,19
  37:2 38:3 41:2,16,
  21 47:16 49:24
  50:4,15,17,21 53:23
  56:5,14 59:23 60:14
  65:25 66:10,20
  67:23 68:8,14 69:9
  71:3 81:24
pending  41:20
people  7:7 13:3
  14:11 24:12 33:12,
  14 35:11 48:8 56:8
  66:5 70:1 77:9
perception  54:16
  68:6
performance  40:12
  54:11 58:9 74:9,21
  81:5,6,8,11
performing  49:22
period  49:19 68:12
  80:5
person  17:15,23
  55:25
personal  16:8 38:5,
  21 39:19 42:13
  51:17 57:19

Katherine Doxey
December 16, 2019

10

**personally** 43:18
56:22
**phase** 31:3 34:1
**philosophy** 69:23
**phone** 43:24 56:1,9
**phonetic** 21:3 77:17
**physically** 55:24
**picture** 73:1,4
**piece** 67:3
**place** 35:13 52:19
64:8 79:21 83:16
**Plaintiff's** 18:12
59:19 60:4
**plan** 33:6
**plans** 16:7
**platform** 34:23
**platforms** 33:16
**point** 7:11,13 8:1
14:13,23 16:9,10,18
17:11 21:7 27:9
37:21 40:10,12
50:18 66:25 76:1,19
**pointed** 64:13
**policies** 8:11,13
9:3 16:9 33:16
80:24
**policy** 25:4 27:12
28:6 45:16,20 75:6
80:14,18,21,25
**pool** 22:10
**posed** 7:14
**position** 12:24
13:12,19 15:2 17:9
20:19 22:21,22
24:24 25:10,22,24
30:2 32:1 39:16
42:9,10,14,15 76:16
78:9,16,19,22,25
79:24
**positions** 21:15
22:7 25:8 26:6
49:12 76:3 78:1
**possibilities**
20:12,14 21:5 74:12
**possibility** 21:9
22:8 76:2
**possibly** 16:12 22:4
23:24 39:21
**post** 31:22
**potential** 22:15
29:9 30:25

**potentially** 30:22
39:25
**pre-approved** 46:3
**prep** 6:10 9:24
**preparation** 9:12
7:7,15 79:8,19
**prepare** 8:9
**prescription** 11:1,6
**present** 19:24 61:4
63:24
**pretty** 27:17 80:9
**previous** 65:1
**previously** 4:15
10:17 27:16,21 36:1
63:5
**prior** 6:8 13:9
31:10 68:5,21
**procedures** 20:7
33:16
**proceed** 7:24
**process** 15:13 28:10
61:22 62:3 74:23
79:6 81:15
**professional** 11:23
**projects** 18:1
**promotion** 14:24
**proof** 53:19
**proper** 43:7
**properly** 70:1
**proposal** 40:7 75:5,
8
**proposals** 74:25
**propose** 22:14
**provide** 53:19
**provided** 37:12
**PUBLIC** 82:19
**publishing** 35:1
**pull** 35:3
**purpose** 39:1 67:24
**purposes** 55:8
**put** 27:22 30:9 32:3
35:10,13 39:15
42:15,19,24 43:6
45:24 54:21 74:22

**Q**

**qualified** 78:20
**querying** 35:3

**question** 7:9,11,14,
17,25 8:6 24:1
27:18 29:1 32:9
41:19 66:13,23 81:5
**questions** 7:4,22
11:11 17:24 56:9
60:1 66:6 81:23
**queue** 77:3
**quick** 19:3 41:1
**quote** 60:12,18

**R**

**raise** 58:21
**range** 15:8
**rankings** 34:20 55:9
71:6,9 74:20
**rate** 37:7
**rationale** 75:3
**reaccreditation**
79:5
**reach** 52:13,14
65:20
**reached** 29:14
**reaching** 60:10
**reaction** 22:16
75:20 76:9
**read** 8:21 82:5
**ready** 79:5
**realize** 21:1
**rearranging** 73:22
**reason** 11:9
**reasonable** 15:9
55:24 56:4,13,18
**reasons** 22:1 53:21,
22
**reassess** 67:1
**recall** 16:24 18:24
19:13,18 22:11
23:23 27:2,3,9
29:18 35:14,16
37:14 39:24 41:9
48:16,25 49:2 52:23
53:18 54:3 55:20
57:7 61:2,6,9 62:18
63:1 64:1,7 65:23
66:11,16 76:21
77:16
**receiving** 18:24
**recent** 9:8 10:3

Katherine Doxey
December 16, 2019

11

recertify 12:14
recognize 7:2 18:16
recollection 57:13
record 4:11,17 41:3
  43:5 57:14 64:12
  80:11 83:11
recorded 83:7
recreate 33:15
recruiting 17:18
recruitment 18:1
redirect 81:24
reduced 83:8
reference 81:7,10,
  19
referenced 61:1
referred 14:12 59:1
  71:14
referring 9:17
reflect 64:13
reimburse 41:15
reimbursing 42:1
reinstate 40:5
  41:15 42:7
reinstating 39:21,
  25 42:1
related 41:25 50:2
relations 17:17
  75:7
relative 83:18,19
relaying 66:3
remember 29:21 32:6
  35:6 50:11 52:10
  61:3,12 62:20 65:18
  69:14
reminding 5:19
remote 70:3
remotely 55:11 56:7
  69:24
removed 33:23 81:8,
  11,20
reorg 31:23
reorganization
  32:14
repeated 54:25
repetitive 7:1
rephrase 7:15 41:23
  66:24 68:17
replaced 70:22
replacement 17:15

report 33:24 70:23
  71:20
reporter 7:3 32:12
reporting 35:8,12
reports 35:4
representing 4:18
request 20:24
  28:13,22 29:4 46:17
  59:14 62:6,11 63:1
requesting 27:13
  28:10 56:3
requests 14:24
  42:23 43:1 59:5
required 28:22 29:4
  31:1 74:12
requires 42:20
  74:23
requisitions 76:25
research 15:23
reserve 81:25
resources 11:23
  13:2
respective 47:14
respond 19:1
response 19:11
  39:12 54:5 55:17
  58:1 64:2
responses 7:5
rest 46:5 57:20
restructured 17:10
result's 42:18
retained 70:25
review 8:13 9:10
  16:9 18:13 27:17
  59:20 63:6
reviewed 6:18 27:25
  60:3 75:5
reviewing 72:23
revise 80:23
revised 66:18
Rochester 11:18
role 13:23 14:20
  17:8 21:18 23:6,10,
  15,18 24:3,7,8,11,
  20 25:17,21 26:19
  29:10 30:1,13,22
  31:8,12 34:5,6,12,
  18 35:17 36:22
  37:1,22 38:15,24
  39:18 40:10 41:7
  42:6,16,20,24 49:8,

12 70:11 71:2 72:4,
  9,23 74:19 75:12,14
  76:6,10,24 77:6,10
  78:6 79:5,21
roles 21:14 25:25
  34:14 49:21
room 10:5 52:21
rule 7:2
rules 6:23 68:25
runs 51:16

                S

Sage 19:22
sake 32:11
salaried 25:13,18
  39:17
salary 26:2
sat 78:11
save 82:6
SC 13:4
schedule 46:19
scheduled 71:15
scheduling 45:18
  57:16 58:17
school 12:5 13:10
  16:10,11 17:13 21:5
  22:2 32:23,24,25
  33:24 52:21 61:18
  71:6 79:10
schools 13:11 21:7
  32:14,16,21,23
  33:2,10 74:7 79:14,
  16,19
scope 72:18
security 42:22,25
seek 61:17
seeking 29:2
send 73:4 79:7
Senior 11:23
separately 9:20
  31:19
separations 8:16,
  17,18
September 36:9
  44:16 49:8
September-ish 69:15
services 10:12
  33:25 34:3

Katherine Doxey
December 16, 2019

12

| | | |
|---|---|---|
| session 16:6 | sort 16:2 17:12 | status 5:9,12 51:9 |
| sessions 9:25 | sound 24:11 | 77:7 |
| set 22:21 34:5 | sounded 24:7,8 | stay 57:17 70:5 |
| 38:25 71:8 | Southern 12:17 | 79:12 |
| sets 72:17 | span 49:2 | stenotype 83:8 |
| SHA 52:21 | speak 9:12 10:19,22 | step 70:7,11 |
| Shackell 18:20 | 17:13 20:14 22:6 | stepped 71:1 72:8, |
| 21:25 | 29:16,19 30:11,16 | 22 |
| Shackell-dell 21:3 | 40:21 44:14,21 52:1 | stop 74:6 |
| Shaw 76:20 | 54:13 | stopped 69:11 |
| Shawn 5:14 80:13,14 | speaking 7:7 9:17 | 70:10,13 |
| 81:4 | speaks 19:6 60:15 | straight 47:18 |
| Shaylor 83:3,25 | special 12:5 | strike 5:6 10:7 |
| she'd 21:17 26:13 | specialists 17:14 | 16:2 17:20 30:10 |
| 29:15,23 40:12 51:2 | specialized 11:21 | 31:7 37:20 63:15 |
| sheet 82:8 | specific 14:5 | 75:15 |
| shift 75:14 | 21:14,15 23:25 | structure 16:11 |
| shifted 38:7,10,13 | 28:22 29:4,7,21 | 69:8 71:16 |
| 74:1,2,11 | 30:20 46:20 48:9 | student 33:25 34:3 |
| short-term 20:6 | 50:23 52:4 54:18 | stuff 6:20 33:8 |
| shortly 16:17 48:18 | 64:24 65:17 72:11 | 72:17,19,21 77:3 |
| 64:9 | specifically 19:18 | submitted 71:8 |
| shot 73:1 | 53:18 61:10 62:20 | SUBSCRIBED 82:14 |
| show 27:15 35:25 | 64:9 65:2 69:14 | substance 6:5 9:15 |
| 59:18 63:5 | 79:12 | 36:15 |
| sick 16:8 | specifics 58:20 | substantively 5:22 |
| side 27:23 | 65:14 | suggest 15:1,4 68:9 |
| sign 81:25 | spell 77:19 | suggesting 15:9 |
| signed 47:8 48:17 | SPHR 11:24,25 | suggestion 14:22 |
| signing 47:11 | spoke 6:1 22:20 | summer 26:15,17 |
| similar 24:8,11,13 | 26:5 30:21 57:4,10 | 73:21 |
| 79:15,18 | spoken 5:4,6 6:4,11 | supervise 13:24 |
| simply 25:4 | 80:3 | 14:5,7,11,14 70:1, |
| simulation 15:23 | spread 25:2 | 17 72:20 |
| 20:16 31:2 | spring 38:12 | supervising 14:2 |
| sit 55:10 64:3 | staff 33:10,23 | 69:11 70:10,14 |
| Sitting 11:9 | standpoint 43:22 | 71:12 |
| situation 31:23 | 45:18 46:22,23 | supervision 83:9 |
| 51:17 65:9 | 55:23 | supervisor 10:14,15 |
| skill 30:23 | start 7:9,11 43:2, | 21:3 35:17 46:21 |
| skills 30:8 32:2 | 17 48:11 | 47:15,20 70:15 |
| skim 8:21 9:2 | started 13:21 16:17 | 72:13 74:17 |
| skimmed 9:1 | 38:24 62:3 | supervisors 5:10 |
| slated 60:18,23 | starting 14:23 | support 21:24 22:9 |
| sleep 65:12 | 18:19 20:25 51:18 | 64:6 74:10 |
| slept 65:11 | starts 28:18 36:12 | supports 22:10 |
| small 80:12 | state 4:11 25:4 | supposed 49:21 |
| snap 72:25 | 82:2 83:1 | 51:14 |
| software 20:24 35:2 | states 49:8 | surgery 26:15 |
| | statistics 22:3 | surprised 75:22,23 |

Katherine Doxey
December 16, 2019

13

survey  38:12
surveys  34:20 55:9
  71:5 74:19
sworn  4:3 82:14
  83:5
Syer  5:16,25 6:4,9
  31:19 38:25 40:8,14
  41:13 42:4 69:22
  70:24 71:14 75:18
Syer's  40:22 41:13,
  25
system  73:2
systems  33:17

**T**

taking  7:3 8:7
  21:18 53:11 54:20
  59:1 75:10 83:4
talk  16:6,9 20:11
  21:10,16 26:19
  52:17 54:7 57:14
  71:15
talked  5:17 22:8
  32:20 40:20 51:10
  69:22
talking  21:4
Tammy  10:14 35:10
  43:4,10,13 45:9,12,
  19,23,25 46:2 48:8
  50:25 51:10 54:18
  55:16,18,19 60:19
  64:16 65:3 66:14
  68:23 69:18 70:2,23
  71:7,12,20 73:4
  74:3,20 79:9 81:18
Tammy's  54:22 75:12
tangentially  78:7
task  33:8
team  14:12 21:21,22
  22:16 34:13 55:11
  74:1 75:1,9 79:7
telling  18:21
ten-ish  35:23
term  81:6
termed  44:22
termination  9:9
terms  26:11
testified  4:4 36:21
  41:11,24 71:25

testify  11:3 83:5
testimony  41:17
  83:12
thing  35:1 77:15
  80:12
things  14:25 16:2
  24:13 31:22 33:21
  34:21 39:4 43:20
  45:13,22 46:23
  47:18 51:17 53:14
  71:9
thinking  61:12
  69:15 71:19
thought  34:11 72:13
  74:21
thrown  33:11
Thursday  10:3
time  5:17 6:1 7:12,
  13,21 8:1,3 16:8,15
  17:19,20 18:2,5
  19:19,21,23 20:10,
  19 21:6,20 22:7,20
  23:1,9,16 24:14
  26:8,23,24 27:8,11,
  17 28:8 31:1 32:10
  33:9 34:4,16 35:20
  37:11,21 39:15,19,
  24 40:1,6,9 41:15
  42:1,4,7,17,19,23
  43:1,6 45:25 47:7
  49:2,19 50:9,18
  51:7,8,11,22 52:17
  53:3,4 54:17 57:6,
  15,19 59:1,7,20
  63:14 68:12 69:10,
  22 70:13 73:14,16
  76:4 79:22 81:18
  83:15
timecard  43:14
  45:24 59:2 72:24
  73:1,5
timeline  61:11
times  10:1 30:15
  32:13 38:1 44:4,8
  53:13,20 59:12
  68:22,24 71:10
timing  31:4
tiny  42:16
title  10:12 13:1
  37:5,9 39:18 78:21,
  23

titles  14:5 37:5
today  9:13 10:23
  11:3,9 32:13
today's  8:10 9:24
  33:19
told  18:9 41:25
  53:25 62:4 71:19,23
  76:5
tons  79:7,8
tool  75:1
top  60:17 63:17
touch  62:13 65:19
tough  45:13
traditional  49:12
train  51:19
training  17:25
  55:8,12,25 66:6
transactions  77:2
transcript  7:6 17:5
transfer  55:12
treating  43:14
treatment  26:14
  65:18,21 67:12
treatments  62:23
true  82:6 83:11
truth  83:6,7
Tubbs  62:14
type  28:22
typewriting  83:8
typically  20:5 26:2
  28:18

**U**

Uh-huh  4:16 6:25
  12:1 15:20 17:2,6
  19:4 24:18,21 26:9
  36:14 38:18 46:11
  49:10,14 52:8 59:3
  61:19 63:11 69:5
  72:2
ultimately  15:16
  31:7,19 50:1 78:24
uncertainty  40:10
  42:6
Undergrad  32:25
understand  7:14,16
  11:11 43:3 56:8
  64:18 65:4 66:2

Katherine Doxey
December 16, 2019

14

**understanding** 22:22
23:17 24:2 34:17
42:5 50:8 65:8
71:18
**understood** 7:18
64:4
**unhappy** 65:24 66:1
**union** 80:22
**university** 5:3,5,7
8:18 11:18 12:17,19
25:3 27:5 32:22
35:20,21,22 39:10
59:15 64:5 73:17,20
74:23 79:25
**university's** 77:1
81:6,15
**unreasonable** 57:18
**unusual** 31:21
**updating** 57:2
**usual** 44:24

**V**

**vacant** 24:14
**vacation** 40:4 42:13
**vague** 69:9
**Val** 9:19
**Varma** 80:13 81:2
**verbal** 7:5
**verified** 73:13
**versions** 59:13
**versus** 51:15
**Vinci** 4:6,18 38:4
40:25 50:5,16 59:25
64:12 68:13,16 80:8
81:22 84:3
**Virginia** 16:25
**virtual** 26:22
**virtue** 58:15
**Vishal** 79:16
**visit** 79:7

**W**

**wait** 30:25
**wanted** 21:10,12,16
22:5,18 42:14 44:16
45:18 46:1 48:8
52:16 54:19,21 55:8
56:17 65:5,15 69:18

70:3 73:23 81:7
**wanting** 42:19
**warranted** 38:13
**Weaver** 16:17,21
17:21 19:25 20:1,8
28:17 38:17 40:19,
22 41:12,25 44:21
45:7 56:23 57:10
58:1,14 60:9,11,17,
24 61:17 64:15 77:5
**web** 74:25
**week** 9:4,10 60:19
**weekly** 45:4
**whatnot** 15:3
**when's** 5:17,25
**wide** 25:2
**withdraw** 66:23
**word** 50:19
**words** 46:15
**work** 14:6 31:5
34:1,15 38:12 39:20
42:12,18 43:15
46:2,4,5,8,10,17,
18,19,22 47:1,24
48:4,11,12,14,17
50:2,10,13,20 51:20
55:13 56:6,10
57:20,21 59:5 62:24
65:3,5,7 68:21
69:6,8,19,24 70:3
71:7 72:8,12,15
74:2,6,9,11,14,16
75:4,25 79:2,15
80:14 81:3
**Workday** 73:3 76:25
**worked** 35:20,22
47:19 51:2 62:10
77:23 79:25
**workforce** 75:5
80:18,21
**working** 20:15 31:2
39:15 47:9 49:12
51:13 55:11 67:17
73:25
**would've** 19:22
29:22 37:18 39:16
55:16 62:7 76:21
77:7 78:3
**wrapped** 80:9
**write** 75:3 80:23
**wrong** 21:1 45:15,

20,21 64:17

**Y**

**year** 12:13 38:6,23
41:6 44:10 71:25
**years** 12:13,23
13:14,17 35:23 39:9
79:6
**YORK** 82:2 83:1