**EXHIBIT XX**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

DENISE PAYNE,

                Plaintiff,

v.

CORNELL UNIVERSITY,

                Defendant.

**FILED ELECTRONICALLY**

**DECLARATION OF
KATHERINE DOXEY**

Civil Action No. 18-cv-1442 (GTS/ML)

---

Katherine Doxey, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that:

1. I am employed by Defendant Cornell University ("Cornell") in Human Resources ("HR") on its main campus in Ithaca, New York, where I have been continuously employed for the past 12 years. My current title is Director of Human Resources in the Cornell SC Johnson College of Business ("College of Business"). I have personal knowledge of the facts set forth in this declaration based on my experience in HR at Cornell and my review of relevant University records, as described in more detail below.

2. I make this declaration as a fact witness and record custodian in support of Cornell's motion for summary judgment in this matter.

3. Apart from a short orientation session in 2015, I began interacting with Denise Payne in 2016, when she was working part-time as a Research Aide III in the Business Simulation Lab ("BSL") in the Johnson Graduate School of Management. This was one of Cornell's schools before it merged with two other schools to create the College of Business, effective July 1, 2016.

4. I reviewed her employment file and scheduled a meeting with Ms. Payne after I learned of performance concerns BSL had with her. Some faculty felt that she was not receptive

to constructive criticism or other feedback about her work. In connection with the planned merger, there were also plans being discussed by the BSL academic director and faculty committee to restructure BSL, which would have eliminated Ms. Payne's position. Her position involved relatively low-level administrative work, such as tracking hours of experiment participants, scheduling and running the surveys, maintaining equipment and supplies, and training student employees. The faculty realized they needed an employee who could design and program surveys in multiple software programs, something Ms. Payne was not trained to do. I wanted to assess whether her career goals might line up with other positions that were then available or might become available in the future. I determined from her employment file that her current role in BSL was a non-exempt band C position.

5. At Cornell, both hourly and salaried jobs are classified based on pay bands, with the lowest level being "band A" and the highest level being "band I." Generally, bands A through D are hourly non-exempt employees (meaning they are eligible for overtime pay if they work beyond their scheduled hours); those in band E are a mix of hourly and salaried employees depending on the level of responsibility; and bands F and above are generally exempt, salaried employees with decision-making authority and responsibilities that have an impact in other departments inside the University and outside of the Cornell community.

6. Before the meeting I had scheduled, Ms. Payne contacted me on June 13, 2016 and disclosed her breast cancer diagnosis, which caused me to adjust the agenda for the meeting to include discussion of the mechanics for taking medical leave and Cornell's generous short-term and long-term disability benefits.

7. As noted above, the Johnson Graduate School of Management, the Dyson School of Applied Economics and Management, and the School of Hotel Administration were in the

2

process of merging to create the College of Business. This merger was designed to streamline operations and eliminate overlapping academic programs and business functions among the three schools.

8.  I had not participated in this type of merger before, and from an HR perspective it was challenging. Not only were business services merging, but job descriptions were changing, office teams were being realigned, and redundancy was being eliminated, meaning people were being reassigned and assuming new roles in new departments. It was a period of significant turmoil for all involved.

9.  At the meeting with Ms. Payne on June 23, 2016, I explored her career goals and position options, including a concept for a new position of Data Analyst that was being contemplated for a new unit to be known as Business Analytics in the newly formed College of Business. She expressed interest in the Data Analyst position.

10.  On July 20, 2016, I informed Ms. Payne via email that Lucinda Allen ("Allen") had been selected to run the Business Analytics unit and that the University intended to move Ms. Payne into a new position within this unit.

11.  Ultimately, Cornell did offer Ms. Payne this new position, and she accepted it on the terms laid out in the offer letter. Because she was out on a short-term disability leave at the time, Ms. Payne received an email on September 26, 2016 from Julie Weaver with an offer letter (prepared and dated September 23, 2016), offering her a promotion to Data Analyst II in the Business Analytics unit, to take effect on September 19, 2016. Ms. Payne responded by accepting the promotion by email, and Ms. Weaver printed Ms. Payne's email acceptance and included it in Ms. Payne's personnel file. A true and complete copy this September 23, 2016 offer letter is attached as Exhibit N to the Statement of Material Facts submitted in support of

3

Cornell's motion for summary judgment ("Statement of Material Facts"). A true and complete copy of Ms. Payne's September 26, 2016 email response to Ms. Weaver's email is attached as Exhibit VV to the Statement of Material Facts.

12. Under the terms of the offer letter, through December 31, 2016, Payne would work 10 hours per week for the BSL and 20 hours per week in her new position for Business Analytics; after that point, she would work 30 hours per week for Business Analytics.

13. Effective September 19, 2016, Payne's 20 hours per week for Business Analytics would be paid to her at the band E level, and her 10 hours per week for the BSL would be paid to her at the band C level. Because she was on leave for much of this time, she did not actually work this schedule; however, she was paid as if she worked these hours under Cornell's various benefits program.

14. Ms. Payne's promotion was unusual, in that it included a two-band increase in pay from band C to band E. In my experience, most employees in the University move up one band at a time.

15. The role was new, and we anticipated it might evolve as the College evolved, so I classified it band E to allow flexibility in pay as the job responsibilities were formalized. With the uncertainty surrounding the new Business Analytics team, not to mention Ms. Payne's role in the unit, Associate Dean Laura Syer ("Syer") and unit supervisor Ms. Allen decided to place Ms. Payne at the minimum pay for the Data Analyst profile in band E. Dean Syer and Ms. Allen consulted with me when they made this decision.

16. Shortly after her promotion, Ms. Payne took a 3-month medical leave, from October 13, 2016 through January 12, 2017. When she returned, Payne was supposed to be working 30 hours per week for the Business Analytics team.

4

17. As a result of Ms. Payne's leave, she had missed training, team building, and divisions of labor among the new team members, among other things. According to her time records, from her start date on September 19, 2016 through the end of her leave on January 12, 2017, Ms. Payne only worked seven days: September 19-21, October 4, October 6, and October 10-11, 2016. She missed 69 out of a possible 76 workdays during this period while other members of the new Business Analytics team established a working relationship and workflow to meet the business needs of the College of Business.

18. University Policy 6.6.13 (Flexibility in the Workplace) is designed to enable employees, like Ms. Payne to work remotely and/or work flexible hours to attend to personal needs while still performing their job responsibilities. Because the business needs of the unit are a priority, the scope of any arrangements under this policy are at the discretion of unit supervisors. Ms. Payne took advantage of this policy to arrange several Flexible Work Arrangement-Agreements ("Flex Agreements").

19. Her first Flex Agreement was entered in February 2017, giving her both flexible hours and remote worktime to attend to her medical appointments and recovery needs. When her cancer treatments were completed and her needs changed, she entered into a Second Flex Agreement with the University, effective May 1, 2017, that authorized flexibility "when needed" for medical issues. After Ms. Payne requested and received a formal disability accommodation from Cornell under University Policy 6.13, she entered into a Third Flex Agreement with the University on August 28, 2017 that allowed her to adjust her work schedule significantly to accommodate her continuing medical needs. True and complete copies of the Three Flex Agreements are attached as Exhibits I, J, and K to the Statement of Material Facts, respectively.

5

20. It was brought to my attention that Ms. Payne started having conflicts with unit supervisors Ms. Allen and Tammy Lindsay ("Lindsay") shortly after she returned from her extended medical leave and began performing her new job responsibilities. Her direct supervisor, Ms. Lindsay, was given guidance from HR about according Ms. Payne flexibility to attend to her medical needs through work assignments that could be done remotely and training opportunities to get caught up on training. Ms. Payne was counseled by HR to be more communicative about her time out of the office.

21. As of April 5, 2017, Ms. Payne began working full-time 40 hours per week, but this change in status did not help matters because she soon began missing additional time for non-medical reasons, as well as the time she was missing for medical treatment. For example, records indicate that Ms. Payne took a 2-hour lunch to attend to banking on April 26; she left early the following day on April 27, due to a migraine; on May 1, she arrived late because took her son to convenient care and then left early because of the nice weather that day; on May 5, she left early for house issues; and, on May 8, she arrived late because she had banking to do. On May 9, 2017, Ms. Payne also asked about taking a long lunch with an old friend, but when Ms. Lindsay informed Ms. Payne she would have to make up the time, Ms. Payne cancelled the lunch. In the course of this litigation, Ms. Payne has produced numerous documents in response to Cornell's discovery requests. I have reviewed certain documents to identify some of the above-referenced episodes. True and complete copies of two email exchanges, dated May 9, 2017, and labeled with Ms. Payne's document production numbers P000459-460 and P000506, are attached collectively as Exhibit HH to the Statement of Material Facts. True and complete copies of two email exchanges, from May 5-8, 2017 and May 23, 2017, and labeled with Ms.

Payne's document production numbers P000555 and P000598, are attached collectively as Exhibit II to the Statement of Material Facts.

22.     In June and July 2017, Ms. Payne complained repeatedly that Ms. Lindsay was "micromanaging" her by, among other things, changing her timecard. At Cornell, non-exempt employees must keep track of their hours worked and time off through an electronic timecard system. When an employee is out of the office, this time off – whether it is vacation time or health and personal ("HAP") time – has to be documented. The non-exempt employee's supervisor is responsible for reviewing the timecard to ensure that the information is not only accurate but also to ensure that the employee does not take time off that he or she has not yet accrued. For example, an employee with only four hours of vacation time accrued cannot enter vacation time for the entire day. Ms. Payne sometimes entered more time off on her timecard than she had earned, and her supervisor made changes to submit an accurate timecard to facilitate Cornell's payroll processing.

23.     During a performance review on June 15, 2017, Ms. Payne got upset after Ms. Lindsay raised some of the above issues, including Ms. Payne's time out of the office and her inability to get trained and caught up with the rest of the team. I was informed that Ms. Payne had asked Ms. Lindsay about being reclassified as an exempt employee and, potentially, promoted to pay band F. Ms. Payne complained to HR about this meeting and Ms. Lindsay's refusal to entertain a reclassification or promotion, even though Ms. Lindsay did not have authority for such decisions and was merely relaying constructive feedback from the Business Analytics unit. Position classifications and pay are my functions as Director of HR for the College of Business.

7

24.     Ms. Payne's complaints to HR about Ms. Lindsay and Ms. Allen continued. On July 7, 2017, Ms. Allen accidentally sent Ms. Payne an email meant for another Cornell employee, criticizing Ms. Payne's work product. When Ms. Payne complained to HR about this incident, we advised her to do her best to work with her supervisors. In this litigation, Ms. Payne produced this July 7, 2017 email exchange involving Ms. Lindsay and Ms. Allen. A true and complete copy of this email exchange, labeled with Ms. Payne's document production numbers P000469-470, is attached as Exhibit LL to the Statement of Material Facts.

25.     In July 2017, Ms. Payne finally sought formal accommodation of a disability pursuant to University Policy 6.13. Prior to July 2017, HR had been encouraging her to seek a formal accommodation as it appeared the Flex Agreements were not sufficient to establish effective work arrangements for her in the Business Analytics unit. Cornell's process for assisting individuals with disabilities, outlined in Policy 6.13, is an interactive process whereby the faculty or staff member works with the University to agree upon reasonable accommodations that meet both the individual's needs and the business needs of the University. To take advantage of this process, the employee has to ask officially for disability accommodation.

26.     After Ms. Payne submitted her formal request for accommodation, it was approved on August 2, 2017. Thereafter, on August 14, 2017, Julie Weaver and I held a meeting with Ms. Payne, Ms. Lindsay, and Ms. Allen to discuss how best to implement Ms. Payne's disability accommodation. The sole purpose of the meeting was to find an acceptable balance between Ms. Payne's medical needs and the business needs of the Business Analytics team. Ms. Payne wanted to work very early in the morning, but Ms. Allen and Ms. Lindsay were concerned that Ms. Payne would be so unavailable during normal business hours, when the rest of the team was working. During the meeting and through email exchanges afterward, Ms. Weaver and I

facilitated a compromise that satisfied all three. A true and complete copy of an August 16, 2017 email exchange with everyone, labeled with Ms. Payne's document production numbers P000269-270, is attached as Exhibit MM to the Statement of Material Facts.

27. Based on this compromise, Ms. Payne entered into a Third Flex Agreement at the end of August 2017. A week later, Medical Leaves Administration ("MLA") representative Jill Tubbs reached out to check on the accommodations, and Ms. Payne responded that the accommodations were "working fine." I reviewed this email in connection with this litigation and Cornell's response to Ms. Payne's Equal Employment Opportunity Commission ("EEOC") charge.

28. Later that Fall, Lindsay stopped serving as a manager for the Business Analytics team for personal reasons, and, in October 2017, Ms. Allen accepted another position in a different College at Cornell. Dean Syer then took over supervising Ms. Payne. Dean Syer asked Ms. Payne to copy Ms. Lindsay on survey and rankings work so that Ms. Lindsay could proofread the work. Unfortunately, Ms. Payne believed that Ms. Lindsay was somehow still trying to micromanage her. On October 10, 2017, Ms. Payne complained via email to HR and Dean Syer about Syer's request. In response, Dean Syer explained that, with Ms. Allen gone and the Business Analytics team going through a major transition, Dean Syer needed help getting everything done and had asked Ms. Lindsay to proofread the surveys and rankings work for accuracy because they needed to be validated and would be subject to scrutiny outside of Cornell. A true and complete copy the October 10-13, 2017 email exchange, labeled with Ms. Payne's document production numbers P000872-873, is attached as Exhibit PP to the Statement of Material Facts.

9

29. The next month, Ms. Payne complained because she thought that Ms. Lindsay was reviewing her timecards again. This complaint was based on Dean Syer forwarding one of Ms. Payne's time off requests to Ms. Lindsay. Ms. Payne, again, complained to HR by email on November 6, 2017, copying Dean Syer. In response, Dean Syer explained that she did not yet have access to Ms. Payne's timecard on the system, so she had asked Ms. Lindsay to send a screenshot of the timecard for Dean Syer to review and approve. A true and complete copy the November 6-8, 2017 email exchange, labeled with Ms. Payne's document production numbers P000237-238, is attached as Exhibit QQ to the Statement of Material Facts.

30. Ms. Payne continued to work under the Third Flex Agreement until a decision was made by the College of Business to eliminate the Business Analytics unit and lay off both Ms. Payne and Ms. Lindsay, who by November 2017 were the only two employees in the unit.

31. As Director of Human Resources at the College of Business, I was consulted about the potential elimination of the Business Analytics unit and potential layoffs and actively participated in formulating the justification for such changes that Cornell requires before layoffs are implemented.

32. In anticipation of these potential layoffs of Ms. Payne and Ms. Lindsay, I contacted Ms. Tubbs regarding Ms. Payne's medical leaves and time off, so that HR could properly calculate a potential payout amount for Ms. Payne (Cornell gave both employees one week of severance for every year of service, along with four additional weeks of severance and four additional weeks of pay). On November 9, 2017, Ms. Tubbs sent me an email documenting Ms. Payne's various disability leaves to help with this calculation. A true and complete copy of this email is attached as Exhibit EE to the Statement of Material Facts.

33. In her email, Ms. Tubbs references a "1 week waiting period." She is referring to the New York state law (which mirrors Cornell's own requirement in Policy 6.9 – Time Away from Work) requiring an employee be absent for one week before qualifying for short term disability. Pursuant to Policy 6.9, after this first week, the University's short-term disability benefit covered 50% of Ms. Payne's pay. She used her accrued vacation and HAP time, along with time donated by her colleagues, to supplement the short-term disability so that she received her full compensation while out on these medical leaves.

34. Pursuant to University Policy 6.12 (Separations, Voluntary and Involuntary, Including Layoff (Excluding Academic and Bargaining Unit Staff)), the College of Business asked me to draft the rationale for the elimination of the Business Analytics unit and the corresponding layoffs of Ms. Payne and Ms. Lindsay. This proposal was then reviewed by numerous Cornell departments, including Workforce Diversity Inclusion and Policy and Labor Relations. Counsel's Office also reviewed the proposal. A true copy of the rationale, entitled "Justification to Eliminate Business Analytics Department in the SC Johnson College of Business," is attached as Exhibit RR to the Statement of Material Facts. Cornell has omitted all the supporting documentation, which included contents from individual personnel files for other Cornell employees, because these files contain confidential employment information.

35. After the proposal was approved, I drafted a letter in Dean Syer's name, dated December 1, 2017, informing Ms. Payne of the dissolution of the Business Analytics team and the layoff. A true and complete copy of this letter is attached as Exhibit SS to the Statement of Material Facts.

36. Ms. Payne's layoff took effect January 2, 2018. She was a candidate for two open position searches at the College of Business at that time: Information & Research Analyst, band

11

F position and the Project Manager, band G position. She interviewed for both positions but was not selected, as a candidate with more suitable job skills and applicable experience was selected for each position.

37.     Assistant Dean of Student Services Amanda Shaw was in charge of the search for one of the positions: the Information & Research Analyst, band F position. This search and the interviews were conducted in December 2017 and January 2018. In its regular course of business, Cornell keeps a file containing information about each candidate, along with feedback and notes from each interviewer. I have reviewed the candidate files for this position. Dean Shaw chose the candidate the search committee overall viewed as the most qualified of the interested applicants. The successful candidate had a Bachelor of Science in Hotel Management, as well as an MBA and relevant work experience at IBM. Ms. Payne, on the other hand, only had a Bachelor of Science in Biological Sciences, and the committee felt as if she did not have the background with data (in particular, the higher-level analytical skills) necessary to succeed in the role.

38.     Assistant Dean of Academic Affairs Beth Fox was in charge of the search for the Project Manager, band G position. This search and the interviews were also conducted in December 2017 and January 2018. I have reviewed the candidate files for this position. Dean Fox also chose the candidate the committee viewed as the most qualified applicant. This candidate not only had a Bachelor of Arts in Linguistics and Master's Degree in Public Administration but relevant work experience at another university. With regard to Ms. Payne, the search committee noted that there was no evidence she possessed the higher-level analytical skills necessary for the position, and the committee expressed concerns about her communication

skills and her ability to work well with faculty, all of which were also essential skills for the position.

39. In this litigation, Ms. Payne produced an email with Dean Fox regarding Ms. Payne's application and interview for this position. A true and complete copy of this email exchange from January 30, 2018 to February 7, 2018, labeled with Ms. Payne's document production number P002137, is attached as Exhibit UU to the Statement of Material Facts.

40. I was informed in March 2018 that Ms. Payne had filed a Charge of Discrimination with the EEOC alleging disability discrimination against Cornell over the period February 1, 2017 through March 13, 2018. A true and complete copy of the EEOC Notice of Charge of Discrimination is attached as Exhibit C to the Statement of Material Facts.

41. On April 12, 2018, the EEOC asked Cornell to provide a response to Ms. Payne's allegations. Along with Julie Weaver, I assisted Cornell in preparing this comprehensive response ("EEOC Response"), including many of the relevant emails that I exchanged with or was copied on by Ms. Payne and her supervisors regarding the issues described in this Declaration. The EEOC requested more information twice, meaning Cornell responded three times, on May 10, 2018, May 25, 2018, and June 14, 2018.

42. In total, the University produced 588 pages of relevant documentation, including documents related to the job searches for the Information & Research Analyst, band F position and Project Manager, band G position, Ms. Payne's flexible work agreements, the layoff justification memorandum, and various relevant correspondence.

43. In assisting Cornell prepare its EEOC Response, I also collected and reviewed numerous other materials related to Ms. Payne's allegations, which were provided to the EEOC. These materials included several Cornell policies:

13

   a. Policy 6.9 – Time Away from Work: Medical Leaves for Nonacademic Staff;

   b. Policy 6.13 – Disability Accommodation Process for Faculty and Staff;

   c. Policy 6.6.13 – Flexibility in the Workplace.

A true and complete copy of the version of Policy 6.9 effective at the time of the EEOC Response is attached as Exhibit E to the Statement of Material Facts. A true and complete copy of Policy 6.13 is attached as Exhibit F to the Statement of Material Facts. A true and complete copy of Policy 6.6.13 is attached as Exhibit G to the Statement of Material Facts.

   44. The EEOC Response also included the following relevant materials:

   a. An August 14, 2015 letter from Margaret Shackell-Dowell, Assistant Director of the BSL, offering Ms. Payne her Research Aide III position (Bates Number 447). A true and complete copy of this letter is attached as Exhibit AA to the Statement of Material Facts.

   b. A June 22, 2016 email from Ms. Payne to Manoj Thomas, Director of BSL, complaining that she was not included in discussions about restructuring BSL and the potential elimination of her position (Bates Number 451). This email exchange was later forwarded to my attention. A true and complete copy of her email to Dr. Thomas is attached as Exhibit BB to the Statement of Material Facts.

   c. A June 23, 2016 email from Ms. Payne to Ms. Shackell-Dowell and Dr. Thomas after my meeting with Ms. Payne earlier that day, explaining that "I feel supported and hopeful that I will have great opportunities here at Johnson." (Bates Number 459). This email exchange was later forwarded to my attention. A true and complete copy of her email is attached as Exhibit CC to the Statement of Material Facts.

   d. A June 29, 2016 email from Ms. Payne to me, copying Ms. Shackell-Dowell, complaining that her potentially negative performance review is the result of being "unfairly targeted by a few faculty members" (Bates Number 471-472). A true and complete copy of this email, and Ms. Shackell-Dowel's response, is attached as Exhibit DD to the Statement of Material Facts.

   e. A February 27, 2017 email exchange between Ms. Weaver and Ms. Lindsay, discussing earlier communications between Ms. Lindsay and Ms. Payne (Bates Numbers 484-485). A true and complete copy of this email exchange is attached as Exhibit GG to the Statement of Material Facts.

   f. A June 15, 2017 email exchange among Ms. Lindsay, Ms. Weaver, Ms. Allen, and me, discussing a meeting that same day between Ms. Lindsay and Ms. Payne

14

  regarding Ms. Payne's workplace performance (Bates Number 497-498). A true and complete copy of this email exchange is attached as Exhibit JJ to the Statement of Material Facts.

  g. A September 5, 2017 email exchange between MLA representative Jill Tubbs and Ms. Payne (Bates Number 045). A true and complete copy of this email exchange is attached as Exhibit NN to the Statement of Material Facts.

  h. A September 21, 2016 email from Ms. Weaver seeking donations of time off from Cornell employees, on Ms. Payne's behalf (Bates Number 477). A true and complete copy of this email is attached as Exhibit TT to the Statement of Material Facts.

45. I recall that Ms. Payne had made similar accusations of retaliation long before her cancer diagnosis, and there are emails documenting her earlier accusations. For example, in February 2015, after Ms. Payne had improperly requested time off, she accused her supervisor of retaliating against her by sending a "barrage of emails ... questioning details of my projects and work, micromanaging me." Ms. Payne made these accusations to then HR Director for the Research Division, Deborah Shigley, in a February 2-3, 2015 email exchange. A true and correct copy of the relevant portions of this email exchange is attached as Exhibit Z to the Statement of Material Facts.

46. I was informed that the EEOC dismissed Ms. Payne's Charge in August 2018, after finding insufficient evidence to conclude that any violation of law occurred. A true and complete copy of the EEOC Dismissal is attached as Exhibit D to the Statement of Material Facts.

47. I was informed that Ms. Payne started a lawsuit in November 2018.

48. I was disappointed to learn of her lawsuit because I devoted significant time and resources to assist Ms. Payne during her time here at Cornell. Ms. Weaver and I worked hard to inform her of the benefits available to Cornell employees who needed medical leave time, and

we worked hard to implement Cornell's related policies.

DATED:     February 27, 2020

_____
Katherine Doxey