UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DENISE PAYNE,

              Payne,

     v.

CORNELL UNIVERSITY,

              Defendant.
_____

Civil Action No. 18-cv-1442 (GTS/ML)

## PAYNE'S RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS PURSUANT TO NDNY LOCAL RULE 7.1(a)(3)

Payne Denise Payne ("Payne"), in opposition to defendant Cornell university's ("Defendant's") motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 7.1 of the Local Rules of Practice for the Northern District of New York**,** submits the following Response to Defendant's Statement of Material Facts:

### Procedural History

1.     Payne Denise Payne ("Payne") commenced this action by filing a Summons with Notice in state court on November 7, 2018.  Because of the federal questions referred to in the Notice, Cornell removed the action to this Court and demanded service of a complaint.  Ex. YY attached hereto, Declaration of Adam Pence, dated March 2, 2020 ("Pence Decl."), ¶ 3.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 1.

2.     Payne filed and served her Complaint on January 2, 2019, asserting four causes of action under the New York State Human Rights Law and four causes of action under the federal

Americans with Disabilities Act.  Ex. YY, Pence Decl. ¶ 4; Complaint, Exhibit A attached hereto.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 2.

3.     Cornell filed and served its Answer on March 4, 2019, denying all allegations of discrimination and retaliation and asserting affirmative defenses of failure to state a viable claim, failure to exhaust administrative remedies, and a time bar under federal law as to certain allegations. Ex. YY, Pence Decl. ¶ 5; Answer, Ex. B attached hereto.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 3.

4.     Prior to the filing of this action, on or about March 19, 2018, Payne had filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging disability discrimination against Cornell in connection with her diagnosis and treatment for breast cancer.  She alleged discrimination from February 1, 2017 through March 13, 2018, and alleged a continuing violation.  Her charge was cross-filed with the New York State Division of Human Rights.  Ex. A, Complaint ¶¶ 5, 29; Ex. B, Answer ¶ 5; Ex. YY, Pence Decl. ¶ 7; Ex. XX, attached hereto, Declaration of Katherine Doxey, dated February 27, 2020 ("Doxey Decl."), ¶ 40; EEOC Charge, Ex. C attached hereto.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 4.

**4.1.** Payne initially filed an inquiry with the EEOC on August 15, 2017 after her approved disability accommodations at Cornell were not being properly administered and were, in fact, being denied to her. *See* Declaration of Gabrielle Vinci ("Vinci Decl"), Ex. 26 (Declaration of Plaintiff Denise Payne ("Payne Decl.")) at ¶¶ 56-57.

**4.2.** Cornell was on notice of Payne's contact with the EEOC in August of 2017. *See Id.*

5.      The EEOC investigated Payne's allegations, and Cornell provided hundreds of pages of documentation regarding its policies and its administration of those policies to benefit Payne during the course of her employment following her cancer diagnosis in June 2016.  The EEOC issued a Dismissal and Notice of Rights on or about August 13, 2018, including a determination that "[b]ased upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes."  Ex. YY, Pence Decl. ¶¶ 8-9; Ex. XX, Doxey Decl. ¶¶ 42-46; EEOC Dismissal and Notice of Rights, Ex. D attached hereto.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 5 but objects to Defendant's misrepresentation of the EEOC's statements in the Dismissal and Notice of Rights. The Dismissal Notice also states: "This does not certify that the respondent is in compliance with the statutes." *See* Vinci Decl., Ex. 5; Def. Ex. C.

6.      Among the policies Cornell provided to the EEOC during the investigation were:

   a.   Policy 6.9 – Time Away from Work: Medical Leaves for Nonacademic Staff;

   b.   Policy 6.13 – Disability Accommodation Process for Faculty and Staff; and

   c.   Policy 6.6.13 – Flexibility in the Workplace.

Ex. YY, Pence Decl. ¶ 9; Ex. XX, Doxey Decl. ¶ 43; Ex. WW attached hereto, Declaration of Julie Weaver, dated February 25, 2020 ("Weaver Decl."), ¶¶ 7, 12, 16; Policy 6.9, Ex. E; Policy 6.13, Ex. F; and Policy 6.6.13, Ex. G (all attached hereto).

**Payne's Response: Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 6.

### Payne Complained About Unfairness and "Retaliation" Even Before Cancer Diagnosis

7.       In November 2013, Cornell hired Payne to work as an administrative assistant in the Office of Research, Integrity, and Assurance, a central administrative office that served all of Cornell's fourteen colleges and schools.  Ex. A, Complaint ¶¶ 10, 12; Ex. B, Answer ¶¶ 10, 12.

**Payne's Response: Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 7.

8.       During her time in this position, Payne complained to Human Resources ("HR") that she was not being treated fairly and had been improperly passed over for promotion based on "impermissible motivations."  Her complaints were unfounded.  Ex. A, Complaint ¶¶ 17-19; Ex. B, Answer ¶¶ 15-16.

**Payne's Response: Payne's Response:** For the purpose of summary judgment only, Payne does not dispute that Payne complained to HR but disputes that such complaints were unfounded.

**8.1.** Payne rightfully complained to Cornell of actions she perceived to be unlawful on the part of her then manager. *See* Payne Decl. at ¶¶ 2-3.

9.      In February 2015, Payne accused her supervisor of retaliation for denying a vacation request.  Despite the supervisor's attempts to find a suitable resolution, Payne emailed the HR Director at the time, complaining of retaliation in the form of a "barrage of emails … questioning details of my projects and work, micromanaging me."   This complaint was unfounded.  Ex. XX, Doxey Decl. ¶ 45; February 2-3, 2015 email chain, Ex. Z attached hereto.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute that Payne complained to HR but disputes that such complaints were unfounded. Payne rightfully complained to Cornell of actions she perceived to be unlawful on the part of her then manager. *See* Payne Decl. at ¶¶ 2-3.

10.     After fewer than two years in her role as an administrative assistant, in August 2015, Payne accepted a part-time position working 20 hours a week as a research aide in the Business Simulation Lab ("BSL") in the Johnson Graduate School of Management.  This was a nonexempt band C position.  Ex. A, Complaint ¶ 23; Ex. B, Answer ¶ 17; Ex. Y attached hereto, Payne's Responses and Objections to Cornell's Interrogatories, p. 5.; Ex. XX, Doxey Decl. ¶¶ 3-4, 44(a); August 14, 2015 Offer Letter, Ex. AA attached hereto.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 10.

**10.1.**  Payne sought a position outside of the Office of Research, Integrity, and Assurance after discussions with Defendant's Ombudsman. *See* Payne Decl. at ¶ 4.

**10.2.**  During her interview for the BSL role, Payne was assured that the role would evolve into a full-time position and that part of her responsibilities would be to shape the role into such full-time position within approximately one year. In addition, the

new projected full-time role was anticipated to be compensated at a higher pay band and scale. Payne accepted the part-time role under these conditions. *See* Payne Decl. at ¶¶ 4-5; Vinci Decl., Ex 1 (Plaintiff's Complaint ("Compl.")) at ¶¶ 23-26.

11.     At Cornell, both hourly and salaried jobs are classified based on pay bands, with the lowest level being "band A" and the highest level being "band I."  Ex. U attached hereto, Katherine Doxey Deposition Transcript ("Doxey Tr.") 20:17-18, 24:19-25:8, 25:12-14; Ex. XX, Doxey Decl. ¶ 5.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 11.

12.     Generally, bands A through D are hourly non-exempt employees (meaning they are eligible for overtime pay if they work beyond their scheduled hours); those in band E are a mix of hourly and salaried employees depending on the level of responsibility; and bands F and above are generally exempt, salaried employees with decision-making authority and responsibilities that impact the University and beyond.  Ex. U, Doxey Tr. 25:21-26:3; Ex. XX, Doxey Decl. ¶ 5.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 12.

13.     The more complex the position the higher the pay band.  Ex. U, Doxey Tr. 25:9-11; Ex. XX, Doxey Decl. ¶ 5.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 13.

14.     After Payne had been in this role for approximately eight months, the faculty committee and faculty director of BSL concluded that they had hired at the wrong job level to meet faculty needs.  Ex. U, Doxey Tr. 20:20-21:6.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 14.

15.     The research aide's duties were geared toward relatively low-level administrative work: finding, tracking hours of, and paying participants in experiments; scheduling the experiments on the BSL calendar; testing and running the surveys; training student employees; and maintaining equipment and supplies.  Ex. A, Complaint ¶ 15; Ex. B, Answer ¶ 14; Ex. U, Doxey Tr. 20:8-21:6; Ex. XX, Doxey Decl. ¶ 4.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 15.

16.     On reflection, the faculty concluded that they needed an employee with higher technical skills – someone who could design and program their surveys in multiple software programs.  Ex. U, Doxey Tr. 20:20-21:6; Ex. XX, Doxey Decl. ¶ 4.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 16.

17.     Payne did not have the design and programming skills to fulfill these higher-level needs, and was not familiar with the software some of the new faculty wanted to use, so she was not a good fit for the position as it was being mapped out to meet evolving business needs.  Ex. U, Doxey Tr. 20:20-21:6; Ex. XX, Doxey Decl. ¶ 4.

> **<u>Payne's Response:</u>** For the purpose of summary judgment only, Payne disputes the facts in Defendant's paragraph 17. Payne did have the requisite skills to fulfill Cornell's alleged higher-level needs and had experience using several applicable software platforms and had, in fact, been designing and launching studies in multiple platforms. *See* Payne Decl. at ¶ 6.

18.     In addition, Payne was creating tension within the BSL: she was often defensive and did not take feedback well from the faculty members with whom she worked.  Ex. U, Doxey Tr. 20:20-21:6; Ex. XX, Doxey Decl. ¶ 4.

> **<u>Payne's Response:</u>** For the purpose of summary judgment only, Payne disputes the facts in Defendant's paragraph 18. At all times, Payne acted professionally and ethically, and always performed and acted in accordance with Cornell policies. *See* Payne Decl. at ¶¶ 2, 6.

19.     In the spring of 2016, the BSL director and faculty committee were discussing possible solutions, including eliminating Payne's position altogether.  HR began to consider whether there were other positions within the University that were suitable for Payne's skill set. Ex. XX, Doxey Decl. ¶ 4.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 19.

20.     Payne's supervisor, Margaret Shackell-Dowell, informed Payne that her position might be eliminated, which resulted in Payne sending an email, dated June 22, 2016, to BSL management complaining that she was not consulted in the discussion of changes.   Ex. XX, Doxey Decl. ¶ 44(b); June 22, 2016 email, Ex. BB attached hereto.

**Payne's Response:** For the purpose of summary judgment only, Payne disputes the facts in Defendant's paragraph 20. Following disclosing her cancer diagnosis to Ms. Shackell-Dowell, Payne was informed that Cornell intended to either eliminate her position or hire an IT Programmer to replace her. In response to learning about the possible elimination of her position or the replacement of her in the position, Payne reached out to BSL management to express her disappointment that she was not consulted regarding her role and was not offered constructive coaching or development opportunities to grow in the role. *See* Def. Ex. BB; Payne Decl. at ¶¶ 8-9.

**Payne Discloses Cancer Diagnosis And Cornell Hires Her in New Position**

21.     On June 13, 2016, around the same time that the BSL was considering eliminating Payne's research aide position, Payne notified Cornell HR Representative Katherine Doxey ("Doxey") that she had just been diagnosed with breast cancer.   Ex. A, Complaint ¶¶ 31-32; Ex. B, Answer ¶ 7; Ex. U, Doxey Tr. 18:5-25; June 13-20, 2016 email chain (Doxey Dep. Ex. D), Ex. V attached hereto.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 21.

**21.1.**   Payne initially informed her supervisor, Ms. Shackell-Dowell, of her diagnosis via email. After disclosing her diagnosis to Ms. Shackell-Dowell, Payne then disclosed her diagnosis to Doxey. *See* Vinci Decl., Ex. 2 (Deposition Transcript of Plaintiff Denise Payne ("Payne Trans.")) at 8:24-11:17; Compl. ¶¶ 29-35; Vinci Decl., Ex. 14; Vinci Decl., Ex. 3 (Deposition Transcript of Katherine Doxey ("Doxey Trans.")) at 18:5-9.


22.    On June 23, 2016, in connection with an already-planned meeting for Doxey to discuss performance concerns and explore Payne's career goals to determine if there were possible position matches outside of BSL, Payne and Doxey met in person, along with HR representative Julie Weaver ("Weaver"). They discussed Cornell's medical leave and disability benefits, Payne's medical treatment plan, concerns about Payne's job performance and skills to meet the business needs of BSL, and other roles at Cornell that may fit with Payne's career goals.  Ex. A, Complaint ¶ 35; Ex. B, Answer ¶ 19; Ex. U, Doxey Tr. 19:10-21:13; Ex. WW, Weaver Decl. ¶¶ 3-4, 6; Ex. XX, Doxey Decl. ¶¶ 5-6.

**Payne's Response:** For the purpose of summary judgment only, Payne partially disputes the facts in Defendant's paragraph 22. The primary focus and topic of discussion of the June 23rd meeting was Payne's cancer diagnosis. The only reference to any alleged performance issues was a discussion regarding an issue Payne had had with a faculty member which Doxey and Weaver described as a "communication issue." There was no other discussion of performance during that meeting. *See* Payne Decl. at ¶¶ 10-11, 13.

23.     More specifically, Weaver explained Cornell's short-term disability benefits and the mechanics of a medical leave of absence under Policy 6.9, if Payne decided to take a medical leave to pursue her cancer treatments.  Ex. WW, Weaver Decl. ¶¶ 4, 6; Ex. E, Policy 6.9, pp. 14-17.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 23.

24.     Doxey identified BSL's concerns with Payne's job performance and explored Payne's skill set and career goals, as well as her interest in moving to a different position within the University.  Ex. U, Doxey Tr. 21:6-13; Ex. XX, Doxey Decl. ¶¶ 4, 6, 9.

**Payne's Response:** For the purpose of summary judgment only, Payne disputes the facts in Defendant's paragraph 24. The only reference to any alleged performance issues was a discussion regarding an issue Payne had had with a faculty member which Doxey and Weaver described as a "communication issue." There was no other discussion of performance during that meeting. Rather, with respect to Payne's performance and qualifications, Doxey merely mentioned that the BSL wanted to hire an "IT Programmer", which Defendant knew Payne was not. *See* Payne Decl. at ¶¶ 10-11, 13.

25.     Doxey mentioned several potential positions, including a new data analyst position being created within the new business analytics unit ("Business Analytics") that was being planned to serve the needs of a new college to be named the Cornell SC Johnson College of Business ("JCB").  Ex. U, Doxey Tr. 21:6-22:5; Ex. XX, Doxey Decl. ¶ 9.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 25.

**25.1.**   At the time of the June 23rd meeting, the position being created in the Business Analytics unit was merely a concept with no formal job description. However, Payne expressed interest and excitement in pursuing the role. *See* Doxey Trans. at 22:13-23:3.

**25.2.**   Following the initial discussion about the business analytics role, Doxey introduced Payne to Lucinda Allen ("Allen") via email. *See* Doxey Trans. at 26:20-22.

26.     JCB was formed, effective July 1, 2016, through the merger of three existing schools: Johnson Graduate School of Management, Dyson School of Applied Economics and Management, and the School of Hotel Administration.  The merger was designed to streamline operations and eliminate overlapping academic programs and business functions.   Ex. A, Complaint ¶ 36; Ex. B, Answer ¶ 20; Ex. U, Doxey Tr. 32:10-33:5; Ex. W attached hereto, Lucinda Allen Deposition Transcript ("Allen Tr.") 12:21-13:7; Ex. XX, Doxey Decl. ¶ 7.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 26.

27.     The position within Business Analytics was only a concept when it was first presented to Payne.   There was no job description, and no pay band fixed within the HR structure. Ex. U, Doxey Tr. 22:20-23:3, 34:4-15; Ex. XX, Doxey Decl. ¶ 9.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 27.

**27.1.** Payne was excited for the role when she first heard about it. *See* Doxey Trans. at 22:13-23:3.

28.     Payne expressed interest in the position.  Ex. U, Doxey Tr. 22:13-19; Ex. XX, Doxey Decl. ¶ 9.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 28.

29.     After the June 23, 2016 meeting Payne wrote an email to her BSL supervisors informing them of her meeting with HR.  She asserted that BSL management had assessed her current performance unfairly, but she felt supported and hopeful about her future.  Ex. XX, Doxey Decl. ¶ 44(c); June 23, 2016 email chain, Ex. CC attached hereto.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 29.

30.     On June 29, 2016, however, anticipating a poor performance review, Payne complained that she was, again, being unfairly treated, and said that "an investigation would likely show that I was unfairly targeted by a few faculty members."  She made no reference to her cancer diagnosis or any need for disability accommodation in the workplace; indeed, her email six days earlier acknowledged that she felt supported in her current role.  Ex. XX, Doxey Decl. ¶ 44(d); June 24-30, 2016 email chain, Ex. DD attached hereto; *cf.* Ex. CC.

**Payne's Response:** For the purpose of summary judgment only, Payne partially disputes the facts in Defendant's paragraph 30. Payne did not "anticipate a poor performance review" and in fact was shocked to learn that there were any issues with her performance as she had not received any negative feedback from her manager at that time. *See* Payne Decl. at ¶ 14.

31.     In response to her June 29, 2016 email, Payne's supervisor at the time, Margaret Shackell-Dowell, informed Payne that her work would be graded as "successful." Ex. DD.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 31.

32.     Payne thereafter took a series of short-term disability leaves for surgery and treatment on the following dates: July 5-11, August 4-8, August 29-September 2, September 12-16, and September 26-30.  Ex. A, Complaint ¶ 36; Ex. B, Answer ¶ 20; Ex. WW, Weaver Decl. ¶ 7; Ex. XX, Doxey Decl. ¶ 32; November 9, 2017 email, Ex. EE attached hereto.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 32.

33.     New York State law and Cornell Policy 6.9 require an absence of longer than one week for a medical reason before an employee is eligible for disability coverage.  As such, Payne was not eligible for short term disability for her initial absence from July 5-11, 2016.  After this statutory waiting period of one week, however, Payne was then eligible for short term disability. Ex. XX, Doxey Decl. ¶ 33; Ex. EE; Ex. E, Policy 6.9 -Time Away from Work, pp. 5, 10

(requiring employee, before being eligible, to "have been absent from work for at least one week").

> **Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 33 but objects to the extent the facts state a legal conclusion and are therefore not properly asserted in Defendant's statement of facts.

34.     As such, all subsequent leaves Payne took after this first leave on July 5-11 included 50% pay covered by the University's short-term disability benefit in accordance with Policy 6.9.  Payne utilized her accrued vacation and health and personal ("HAP") leave time to supplement the short-term disability leave pay in order to receive full compensation for each leave.  Ex. WW, Weaver Decl. ¶ 9; Ex. XX, Doxey Decl. ¶ 33; Ex. EE.

> **Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 34.

35.     On July 20, 2016, Doxey sent an email to Payne informing her that Lucinda Allen ("Allen") was selected to oversee the new Business Analytics unit in JCB and, as part of the college merger process, Cornell intended to move Payne from her existing BSL position into the new Business Analytics unit in JCB.  Ex. A, Complaint ¶ 36; Ex. B, Answer ¶ 20; Ex. U, Doxey Tr. 26:13-22; Ex. XX, Doxey Decl. ¶ 10; Ex. W, Allen Tr. 12:25-13:11.

> **Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 35.

36.    Allen and Payne subsequently discussed a possible role for Payne on the Business Analytics team, and Payne disclosed her cancer diagnosis to Allen.  Ex. W, Allen Tr. 12:25-13:17, 19:25-20:18.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 36.

**36.1.**    Payne and Allen had two subsequent meetings to discuss the role on the Business Analytics team. During the first meeting, Allen and Payne discussed the general concept of the role. During the second meeting, Payne had an informal interview with Allen wherein Allen expressed that the compensation for the role was anticipated to be at the E or F-band pay scale and that the role would be an "exempt" position. *See* Payne Decl. at ¶¶ 15-17; Payne Trans. at 16:5-17:9; Compl. ¶¶ 36-38.

**36.2.**    During these meetings, Allen asked Payne about her health and medical condition, and Payne, in response, provided Allen with details of her diagnosis and treatment plan. *See* Payne Decl. at ¶¶ 15-17.

37.    On September 26, 2016, while Payne was out on her fifth short-term disability leave, Weaver sent Payne an email with an offer letter, prepared on September 23rd, in which Cornell offered Payne a promotion to Data Analyst II in the Business Analytics unit, to take effect on September 19th before she went out on leave.  Payne responded by email, accepting the promotion and terms of employment outlined in the letter, and her pay was increased to band E, back dated to the effective date of her promotion.  Ex. A, Complaint ¶¶ 37, 39, 42; Ex. B, Answer ¶¶ 21-23. Ex. WW, Weaver Decl. ¶ 8; Ex. XX, Doxey Decl. ¶ 11; Ex. H attached hereto, Denise Payne Deposition Transcript ("Payne Tr.") 177:2-22; September 23, 2016 Offer Letter

(Payne Dep. Ex. 9), Ex. N attached hereto; September 23, 2016 email exchange, Ex. VV attached hereto.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 37.

**37.1.**   The official offer letter was signed by Doxey and sent on behalf of Allen. *See* Vinci Decl, Ex. 6. Doxey testified that Allen would have had to agree to hire Payne into the role as she was overseeing the business analytics unit. *See* Doxey Trans. at 29:19-30:5. Allen, who had discussed Payne's disability with her in detail, testified that she did not have a choice and that human resources does not seek her approval. *See* Vinci Decl., Ex. 4 (Deposition Transcript of Lucinda Allen ("Allen Trans.")) at 18:9-19:24; Payne Decl. at ¶ 17.

**37.2.**   The job offer classified the position as an "hourly position" in the E-band pay scale. *See* Vinci Decl., Ex. 6. Notably, the pay scale was set at the lowest possible rate within the E-band level. *See* Payne Decl. at ¶ 19; Payne Trans. at 21:3-22:9. Payne knew that the job was set at the lowest possible rate within the E-band as she had access to such information through Defendant's website. *See* Payne Trans. at 21:3-22:9.

**37.3.**   The compensation level was not what Payne had expected as she had last heard from Allen that the role was anticipated to be an "exempt" salaried position in the E or F band. *See* Payne Decl. at ¶¶ 17-20.

**37.4.**   Notably, other than her initial discussion with Allen, no one at Cornell contacted Payne prior to sending the offer letter to discuss the role's classification or

compensation level. This was the first time that had happened in Payne's tenure with Defendant. *See* Payne Trans. at 24:2-11.

38.     Under the terms and conditions explained in the job offer, through December 31, 2016, Payne would have two part-time positions: she would retain her current role of Research Support Aide with BSL for 10 hours per week, while also working 20 hours per week in the new position of Data Analyst II with the Business Analytics team.  Ex. XX, Doxey Decl. ¶¶ 12-13; Ex. N.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 38.

39.     Payne's promotion was unusual, in that it included a two-band increase in pay from band C to band E, and included an increase in her total number of hours from 20 to 30 hours per week.  Ex. XX, Doxey Decl. ¶ 14; Ex. N.

**Payne's Response:** For the purpose of summary judgment only, Payne disputes the facts in Defendant's paragraph 39. It was not uncommon for a change in position to result in a two-band increase and Payne had seen it happen before. *See* Payne Decl. at ¶ 18.

40.     In consultation with HR, Associate Dean Laura Syer ("Syer") and Allen decided to place Payne at the minimum of the E band because neither Syer nor Allen knew what Payne's skills and abilities really were at that time, or how those skills and abilities would align with the needs of the Business Analytics team.  The offer letter stated that the position would be paid at a

non-exempt, hourly rate at band E.  Ex. U, Doxey Tr. 31:10-32:3; Ex. XX, Doxey Decl. ¶ 15; Ex. N.

> **Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 40.

> **40.1.**   At the time of the offer, Allen was aware of Payne's cancer diagnosis and treatment plan prior to sending the formal offer letter. *See* Payne Decl. at ¶ 17; Allen Trans. at 18:9-19:24.

41.    Payne accepted the position, including the proposed pay and position classification, confirming her agreement to all the terms and conditions of the written offer.  Ex. A, Complaint ¶¶ 42, 45; Ex. B, Answer ¶ 23; Ex. H, Payne Tr. 24:12-15, 177:2-22; Ex. XX, Doxey Decl. ¶ 11; Ex. N; Ex. VV.

> **Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 41.

> **41.1.**   Payne accepted the position and terms of the job offer, including the proposed pay and classification, as she was at that time on disability leave recovering from her surgery and undergoing cancer treatments and did not have the strength to push back on the offer. *See* Payne Decl. at ¶ 20. However, Payne was determined to address the issue and upon her return to work, asked her new manager Tammy Lindsay about her classification and job description. *See Id*.; Payne Trans. at 24:24-25:19. At that time, Tammy Lindsay advised that Defendant was working on it. *Id*.

**Cornell Collects Employee Donations of Health And Personal Leave Time For Payne**

42.     Throughout September 2016, Payne encountered medical challenges which caused her to miss more work than she had anticipated.  Her vacation and HAP leave accruals were almost depleted.  Ex. WW, Weaver Decl. ¶ 9; Ex. H, Payne Tr. 175:18-176:23; September 21-22, 2016 email chain (Payne Dep. Ex. 8), Ex. M attached hereto.

> **Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 42.
>
> **42.1.**   As a first time cancer patient, Payne did not know what to expect and often suffered severe symptoms and side effects of her treatments. *See* Payne Decl. at ¶ 21.
>
> **42.2.**   As a result. Payne used her vacation and health and personal ("HAP") time to cover her absences. *See* Payne Decl. at ¶ 22.

43.     In order to preserve her pay, HR representative Julie Weaver circulated an anonymous request via e-mail to all benefits-eligible staff and faculty in JCB, pursuant to University Policy 6.9, requesting catastrophic leave donations.  Ex. WW, Weaver Decl. ¶ 9; Ex. XX, Doxey Decl. ¶ 44(h); Ex. H, Payne Tr. 47:11-21; Ex. M; September 21, 2016 email, Ex. TT attached hereto.

> **Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 43.

44.     In response to the leave donation request, HR received a total of 66 days of donated time from 18 different individuals.  Ex. WW, Weaver Decl. ¶¶ 9-10.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 44.

**44.1.** Payne was not advised of the total amount of donated leave and, in fact, many of the donated leave hours were not initially offered to Payne. *See* Def. Ex. FF; Payne Decl. at ¶ 51.

45.     To meet Payne's immediate needs and to continue her salary at full pay during her extended leave, HR transferred a portion of the donated time to her accrual balances and held the remaining days in reserve.  Ex. WW, Weaver Decl. ¶ 10.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 45.

46.     As was customary practice, HR held some donated days in reserve so that if Payne did not need all the time that was donated in response to the anonymous request, the days could be redistributed to other employees in need.  Ex. WW, Weaver Decl. ¶ 10.

**Payne's Response:** For the purpose of summary judgment only, Payne disputes the facts in Defendant's paragraph 46. Weaver advised Allen that the reserved donated leave was not being help to allocate to other employees but was for Payne. *See* Def. Ex. FF. Payne was not made aware of the availability of the reserve donated time until much later. *See* Payne Decl. at ¶ 51.

**Payne Went on Extended Medical Leave from October 13, 2016 to January 12, 2017**

47.     While she underwent chemotherapy, Payne was on disability leave from October 13, 2016 through January 12, 2017, in consultation with Cornell's Medical Leaves Administration ("MLA").   Ex. A, Complaint ¶¶ 46-47; Ex. B, Answer ¶¶ 7, 25; Ex. WW, Weaver Decl. ¶ 8; Ex. XX, Doxey Decl. ¶ 16; Ex. H, Payne Tr. 20:7-18, 182:23-183:16; October 3, 2016 email chain (Payne Dep. Ex. 11), Ex. O attached hereto.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 47.

48.     During this time period, Payne received full pay pursuant to a combination of Cornell's short-term disability benefits and the donated catastrophic leave time from JCB employees pursuant to Cornell Policy 6.9.  Ex. A, Complaint ¶ 46; Ex. B, Answer ¶ 25; Ex. WW, Weaver Decl. ¶ 9.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 48.

49.     As of January 1, 2017, Payne's role with the BSL ended, and her Data Analyst position in the Business Analytics unit increased to 30 hours per week.  Ex. XX, Doxey Decl. ¶¶ 12, 16; Ex. WW, Weaver Decl. ¶ 11; January 10-12, 2017 email chain, Ex. FF attached hereto.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 49.

50.     This change, while she was on disability leave, again increased Payne's pay.  The catastrophic leave donations enabled her to receive the full value of the increase despite the fact that she was not working.  Ex. WW, Weaver Decl. ¶ 10; Ex. XX, Doxey Decl. ¶ 13.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 50.

**50.1.**  The increase in pay, which was roughly $2.00 per hour, was not due to a raise by Cornell in light of Payne's qualifications or skills. The increase was the result of Payne falling below the minimum requirement for a non-exempt E-band employee and was administered as a matter of course. *See* Payne Decl. at ¶¶ 23-24.

51.     Payne was cleared to return to work without restriction in her 30-hour-per-week position, effective January 12, 2017.  Ex. WW, Weaver Decl. ¶¶ 10-11; Ex. FF; Ex. XX, Doxey Decl. ¶¶ 12, 16.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 51.

52.     In preparation for her return, Allen inquired with Julie Weaver about Payne's leave accruals and the means by which the Business Analytics team could accommodate Payne's ongoing need for treatment.  Weaver advised Allen to contact HR if Payne needed more flexibility.  Ex. FF at P000529.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 52.

53.     Allen noted that Payne had requested to work from home when she had radiation treatments and said "I am a bit nervous about that only in the sense she has a lot of training ahead …" Ex. FF at P000529.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 53.

54.     Payne returned to work in January 2017.  Ex. A, Complaint ¶ 47; Ex. B, Answer ¶ 7.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 54.

55.     In total, between her start date on September 19, 2016 and the end of her extended leave, Payne only worked seven total days.  She missed 69 out of a possible 76 workdays with the Business Analytics team.  Ex. XX, Doxey Decl. ¶ 17.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 55.

**Payne Returned From Medical Leave and Signed the First Flex Agreement**

56.     When Payne returned to work, she worked on a part-time basis 30 hours a week as a Data Analyst II.  Ex. A, Complaint ¶ 47; Ex. B, Answer ¶ 7; Ex. XX, Doxey Decl. ¶ 16; Ex. N.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 56.

57.     Payne's new supervisor, Tammy Lindsay, permitted Payne to work from home on days Payne was scheduled to receive medical treatment, and this arrangement was memorialized in a flexible work agreement (the "First Flex Agreement"), effective February 6, 2017.  Ex. A, Complaint ¶¶ 49-50; Ex. B, Answer ¶ 26; Ex. WW, Weaver Decl. ¶ 12; Ex. XX, Doxey Decl. ¶¶ 18-19; Ex. H, Payne Tr. 27:9-28:2; Flexible Work Arrangement-Agreement, signed February 2, 2017 (Payne Dep. Ex. 1), Ex. I attached hereto.

**Payne's Response:** For the purpose of summary judgment only, Payne partially disputes the facts in Defendant's paragraph 57. Payne does not dispute that she entered into the First Flex Agreement but maintains that it was not to permit Payne to work from home solely on days she received treatment. *See* Vinci Decl., Ex. 7. The First Flex Agreement permits Payne to work remotely from home and to adjust her standard start and end time for work as necessary. *Id*. It was Payne's understanding that the First Flex Agreement, and the terms thereof, could be applied both on treatment days and on recovery days following her cancer treatments. *See* Payne Decl. at ¶ 26. The First Flex Agreement was drafted by Payne although Lindsay and Allen discussed the terms of the First Flex Agreement, and those thereafter. *See* Payne Trans. at 29:22-24; Allen Trans. at 29:1-11. According to Allen, even though it was agreed in the First Flex Agreement, and those thereafter, that Payne was allowed to work from home, Payne's ability to work from home was not a right or a given. *See* Allen Trans. at 41:18-25.

58.     University Policy 6.6.13, entitled "Flexibility in the Workplace," describes the discretion of department heads or designees to implement this business practice to manage

employees, time, space, workloads, and personal needs while achieving the goals of the University. Ex. G, p. 1.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 58.

59.     The First Flex Agreement listed a "Review of Agreement Date" of May 1, 2017, meaning at that time Payne and the University would review the agreement to determine its efficacy.  Ex. A, Complaint ¶ 51; Ex. B, Answer ¶ 27; Ex. I.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 59.

60.     Under the First Flex Agreement, Payne was authorized to work her six hours daily between the hours of 7 AM and 6 PM, and provided the opportunity to work remotely from her home.  Ex. H, Payne Tr. 28:14-32:16; Ex. I.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 60.

**60.1.**   There is nothing in the First Flex Agreement which expressly limits the flexibility in Payne's schedule to days where she received medical treatment. *See* Payne Decl. at ¶ 26, Vinci Decl., Ex. 7.

61.     The First Flex Agreement appended certain conditions that Payne had to fulfill in order to work remotely.  Ex. I.  These conditions included the following:

The staff member must comply with all university policies and procedures, while working off-site … Requests to work overtime, declare vacation or take other

26

time off from work must be pre-approved in writing by the staff's supervisor … According to the terms of this Agreement, the off-site work schedule is detailed in this agreement.  For non-exempt staff, this specification must be in accordance with FLSA guidelines and should include meal breaks.  If the staff member needs to change his or her schedule, he or she agrees to obtain advance written approval from the supervisor.  Ex. I, Appendix A (Remote Work).

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 61.

> **61.1.**   Payne duly followed the terms and conditions of the First Flex Agreement and sought pre-approval when necessary and required to do so, and gave notice of when she was using her remote work or flexible time under the First Flex Agreement, and those thereafter. *See* Payne Decl. at ¶¶ 27-28; Vinci Decl., Ex. 25.

62.     While Payne was allowed to work a flexible schedule and work remotely, she was required to keep her supervisors informed of her schedule and required to get pre-approval to work from home.  Ex. I; Ex. G; Ex. W, Allen Tr. 29:1-16, 38:5-16, 41:18-25; Ex. H, Payne Tr. 75:13-76:5, 109:18-111:11; *see also* Ex. H, Payne Tr. 70:18-71:2.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 62.

**62.1.** Payne duly followed the terms and conditions of the First Flex Agreement and sought pre-approval when necessary and required to do so, and gave notice of when she was using her remote work or flexible time under the First Flex Agreement, and those thereafter. *See* Payne Decl. at ¶¶ 27-28; Vinci Decl., Ex. 25.

**62.2.** Payne further shared details of her medical appointments and treatments with her supervisors and always kept them apprised of her schedule, going so far as to share her office calendar with Lindsay. *See* Payne Decl. at ¶¶ 27-28.

**62.3.** Often, even when Payne advised Lindsay of her schedule and need to work remotely, Lindsay would admonish Payne and accuse Payne of not keeping her updated, despite Payne sharing her calendar of appointments with Lindsay. *See* Payne Trans. at 35:6-36:9.

**62.4.** Lindsay often used Payne's alleged failure to notify her of the need to work remotely or adjust her hours under the First Flex Agreement (and those thereafter) as a basis to deny Plaintiff her accommodations under the flex agreement(s). *See* Payne Trans. at 38:17-41:15, 73:15-24, 76:18-77:4, 77:9-19.

63.     Between the effective date and February 20, 2017, Payne worked for Cornell under the First Flex Agreement 'with little to no issues [sic]." Ex. A, Complaint ¶¶ 52-53.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 63.

64.     Around February 2017, Payne and Lindsay had disputes concerning Payne's requests to work from home.  Ex. A, Complaint ¶¶ 53-54; Ex. WW, Weaver Decl. ¶ 14.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 64 but objects to Defendant's characterization of the "dispute" between Payne and Lindsay. Lindsay began to unfairly criticize Payne's use of her rights under the First Flex Agreement. *See* Payne Decl. at ¶¶ 29-30. Lindsay would refuse to approve Payne's requests to work from home, although they would be appropriate under the First Flex Agreement, and complained that Payne was not properly

documenting her need to take time off or use the First Flex Agreement. *See* Payne Decl.

at ¶30; Payne Trans. at 38:17-41:15, 73:15-24, 76:18-77:4, 77:9-19.

65.    Payne was not providing the required notification of adjustments to her workday,

and she was not getting the required pre-approval to work from home on days when she knew

she would not be in the office.  Ex. W, Allen Tr. 38:5-23; *see also* Ex. H, Payne Tr. 56:15-22,

61:14-18, 70:6-71:2, 75:13-16.

> **Payne's Response:** For the purpose of summary judgment only, Payne disputes the facts
>
> in Defendant's paragraph 65. Payne duly followed the terms and conditions of the First
>
> Flex Agreement and sought pre-approval when necessary and required to do so, and gave
>
> notice of when she was using her remote work or flexible time under the First Flex
>
> Agreement, and those thereafter. *See* Payne Decl. at ¶¶ 27-28; Vinci Decl., Ex. 25. Payne
>
> further shared details of her medical appointments and treatments with her supervisors
>
> and always kept them apprised of her schedule, and shared her office calendar with
>
> Lindsay which clearly noted the days when Payne was not able to be on site. *See* Payne
>
> Decl. at ¶¶ 27-28.

66.    Payne was also not logging time she was out of the office on Lindsay's personal

calendar, even though Lindsay had asked Payne to do this so it would be easier for Lindsay to

keep track of Payne's whereabouts.  Ex. U, Doxey Tr. 54:12-25; Ex. H, Payne Tr. 35:18-36:9,

37:16-22.

> **Payne's Response:** For the purpose of summary judgment only, Payne partially disputes
>
> the facts in Defendant's paragraph 66. Payne shared details of her medical appointments

and treatments with her supervisors and shared her office calendar with Lindsay which clearly noted the days when Payne was not able to be on site. *See* Payne Decl. at ¶¶ 27-28. Despite having access to Payne's calendar to see all of Payne's appointments, Lindsay refused to do so and demanded that Payne input the information directly onto Lindsay's calendar. However, when Payne did so, Lindsay would frequently not accept the invitation to have the information placed on her calendar, resulting in the information not being on Lindsay's calendar during a time when Lindsay continued to refuse to look at Payne's shared calendar for the necessary information. *See Id.*; Payne Trans. at 35:6-36:9.

67.    On February 20, 2017, Payne consulted MLA Representative Jillian Tubbs ("Tubbs") about her disputes with Lindsay.  Ex. A, Complaint ¶¶ 57-58; Ex. B, Answer ¶ 29.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 67.

**67.1.**    Payne reached out to Tubbs after she was admonished for allegedly not advising Lindsay of her schedule despite sharing her calendar or appointments with Lindsay. *See* Payne Trans. at 35:6-36:9, 41:16-42:14. Payne met with Tubbs because she felt she was being denied her disability accommodations. *See* Payne Trans. at 41:16-42:14. In response, Tubbs advised Payne that formal accommodations should not be necessary and told Payne to try and work it out with Lindsay. *See* Payne Trans. at 41:16-42:14; Payne Decl. at ¶¶ 31-32.

**67.2.**    Following Tubbs' advise, Payne met with Lindsay and Allen and discussed that she felt she was not being properly mentored and was being denied accommodations.

In response, Lindsay and Allen ignored Payne's complaint that she was being denied accommodations and only addressed Payne's concern that she was not being properly mentored. *See* Payne Trans. at 43:3-9, 44:4-9.

68.     Despite meeting with Tubbs, Payne did not request formal accommodation in February 2017.  Ex. H, Payne Tr. 41:16-42:17.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute that Plaintiff did not request formal accommodations in February of 2017 but disputes that this was "despite meeting with Tubbs". During the meeting with Tubbs, Tubbs informed Payne that formal medical accommodations should not be necessary and told Payne that there must have been a misunderstanding between her and Lindsay. Instead of encouraging Payne to request formal accommodations, Tubbs urged Payne to work it out herself with Lindsay and HR. *See* Payne Trans. at 41:16-42:14; Payne Decl. at ¶¶ 31-32. In light of her meeting with Tubbs, Payne did not request formal accommodations at that time and set out to work out the issue with Lindsay and HR directly, which proved unsuccessful. *See* Payne Trans. at 43:3-9, 44:4-9; Payne Decl. at ¶ 32.

69.     Around this same time, Lindsay contacted HR because she was running out of projects that Payne could complete at home without receiving more training.  Ex. WW, Weaver Decl. ¶ 14; Ex. XX, Doxey Decl. ¶ 44(e); February 21-27 email chain, Ex. GG attached hereto.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 69.

31

**69.1.**   In response to Lindsay's email regarding work for Payne, Weaver responded that there was not much to do to push back on Payne's remote work arrangement in light of the First Flex Agreement and suggested revisiting the First Flex Agreement to place additional limits on Payne's ability to work remotely due to her disability. *See* Def. Ex. GG.

70.   Payne started working full time on April 5, 2017.  Ex. B, Answer ¶ 30; Ex. XX, Doxey Decl. ¶ 21; Ex. H, Payne Tr. 93:9-16.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 70.

**70.1.**   Payne returned to working full time in April of 2017 after her cancer radiation treatments had ended. Despite her radiation treatments being completed, Payne remained on active cancer treatments until approximately October of 2017. Payne notified Defendant of her ongoing treatment after radiation. *See* Payne Decl. at ¶ 33; Vinci Decl., Ex. 20.

**70.2.**   After Payne completed radiation or "rang the bell" as Allen described it, Allen and Lindsay assumed that Payne would be fully able to return to work without restrictions but complained that, in essence, Payne thought she was still on leave when complaining about her accommodations. *See* Allen Trans. at 55:22-56:21.

### Payne Continued to Miss Work and Failed to Get Caught Up

71.   On May 9, 2017, Payne informed Lindsay that she would be taking a longer lunch to meet up with a former co-worker.  When Lindsay asked if Payne was going to make up this

time, Payne cancelled the lunch.  Ex. XX, Doxey Decl. ¶ 21, May 9, 2017 email chains, Ex. HH attached hereto.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 71.

**71.1.**   In her responsive email to Payne, Lindsay accused Payne of "missing a lot of time" and stated they needed to talk about Payne's time off. In her email, Lindsay, without basis, accuses Payne of using her time off too often for non-medical needs. *See* Vinci Decl., Ex. 8.

**71.2.**   Payne was more than willing to make the time up but was confused by this inquiry as in an earlier discussion with Lindsay, Lindsay advised she was running out of work to give to Payne and had also cancelled Payne's training in the same email correspondence. *See* Vinci Decl., Ex. 8; Payne Decl. at ¶ 35.

72.    In this same email exchange, Lindsay also raised concerns that Payne was using non-medical time off as fast as she was accruing it and that Payne was not getting caught up so that she could be more useful to the Business Analytics team.  Ex. HH; Ex. H, Payne Tr. 50:17-51:20.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 72.

**72.1.**   In her email, Lindsay, without basis, accuses Payne of using her time off too often for non-medical needs. *See* Vinci Decl., Ex. 8. In reality, Payne rarely used time off for non-medical reasons and the vast majority of her time needed off or from home was due to her cancer diagnosis and treatments. Payne Decl. at ¶ 35.

73.     Lindsay's comments on May 9, 2017 came after Payne had been out of the office numerous days for non-medical related reasons.  For example, Payne took a 2-hour lunch to attend to banking on April 26; she left early the following day on April 27, due to a migraine; on May 1, she arrived late because she took her son to convenient care and then left early because of the nice weather that day; on May 5, she left early for house issues; and, on May 8, she arrived late because she had banking to do again.  Ex. XX, Doxey Decl. ¶ 21; May 5-8, 2017 email chain and May 23, 2017 email chain, Ex. II attached hereto.  A couple of weeks later, Payne asked for time off for a funeral, inquiring about the University's policy to provide a half day of sympathy leave, meaning she would not have to use any of her vacation or HAP time.  Ex. II at P000528.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 73.

74.     Both Lindsay and Allen were concerned with how much time Payne was out of the office, particularly the time unrelated to medical treatment: because Payne was missing so much work, she was not completing her training, meaning there was only so much work Payne could perform.  Ex. U, Doxey Tr. 55:1-16; Ex. W, Allen Tr. 43:6-22; Ex. WW, Weaver Decl. ¶ 14; Ex. XX, Doxey Decl. ¶¶ 21, 23.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 74.

**74.1.**  Payne asked for more work to do and attempted to participate in training that Lindsay cancelled. *See* Vinci Decl., Ex. 8.

**Payne Signed Second Flex Agreement**

75.     Payne signed a second flexible work agreement (the "Second Flex Agreement"), effective May 1, 2017, after she "rang the bell" on radiation treatments and agreed with Lindsay that flexibility "as needed" would satisfy her needs.  Ex. A, Complaint ¶¶ 75-77; Ex. B, Answer ¶ 33; Ex. WW, Weaver Decl. ¶ 15; Ex. XX, Doxey Decl. ¶ 19; Ex. H, Payne Tr. 68:4-22; Second Flex Agreement (Payne Dep. Ex. 4), Ex. J attached hereto; Ex. W, Allen Tr. 32:1-33:4.

**Payne's Response:** For the purpose of summary judgment only, Payne partially disputes the facts in Defendant's paragraph 75. Initially, Payne did not want to put the "as needed" language in the Second Flex Agreement and wanted to be more specific but Lindsay would not agree to that. At first Payne did not think the "as needed" language would pose a problem but was ultimately wrong. *See* Payne Trans. at 72:19-73:14.

**75.1.**   Payne signed the Second Flex Agreement and "rang the bell" with respect to her radiation treatments only. As Payne advised Defendant's representatives, although her radiation treatments were completed, she still had months more of treatment, including targeted monthly treatments until October of 2017. *See* Payne Decl. at ¶¶ 36-37; Vinci Decl., Ex. 20.

76.     The Second Flex Agreement provided that Payne could work remotely "as needed," to attend to her medical appointments, treatments, and recovery periods.  Ex. A, Complaint ¶¶ 76-77; Ex. B, Answer ¶ 33; Ex. WW, Weaver Decl. ¶ 15; Ex. XX, Doxey Decl. ¶ 19; Ex. J.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 76.

**76.1.**   Initially, Payne did not want to put the "as needed" language in the Second Flex Agreement and wanted to be more specific but Lindsay would not agree to that. At first Payne did not think the "as needed" language would pose a problem but was ultimately wrong. *See* Payne Trans. at 72:19-73:14.

77.   The Second Flex Agreement appended certain conditions that Payne had to fulfill in order to work remotely, including the following:

> The staff member must comply with all university policies and procedures, while working off-site … Requests to work overtime, declare vacation or take other time off from work must be pre-approved in writing by the staff's supervisor … According to the terms of this Agreement, the off-site work schedule is detailed in this agreement.  For non-exempt staff, this specification must be in accordance with FLSA guidelines and should include meal breaks.  If the staff member needs to change his or her schedule, he or she agrees to obtain advance written approval from the supervisor.

Ex. J, Appendix A.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 77.

**77.1.**   Payne duly followed the terms and conditions of the Second Flex Agreement and sought pre-approval when necessary and required to do so, and gave notice of when she was using her remote work or flexible time under the Second Flex Agreement, and those thereafter. *See* Payne Decl. at ¶¶ 27-28; Vinci Decl., Ex. 25.

78.   While Payne was allowed to work remotely, she was required to keep her supervisors informed of her schedule and required to get pre-approval to work from home.  Ex. J;

Ex. G; Ex. W, Allen Tr. 29:1-16, 38:5-16, 41:18-25; Ex. H, Payne Tr. 70:18-71:2, 75:13-76:5; 109:18-111:11.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 78.

**78.1.** Payne duly followed the terms and conditions of the First Flex Agreement and sought pre-approval when necessary and required to do so, and gave notice of when she was using her remote work or flexible time under the Second Flex Agreement, and those thereafter. *See* Payne Decl. at ¶¶ 27-28; Vinci Decl., Ex. 25.

### Payne Complained About HAP Issue, Which Cornell Resolved

79.     On June 5, 2017, Payne contacted the JCB payroll office with concerns about her timecard, claiming that she was only accruing time off and personal time on a part-time rather than full-time basis.  Ex. A, Complaint ¶¶ 60-63; Ex. B, Answer ¶ 30.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 79.

80.     On June 6, 2017, the next day, Cornell adjusted Payne's employment records to reflect full-time pay and accrued HAP time, retroactive to April 5, 2017.   Ex. A, Complaint ¶¶ 60-63; Ex. B, Answer ¶ 30; Ex. U, Doxey Tr. 38:1-20.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 80.

81.     With these adjustments, Cornell "fixed the issue" as Payne herself admits.  Ex. A, Complaint ¶ 63; Ex. B, Answer ¶ 30; Ex. U, Doxey Tr. 38:1-20; Ex. H, Payne Tr. 46:22-47:10.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 81.


### Payne Complained about Various Mistreatment and Demanded Promotion

82.   In June and July 2017, Payne complained repeatedly that Lindsay was unfairly micromanaging her, particularly with her timecard and work-from-home schedule.   *See, e.g.*, Ex. A, Complaint ¶¶ 81, 89, 102; Ex. B, Answer ¶¶ 35, 36; Ex. XX, Doxey Decl. ¶¶ 22-23.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 82.

**82.1.**   Lindsay would pressure Payne to work a full time schedule against her medical needs, admonish Payne for not notifying Lindsay of her schedule in the exact way Lindsay preferred, refuse to approve Payne's requests to work from home under flexible work agreements and either make her take the day off or use personal time to make up the hours, denied Payne the ability to flex her time, and changed entries on Payne's timecards to switch time previously approved to work from home to time used as vacation without Payne's consent or notice to Payne. *See* Payne Trans. at 34:2-10, 35:6-36:9, 73:15-24, 76:18-19, 103:17-104:9.

**82.2.**   Over the course of her tenure, Payne made several complaints to Allen, Lindsay, Tubbs, Weaver, and Doxey that she was being denied accommodations and that her requests to work under terms of her flex work agreements and her timecard were being placed under significant scrutiny. *See See* Payne Trans. at 38:17-41:15, 72:19-24, 76:18-77:4, 77:9-19, 87:17-88:9, 103:17-104:9, 130:12-21; Doxey Trans. at 43:9-44:10; Vinci Decl., Exs. 18, 19, 21, 24.

**82.3.**   Payne confirmed with her co-workers also supervised by Lindsay that they did nt receive he same scrutiny and did not experience Lindsay making changes to their timecard to erase time or change entries as Payne had experienced. *See* Payne Trans. at 97:9-23.

83.   Lindsay sometimes corrected Payne's timecard because Payne would log more HAP time on the timecard than she had accrued, or Payne would fail to track accurately her flexible work schedule to document time actually worked.  Ex. W, Allen Tr. 38:5-23; Ex. U, Doxey Tr. 45:19-46:6; Ex. H, Payne Tr. 60:18-61:5; Ex. XX, Doxey Decl. ¶ 22.

**Payne's Response:** For the purpose of summary judgment only, Payne disputes the facts in Defendant's paragraph 83. Payne never logged more HAP time than she had accrued as if she even attempted to do so, she would receive an error or be asked by the system to get manager approval. *See* Payne Decl. at ¶ 39. Payne always accurately tracked and logged her time worked. In contrast, Lindsay would remove time from Payne's time-card as if Payne had not worked that time or had not been properly approved for the time, even if Payne had been *See* Payne Decl. at ¶ 40.

84.   As a non-exempt employee, Payne had to keep records of her time worked and time off on an electronic timecard.  Ex. H, Payne Tr. 59:5-13; Ex. XX, Doxey Decl. ¶ 22.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 84.

**84.1.**   Payne always accurately tracked and logged her time worked. *See* Payne Decl. at ¶ 40.

85.     At Cornell, it is standard procedure for a supervisor to review and sign-off on timecards. Ex. W, Allen Tr. 41:9-17; Ex. H, Payne Tr. 54:7-13; Ex. XX, Doxey Decl. ¶ 22.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 85.

**85.1.**   Lindsay would often retroactively change entries on Plaintiff's time card for instances where Payne was approved to work from home or flex her time. Lindsay did not subject her other reports to such scrutiny. *See* Payne Trans. at 103:17-104:9, 97:9-23.

86.     Payne also complained to the Business Analytics team that she should be classified as an exempt employee, and possibly receive a promotion to band F pay.  Ex. A, Complaint ¶ 83; Ex. XX, Doxey Decl. ¶¶ 23, 44(f); June 15, 2017 email chain, Ex. JJ attached hereto.

**Payne's Response:** For the purpose of summary judgment only, Payne disputes the facts in Defendant's paragraph 86. Payne complained that, based on her discussion with Allen before accepting the Data Analyst role, she was to be classified as an exempt employee and band E or F pay. *See* Payne Decl. at ¶ 41. Plaintiff also raised these concerns to Lindsay who said it was being worked on. *See* Payne Trans. at 24:24-25:19.

87.     At a June 15, 2017 meeting to review Payne's job performance, Lindsay told Payne that she had not demonstrated to the Business Analytics team that she was responsible and independent enough to be promoted or classified as exempt; Lindsay also expressed concerns

about Payne's non-medical absences and her inability to get trained and caught up with the rest of the team.  Ex. B, Answer ¶ 35; Ex. XX, Doxey Decl. ¶ 23; Ex. JJ.

> **Payne's Response:** For the purpose of summary judgment only, Payne disputes the facts in Defendant's paragraph 87. During a June 15, 2017 meeting, Lindsay accused Payne of poor performance but refused to give any examples or participate in a meeting with HR to discuss Payne's alleged performance deficiencies. *See* Payne Decl. at ¶¶ 42-43. Instead, Lindsay focused almost exclusively on Payne's time off as the basis for not re-classifying Payne's job and pay scale. (payne affidavit). At no point during the meeting did Lindsay express a concern over Payne's training. *Id.*

88.     Payne claimed the meeting upset her so much that she began having heart palpitations, and that she told Lindsay she was too ill to remain at work and would work from home instead.  Ex. A, Complaint ¶ 86; Ex. U, Doxey Tr. 46:3-6, 57:13-24; Ex. JJ.

> **Payne's Response:** For the purpose of summary judgment only, Payne partially disputes the facts in Defendant's paragraph 88. Payne did not tell Lindsay that she would work from home but requested to work from home for the remained of the day. Lindsay at first questioned Payne's need to work from home and ultimately told Payne to just go home and not work the remained of the day. *See* Payne Trans. at 87:17-88:9.

89.     Both Lindsay and HR representative Weaver told Payne that she should not work from home if she was not feeling well, explaining that if Payne were too ill to remain at work, she would be too ill to work from home and should take personal time.  Ex. U, Doxey Tr. 46:3-6, 57:13-24; Ex. JJ.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 89.

90.     On July 5, 2017, Payne informed Lindsay that she was "not feeling well enough to drive in today" so Payne planned to close her timecard entry for the day by documenting that she would work from home for a couple hours and take vacation time for the rest of the day.  Ex. H, Payne Tr. 185:5-14; July 5-6, 2017 email chain (Payne Dep. Ex. 13) at 3, Ex. Q attached hereto; Ex. WW, Weaver Decl. ¶ 17; July 5-6, 2017 email chain at P000280, Ex. KK attached hereto.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 90.

91.     Lindsay replied that the "request" to work from home was denied because working from home required preapproval.  Lindsay further explained that "with you being sick and putting your time in before you work it, and with the end of the pay period today, I do not feel comfortable with you working from home."   Ex. Q at 2-3; Ex. KK at P000280.  Lindsay also raised several additional issues with Payne's timecard entries for the current pay period that Lindsay would need to fix before the close of the period.  Ex. Q; Ex. KK at P000280.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 91.

92.     In response, Payne contacted Jill Tubbs in MLA seeking to file a formal request for accommodation for her work schedule.  Ex. A, Complaint ¶¶ 101-102; Ex. B, Answer ¶ 36;

Ex. WW, Weaver Decl. ¶ 16; Ex. H, Payne Tr. 183:18-184:17; June 5 email chain at P000245-246 (Payne Dep. 12), Ex. P attached hereto; Ex. Q at 1; Ex. KK at P000279-280.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 92.

93.     HR had been encouraging Payne to seek formal accommodations pursuant to Policy 6.13 as a way to resolve the tension between Payne and Lindsay in the workplace and enable all who were involved in addressing the conflicts between them to move forward productively.  The purpose behind Policy 6.13 was to establish an "interactive process" between faculty and staff with the university to find reasonable accommodations.  At the same time, under this policy, "Faculty and staff are responsible for initiating requests."  Ex. U, Doxey Tr. 61:16-19; Ex. XX, Doxey Decl. ¶ 25; Ex. F at 10; *see generally* Ex. F.

**Payne's Response:** For the purpose of summary judgment only, Payne disputes the facts in Defendant's paragraph 93. No one from MLA encouraged Payne to seek formal accommodations; rather, Payne was advised to work it out herself with Lindsay. *See* Payne Trans. at 41:16-42:14; Payne Decl. at ¶¶ 31-32; Payne Decl. at ¶¶ 31-32. Payne arrived at the decision to seek formal accommodations as her attempts to work things out with Lindsay were unsuccessful as Lindsay continued to deny Payne her right to work from home and flex her time as allowed under the various flexible work agreements. *See* Payne Decl. at ¶ 45, Vinci Decl., Exs. 19, 24.

94.     On July 6, 2017, Payne filed a formal request for a disability accommodation.  Ex. A, Complaint ¶ 102; Ex. B, Answer ¶ 36; Ex. H, Payne Tr. 185:5-186:14; Ex. XX, Doxey Decl. ¶ 25; Ex. WW, Weaver Decl. ¶ 16.

> **Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 94.
>
> **94.1.**   Payne arrived at the decision to seek formal accommodations as her attempts to work things out with Lindsay were unsuccessful as Lindsay continued to deny Payne her right to work from home and flex her time as allowed under the various flexible work agreements. *See* Payne Decl. at ¶ 45, Vinci Decl., Exs. 19, 24.

95.     On July 7, 2017, Allen accidentally sent Payne an email that was meant for another supervisor criticizing Payne's work product and raising concerns about Payne's skills and abilities.  Ex. A, Complaint ¶¶ 103, 106; Ex. W, Allen Tr. 47:25-49:7; Ex. XX, Doxey Decl. ¶ 24; July 7, 2017 email chain at P000470, Ex. LL attached hereto.

> **Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 95.

96.     After Allen realized her mistake, she tried to discuss with Payne in person her concerns about Payne's performance.  Specifically, Allen tried to explain that she had concerns about how Payne was developing in the group and concerns about Payne's ability to work independently on various projects.  Ex. W, Allen Tr. 49:8-24; Ex. LL.

> **Payne's Response:** For the purpose of summary judgment only, Payne partially disputes the facts in Defendant's paragraph 96. After erroneously sending the email, Allen

approached Payne and apologized and thereafter the two tried to discuss the criticisms in the email. Payne asked for examples of her poor performance but Allen did not give her any. *See* Payne Trans. at 121:19-122:14. Payne further discussed Lindsay's treatment of her to which Allen responded that she did not find anything wrong with Lindsay's behavior but noted that Payne made a lot of mistake because of her accommodations. *See* Payne Trans. at 123:2-10, 124:23-125:15; Payne Decl. at ¶¶ 46-48.

97.     In response, Payne started screaming and yelling – that she was as good as anybody in the group – and stormed away from Allen.  Ex. W, Allen Tr. 49:8-24.

**Payne's Response:** For the purpose of summary judgment only, Payne disputes the facts in Defendant's paragraph 97. At no point during their conversation, did either Allen or Payne scream or raise their voices at one another. During their conversation, Payne raised Lindsay's hostile behavior to Allen who responded that she did not find Lindsay's behavior to be hostile and accused Payne's need for accommodations to be the real problem. When Payne asked for examples of her alleged poor performance and the problems her accommodations were causing, Allen did not provide any. After several minutes, Payne advised she had to leave for a pre-planned meeting with Weaver in HR and stated it was about the concerns she had just raised to Allen regarding Lindsay's behavior. Allen requested to attend the meeting but Payne declined as she wanted to meet with HR privately. Payne then left professionally and peacefully. *See* Payne Trans. at 123:2-10, 124:23-126:11; Payne Decl. at ¶¶ 46-48.

98.     Payne later complained to HR, which encouraged her, again, to work with her supervisors, including Allen.  Ex. A, Complaint ¶ 109; Ex. XX, Doxey Decl. ¶ 24.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 98.

**98.1.**   Payne again complained to Weaver at a pre-scheduled meeting that she was being subjected to discrimination and not having her medical needs accommodated. In addition, Payne complained of Allen's behavior. In response, Weaver did not offer any substantive assistance but merely advised Payne to be "less defensive" with her managers. *See* Payne Decl. at ¶ 49; Payne Trans. at 126:12-127:6.

99.     On July 31, 2017, as part of an annual review of pay bands and market data for comparable positions, Cornell increased Payne's pay to $25.88 an hour retroactively to the start of Cornell's fiscal year on July 1, 2017.  Ex. H, Payne Tr. 188:16-189:16; July 31, 2017 Letter (Payne Dep. Ex. 16), Ex. T attached hereto.

**Payne's Response:** For the purpose of summary judgment only, Payne disputes the facts in Defendant's paragraph 99. In July of 2017, while reviewing the published recommended pay rates for employees at her pay scale, Payne noticed that she fell below the minimum and immediately contacted HR. As a result of Payne's efforts, Defendant increased Payne's pay to meet the minimum requirements. *See* Payne Decl. at ¶ 50; Vinci Decl., Ex. 17.

**Cornell Approved Payne's Request for Disability Accommodation**

100.    In response to Payne's request for a formal disability accommodation pursuant to

46

Policy 6.13, HR and MLA began working with her to meet her specific needs.  Ex. F, Policy 6.13 pp. 11, 13-14; Ex. B, Answer ¶¶ 39-41; Ex. H, Payne Tr. 186:16-187:12; July 18, 2017 email (Payne Dep. Ex. 14), Ex. R attached hereto.

> **<u>Payne's Response:</u>** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 100.


101.    Payne complained that she did not have enough accrued time off to support her absences for treatment, so Weaver arranged to allocate the remaining 20 days of donated catastrophic leave to cover these absences.  Ex. WW, Weaver Decl. ¶ 17; Ex. KK at P000279; Ex. Q at 1.

> **<u>Payne's Response:</u>** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 101.

> **<u>101.1.</u>** Until that point, Payne had been unaware that there were additional days of donated catastrophic leave for her to avail herself of, despite Allen having been advised of such leave months before. *See* Def. Ex. FF; Payne Decl. at ¶ 51.


102.    On August 2, 2017, Cornell notified Payne by letter that the University had approved her request for accommodation on the terms outlined in the letter.  Ex. A, Complaint ¶ 114; Ex. B, Answer ¶ 40; Ex. WW, Weaver Decl. ¶ 18; Ex. XX, Doxey Decl. ¶ 26; Ex. H, Payne Tr. 113:18-115:5; August 2, 2017 Letter (Payne Dep. Ex. 6), Ex. L attached hereto.

> **<u>Payne's Response:</u>** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 102.

103.    Cornell granted Payne every accommodation she requested.  Ex. H, Payne Tr. 119:16-23.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 103.

**103.1.**  The approved accommodations included (i) flexible work hours; (ii) flexible work space/working from home; and (iii) reduced hours when necessary. *See* Vinci Decl., Ex. 9.

**103.2.**  The letter confirming Payne's accommodations stated the following with respect to prior notice:

> You have agreed that you will communicate your need <u>as far in advance as possible</u>. For occasions when you aren't feeling well unexpectedly, you will let [Allen] and [Lindsay] know as soon as you are able that you <u>will be</u> utilizing your accommodations. *See* Vinci Decl., Ex. 9.

104.    On August 14, 2017, HR held a meeting with Payne, Lindsay, and Allen to discuss the implementation of Payne's disability accommodation.  Ex. A, Complaint ¶ 119; Ex. B, Answer ¶ 41; Ex. U, Doxey Tr. 63:23-65:21; Ex. WW, Weaver Decl. ¶ 18; Ex. XX, Doxey Decl. ¶ 26.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 104.

**104.1.**  During the meeting, Lindsay questioned why they had to meet or discuss Payne's accommodations at all. Lindsay further expressed that she believed that Payne had received enough accommodations and that she had a business to run, and challenged Payne's accommodations and Cornell's approval of them. *See* Payne Trans. at 106:20-107:9, 131:16-134:25; Payne Decl. at ¶¶ 52-54.

**104.2.** During the meeting, both Lindsay and Allen questioned Payne's need for accommodations and made Payne explain why she needed certain accommodations, even though doing so resulted in Payne sharing extremely personal and sensitive information about her health and treatment. *See Id.*

**104.3.** During the meeting, Doxey offered to go back to the MLA to discuss Payne's accommodations which Lindsay showed appreciation for. *See Id.*

105.     Payne explained at the meeting that she wanted to work very early in the morning sometimes (if she had trouble sleeping because of her medication).  Ex. U, Doxey Tr. 65:4-14; Ex. XX, Doxey Decl. ¶ 26.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 105.

**105.1.** During the meeting, Lindsay questioned why they had to meet or discuss Payne's accommodations at all. Lindsay further expressed that she believed that Payne had received enough accommodations and that she had a business to run, and challenged Payne's accommodations and Cornell's approval of them. *See* Payne Trans. at 106:20-107:9, 131:16-134:25; Payne Decl. at ¶¶ 52-54.

**105.2.** During the meeting, both Lindsay and Allen questioned Payne's need for accommodations and made Payne explain why she needed certain accommodations, even though doing so resulted in Payne sharing extremely personal and sensitive information about her health and treatment. *See* Payne Trans. at 106:20-107:9, 131:16-134:25; Payne Decl. at ¶¶ 52-54.

**105.3.** During the meeting, Doxey offered to go back to the MLA to discuss Payne's accommodations which Lindsay showed appreciation for. *See* Payne Trans. at 106:20-107:9, 131:16-134:25; Payne Decl. at ¶¶ 52-54.

106.    Payne also explained that she wanted to leave early a few days to go to a chiropractic appointment, which was approved after HR contacted MLA and confirmed that the chiropractic treatments were in the treatment plan connected to her disability.  Ex. U, Doxey Tr. 65:14-21, 66:24-67:13; Ex. XX, Doxey Decl. ¶ 26; Ex. WW, Weaver Decl. ¶¶ 18-19; August 16, 2017 email chain, Ex. MM attached hereto.

**Payne's Response:** For the purpose of summary judgment only, Payne partially disputes the facts in Defendant's paragraph 106. Payne did not request to leave early but rather to shift her schedule to allow her to work the same number of hours and also attend her doctor appointments. *See* Payne Trans. at 106:20-107:9, 131:16-134:25; Payne Decl. at ¶¶ 52-54.

**106.1.**  During the meeting, Lindsay questioned why they had to meet or discuss Payne's accommodations at all. Lindsay further expressed that she believed that Payne had received enough accommodations and that she had a business to run, and challenged Payne's accommodations and Cornell's approval of them. *See* Payne Trans. at 106:20-107:9, 131:16-134:25; Payne Decl. at ¶¶ 52-54.

**106.2.** During the meeting, both Lindsay and Allen questioned Payne's need for accommodations and made Payne explain why she needed certain accommodations, even though doing so resulted in Payne sharing extremely personal and sensitive

information about her health and treatment. *See* Payne Trans. at 106:20-107:9, 131:16-134:25; Payne Decl. at ¶¶ 52-54.

**106.3.** During the meeting, Doxey offered to go back to the MLA to discuss Payne's accommodations which Lindsay showed appreciation for. *See* Payne Trans. at 106:20-107:9, 131:16-134:25; Payne Decl. at ¶¶ 52-54.

107.    Lindsay and Allen expressed concern about Payne being unavailable during regular business hours, to correspond with other employees on the team as well as faculty seeking the services of the Business Analytics team, whether in terms of answering their questions or getting training herself.  Ex. U, Doxey Tr. 66:1-6; Ex. XX, Doxey Decl. ¶ 26.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 107.

**107.1.** Payne was frequently on site during regular business hours. However, Allen and Lindsay's concerns were unfounded as, even when on site, Payne rarely interacted in person with any faculty or students and the majority of Payne's work was completed digitally. *See* Payne Decl. at ¶ 55.

108.    The result of the meeting and the subsequent discussions was a mutual, general understanding of Payne's accommodation needs and the business needs of the Business Analytics unit.  Ex. U, Doxey Tr. 63:23-67:13; Ex. WW, Weaver Decl. ¶¶ 18-19; Ex. XX, Doxey Decl. ¶¶ 26-27; September 5, 2017 email chain, Ex. NN attached hereto; Ex. MM.

**Payne's Response:** For the purpose of summary judgment only, Payne disputes the facts in Defendant's paragraph 108. The result of the meeting was not a mutual understanding

of Payne's accommodation needs and/or Defendant's business needs. *See* Payne Decl. at ¶ 54.

### Payne Signed a Third Flex Agreement

109.    On August 16, 2017, Weaver sent an email to Doxey, Allen, and Lindsay (copying Tubbs), summarizing the discussions from the earlier meeting and Weaver's subsequent discussions with Tubbs.  Ex. B, Answer ¶ 41; Ex. WW, Weaver Decl. ¶¶ 18-19; Ex. XX, Doxey Decl. ¶ 26; Ex. MM.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 109.

110.    Payne had requested (and was granted) for the next six weeks an 8:00 AM to 4:30 PM schedule for Monday through Thursday, and a 7:30 AM to 3:00 PM schedule on Friday; she was allowed to start work at 6:00 AM, as long as she informed Lindsay of her earlier start time and schedule for that day; to the extent Payne needed to utilize any of her further accommodations (e.g., reduced work hours, flexible start time, and working from home), she would communicate this need to Lindsay and provide Lindsay an understanding of the status of any outstanding assignments, as well as the impact of the accommodation; finally, any accommodations that were foreseeable (e.g., doctor's appointments and likely recovery days) would be communicated to Lindsay as soon as Payne was aware of them.  Ex. WW, Weaver Decl. ¶¶ 18-19; Ex. XX, Doxey Decl. ¶ 26; Ex. MM at P000269.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 110.

111.    After several more email exchanges regarding Payne's work schedule and accommodations, on August 28, 2017, Payne signed a third Flexible Work Arrangement-Agreement (the "Third Flex Agreement").  Ex. B, Answer ¶ 41; Ex WW, Weaver Decl. ¶ 19; Ex. XX, Doxey Decl. ¶ 27; Ex. H, Payne Tr. 104:11-105:14; Third Flex Agreement (Payne Dep. Ex. 5), Ex. K attached hereto.

> **Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 111.

> ***111.1.*** Prior to signing the Third Flex Agreement, Payne filed an inquiry with the EEOC on August 15, 2017. Defendant had notice of Plaintiff's EEOC inquiry. *See* Payne Decl. at ¶¶ 56-57.

112.    The Third Flex Agreement listed a "Review Date" of October 30, 2017, provided that Payne could work remotely "as needed" to attend to her medical appointments and treatments, and appended certain conditions that Payne had to fulfill in order to work remotely. Ex. B, Answer ¶ 41; Ex. H, Payne Tr. 105:12-105:14; Ex. K.

> **Payne's Response:** For the purpose of summary judgment only, Payne partially disputes the facts in Defendant's paragraph to the extent that the Third Flex Agreement does not explicitly limit Payne's ability to work remotely to days she has medical appointments and treatments. *See* Vinci Decl., Ex. 11.

113.    These conditions included the following:

The staff member must comply with all university policies and procedures, while working off-site … Requests to work overtime, declare vacation or take other time off from work must be pre-approved in writing by the staff's supervisor … According to the terms of this Agreement, the off-site work schedule is detailed in

this agreement.  For non-exempt staff, this specification must be in accordance with FLSA guidelines and should include meal breaks.  If the staff member needs to change his or her schedule, he or she agrees to obtain advance written approval from the supervisor.

Ex. K.

**<u>Payne's Response:</u>** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 113.

**<u>113.1.</u>** Payne duly followed the terms and conditions of the First Flex Agreement and sought pre-approval when necessary and required to do so, and gave notice of when she was using her remote work or flexible time under the First Flex Agreement, and those thereafter. *See* Payne Decl. at ¶¶ 27-28; Vinci Decl., Ex. 25.

114.    In addition, the Third Flex Agreement included the following "Additional comments/notes" agreed upon by Payne: "When working from home I will communicate my remote needs as far in advance as possible … I will add to my supervisor's calendar what I will be working on remotely from home on a daily basis and I will communicate on a daily basis the status of that work."  Ex. K.

**<u>Payne's Response:</u>** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 114.

115.    While Payne was allowed to work remotely, she was required to keep her supervisors informed of her schedule and required to get pre-approval to work from home.  Ex. K; Ex. G; *see also* Ex. W, Allen Tr. 29:1-16, 38:5-16, 41:18-25; Ex. H, Payne Tr. 70:18-71:2, 75:13-76:5.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 115.

**115.1.**   As per the formal confirmation of Payne's accommodations, Payne was required to get approval as soon as practicable and would still be able to use her accommodations when she felt unexpectedly by telling Allen and Lindsay that she was invoking her accommodations. *See* Vinci Decl., Ex. 9.

## Changes in the Business Analytics Team

116.   In the Fall of 2017, Lindsay stopped serving as a manager for the Business Analytics team in order to work more from home herself, after moving a substantial distance away from the Cornell campus.  Ex. U, Doxey Tr. 69:10-70:12; Ex. XX, Doxey Decl. ¶ 28.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 116.

117.   As a result, Allen took over supervising Payne again.  Ex. U, Doxey Tr. 70:13-16; Ex. H, Payne Tr. 145:19-25; Ex. W, Allen Tr. 24:6-25:7.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 117.

118.   On September 5, 2017, Tubbs emailed Payne, asking how the accommodations were working; Payne responded "[t]he accommodations are working fine, I'm grateful that the medical leaves board approved and HR has backed up my flex time etc.  Thanks for checking in!"  Ex. XX, Doxey Decl. ¶¶ 27, 44(g); Ex. NN.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 118.

**118.1.** After Lindsay was removed as Payne's manager, the implementation of Payne's accommodations ran smoothly and Payne's accommodations were seemingly being adhered to by Allen and later Laura Syer ("Syer"). *See* Payne Decl. at ¶ 64.

119.    On September 12, 2017, Payne informed HR that she had complained to the EEOC after the August 14, 2017 meeting, specifically alleging that her needs had not been met; in this same email, however, Payne acknowledged that she was no longer getting "harassment when I request time off."  Ex. A, Complaint ¶ 127; Ex. B, Answer ¶ 44; Ex. WW, Weaver Decl. ¶ 20; September 12, 2017 email chain at P000691, Ex. OO attached hereto; Ex. H, Payne Tr.135:4-22.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 119.

120.    The next day, on September 13, 2017, Syer sent out a meeting invitation to the Business Analytics team for a September 21, 2017 meeting to go over, among other things, upcoming projects and the structure of the team.  Ex. A, Complaint ¶ 128; Ex. H, Payne Tr. 137:5-9, 139:3-25.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 120.

121.    Payne denied the meeting request and contacted Doxey to inquire about the subject of the meeting; Doxey explained the nature of the meeting and encouraged her to attend. Ex. A, Complaint ¶ 129; Ex. H, Payne Tr. 137:5-9, 139:3-25; Ex. U, Doxey Tr. 71:11-23.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 121.

122.    On September 15, 2017, Payne met with Doxey, who informed her that Lindsay would no longer be her supervisor.  Ex. A, Complaint ¶¶ 130-132; Ex. U, Doxey Tr. 71:11-23.

**Payne's Response:** For the purpose of summary judgment only, Payne partially disputes the facts in Defendant's paragraph 122. During Payne's meeting with Doxey, Doxey was the first to inform Payne that Lindsay had already been removed as Payne's supervisor. *See* Doxey Trans. at 71:11-21.

123.    At this meeting, Payne renewed her complaints that she was misclassified and should be an exempt employee.  Ex. U, Doxey Tr. 39:13-40:23, 71:24-72:5.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 123.

**123.1.**  Payne again raised her concern regarding her classification and asked for a formal job description for her position. *See* Payne Decl. at ¶¶ 59-61. Payne also discussed her ongoing complaints regarding Lindsay's failure to accommodate her disability and her EEOC Complaint. *See* Payne Trans. at 142:4-16.

124.    HR later consulted with Syer, but she declined to change Payne's employment status because of uncertainty about the job and the future of the department, along with concerns about Payne's job performance.  Ex. U, Doxey Tr. 39:13-40:23, 42:9-24, 51:11-52:15.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 124.

125.    In early October 2017, Allen accepted a new position in the Engineering College, and Syer took over supervising both Lindsay and Payne, the only two employees left in the Business Analytics unit.  Ex. U, Doxey Tr. 70:17-24; Ex. W, Allen Tr. 60:12-15; Ex. XX, Doxey Decl. ¶ 28.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 125.

126.    After Syer took over supervising duties, Payne complained when Syer asked Payne to copy Lindsay on all surveys and rankings work because Payne felt that Lindsay was still supervising her.   Ex. XX, Doxey Decl. ¶ 28; October 10-13, 2017 email chain at P000872, Ex. PP attached hereto.

**Payne's Response:** For the purpose of summary judgment only, Payne disputes the facts in Defendant's paragraph 126. Payne did not complain about having to copy Lindsay on correspondence but rather requested clarification of Lindsay's role. *See* Vinci Decl., Ex. 12. In addition, Payne advised Syer of her ongoing and pending EEOC complaint. *See* Vinci Decl., Ex. 12.

127.     As Syer later explained, however, Lindsay was not supervising Payne; Lindsay was instead reviewing and proofreading the surveys and rankings work for accuracy, as a "another set of eyes," because the work needed to be validated and would be subject to scrutiny from outside of Cornell.  Ex. XX, Doxey Decl. ¶ 28; Ex. PP at P000872; *see also* Ex. U, Doxey Tr. 70:25-71:10.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 127.

**127.1.**  Syer further questioned Payne's act of asking for clarification of the various roles within the Business Analytics team. *See* Vinci Decl., Ex. 12.


128.     Payne also complained to HR a couple weeks later on November 6, 2017, that Syer had forwarded Payne's time off request to Lindsay, as it appeared to her Lindsay would be the one approving the request.  Ex. XX, Doxey Decl. ¶ 29; November 6-8, 2017 email chain at P000238, Ex. QQ attached hereto.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 128.

**128.1.**  Payne was particularly concerned with Lindsay reviewing her timecard in light of the past issues regarding Payne's use of her accommodations and flex work arrangements. *See* Payne Decl. at ¶¶ 62-63.


129.     Syer later explained that she did not have access to Payne's timecard to approve the time off, so she had asked Lindsay to send her a screenshot of the card.  Ex. XX, Doxey Decl. ¶ 29; Ex. QQ at P000237.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 129.


**Cornell Decides to Disband Business Analytics Team, Laying Off Lindsay and Payne**

130.    Shortly after Allen left for her new job in the Engineering College, JCB decided to eliminate the Business Analytics unit.   Ex. XX, Doxey Decl. ¶¶ 31-36; Justification to Eliminate Business Analytics Department in the SC Johnson College of Business, dated November 14, 2007, at 514, Ex. RR attached hereto.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 130.

**130.1.** As a result of the elimination, Payne's role was split between a new department under Amanda Shaw and a department within Academic Affairs under Beth Fox. Payne was trained in all of the databases that were now being utilized by the two separate departments. *See* Payne Decl. at ¶ 65.


131.    By this time, another department within JCB, Academic Affairs, had already taken over management of some of the databases on which the Business Analytics group had been working.  Ex. U, Doxey Tr. 73:16-25; Ex. RR at 513-14.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 131.

**131.1.** As a result of the elimination, Payne's role was moved to a new department under Amanda Shaw and other roles were moved within Academic Affairs under Beth Fox.

Payne was trained in all of the databases that were now being utilized by the two separate departments. *See* Payne Decl. at ¶¶ 65-67.

132.    Because of this workflow change, some of the employees in the group had already shifted to Academic Affairs.  Ex. U, Doxey Tr. 73:25-74:4; Ex. RR at 513-14.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 132.

**132.2.** Pursuant to Cornell's Policy 6.10.19: "Staff Tranfers", considering that Payne had already had the skills and performed the work necessary to fulfill the Information & Research Analyst role, Cornell had the option of simply transferring Payne into the role. *See* Vinci Decl., Ex. 13. Payne was not transferred to either of the new departments fulfilling her previous role. *See* Payne Decl. at ¶ 67.

133.    Then Allen left, and Syer began to reassess workflow and personnel.  She believed there was both a need for an experienced "higher level" employee like Allen and, simultaneously, not enough work for Payne and Lindsay at their skill level.  Ex. U, Doxey Tr. 74:4-22; Ex. RR at 514.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 133.

134.    Syer felt as if there was only enough work for one employee: half of the work that was Payne's (rankings and surveys) and half that was Lindsay's (key performance indicators). Ex. U, Doxey Tr. 74:4-22; Ex. RR.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 134.

135.    Given that Allen was gone, and there was only enough work for one employee, a proposal was made to eliminate the Business Analytics team and have the remaining work done by one employee, who would be placed in Academic Affairs.  Ex. U, Doxey Tr. 74:11-75:14; Ex. RR at 514.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 135.

136.    The proposed position of Information & Research Analyst would be at the F level pay band, which was in-between Payne's E band position and Lindsay's G band position.  Ex. U, Doxey Tr. 75:10-14; Ex. RR at 514-515; Ex. XX, Doxey Decl. ¶¶ 36-37.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 136.

137.    The proposed Information & Research Analyst position was also an amalgamation of Payne's and Lindsay's prior duties, along with additional new job functions. Ex. U, Payne Tr. 149:16-20; Ex. RR at 514-515; Ex. XX, Doxey Decl. ¶¶ 36-37.

**Payne's Response:** For the purpose of summary judgment only, Payne partially disputes the facts in Defendant's paragraph 137. The new Information & Research Analyst position was not just an amalgamation of Payne's and Lindsay' former roles and Payne

had performed all of the duties as outlined in the new position's job description at some point during her tenure in the Data Analyst role. *See* Payne Decl. at ¶ 68.

138.    Pursuant to University Policy 6.12 – Separations, Voluntary and Involuntary, Including Layoff (Excluding Academic and Bargaining Unit Staff) – the team had to draft a rationale for the proposed layoff, outlining the changes and where the work was going.  Ex. U, Doxey Tr. 74:23-75:5; Ex. RR; Ex. XX, Doxey Decl. ¶ 34.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 138.

139.    The proposal was then reviewed by numerous departments, including Workforce Diversity Inclusion, Policy and Labor Relations, and even Counsel's Office, to verify compliance with the University's obligations under Policy 6.12 and the law.  Ex. U, Doxey Tr. 75:5-9; Ex. XX, Doxey Decl. ¶ 34.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 139.

140.    On December 1, 2017, both Payne and Lindsay were informed that they were going to be laid off, effective January 2, 2018.  Ex. A, Complaint ¶ 139; Ex. B, Answer ¶ 47; Ex. XX, Doxey Decl. ¶ 35; Ex. U, Doxey Tr. 75:15-19; Ex. H, Payne Tr. 147:24-148:19; December 1, 2017 letter, Ex. SS attached hereto.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 140.

141.    Both Lindsay and Payne were told about the new Information & Research Analyst, band F position in Academic Affairs and encouraged to apply.  Ex. U, Doxey Tr. 76:2-14; *see also* Ex. SS; Ex. RR at 514-515; Ex. XX, Doxey Decl. ¶¶ 36-37.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 141.

**141.1.**  Payne expressed her interest in the position and was confident she would be a good fit as she had performed all of the duties as outlined in the new position's job description at some point during her tenure in the Data Analyst role. *See* Payne Decl. at ¶¶ 65-68.

## Payne Applies To Other Jobs At Cornell

142.    Assistant Dean of Student Services, Amanda Shaw, launched a search for the Information & Research Analyst, band F position.  Ex. XX, Doxey Decl. ¶ 37.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 142.

**142.1.**  Payne had previously worked with Amanda Shaw, who had compliments Payne's performance on her Rankings and Surveys work. *See* Payne Decl. at ¶¶ 65-66.

**142.2.**  Pursuant to Cornell's Policy 6.10.19: "Staff Tranfers", considering that Payne had already had the skills and performed the work necessary to fulfill the Information & Research Analyst role, Cornell had the option of simply transferring Payne into the role. *See* Vinci Decl., Ex. 13.

143.    Both Lindsay and Payne applied for the position and were granted interviews. Ex. U, Doxey Tr. 76:13-17.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 143.

144.     Neither Lindsay nor Payne was hired for this position.  Ex. U, Doxey Tr. 77:10-11; Ex. WW, Weaver Decl. ¶ 23.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 144.

145.     Shaw instead decided to hire another candidate with more experience and a better set of skills for the position.  The successful candidate had a Bachelor of Science in Hotel Management, as well as an MBA and relevant work experience at IBM.  On the other hand, Payne had a Bachelor of Science in Biological Sciences, and the search committee felt that she did not have the higher-level skills necessary to analyze data, which was essential to the role. Ex. U, Doxey Tr. 77:12-15; Ex. WW, Weaver Decl. ¶ 23; Ex. XX, Doxey Decl. ¶ 37.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute that Shaw hired another candidate but disputes that such candidate's qualifications and experience were superior to Payne's.

146.     Payne had not yet filed her EEOC charge at the time Shaw made the interviewing and hiring decisions in January 2018.   Ex. WW, Weaver Decl. ¶ 23; Ex. XX, Doxey Decl. ¶¶ 37, 40; Ex. C (EEOC Charge).

**Payne's Response:** For the purpose of summary judgment only, Payne disputes the facts in Defendant's paragraph 146. Payne had not formally filed a charge with the EEOC at

the time of this interviewing and hiring process but she had already filed an inquiry with the EEOC which Defendant and Defendant's HR agents were aware of. *See* Payne Decl. at ¶¶ 56-57.

147.    Payne interviewed for one other position at Cornell: a Project Manager band G position.  Ex. U, Doxey Tr. 77:22-78:10; Ex. XX, Doxey Decl. ¶ 38.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 147.

148.    Assistant Dean of Academic Affairs, Beth Fox, was in charge of the search and formed a search committee.  Ex. U, Doxey Tr. 78:2-14; Ex. XX, Doxey Decl. ¶ 38.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 148.

149.    The search committee chose another candidate, who had the most relevant experience and strong skills to gather and to analyze data.  Ex. U, Doxey Tr. 78:15-20; Ex. WW, Weaver Decl. ¶ 23; Ex. XX, Doxey Decl. ¶ 38.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute that the committee hired another candidate but disputes that such candidate's qualifications and experience were superior to Payne's.

150.    The successful candidate not only had a Bachelor of Arts in Linguistics and Master's Degree in Public Administration but relevant work experience at another university.

On the other hand, the committee saw no evidence Payne possessed the necessary higher-level analytical skills, and was concerned about her communication skills and her ability to work well with faculty, all of which were essential skills for the position.  Ex. XX, Doxey Decl. ¶ 38.

> **Payne's Response:** For the purpose of summary judgment only, Payne does not dispute that the committee hired another candidate but disputes that such candidate's qualifications and experience were superior to Payne's.

151.    As Fox explained to Payne later, the successful candidate had the most experience leading and managing complex college or program-wide projects with faculty, which was a "significant component" of the position.  Ex. XX, Doxey Decl. ¶ 39; February 7, 2017 email chain, Ex. UU attached hereto.

> **Payne's Response:** For the purpose of summary judgment only, Payne does not dispute that the committee hired another candidate but disputes that such candidate's qualifications and experience were superior to Payne's.

152.    Payne had not yet filed her EEOC charge at the time Fox made her hiring decision in January 2018.  Ex. WW, Weaver Decl. ¶ 23; Ex. XX, Doxey Decl. ¶¶ 37, 40; Ex. C, EEOC Charge.

> **Payne's Response:** For the purpose of summary judgment only, Payne disputes the facts in Defendant's paragraph 152. Payne had not formally filed a charge with the EEOC at the time of this hiring decision but she had already filed an inquiry with the EEOC which Defendant and Defendant's HR agents were aware of. *See* Payne Decl. at ¶¶ 56-57.

**Lindsay Granted Short Term Employment**

153.    A couple months after the layoff, Lindsay was hired for a short-term, six-month project assisting certain Cornell schools with reaccreditation.  Ex. U, Doxey Tr. 79:2-10, 20-23.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 153.

154.    Lindsay had been through the accreditation process before, so the Hotel School asked her to help.  Ex. U, Doxey Tr. 79:4-19.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 154.

155.    Lindsay did not work for the University after this six-month project concluded. Ex. U, Doxey Tr. 79:24-80:2.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 155.

**Payne Files Charge of Discrimination with EEOC**

156.    On February 22, 2018, Payne wrote Tubbs an email explaining that because Cornell did not hire Payne back, she was proceeding with her EEOC claim.  Payne went on to write "I just want you to know that your department, and you personally, did an excellent job of supporting me in my time of need."  Ex. H, Payne Tr. 187:14-188:14; January 31-February 22, 2018 email chain (Payne Dep. Ex. 15), Ex. S attached hereto.

**<u>Payne's Response:</u>** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 156.

157.    On March 19, 2018, Payne filed a Charge of Discrimination with the EEOC.  Ex. A, Complaint ¶ 5; Ex. B, Answer ¶ 5; Ex. XX, Doxey Decl. ¶ 39; Ex. C.

**<u>Payne's Response:</u>** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 157.

158.    On March 28, 2018, the EEOC informed Cornell of Payne's filing of the Charge of Discrimination.  Ex. C.

**<u>Payne's Response:</u>** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 158.

159.    On April 12, 2018, the EEOC asked Cornell to provide a statement of position in response to Payne's allegations.  Ex. XX, Doxey Decl. ¶ 41.

**<u>Payne's Response:</u>** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 159.

160.    In response to the EEOC's request for information, Cornell responded three times, providing the Commission information concerning Payne's employment, Cornell's policies regarding disability accreditation and how these policies were implemented to benefit Payne, and Payne's layoff when JCB eliminated the Business Analytics unit.  Ex. WW, Weaver Decl. ¶ 24; Ex. XX, Doxey Decl. ¶ 41.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 160.

161.    In three separate responses, the University provided the EEOC with 588 pages of documentation, including, but not limited to, copies of various Cornell policies; documents related to the job searches for the Information & Research Analyst, band F position and Project Manager band G position; Payne's flexible work agreements; Payne's correspondence with Lindsay, Allen, and HR; and the layoff justification memorandum outlining the rationale for eliminating Business Analytics and laying off the two employees, Lindsay and Payne.  Ex. XX, Doxey Decl. ¶¶ 41-44.

**Payne's Response:** For the purpose of summary judgment only, Payne does not dispute the facts in Defendant's paragraph 161.

162.    Based on its analysis of Cornell's submissions, on August 13, 2018, the EEOC closed its investigation and dismissed the charges against the University, noting "[b]ased upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes."  Ex. B, Answer ¶ 6; Ex. D.

**Payne's Response:** For the purpose of summary judgment only, Payne partially disputes the facts in Defendant's paragraph 162 and objects to Cornell's piecemeal description of the EEOC's findings. The EEOC's statements in the Dismissal and Notice of Rights also states: "This does not certify that the respondent is in compliance with the statutes." *See* Vinci Decl., Ex. 5; Def. Ex. C.

Dated: April 14, 2020
          New York, New York

                              Respectfully Submitted,


                              /s/ Gabrielle Vinci
                              Gabrielle Vinci, Esq.