# EXHIBIT 26

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DENISE PAYNE,                              Civil Action No. 18-cv-1442 (GTS/ML)

                Plaintiff,           DECLARATION OF PLAINTIFF
                                            DENISE PAYNE IN OPPOSITION TO
   v.                                       DEFENDANT CORNELL UNIVERSITY'S
                                            MOTION FOR SUMMARY JUDGMENT
CORNELL UNIVERSITY,

                Defendant.
_____

**DENISE PAYNE, of full age and sound mind, declare the following:**

1. I am the plaintiff in this action and I submit this declaration in opposition to Defendant Cornell University's ("Cornell's") motion for summary judgment dismissing my complaint.

2. I am a former employee of Cornell and last worked for Cornell in December of 2017. Specifically, I was officially laid off January 1, 2018 when my position was transferred to a new department. At all times that I was employed at Cornell, I acted professionally, ethically, and diligently. Moreover, I never hesitated to avail myself of the various Cornell policies which allowed me the right to raise complaints regarding my workplace but only did so when I believed there was a genuine dispute or concern of improper behavior by my fellow Cornell employees.

3. In or around November of 2013, I began working for Cornell as an administrator in Cornell's Office of Research, Integrity, and Assurance. During my time in this position, I experienced and observed what I perceived to be unlawful actions on the part of my then

manager, Amita Verma, which I duly reported to Cornell's human resources ("HR") department.

4. In or around August of 2015, after discussions and suggestion by Cornell's Ombudsman, I decided to leave my position with the Office of Research, Integrity, and Assurance and accepted a new part-time position at the Johnson College of Business as the Business Simulation Laboratory Administrator ("BSL Admin"). As discussed during my interview for the BSL Admin position, and as confirmed in follow up emails, I accepted the BSL position with the understanding that I would develop the role into a full-time position with the help of my new manager, Margaret Shackell-Dowell ("Ms. Shackell-Dowell").

5. Also during my interview with Ms. Shackell-Dowell for the BSL Admin role, I was assured that the role would evolve into a full-time position within approximately one year and would be reclassified into a higher pay band and scale.

6. While I was employed as the BSL Admin, I had been trained and experienced in using several different research launching software platforms and had, in fact, designed and launched studies from multiple platforms as part of my role.

7. I was diagnosed with breast cancer in or around June of 2016. I informed my then manager, Ms. Shackell-Dowell, as well as Cornell's HR about my diagnosis shortly after learning of my diagnosis.

8. Shortly after disclosing my cancer diagnosis to Cornell, I was informed by Ms. Shackell-Dowell that Cornell intended to either eliminate my BSL position or hire an "IT Programmer" as my replacement.

9. I was initially shocked and very disheartened to hear about Cornell's intention with my BSL position as I had worked very hard to shape the role and felt I should have been

included in such discussion regarding the fate of the role I was tasked with developing. Accordingly, I reached out to the BSL Director to express my disappointment that I was not consulted regarding my role and was not offered constructive coaching or development opportunities to grow in the role.

10. On or about June 23, 2016, I met with Cornell's HR Representatives Kathy Doxey ("Doxey") and Julie Weaver ("Weaver") to discuss my cancer diagnosis. Although the meeting was pre-planned, after disclosing my diagnosis the primary focus of the meeting was on my medical condition and what that would entail for my employment.

11. Also discussed during the June 23rd meeting were several issues I had experienced with some faculty members with respect to communication, as well as other potential job opportunities. There was no further discussion of any alleged performance issues.

12. During the June 23rd meeting, Doxey discussed two potential positions for me to fill – a role as a Data Analyst in the newly forming Business Analytics department and a role as an administrator in faculty support. I expressed an interest in the data analyst position.

13. With respect to my performance as a BSL Admin, the only discussion of my performance or qualifications was an assertion by Doxey that Cornell wanted to hire an "IT Programmer", something that upon my hire into the role, Cornell knew I was not.

14. On or about June 29, 2016, just days before my scheduled surgery to remove cancer, I arrived at my office at Cornell and found a sealed letter on my desk which advised that I had not qualified for a raise due to my "performance." This was the first time I had received such a letter. I was confused by the letter as I had not had any discussion with Ms. Shackell-Dowell previously regarding any deficiencies in my performance and had expected that I would be reviewed well.

15. In or around July of 2016, I met with Lucinda Allen ("Allen") twice to discuss the data analyst role in the Business Analytics department. During the first discussion, Allen and I generally discussed the role and the general concept for the role. However, thereafter I met with Allen a second time for an informal interview wherein we discussed the role more in depth and went over the primary tasks for the role, particularly in the first six months of the role, an outlined job title for the role, and compensation for the role.

16. With respect to compensation, Allen advised that she anticipated the role would likely be an "exempt" position at one of two pay-bands, either E-level or F-level.

17. During the two meetings with Allen, I also discussed my cancer diagnosis and treatment plan in response to Allen's inquiries about my health and condition.

18. Following the verbal discussion with Allen, I received a formal written offer for the Data Analyst position in September of 2016, while on disability leave. The role was set at the lowest pay scale within the E-band and was classified as a "non-exempt" position which represents a much lower pay rate than "exempt". Although this new role signified a jump of two pay bands, in my experience this was not uncommon as I had previously witnessed a colleague jump from a D-band to an F-band when accepting a new role.

19. Notably, the formal offer set the pay at the lowest possible scale within the E-level, non-exempt.

20. At the time I received the offer, I was on medial leave undergoing chemotherapy and recovering from my surgery and did not have the strength to push back or negotiate for a higher pay. Ultimately, I accepted the position and terms of the offer but was determined to discuss the compensation issue at the appropriate time and with the appropriate people once I was able to.

21. Throughout my cancer treatment in the Summer of 2016 and continuing through the Fall of 2016 and beyond, I was taken aback by the severe toll my surgery and chemotherapy treatments took on me both physically and mentally. I frequently experienced the following symptoms: frequent and uncontrolled vomiting, loss of consciousness, severe nausea, severe fatigue, disruption of my sleep patterns – including being unable to fall asleep (insomnia), waking up at all times of night and day, and feeling like sleep was the only thing I could do, and body pains.

22. As a result, throughout September of 2016, I had to use some of my vacation time and health and personal ("HAP") time to cover absences.

23. In January of 2017, I was no longer working two part-time roles and was exclusively working as a Data Analyst in the Business Analytics Department.

24. This change in role resulted in a $2.00 per hour increase in pay solely to meet the minimum requirements for the non-exempt E-band pay scale.

25. I returned to work on or about January 12, 2017. At such time, my new supervisor was Tammy Lindsay ("Lindsay").

26. When I returned to work, I entered into my first Flexible Work Agreement with Cornell (the "First Flex Agreement"). The First Flex Agreement permitted me to flex my standard work hours and to work remotely from home. There was nothing in the First Flex Agreement which limited when the terms of the agreement would apply and it was my understanding that the flexibility in my work schedule and arrangements could and would apply both on days I received cancer treatments and on days I did not feel well or was recovering from said treatments.

27. As part of the First Flex Agreement, I was required to obtain pre-approval for certain situations, such as taking time off. I always followed the terms and conditions of the First Flex Agreement (and the flex agreements thereafter) and duly sought pre-approval from my supervisors.

28. I also kept my supervisors apprised of my schedule by, among other things, sharing details of my treatment and medical appointments with them and sharing my calendar which noted my medical treatments.

29. Initially, things ran smoothly under the First Flex Agreement. After a while, however, Lindsay began to unnecessarily and harshly criticize me for utilizing my rights under the terms of the First Flex Agreement.

30. Specifically, Lindsay would refuse to approve my requests to work from home, although to my understanding they would be appropriate under the First Flex Agreement, and complained that I was not properly documenting my need to take time off or use the First Flex Agreement.

31. On or about February 20, 2017, I met with Cornell's Medical Leave's representative, Jillian Tubbs ("Tubbs") to discuss the issues I had been having with Lindsay related to my use of the First Flex Agreement.

32. At that time, Tubbs appeared shocked that a cancer patient would be treated in such a matter but insisted that formal disability accommodation should not be necessary. Instead, Tubbs categorized the issues between me and Lindsay as a misunderstanding and urged me to work it out myself with Lindsay and HR. Relying on Tubbs' advice, I set out to work out the issue with my manager myself.

33. On or about April 5, 2017, I returned to work for Cornell full-time following completion of my cancer radiation treatments. Although my radiation treatments had ended, I was still under active cancer treatment through October of 2017 and continued to receive monthly targeted treatments.

34. Although from time to time I would request time off to attend to non-medical related obligations, such requests were few and far between. The vast majority of any time off I required was a result of my cancer and cancer treatments.

35. Lindsay accused me of using too much time off unrelated to my medical needs which was confusing to me in light of the fact that I rarely took time off to address non-medical obligations. In an email where Lindsay accused me of this, she did not offer any support for her assertion and asked if I would be making the time up. Although I was more than willing to make up the time off for non-medical reasons, in that case a luncheon with a friend, I was confused by her inquiry as Lindsay had also not provided work for me to do, as I requested, and had cancelled my participation in training in the same email correspondence.

36. Following the conclusion of the First Flex Agreement, I signed a second flexible work agreement (the "Second Flex Agreement") after completing my cancer radiation treatments.

37. Although I had completed my cancer radiation treatments, I was still undergoing cancer treatments and had advised Cornell's representatives and my management that I would continue to receive treatment until October of 2017.

38. On or about June 5, 2017, I contacted the JCB payroll office to discuss my HAP time. Specifically, I complained that I had not accrued any HAP time since my return to work in January of 2017.

39. Despite not having accrued HAP time, I never logged more HAP time on my timecard than I had available. Indeed, the system would not permit such a thing or would request that there be manager approval before submitting the time. Instead, I would use my vacation time as quickly as I could in order to cover my medical absences.

40. I always made sure to track my hours, whether working from home or on site, accurately. However, despite tracking my hours and time worked correctly, Lindsay would change my hours even if I had actually worked or been approved for the time off.

41. Throughout my time as a Data Analyst in the Business Analytics department, I raised concerns that based on my prior conversations with Allen, I was supposed to be an exempt employee at a band E or F.

42. During a June 15, 2017 meeting to review my performance, Lindsay made several accusations about my allegedly deficient performance and behavior. I was shocked and disagreed with Lindsay and asked for specific examples, as well as a meeting with HR to discuss the issue further. I was never provided examples of what Lindsay alleged were performance deficiencies or behavioral issues. Nor was I allowed a follow-up meeting with HR.

43. During the June 15, 2017 meeting, Lindsay repeatedly used my need for time off as a basis for not rectifying my job classification and pay scale. At no point did she discuss that my training had become an issue or that there was an inability of me to be trained.

44. Lindsay continued to refuse to allow me to work under my various flex work agreements by, among other things, refusing to approve me to work from home, refusing to approve me to flex my time, or retroactively changing the approval of time off or time worked remotely.

45. As I could not work out the issue informally with Lindsay and HR, as MLA had advised, I chose to seek formal disability accommodations.

46. On or about July 7, 2017, I received an email from Allen which detailed what Allen perceived to be issues in my performance. Allegedly, the email was sent in error to me and was meant for a different recipient.

47. Thereafter, I spoke with Allen about her email and the allegations in it. At no point during the conversation did either of us raise our voice to each other.

48. During the conversation, I raised concerns about Lindsay's treatment of me and failure to allow my accommodations as per my flex agreements. In response, Allen stated she did not find Lindsay to be hostile and said that my need for accommodations was the problem, although she would not elaborate or give examples. During the conversation, I advised that I had to leave to attend a pre-scheduled meeting with Weaver in HR to discuss Lindsay's behavior. Allen requested to join but I declined and left our discussion.

49. During my meeting with Weaver, I relayed my concerns regarding Lindsay's hostile behavior, failure to accommodate my disability as per my flex agreements, as well as Allen's behavior. In response, at no point did Weaver advise or encourage me to make a formal request for accommodations or offer substantive help. Instead, she merely told me to be "less defensive" with my managers.

50. At the end of July 2017, while reviewing the published recommended pay rates for employees at my pay scale, I noticed that my pay had fallen below the minimum and immediately contacted HR. As a result of my efforts, Cornell marginally increased my pay to meet the minimum requirements.

51. While discussing my need for formal disability accommodations, I learned that there were an additional 20 days of donated leave time that Cornell could allocate to me. This was the first time I had learned of the additional donated leave time.

52. After my formal disability accommodations were approved, I participated in a meeting with Doxey, Weaver, Allen, and Lindsay. The primary focus of the meeting was, to my understanding, to go over my approved accommodations and how to implement them. However, during the meeting, Lindsay openly expressed her disdain for my accommodations, questioned why I needed to be provided any more accommodations, and requested that my accommodations be re-reviewed. In addition, Allen questioned my specific requests, forcing me to disclose personal information in defense of myself and my disability needs.

53. During the meeting I also offered to shift my scheduled hours on certain days to accommodate and attend my doctor appointments which would have allowed me to retain the same number of hours and also attend my medical appointments. Often when I tried to do this, Allen and Lindsay would perceive this as leaving early.

54. The result of the meeting, to my understanding, was not as planned; there was no understanding of how precisely my accommodations would be implemented and in fact, I left the meeting understanding that HR was going to have my accommodations reviewed with MLA as per Lindsay's request.

55. Allen and Lindsay allegedly had concerns over my ability to be onsite for person to person interactions with the staff and faculty. However, such concerns were misplaced as even when I was on site, which I was regularly, I never interacted in person with any faculty or students and all of my work was completed digitally.

56. I first contacted the EEOC regarding my claims of disability discrimination and a failure to accommodate on August 15, 2017. At that time, I filed an inquiry with the EEOC. I was compelled to go to the EEOC because my disability accommodations, which had at that point been formally approved, were being denied to me. I was also compelled to go to the EEOC after a meeting with my manager and Human Resources ("HR") resulted in my need for my approved accommodations being challenged and questioned.

57. I advised Cornell's HR team about my August EEOC inquiry via email.

58. In or around September of 2017, I received a meeting invitation from Syer. Since I did not know the purpose of the meeting, I declined the invitation and requested a meeting with Doxey.

59. I thereafter met with Doxey who shockingly informed me that Lindsay had been removed as my supervisor weeks prior. Notably, I had noticed that after Lindsay ceased being my manager, it seemed as though Cornell's management, mainly Allen and Laura Syer, were implementing and respecting my accommodations more efficiently.

60. In addition, Doxey advised that the purpose of the meeting with Syer was to go over upcoming projects and the future of the business analytics team.

61. During my conversation with Doxey, I again raised concern over my classification and pay scale and requested a formal job description for my role.

62. Despite being advised that Lindsay was no longer my manager, I was still required to carbon copy Lindsay on correspondence with Syer and was actually told by Lindsay that she was still required to supervise and manage all of my work.

63. This was especially troubling when it came to my timecard as she had previously created issues with my time while supervising my work under my various flex arrangements by, among other things, challenging my need for accommodations and refusing to properly implement and abide by my flex arrangements.

64. Notably, at no point after Lindsay was removed from reviewing my timecard, i.e. when Syer and Allen were reviewing my card, was I accused of entering time wrong or had my timecard altered as was frequently done under Lindsay's supervision.

65. At some point in late 2017, Cornell apparently determined to eliminate the Business Analytics Department. As a result, my role was moved to a new department under Amanda Shaw and other roles within the department were moved within Academic Affairs under Beth Fox.

66. Notably, I had worked with Amanda Shaw previously and she had complimented my work on Rankings and Surveys.

67. I was trained in all of the databases that were now being utilized by the two separate departments. Despite this, I was not transferred to either Academic Affairs or the new department.

68. Thereafter, my role was slightly altered and retitled as –Information and Research Analyst. While Cornell describes this job as a combination of mine and Lindsay's prior

responsibilities, in reality, I had performed all of the duties outlined in the job description at some point during my tenure as the Data Analyst for the Business Analytics department.

I declare that the foregoing statements made by me are true and accurate to the best of my personal knowledge and belief. I am aware that is any of the foregoing statements made by me are willfully false, I am subject to punishment, including potentially perjury.

*Denise Payne*
Denise Payne

Dated: 4/13/2020