UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DENISE PAYNE,

                Plaintiff,

v.                                      18-CV-1442
                                      (GTS/ML)
CORNELL UNIVERSITY,

                Defendant.
_____

APPEARANCES:                          OF COUNSEL:

NESENOFF & MITLENBERG, LLP         ANDREW MILTENBERG, ESQ.
  Counsel for Plaintiff                  GABRIELLE M. VINCI, ESQ.
363 Seventh Avenue – 5th Floor
New York, NY 10001

CORNELL UNIVERSITY OFFICE OF COUNSEL    CONRAD R. WOLAN, ESQ.
  Counsel for Defendant               JARED M. PITTMAN, ESQ.
300 CCC Building                       VALERIE L. DORN, ESQ.
235 Garden Avenue                   ADAM PENCE, ESQ.
Ithaca, NY 14853

GLENN T. SUDDABY, Chief United States District Judge

## DECISION and ORDER

       Currently before the Court, in this employment discrimination action filed by Denise

Payne ("Plaintiff") against Cornell University ("Defendant"), is Defendant's motion for

summary judgment.  (Dkt. No. 24.)  For the reasons set forth below, Defendant's motion for

summary judgment granted.

## I.    RELEVANT BACKGROUND

### A.    Plaintiff's Claims

Generally, liberally construed, Plaintiff's Complaint claims that Defendant violated the

American with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA") and the New York State Human Rights Law, N.Y. Exec. Law. § 290, *et seq.* ("NYSHRL"), by taking the following four actions: (1) discriminating against Plaintiff by subjecting her to disparate treatment based on her disability; (2) subjecting Plaintiff to a hostile work environment based on her disability; (3) failing to accommodate Plaintiff's disability by refusing to provide her with reasonable accommodations, despite knowing of her disability; and (4) retaliating against Plaintiff after she complained of disability discrimination and a failed to complete an unbiased and thorough investigation into the merits of her claims. (*See generally* Dkt. No. 6 [Plf.'s Compl.].) Familiarity with the factual allegations supporting these claims in Plaintiff's Complaint is assumed in this Decision and Order, which is intended primarily for review by the parties. (*Id.*)

   B.     **Undisputed Material Facts**

   The following facts were asserted and supported with accurate citations by Defendant in its Statement of Material Facts and expressly admitted by Plaintiff in her response thereto or denied without appropriate record citations. (*Compare* Dkt. No. 24, Attach. 1 [Def.'s Rule 7.1 Statement] *with* Dkt. No. 29 [Plf.'s Rule 7.1 Response].)

   1.     In November 2013, Defendant hired Plaintiff to work as an administrative assistant in the Office of Research, Integrity, and Assurance, a central administrative office that served all of Defendant's fourteen colleges and schools. (Dkt. No. 24, Attach. 1 at ⁋ 7.)

   2.     Defendant classifies both hourly and salaried jobs on pay bands, with the lowest level being "band A" and the highest level being "band I." (*Id.* at ⁋ 11.) Generally, bands A through D are hourly non-exempt employees (meaning they

are eligible for overtime pay if they work beyond their scheduled hours); employees in band E are a mix of hourly and salaried employees depending on the level of responsibility; and bands F and above are generally exempt, salaried employees with decision-making authority and responsibilities that impact Defendant and beyond.  (*Id*. at ⁋ 12.)  The more complex the position, the higher the pay band. (*Id*. at ⁋ 13.)

3.     In August 2015, Plaintiff accepted a part-time position as a research aide in the Business Simulation Lab ("BSL") in the Johnson Graduate School of Management.  (*Id*. at ⁋ 10.)  The position required Plaintiff to work 20 hours a week and was a nonexempt band C position. (*Id*.)

4.     On June 13, 2016, around the time that BSL was considering eliminating Plaintiff's research aide position, Plaintiff informed Defendant's Human Resources ("HR") Representative Ms. Katherine Doxey that she had just been diagnosed with breast cancer. (*Id*. at ⁋⁋ 19, 21.)

5.     In the spring of 2016, the BSL director and faculty committee discussed possible solutions, including eliminating Plaintiff's position altogether.  (*Id*. at ⁋ 19.) Defendant began to consider whether there were other positions within the university that were suitable for Plaintiff's skillset. (*Id*.)

6.     Plaintiff's supervisor informed her that her position may be eliminated, which resulted in Plaintiff sending an email, dated June 22, 2016, to BSL management expressing her disappointment that she was not consulted in the discussion of changes. (*Id*. at ⁋ 20.)

7.    On June 23, 2016, Ms. Doxey and HR Representative Ms. Julie Weaver met with Plaintiff to discuss her expected needs, along with other potential job possibilities. (*Id*. at ⁋ 22.)  Specifically, Ms. Weaver explained Defendant's short-term disability benefits and the mechanics of medical leave of absence under Defendant's policy, should Plaintiff decide to take a medical leave to pursue her cancer treatments.  (*Id*.)

8.    Ms. Doxey mentioned several potential positions, including a data analyst position being created within the new business analytics unit ("Business Analytics") to serve a new college–the Cornell SC Johnson College of Business ("JCB").   (*Id*. at ⁋ 25.)  The position within Business Analytics was only a concept when first presented to Plaintiff; there was no job description, and no pay band fixed with the HR structure. (*Id*. at ⁋ 27.)  Plaintiff expressed an interest in the position.  (*Id*. at ⁋ 28.)

9.    After the meeting of June 23, 2016, Plaintiff wrote an email to her BSL supervisors informing them of her meeting with HR in which she asserted that she was subjected to an unfair assessment of her performance, but that she felt supported and hopeful about her future.  (*Id*. at ⁋ 29.)

10.   On June 29, 2016, Plaintiff complained again that she was being treated unfairly. She made no reference to her cancer diagnosis or any need for disability accommodation in the workplace.  (*Id*. at ⁋ 30.)  In response to her email of June 29, 2016, Plaintiff's supervisor at the time informed Plaintiff that her work would be graded as "successful."  (*Id*. at ⁋ 31.)

11.     Plaintiff thereafter took a series of short-term disability leaves for surgery and
        treatment on the following dates in 2016: July 5-11, August 4-8, August 29-
        September 2, September 12-16, and September 26-30.  (*Id*. at ¶ 32.)

12.     Plaintiff was not eligible for short term disability for her initial absence from July
        5-11, 2016.  (*Id*. at ¶ 33.)  After Plaintiff's initial leave (July 5-11, 2016), she was
        then eligible for short term disability, which included 50% pay covered by
        Defendant's short-term disability benefit in accordance with Defendant's Policy
        6.9.  (*Id*. at ¶ 34.)  Plaintiff also utilized her accrued vacation and health and
        personal ("HAP") leave time to supplement the short-term disability leave pay in
        order to receive full compensation for each leave.  (*Id*.)

13.     On July 20, 2016, Ms. Doxey sent an email to Plaintiff informing her of
        Defendant's intention to move Plaintiff from her existing position to the Business
        Analytics unit in JCB.  (*Id*. at ¶ 35.)  Plaintiff subsequently disclosed her cancer
        diagnosis to Ms. Lucinda Allen, Plaintiff's new supervisor.  (*Id*. at ¶ 36.)

14.     On September 26, 2016, Ms. Weaver sent Plaintiff an email with an offer letter,
        prepared on September 23, 2016, in which Defendant offered Plaintiff a
        promotion to Data Analyst II in the Business Analytics unit, to take effect on
        September 19, 2016.  (*Id*. at ¶ 37.)  Plaintiff accepted the promotion and the terms
        of her employment outlined in the letter.  (*Id*.)  The offer letter also stated that the
        position would be paid at a non-exempt, hourly rate at band E.  (*Id*.)

15.     In consultation with HR, Associate Deal Laura Syer and Ms. Allen decided to
        place Plaintiff at the minimum of the E band because neither individual knew

what skills and abilities Plaintiff possessed at the time, or how those skills and abilities would align with the needs of the Business Analytics team.  (*Id*. at ¶ 40.)

16.   Throughout September 2016, Plaintiff encountered medical challenges that caused her to miss more work than she had anticipated.  (*Id*. at ¶ 42.)  Due to the near depletion of Plaintiff's vacation and HAP leave, Ms. Weaver circulated an anonymous request to all benefits-eligible staff and faculty in JCP, requesting catastrophic leave donations.  (*Id*. at ¶¶ 42-43.)  HR then received a total of 66 days of donated time from 18 different individuals.  (*Id*. at ¶ 44.)  Although some of the donated time was held in reserve, HR transferred a portion of donated time to meet Plaintiff's immediate needs and to continue her salary at full pay during her extended leave.  (*Id*. at ¶¶ 45-46.)

17.   While undergoing chemotherapy, Plaintiff was on disability leave from October 13, 2016, through January 12, 2017, in consultation with Defendant's Medical Leave Administration ("MLA").  (*Id*. at ¶ 47.)  During this time period, Plaintiff received full pay pursuant to a combination of Defendant's short-term disability benefits and the donated catastrophic leave time from JCB employees pursuant to Defendant's policy 6.9.  (*Id*. at ¶ 48.)

18.   As of January 1, 2017, Plaintiff's role in the Business Analytics unit increased to 30 hours per week.  (*Id*. at ¶ 49.)  This change, which occurred while Plaintiff was on disability leave, increased her pay.  (*Id*. at ¶ 50.)  The catastrophic leave donations enabled Plaintiff to receive the full value of the increase.  (*Id*.)

19.   Plaintiff was cleared to return to work without restriction, effective January 12,

6

2017.  (*Id*. at ℙ 51.)  In preparation for Plaintiff's return, Ms. Allen inquired about the means by which the Business Analytics team could accommodate Plaintiff's ongoing need for treatment.  (*Id*. at ℙ 52.)  Ms. Allen noted that Plaintiff requested to work from home when she had radiation treatments and said in the email, "I am a bit nervous about that only in the sense she has a lot of training ahead . . . ."  (*Id*. at ℙ 53.)

20.     Between her start date on September 19, 2016, and January 12, 2017, Plaintiff worked only seven days.  (*Id*. at ℙ 55.)  She missed 69 out of a possible 76 workdays with the Business Analytics team.  (*Id*.)

21.     On February 2, 2017, Plaintiff and Defendant, through Plaintiff's new supervisor Ms. Tammy Lindsay, entered into a flexible work agreement ("First Flex Agreement").  (*Id*. at ℙ 57.)  The First Flex Agreement listed a "Review of Agreement Date" of May 1, 2017, when Plaintiff and Defendant would review the agreement to determine its efficacy.  (*Id*. at ℙ 59.)  The First Flex Agreement authorized Plaintiff to work her six daily hours between the hours of 7:00 AM and 6:00 PM and provided the opportunity to work remotely from her home.  (*Id*. at ℙ 60.)  The agreement also appended certain conditions that Plaintiff had to fulfill in order to work remotely.  (*Id*. at ℙ 61.)

22.     Pursuant to the First Flex Agreement, Plaintiff was required to keep supervisors informed of her schedule and was required to get pre-approval to work from home.  (*Id*. at ℙ 62.)

23.     On or about February 20, 2017, Plaintiff and Ms. Lindsay had disputes

concerning Plaintiff's requests to work from home.  (*Id.* at ‖ 63-64.)  Ms. Lindsay
was concerned about Plaintiff's lack of work in the office, her inability to notify
Ms. Lindsay when she made adjustments to her workday, and her failure to
receive pre-approval to work remotely.  (*Id.* at ‖‖ 65-66.)  Specifically, Plaintiff
neglected to notate Ms. Lindsay's calendar as to when she was taking advantage
of the Flex Agreement.  (*Id.*)

24.     On February 20, 2017, Plaintiff consulted MLA Representative Ms. Jillian Tubbs
about her disputes with Ms. Lindsay.  (*Id.* at ‖ 67.)  Plaintiff did not request a
formal accommodation at this meeting.  (*Id.* at ‖ 68.)

25.     On or about February 20, 2017, Ms. Lindsay contacted HR because she was
running out of projects Plaintiff could complete at home without receiving
additional training. (*Id.* at ‖ 69.)

26.     On April 5, 2017, Plaintiff resumed working full time.  (*Id.* at ‖ 70.)

27.     On May 1, 2017, Plaintiff signed a second flexible work agreement ("Second Flex
Agreement"), effective May 1, 2017, where she would be able to work from home
"as needed."  (*Id.* at ‖‖ 75-76.)  Ms. Lindsay and Plaintiff understood the Second
Flex agreement permitted Plaintiff to work remotely to attend her medical
appointments, treatments, and recovery periods.  (*Id.* at ‖ 76.)

28.     The Second Flex Agreement permitted Plaintiff to work remotely, but she was
required to keep her supervisors informed of her schedule and receive pre-
approval to work from home. (*Id.* at ‖ 78.)

29.     On May 9, 2017, Ms. Lindsay raised concerns about how much time Plaintiff was

out of the office, particularly the time unrelated to medical treatment.  (*Id.* at ¶ 72.)  Ms. Lindsay and Ms. Allen were also concerned that Plaintiff was not completing her training, due to the amount of work she missed, thereby limiting the amount of work she could perform.  (*Id.* at ¶ 74.)

30.   On June 5, 2017, Plaintiff contacted JCB payroll with concerns about her timecard.  (*Id.* at ¶ 79.)  On June 6, 2017, Defendant adjusted Plaintiff's employment records, which was made retroactive to April 5, 2017.  (*Id.* at ¶ 80.)  Plaintiff subsequently admitted Defendant fixed the issue.  (*Id.* at ¶ 81.)

31.   In June and July 2017, Plaintiff repeatedly complained that Ms. Lindsay was unfairly micromanaging her, particularly with regard to her timecard and work-from-home schedule.  (*Id.* at ¶ 82.)  As a non-exempt employee, Plaintiff had to keep records of her time worked and time off on an electronic timecard.  (*Id.* at ¶ 84.)

32.   Ms. Lindsay sometimes changed and corrected Plaintiff's timecard.  (*Id.* at ¶ 83.)  At Defendant's university, it is standard procedure for a supervisor to review and sign off on timecards.  (*Id.* at ¶ 85.)

33.   On June 15, 2017, Ms. Lindsay met with Plaintiff to review her job performance.  (*Id.* at ¶ 87.)  During the meeting, Ms. Lindsay informed Plaintiff that she had not demonstrated to the Business Analytics team that she was responsible and independent enough to be promoted or classified as exempt; Ms. Lindsay also expressed concerns regarding Plaintiff's non-medical absences and her inability to be trained and catch up with the rest of the Business Analytics team.  (*Id.*)

34.     On July 5, 2017, Plaintiff informed Ms. Lindsay that she was "not feeling well enough to drive in today" so she planned to close her timecard entry for the day by documenting that she would work from home for a couple of hours and take vacation the rest of the day.  (*Id*. at ¶ 90.)  Ms. Lindsay denied Plaintiff's request to work from home because she had not requested or received the required preapproval.  (*Id*. at ¶ 91.)

35.     In response, Plaintiff contacted Ms. Tubbs seeking to file a formal request for accommodation from her work schedule.  (*Id*. at ¶ 92.)  On July 6, 2017, Plaintiff filed a formal request for disability accommodation.  (*Id*. at ¶ 94.)

36.     In response to Plaintiff's request for a formal disability accommodation, Defendant, through its HR and MLA offices, began working with her to meet her specific needs.  (*Id*. at ¶ 100.)  On August 2, 2017, Defendant notified Plaintiff by letter that the university had approved her request for accommodation and the terms outlined in her letter.  (*Id*. at ¶ 102.)  Defendant granted Plaintiff every accommodation she requested.  (*Id*. at ¶ 103.)

37.     On August 14, 2017, HR held a meeting with Plaintiff, as well as Ms. Lindsay and Ms. Allen to discuss the implementation of Plaintiff's disability accommodation.  (*Id*. at ¶ 104.)  Plaintiff explained that sometimes, if she had trouble sleeping because of her medication, she wanted to work very early in the morning.  (*Id*. at ¶ 105.)  Ms. Lindsay and Ms. Allen expressed concern about Plaintiff being unavailable during regular business hours, to correspond with other employees on the team as well as faculty seeking the services of the Business

Analytics team, whether in terms of answering their questions or receiving training herself.  (*Id*. at ¶ 107.)

38.   On August 16, 2017, Ms. Weaver sent an email to Ms. Doxey, Allen, and Lindsay summarizing the discussions from the earlier meeting and Ms. Weaver's discussion with Ms. Tubbs.  (*Id*. at ¶ 109.)

39.   Plaintiff had requested (and was granted) for the next six weeks an 8:00 AM to 4:30 PM schedule for Monday through Thursday, and a 7:30 AM to 3:00 PM schedule on Friday; she was allowed to start work at 6:00 AM, as long as she informed Ms. Lindsay of her earlier start time and schedule for that day; to the extent Plaintiff needed to utilize any of her further accommodations (e.g., reduced work hours, flexible start time, and working from home), she would communicate this need to Ms. Lindsay and provide Ms. Lindsay an understanding of the status of any outstanding assignments, as well as the impact of the accommodation; finally, any accommodations that were foreseeable (e.g., doctor's appointments and likely recovery days) would be communicated to Ms. Lindsay as soon as Plaintiff was aware of them.  (*Id*. at ¶ 110.)

40.   On August 28, 2017, Plaintiff signed a third Flexible Work Arrangement Agreement ("Third Flex Agreement").  (*Id*. at ¶ 111.)  The Third Flex Agreement listed a "Review Date" of October 30, 2017, and provided that Plaintiff would work remotely "as needed."  (*Id*. at ¶ 112.)  Although Plaintiff was allowed to work remotely, she was required to keep her supervisors informed of her schedule and required to get pre-approval to work from home.  (*Id*. at ¶ 115.)  Additionally,

the Third Flex Agreement included the following requirement, which was agreed to by Plaintiff: "When working from home I will communicate my remote needs as far in advance as possible . . . I will add to my supervisor's calendar what I will be working on remotely from home on a daily basis and I will communicate on a daily basis the status of that work." (*Id.* at ¶ 114.)

41.  In the Fall of 2017, Ms. Lindsay stopped serving as a manager for the Business Analytics team, and as a result, Ms. Allen began supervising Plaintiff again.  (*Id.* at ¶ 116.)  Ms. Lindsay's role was to review and proofread the surveys and rankings work for accuracy "as another set of eyes," because the work needed to be validated and would be subject to scrutiny outside of Defendant's university. (*Id.* at ¶ 127.)

42.  On September 5, 2017, Ms. Tubbs emailed Plaintiff asking how the accommodations were working.  (*Id.* at ¶ 118.)  Plaintiff informed Ms. Tubbs that the accommodations were working fine.  (*Id.*)

43.  On September 12, 2017, Plaintiff informed HR that she had complained to the EEOC after the meeting of August 14, 2017, specifically alleging that her needs had not been met.  (*Id.* at ¶ 119.)  However, in the same email, Plaintiff acknowledged she was no longer getting "harassment when I request time off." (*Id.*)

44.  On September 15, 2017, Plaintiff met with Ms. Doxey and renewed her complaints that she was misclassified and should be an exempt employee.  (*Id.* at ¶ 122.)  HR later consulted with Associate Dean Syer, who declined to change

Plaintiff's employment status due to the uncertainty about the job and the future of the department, along with concerns about Plaintiff's job performance.  (*Id*. at ¶ 124.)

45.     In early October 2017, Ms. Allen accepted a new position in a different college, and Associate Dean Syer took over supervising both Ms. Lindsay and Plaintiff, the only two employees left in the Business Analytics unit.  (*Id*. at ¶ 125.)

46.     Shortly after Ms. Allen accepted her new position, JCB decided to eliminate the Business Analytics unit.  (*Id*. at ¶ 130.)  By this time, another department within JCB had already taken over management of some of the databases on which the Business Analytics group had been working.  (*Id*. at ¶ 131.)

47.     After Ms. Allen left, Associate Dean Syer began to reassess workflow and personnel.  (*Id*. at ¶ 133.)  She believed there was both a need for an experienced "higher level" employee like Ms. Allen, and simultaneously not enough work for Plaintiff and Ms. Lindsay at their skill level.  (*Id*.)  Associate Dean Syer felt as if there was only enough work for one employee: half the work that was Plaintiff's (ranking and surveys) and half that was Ms. Lindsay's (key performance indicators).  (*Id*. at ¶ 134.)

48.     The proposed position of Information and Research Analyst would be at the F level pay band, which was in between Plaintiff's E band position, and Ms. Lindsay's G band position.  (*Id*. at ¶ 136.)  The proposed position was also an amalgamation of Plaintiff and Ms. Lindsay's prior duties, along with additional new job functions.  (*Id*. at ¶ 137.)

49.    Pursuant to Defendant's policy, the team had to draft a rationale for the proposed

layoff, outlining the changes and where the work was going.  (*Id*. at ¶ 138.)  The

proposal was then reviewed by numerous departments (including Workforce

Diversity Inclusion, Policy and Labor Relations, and even Counsel's Office) to

verify compliance with Defendant's obligations under internal policy and law.

(*Id*. at ¶ 139.)

50.    On December 1, 2017, both Plaintiff and Ms. Lindsay were informed that they

were going to be laid off, effective January 2, 2018.  (*Id*. at ¶ 140.)  Both Plaintiff

and Ms. Lindsay were told about the new Information and Research Analyst

position and encouraged to apply.  (*Id*. at ¶ 141.)

51.    Amanda Shaw, Associate Dean of Student Services, launched a search for the

Information and Research Analyst position.  (*Id*. at ¶ 142.)  Both Plaintiff and Ms.

Lindsay applied for the position and were granted interviews.  (*Id*. at ¶ 143.)

Neither Plaintiff nor Ms. Lindsay were hired for the position.  (*Id*. at ¶ 144.)

52.    Associate Dean Shaw instead hired another candidate; one who had a Bachelor of

Science in Hotel Management, as well as an MBA and relevant work experience

at IBM.  (*Id*. at ¶ 145.)  Meanwhile, Plaintiff had a Bachelor of Science in

Biological Sciences.  (*Id*.)  The search committee was concerned that Plaintiff did

not have the higher-level skills necessary to analyze data, which was essential to

the role, and felt that the successful candidate had more experience and a better

set of skills for the position. (*Id*.)

53.    Plaintiff interviewed for another position at Defendant's university, a Project

manager.  (*Id*. at ¶ 147.)  The Project Manager position was on a band G level pay scale. (*Id*.)

54.      Beth Fox, Assistant Dean of Academic Affairs, was in charge of the search and formed a search committee.  (*Id*. at ¶ 148.)  The search committee ultimately chose another candidate, one who had the most relevant experience and strong skills to gather and to analyze data.  (*Id*. at ¶ 149.)  The successful candidate not only had a Bachelor of Arts in Linguistics and a master's degree in Public Administration, but relevant work experience at another university.  (*Id*. at ¶ 150.) On the other hand, the search committee saw no evidence that Plaintiff possessed the necessary higher-level analytical skills, and was concerned about her communications skills, as well as her ability to work well with faculty, all of which were essential skills for the position.  (*Id*.)

55.      Assistant Dean Fox explained to Plaintiff that the successful candidate had the most experience leading and managing complex college or program-wide projects with faculty, which was a "significant component" of the position.  (*Id*. at ¶ 151.)

56.      Plaintiff had not yet formally filed her EEOC charge at the time she was interviewing for the Information and Research Analyst position or the Project Manager position.  (*Id*. at ¶¶ 146, 152.)

57.      A couple of months after the layoff, Ms. Lindsay was hired for a short-term, six-month project assisting Defendant with reaccreditation of certain schools.  (*Id*. at ¶ 153.)  Ms. Lindsay had been through the accreditation process before, so the Hotel School asked her to help.  (*Id*. at ¶ 154.)  Ms. Lindsay did not work for

Defendant after this six-month project concluded.  (*Id.* at ▮ 155.)

58.    On February 22, 2018, Plaintiff wrote Ms. Tubbs an email explaining that,

because Defendant did not hire her back, she was proceeding with her EEOC

claim.  (*Id.* at ▮ 156.)  Plaintiff also wrote, "I just want you to know that your

department, and you personally, did an excellent job of supporting me in my time

of need."  (*Id.*)

59.    On March 19, 2018, before the filing of this action, Plaintiff filed a charge of

discrimination with the Equal Employment Opportunity Commission ("EEOC"),

alleging disability discrimination against Defendant in connection with her

diagnosis and treatment for breast cancer.  (*Id.* at ▮ 157.)  Specifically, Plaintiff

alleged the discrimination occurred from February 1, 2017, through March 13,

2018.  (*Id.* at ▮ 4.)

60.    The EEOC investigated Plaintiff's allegations and issued a Dismissal and Notice

of Rights on or about August 13, 2018.  (*Id.* at ▮ .)  The EEOC closed its

investigation and dismissed the charges against Defendant, noting, "Based upon

its investigation, the EEOC is unable to conclude that the information obtained

establishes violations of the statutes."  (*Id.*)  The Dismissal and Notice of Rights

also states, "This does not certify that the respondent is in compliance with the

statutes."  (*Id.*)

Familiarity with the remaining undisputed material facts of this action, as well as the

disputed material facts is assumed in this Decision and Order, which (again) is intended

primarily for review by the parties.  (*Id.*)

### C.      Parties' Briefing on Defendant's Motion for Summary Judgment

Generally, in support of its motion to dismiss, Defendant asserts the following five arguments: (1) Plaintiff has not established and cannot establish a *prima facie* case for disparate treatment because (a) she has failed to identify any similarly situated employee of Defendant, and even if she did identify a similarly situated employee the record is devoid of any evidence that Plaintiff was treated differently, (b) none of the wrongs alleged by Plaintiff constitute adverse employment actions, (c) Defendant had legitimate, nondiscriminatory reasons for its actions, and (d) Plaintiff has not proffered any evidence of pretext undermining the justification that organizational restructuring is a legitimate nondiscriminatory reason commonly accepted by courts within this circuit, and the hiring decisions were made completely independent of Plaintiff's allegedly protected status (made by employees who were not aware of any protected activity in which she had engaged); (2) Plaintiff has not established and cannot establish a hostile work environment because there is a complete lack of evidence in the record of any conduct that could objectively be considered "hostile" under Second Circuit precedent; (3) Plaintiff has not established and cannot establish a *prima facie* case for failure to accommodate based on the evidence in the record, which establishes that (a) Defendant accommodated Plaintiff in multiple ways under multiple existing policies, (b) Plaintiff admitted, in her email to Ms. Tubbs, that she and her department "did an excellent job of supporting me in my time of need," and (c) Plaintiff's supervisors' requests for advance notice and accurate tracking of time were entirely reasonable; (4) Plaintiff has not established and cannot establish a *prima facie* case for retaliation on the grounds that (a) the wrongs alleged by Plaintiff are not adverse employment actions, (b) Plaintiff cannot demonstrate a causal connection between her protected activity and alleged

retaliation because she cannot demonstrate disparate treatment from similarly situated

employees, and (c) even if Plaintiff could establish a *prima facie* claim for retaliation, Defendant

has established numerous non-retaliatory reasons for each of the alleged actions and there are no

facts in the record to support a causal connection between Defendant's alleged discrimination or

retaliation and any protected activity; and (5) Plaintiff has not and cannot establish damages

other than minimal lost wages.  (*See generally* Dkt. No. 24, Attach. 53 [Def.'s Memo. of Law].)

      Generally, in opposition to Defendant's motion, Plaintiff asserts the following six

arguments: (1) material issues of fact preclude dismissal of Plaintiff's disability discrimination

claims on the grounds that (a) she is entitled to an inference of discrimination because the record

contains sufficient evidence from which a reasonable juror could conclude that she was subject

to adverse action and treatment on the basis of her disability, and (b) the record evidence raises a

question of fact about Plaintiff's subjection to an adverse employment action; (2) a reasonable

juror could conclude that Defendant's proffered justifications are mere pretext and Plaintiff's

disability was the but-for cause of the adverse actions against her; (3) material issues of fact

preclude dismissal of Plaintiff's hostile work environment claims on the grounds that she was

subjected to a continuous and ongoing barrage was objectively severe or pervasive; (4) material

issues of fact preclude dismissal of Plaintiff's failure-to-accommodate claims because, despite

agreeing to work accommodations and entering into various flex work agreements, Defendant

failed to actually allow her to take advantage of such accommodations; (5) material issues of fact

preclude dismissal of Plaintiff's retaliation claims on the grounds that, like the discrimination

context, she was subject to negative performance appraisals and negative comments directly

related to her need for disability accommodations, as well as denied her right to use the disability

accommodations outlined in her various flexible work agreements and formal disability

accommodation; and (6) Defendant improperly seeks summary judgment on Plaintiff's claim for

damages because damages are determined by a jury at trial.  (*See generally* Dkt. No. 30 [Plf.'s

Opp'n Memo. of Law].)

Generally, in reply to Plaintiff's opposition, Defendant asserts the following ten

arguments: (1) Plaintiff's declaration should be stricken or disregarded on the ground that it does

not comply with the requirements of Fed. R. Civ. P. 56(e) because (a) she cannot attest to facts

outside her personal knowledge, contradict her own prior testimony, or recount unsubstantiated

hearsay conversations, and (b) even if Plaintiff's statements in her declaration were admissible,

they are not supported by record evidence; (2) Defendant's statement of material facts should be

deemed admitted in its entirety due to that fact that (a) Plaintiff's response to Defendant's

statement of material facts is in direct breach of the requirements of the local rules, and (b)

striped of its conclusory assertions, Plaintiff's response reveals the key material facts are

undisputed; (3) Plaintiff's opposition arguments are entirely unsupported by the record because

she fails to cite any record evidence or statements of fact in her opposition memorandum of law

and she repeatedly attempts to create genuine issues of facts where there are none; (4) Plaintiff

has not and cannot establish a disparate impact on the grounds that she refers to only

unauthenticated hearsay in her deposition testimony, and without relevant discovery, she cannot

establish that any of her colleagues qualify as a similarly situated employee under the law; (5)

Plaintiff misapplies the legal standard for adverse employment actions by arguing that the

alleged "wrongs," together, resulted in a negative impact of her compensation and benefits, when

such minimal losses are in no way material under the law; (6) Plaintiff fails to establish that

Defendant's nondiscriminatory reasons are pretext because she provides no explanation as to how Defendant's numerous justifications have any connection to her disability; (7) Plaintiff's version of events, even if accepted as true, would not amount to an objectively hostile work environment; (8) Plaintiff's unsubstantiated assertions that Defendant failed to honor the flex agreements has not established a failure to implement reasonable accommodations; (9) Plaintiff's retaliation arguments are meritless due to the fact that there is no record evidence to support her claims; and (10) Plaintiff has produced no evidence to support nearly any of her alleged damages.  (*See generally* Dkt. No. 33 [Def.'s Reply Memo. of Law].)

## II.    RELEVANT LEGAL STANDARDS

### A.    Legal Standard Governing Motions for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[1]  As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255.

---

[1]    As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted].  As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).  However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(a), (c), (e).[2]

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.  Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).  Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant.  *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3).  What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1 (previously Local Rule 7.1[a][3]) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has

---

[2]      Among other things, Local Rule 56.1 (previously Local Rule 7.1[a][3]) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching number paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.  N.D.N.Y. L. R. 56.1.

willfully failed to properly respond to that statement.[3]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3).[4]  Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden.  *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

**B.    Legal Standards Governing Plaintiff's Claims**

**1.    Claims Pursuant to 42 U.S.C. § 12101 (Americans with Disabilities Act)**

**a.    Discrimination Claim**

The ADA prohibits covered entities from discriminating against qualified individuals on

---

[3]    *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases).

[4]    *See*, *e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]); *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

the basis of a disability.  42 U.S.C. § 12112(a) (2008).  In the context of discriminatory

termination, a plaintiff must establish, by a preponderance of the evidence, a *prima facie* case

showing "(1) membership in a protected class; (2) qualification for the position; (3) an adverse

employment action; and (4) circumstances surrounding that action giving rise to an inference of

discrimination."  *Welsh v. Rome Mem'l Hosp., Inc.*, 14-CV-1423, 2016 WL 6603216 at *3

(N.D.N.Y. Nov. 8, 2016) (Hurd, J.) (quoting *Collins v. New York City Transit Auth.*, 305 F.3d

113, 118 [2d Cir. 2002]).  "In what has become known as the *McDonnell-Douglas* burden-

shifting framework, the burden then shifts to the employer to articulate a legitimate, non-

discriminatory reason for the adverse employment decision."  *Prindle v. City of Norwich*, 15-

CV-1481, 2018 WL 1582429, at *8 (N.D.N.Y. Mar. 27, 2018) (Suddaby, C.J.); *Fox v. Costco

Wholesale Corp.*, 918 F.3d 65, 71 (2d Cir. 2019).  After the employer has done so, the burden

then shifts back to the plaintiff to demonstrate that the defendant's reason for its adverse decision

is in fact a pretext for discrimination.  *Prindle*, 2018 WL 1582429, at *3 (citing *Welsh*, 2016 WL

6603216, at *3).  "In the summary judgment context, this means plaintiff must 'establish a

genuine issue of material fact either through direct, statistical, or circumstantial evidence as to

whether the employer's reason for discharging [him] is false and as to whether it is more likely

that a discriminatory reason motivated the employer to make the adverse employment decision.'"

*Welsh*, 2016 WL 6603216, at *3 (citing *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22

F.3d 1219, 1225 [2d Cir. 1994]).

      The ADA defines "disability" as "a physical or mental impairment that substantially

limits one or more major life activities."  42 U.S.C. § 12102(1)(A) (2008).  "Major life activities

are generally those activities that are of central importance to daily life."  *Cody v. Cty. of Nassau*,

577 F. Supp. 2d 623, 638 (E.D.N.Y. 2008).  Major life activities under the ADA include, but are not limited to, caring for oneself, eating, sleeping, concentrating, thinking, working, and neurological functions.  42 U.S.C. § 12102(2)(A)-(B).  "To constitute a disability, an impairment must not merely affect a major life activity, it must substantially limit that activity."  *Cody*, 577 F. Supp. 2d at 639.  "Thus[,] a plaintiff who showed that . . . he had an impairment and that the impairment affected a major life activity would nonetheless be ineligible to prevail under the ADA if the limitation of the major life activity was not substantial."  *Id.* (internal quotation marks omitted).  As defined by the EEOC regulations, an impairment, whether physical or mental, "substantially limits" a major life activity where an individual is the following:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or
>
> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

*Id.* (citing 29 C.F.R. § 1630.2(j)[1]).  The definition of disability under the ADA "shall be construed in favor of broad coverage of individuals under [the Act], to the maximum extent permitted by the terms of [the Act]."  42 U.S.C. § 12102(4)(A).

For an individual to be "qualified" for a position, he or she must be able to "perform the essential functions of the employment position that such individual holds or desires," with or without reasonable accommodation.  42 U.S.C. § 12111(8).  "[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this

description shall be considered evidence of the essential functions of the job."  42 U.S.C. § 12111(8).

###   b.   Hostile Work Environment Claim

The Second Circuit recently determined that hostile work environment claims are actionable under the ADA.  *Fox*, 918 F.3d at 74.  Accordingly, a plaintiff can prevail on a hostile work environment claim "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks omitted).

The workplace must be evaluated "on the totality of the circumstances," and the Court can consider factors including the following: "the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it is unreasonably interfere[d] with [the plaintiff's] work performance."  *Fox*, 918 F.3d at 74 (quoting *Harris*, 510 U.S. at 23).  Hostile work environment claims, however, "are meant to protect individuals from abuse and trauma that is severe" and "are not intended to promote or enforce civility, gentility, or even decency."  *Curtis v. DiMaio*, 46 F. Supp.2d 206, 213-14 (E.D.N.Y. 1999), *aff'd*, 205 F.3d 1322 (2d Cir. 2000).

###   c.   Reasonable Accommodation Claim

The ADA imposes liability on employers for, *inter alia*, failing to make "reasonable accommodations to the known physical or mental limitation of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of

such covered entity." 42 U.S.C. § 12112(b)(5)(A). A plaintiff makes out a *prima facie* case of disability discrimination arising from a failure to accommodate by showing the following: "'(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.'" *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009) (quoting *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 184 [2d Cir. 2006]). The burden of both production and persuasion as to the existence of some accommodation that would allow him to perform the essential functions of his employment lies with the plaintiff. *McBride*, 583 F.3d at 97. Although "essential functions" is not explicitly defined by the ADA, regulations promulgated by the EEOC indicate that it encompasses "the fundamental job duties of the employment position." 29 C.F.R. § 1630.2(n)(1).

Under the express terms of the ADA, the term "reasonable accommodation" includes "job restructuring" and "part-time or modified work schedules." 42 U.S.C. § 12111(9). "The ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated." *McBride*, 583 F.3d at 99 (quoting *Jackan v. N.Y. State Dep't of Labor*, 205 F.3d 562, 566 [2d Cir. 2000]); *see also* 29 C.F.R. § 1630.2(o)(3). Failure to engage in this interactive process does not automatically produce liability for employers if no reasonable accommodation is possible. *McBride*, 583 F.3d at 100. "[A]n employer's failure to engage in a sufficient interactive process does not form the basis of a claim under the ADA and evidence thereof does not allow a plaintiff to avoid summary

26

judgment unless [he] also establishes that, at least with the aid of some identified accommodation, [he] was qualified for the position at issue." *Id.* at 101.

### d.   Retaliation Claim

The ADA makes it unlawful for an employer to "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of . . . any right granted or protected by this chapter." 42 U.S.C. § 12203(b).  The ADA further renders it unlawful for an employer to "discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).

To defeat a motion for summary judgment with regard to a retaliation claim under the ADA, a plaintiff must establish a *prima facie* case showing the following: "'(1) he engaged in protected participation or opposition under the ADA; (2) that the employer was aware of this activity; (3) that the employer took adverse action against the plaintiff; and (4) that a causal connection exists between the protected activity and the adverse action.'" *Skinner v. City of Amsterdam*, 824 F. Supp. 2d 317, 329 (N.D.N.Y. 2010) (Suddaby, C.J.) (quoting *Valtchev v. City of New York*, 06-CV-7157, 2009 WL 2850689, at *6 [S.D.N.Y. Aug. 31, 2009]); *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 148 (2d Cir. 2002).  In a fashion similar to the *McDonnell-Douglas* framework, a defendant must then point to evidence of a legitimate, non-retaliatory reason for the decision.  *Prindle*, 2018 WL 1582429, at *9.  If satisfied, the burden then shifts back to the plaintiff to point to evidence that would be sufficient to permit a rational

fact finder to conclude that the employer's explanation is in fact a pretext for impermissible

retaliation.  *Skinner*, 824 F. Supp. 2d at 329.

      2.        **Claims Pursuant to N.Y. Exec. Law § 291 ("NYSHRL")**

          a.     **Discrimination Claim**

The NYSHRL prohibits employers from discrimination on the basis on "age, race, creed,

color, national origin, sexual orientation, military status, marital status, or disability . . . ."  N.Y.

Exec. Law § 291 (2019).  The NYSHRL defines a disability as "a physical, mental or medical

impairment resulting from anatomical, physiological, genetic or neurological conditions which

prevents the exercise of a normal bodily function or is demonstrable by medically accepted

clinical or laboratory diagnostic techniques."  N.Y. Exec. Law § 292(21).  The elements of a

discrimination claim under the NYSHRL are generally the same as those under the ADA, with

one key difference: the NYSHRL has a broader definition of disability than does the ADA and

does not require any showing that the disability substantially limits a major life activity.  *Ugactz*

*v. UPS, Inc.*, 10-CV-1247, 2013 WL 1232355, at *14 (E.D.N.Y. Mar. 26, 2013); *see also Welch*

*v. United Parcel Serv., Inc.*, 871 F. Supp. 2d 164, 198 (E.D.N.Y. 2012) (noting that the

NYSHRL is not a "carbon copy of the ADA" and that NYSHRL provisions are "'more liberally'

[construed] than their federal and state counterparts").

Employment discrimination claims brought under the NYSHRL are also analyzed under

the *McDonnell-Douglas* burden shifting framework set out by the U.S. Supreme Court.  *Sims v.*

*Tr. of Columbia Univ. in the City of N.Y.*, No. 156566/2013, 2017 WL 5006609, at *5 (N.Y. Sup.

Ct., Nov. 1, 2017).  *See also, supra*, Part II.B.1.a. of this Decision and Order (for a detailed

discussion of the requirements imposed by *McDonnell-Douglas*).

### b.      Hostile Work Environment Claim

Hostile work environment claims under the NYSHRL operate in the same fashion as those brought under federal law.  *See*, *supra*. Part II.B.1.c. of this Decision and Order (for a detailed discussion of Plaintiff's burden on a hostile work environment claim under the ADA).

### c.      Reasonable Accommodation Claim

As does the ADA, the NYSHRL makes it unlawful for an "employer . . . to refuse to provide reasonable accommodations to the known disabilities . . . of an employee, prospective employee, or member in connection with a job or occupation sought or held or participation in a training program."  N.Y. Exec. Law § 296(3)(a).  Reasonable accommodations are defined as "actions taken which permit an employee, prospective employee or member with a disability . . . to perform in a reasonable manner the activities involved in the job or occupation sought or held," provided that the requested accommodation does not "impose an undue hardship on the business, program or enterprise of the entity from which action is requested."  N.Y. Exec. Law § 292(21-e).

In another departure from federal ADA standards, an employer's failure to engage in a good-faith interactive process regarding the reasonableness of an employee's requested accommodation generally precludes the employer from obtaining summary judgment.  *Jacobsen v. New York City Health & Hosps. Corp.*, 22 N.Y.3d 824, 838 (2014).  However, "the plaintiff still bears the burden of proving the existence of a reasonable accommodation that would have enabled the employee to perform the essential functions of his or her position."  *Jacobsen*, 22 N.Y.3d at 838.

### d.      Retaliation Claim

The NYSHRL makes it unlawful for an employer to retaliate against any employee that engaged in a protected activity.  *See generally* N.Y. Exec. Law § 296(7).  On a motion for summary judgment, retaliation claims under the NYSHRL are analyzed under the same standard as retaliation claims under the ADA.  *See Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010) (applying *McDonnell- Douglas* analysis to employment discrimination claims under NYSHRL). For the purpose of brevity, the Court will not recite that standard in its entirety in this Decision and Order but will respectfully direct the reader's attention to Part II.B.1.b. of this Decision and Order.

III.   **ANALYSIS**

   A.   **Whether the Court Can Consider Plaintiff's Declaration in Opposition to Defendant's Motion for Summary Judgment**

As a threshold matter, the Court must determine whether to rely on Plaintiff's declaration.  (Dkt. No. 30, Attach. 27.)  After carefully considering the matter, the Court answers this question in the negative in part for the reasons stated below.

When deciding motions for summary judgment, courts can consider supporting and opposing declarations or affidavits that set forth evidence that would be admissible at trial.  Fed. R. Civ. P. 56(e).  "Where a declaration is used to support or oppose the motion, it 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated."  *Ostreicher v. Chase Bank USA, N.A.*, 19-CV-8175, 2020 WL 6809059, at *2 (S.D.N.Y. Nov. 19, 2020) (quoting Fed. R. Civ. P. 56[c][4]). "If a party fails to properly support an assertion of fact . . . the court may: (1) give an opportunity to properly support . . . the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials . . . show that the movant is

entitled to it; or (4) issue any other appropriate order."  Fed. R. Civ. P. 56(e).

"To the extent that an affidavit or declaration contains material that does not comply with Rule 56(e), the Court may strike those portions, or may simply disregard them."  *Rus, Inc. v. Bay Indus., Inc.*, 322 F. Supp. 302, 307 (S.D.N.Y. 2003) (citing *Larouche v. Webster,* 175 F.R.D. 452, 455 [S.D.N.Y.1996]); *Epstein v. Kemper Ins. Cos.,* 210 F.Supp.2d 308, 313-14 (S.D.N.Y.2002).  Moreover, if a party fails to properly support a statement by an adequate citation to the record, the Court may properly disregard that assertion.  N.D.N.Y. L.R. 56.1; *New World Sols., Inc. v. NameMedia Inc.*, 150 F. Supp. 3d 287, 304-05 (S.D.N.Y. 2015) (citing *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73-74 [2d Cir. 2001]) (noting that "district courts in the Southern and Eastern Districts of New York have interpreted current Local Rule 56.1 to provide that where there are no citations or where the cited materials do not support the factual assertions in the [s]tatements, the [c]ourt is free to disregard the assertion") (alteration and internal quotation marks omitted).

In this case, Plaintiff predominately relies on her declaration when opposing Defendant's Statement of Material Facts.  (Dkt. No. 29.)  However, not only does Plaintiff's declaration fail to properly support numerous statements with adequate record citations, it attempts to assert inadmissible evidence.  (*See generally* Dkt. No. 30, Attach. 27.)  In particular, Plaintiff's declaration contains hearsay, conclusory assertions not based on personal knowledge, and statements contradicted by Plaintiff's own previous deposition testimony.  (Dkt. No. 33, at 6.)

For example, Plaintiff's declaration contains numerous statements made by herself, Ms. Lindsay and other individuals, as well as references to emails throughout Plaintiff's employment. (Dkt. No. 30, Attach. 27, at ¶¶ 4-5, 43, 49, 62, 66.)  Although some of the statements within

Plaintiff's declaration could qualify under the party-opponent admission hearsay exemption (Fed. R. Evid. 801[d][2]), several of the statements constitute inadmissible hearsay.  (*See generally id.*)  Additionally, Plaintiff conclusorily asserts information that is not based on personal knowledge; specifically, she claims she was "unnecessarily" criticized, or her supervisors had "misplaced" concerns over her inability to be onsite for person to person interactions with the staff and faculty, among other conclusory assertions.  (*See generally id.* at ¶¶ 29, 55.)

In in interest of expediency, instead of tediously striking all the portions of Plaintiff's declaration that do not comport with Fed. R. Civ. P. 56(e), the Court has simply disregarded those portions.  *Rus, Inc.*, 322 F. Supp. 2d at 307; *Epstein,* 210 F.Supp.2d at 314 (disregarding portions of affidavits, rather than striking them).

### B.   Whether Plaintiff Has Established a Genuine Dispute of Material Fact to Preclude Summary Judgment on Her Disparate Treatment Claims

After carefully considering the matter, the Court answers this question in the negative for the reasons stated in Defendant's memoranda of law.  (Dkt. No 24, Attach 53; Dkt. No. 33.)  To those reasons, the Court adds the following analysis, which is intended to supplement, and not supplant, Defendant's reasons.

### 1.   Plaintiff's *Prima Facie* Case

To establish a *prima facie* case of discrimination based on disparate treatment, a plaintiff "must 'show by a preponderance of the evidence that: (1) [her] employer is subject to the ADA; (2) [she] was disabled within the meaning of the ADA; (3) [she] was otherwise qualified to perform the essential functions of [her] job, with or without reasonable accommodation; and (4) [she] suffered adverse employment action because of [her] disability.'"  *Fox*, 918 F.3d at 71

(quoting *McMillan v. City of New York*, 711 F.3d 120, 125 [2d Cir. 2013]).  Although Plaintiff's

burden is "minimal and de minimis" *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir.

2005), it nevertheless requires evidence that allows for a reasonable inference of discrimination.

*Ruiz v. Cty. Of Rockland*, 609 F.3d 486, 493 (2d Cir. 2010).  "Under the ADA and the NYSHRL,

'a plaintiff alleging a claim of employment discrimination [must] prove that discrimination was

the but-for cause of any adverse employment action.'"  *Wu v. Metro. Transp. Auth.*, 18-CV-

6543, 2020 WL 615626, at *10 (S.D.N.Y. Feb. 7, 2020) (quoting *Natofsky v. City of New York*,

921 F.3d 337, 348 [2d Cir. 2019]).  Accordingly, "'but-for' causation does not require proof that

[discrimination] was the only cause of the employer's action, but only that the adverse action

would not have occurred in the absence of the [discriminatory] motive." *Kwan v. Andalex Grp.,*

*LLC*, 737 F.3d 834, 846 (2d Cir. 2013).  "An adverse employment action 'must be more

disruptive than a mere inconvenience or an alteration of job responsibilities and might be

indicated by a termination of employment . . . .'"  *Fox*, 918 F.3d at 71-72 (quoting *Patrolmen's*

*Benevolent Ass'n of City of N.Y. v. City of New York*, 310 F.3d 43, 51 [2d Cir 2002]).

　　　To raise an inference of disability discrimination at the *prima facie* stage, a plaintiff

"'must show that she was similarly situated in all material respects to the [non-disabled]

individuals with whom she seeks to compare herself.'"  *Mandell v. Cty. of Suffolk*, 316 F.3d 368,

379 (2d Cir. 2003) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 [2d Cir. 2000]).

"Courts 'must also carefully distinguish between evidence that allows for a reasonable inference

of discrimination and evidence that gives rise to mere speculation and conjecture.'"  *Murphy v.*

*N.Y. State Pub. Emps. Fed'n*, 17-CV-0628, 2019 WL 4257261, at *12 (N.D.N.Y. Sept. 9, 2019)

(McAvoy, J.) (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 425, 448 [2d Cir. 1999]).  "A court

should not engage in 'guesswork or theorization,' and should recognize that 'an inference is not a suspicion or a guess.  It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact [that is known to exist].'"  *Murphy*, 2019 WL 4257261, at *12 (quoting *Bickerstaff*, 196 F.3d at 448).  "Thus, the question is whether the evidence can reasonably and logically give rise to an inference of discrimination under all the circumstances."  *Bickerstaff*, 196 F.3d at 448.

In this case, the Court first analyzes whether Plaintiff is entitled to an inference of discrimination at the *prima facie* stage.  Although Plaintiff argues that the record contains sufficient evidence to support an inference of discrimination based on the actions of Defendant's agents, she noticeably fails to cite to the record in support of her argument.  (Dkt. No. 30, at 13.) Instead, Plaintiff relies on numerous factual assertions that are unsupported by the record and are contrary to the undisputed material facts.  *See*, *supra*, Part I.B. of this Decision and Order.

Moreover, even if Plaintiff had properly supported her factual assertions, the Court would find that the evidence demonstrates mere speculation or conjecture, and not a reasonable inference of discrimination.  Specifically, Plaintiff has failed to compare, let alone identify, a similarly situated employee.  (Dkt. No. 30, at 12-14.)  Plaintiff's argument that no one type of proof is required to show an inference of discrimination (Dkt. No. 30, at 12) ignores the factual allegations of her own Complaint, in which she alleged that she was subjected to "disparate treatment" because she was treated "less well than her similarly situated colleagues outside her protected class . . . ."  (Dkt. No. 6, at ¶¶ 149, 153, 180, 184.)  Although Plaintiff testified that she confirmed with her colleagues that their timecards were never overly scrutinized or changed in her deposition testimony (without any helpful citation to the transcript), this information

constitutes inadmissible hearsay.  (Dkt. No. 30, at 14.)  Accordingly, the Court finds that Plaintiff is not entitled to an inference of discrimination.

Having found that Plaintiff is not entitled to an inference of discrimination, the Court turns to the elements required to demonstrate a *prima facie* case of disparate treatment. Although the parties do not dispute that Defendant is subject to the ADA or that Plaintiff was disabled within the meaning of the ADA, Plaintiff has nevertheless failed to establish a *prima facie* case for her disparate treatment claims because she has failed to demonstrate that her disability was the but-for cause of her adverse employment action.  Even though Plaintiff argues (again without citation) that Defendant's alleged wrongs, when taken together, amount to adverse employment actions, her alleged adverse employment actions were her termination, and Defendant's decision to hire other applicants.  (Dkt. No. 24, Attach. 53 at 23.)  However, based on an independent review of the record, the Court finds that the evidence is not sufficient for a reasonable juror to draw a causal link between Plaintiff's disability and the adverse employment actions.  Accordingly, the Court finds that she has failed to meet the *de minimis* burden of alleging a *prima facie* case.

### 2.    Plaintiff's Allegations of Pretext

Even if the Court had determined that Plaintiff established a *prima facie* case of disparate treatment, the Court would nevertheless find that she has failed to demonstrate that Defendant's legitimate, nondiscriminatory reasons were pretext for her disability.  Although Plaintiff argues that Defendant cannot use the manifestations of her disability as a justification for taking adverse actions against her, her argument is misplaced.  In particular, the Court finds that Plaintiff's termination was the result of a restructuring within Defendant's university.  The Court further

finds that Plaintiff has failed to provide an explanation as to how the disbanding of the entire Business Analytics team had any connection to her disability.  Despite the fact that Plaintiff disputes whether other candidates had qualifications and experience that were superior to hers, she has failed to dispute Defendant's version of events with appropriate record citations.  (Dkt. No. 29, at ¶¶ 145, 149.)  Because Plaintiff fails to present evidence that her disability was the but-for cause for the adverse employment actions, she has failed to demonstrate that Defendant's proffered reasons for the adverse employment actions were pretextual.

Accordingly, the Court finds that Plaintiff has failed to meet her evidentiary burden for her disparate impact claims and grants Defendant's motion for summary judgment with respect to Plaintiff's first and fifth claims.

### C.    Whether Plaintiff Has Established a Genuine Dispute of Material Fact to Preclude Summary Judgment on Her Hostile Work Environment Claims

After carefully considering the matter, the Court answers this question in the negative for the reasons stated in Defendant's memoranda of law.  (Dkt. No. 24, Attach 53; Dkt. No. 33.)  To those reasons, the Court adds the following analysis, which is intended to supplement, and not supplant, Defendant's reasons.

Here, based on the totality of the circumstances, the Court finds that the remarks and actions Plaintiff complains of fall well short of the conditions necessary to establish an abusive work environment.  In support of her argument, Plaintiff claims that she was subjected to a "continuous and ongoing barrage" of discriminatory behavior throughout her tenure, and states that the record substantiates six examples of that behavior: (1) routine questioning regarding her need for disability accommodations, (2) criticism regarding her attempted use of her disability accommodations (provided through her various flex agreements), (3) the docking and changing

of her timecard for time off or working remotely as a result of her disability and cancer treatments, (4) accusations of poor performance and a lack of the necessary skill set of her job based on the manifestations of her disability, (5) discouragement from bringing a formal complaint or seeking formal accommodations, and (6) the open challenging of her need for accommodations by her supervisors in a meeting with HR and also privately during one of her discussions.  (Dkt. No. 30, at 21-22.)  Even though Plaintiff argues the record supports these assertions, she repeatedly fails to cite the voluminous record in support of the assertions.  (*Id.*) Plaintiff also overlooks the fact that the majority of the conduct she alleges took place well before July 6, 2017, the day she filed for a formal accommodation.  *See*, *supra*, Part I.B. of this Decision and Order.  Moreover, Plaintiff did not assert in her opposition to Defendant's statement of material facts, let alone cite anywhere in the record, that she was discouraged from bringing a formal complaint or seeking formal accommodations.  (*See generally* Dkt. No. 29; Dkt. No. 30, at 22.)  Accordingly, the Court finds that this claim is wholly unsupported by the record and without merit.

Furthermore, even if Plaintiff had properly supported her claims, the Court would find that the complained-of conduct is not sufficiently severe or pervasive to alter the conditions of Plaintiff's employment.  Courts within this circuit have found that claims of the denial of time off and a negative evaluation are insufficient to state a hostile work environment claim.  *See Davis-Molina v. Port Auth. of N.Y. and N.J.*, 08-CV-7584, 2011 WL 4000997, at *11 (S.D.N.Y. Aug. 19, 2011) (explaining that the two month period where the plaintiff was allegedly denied time off, told he would never be able to take a vacation, excluded from important meetings, had several job responsibilities stripped from him, and yelled in front of coworkers did not rise to a

hostile work environment because the claims were rooted in conduct amounting to nothing more

than workplace dynamics); *St. Louis v. New York City Health and Hosp. Corp.*, 682 F. Supp. 2d,

216, 234 (EEN.Y. 2010) ("Plaintiff's receipt of negative job evaluations and disciplinary

warnings resulting from the failure to meet a work requirement, without more, do not support a

claim of . . . hostile work environment..")  In this case, like *Davis-Molina*, Plaintiff's isolated

disputes reflect the traditional workplace dynamics between a supervisor and an employee who

had missed a significant amount of work.  Hostile work environment claims "are meant to

protect individuals from abuse and trauma that is severe" and "are not intended to promote or

enforce civility, gentility, or even decency."  *Curtis*, 46 F. Supp.2d at 213-14.  Even considering

the events in totality, including the open challenge to Plaintiff's accommodations, she has not

demonstrated sufficiently pervasive or severe conduct to create a hostile work environment.

Accordingly, given Plaintiff's inability to substantiate her allegations of severe or

pervasive conduct, the Court finds that Defendant is entitled to summary judgment on Plaintiff's

hostile work environment claims.

### D.   Whether Plaintiff Has Established a Genuine Dispute of Material Fact to Preclude Summary Judgment on Her Reasonable Accommodation Claims

After carefully considering the matter, the Court answers this question in the negative for

the reasons stated in Defendant's memoranda of law.  (Dkt. 24, Attach 53; Dkt. No. 33.)  To

those reasons, the Court adds the following analysis, which is intended to supplement, and not

supplant, Defendant's reasons.

"The ADA and the NYSHRL require an employer to afford reasonable accommodation

of an employee's known disability unless the accommodation would impose an undue hardship

on the employer."  *Noll v. Int'l Bus. Mach. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (citing 42

U.S.C. § 12112[b][5][A]; N.Y. Exec. L. 296[3][A]).  An accommodation is reasonable when it "enable[s] an individual with a disability who is qualified to perform the essential functions of that position . . . [or] to enjoy equal benefits and privileges of employment.  29 C.F.R. § 1630.2(o)(1)(ii), (iii).  Although the reasonableness of an employer's accommodation is a "fact-specific" question that is usually resolved by the fact finder, where "the employer has already taken (or offered) measures to accommodate the disability, the employer is entitled to summary judgment if, on the undisputed record, the existing accommodation is 'plainly reasonable.'" *Noll*, 787 F.3d at 94 (citing *Wernick v. Fed Reserve Bank of N.Y.*, 91 F.3d 379, 385 [2d Cir. 1996]).  "[E]mployers are not required to provide a perfect accommodation or the very accommodation most strongly preferred by the employee." *Id.* at 95 (citing 29 C.F.R. § 1630 app.)

In this case, the undisputed record demonstrates that Defendant offered multiple reasonable accommodations to Plaintiff, through various Flex Agreements and other methods, even prior to her formal accommodation request.  Admitting that reasonable accommodations were offered, Plaintiff nevertheless argues that Defendant, through its employees, failed to actually allow her to take advantage of the accommodations and in fact denied her right to use the flexible work agreements when needed.  (Dkt. No. 30, at 23-25.)  The Court respectfully disagrees. "'[I]t is the responsibility of the individual with a disability to inform the employer that an accommodation is needed.'"  *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 184 (2d Cir. 2006) (quoting 29 C.F.R. § 1630, app. at 363).  Here, the undisputed record evidence establishes that Plaintiff did not file for an official accommodation for seven months after returning to work and thirteen months after she was first diagnosed with cancer.  (*See supra* Part

I.B.; Dkt. No. 29, at ⁋ 94.)  The record further establishes that Defendant engaged in a good-faith interactive process when providing accommodations to Plaintiff, and that Defendant provided multiple reasonable accommodations to her through the three Flex Agreements, medical leave, and other methods.  (Dkt. No. 24, Attach. 53 at 31-32.)

Moreover, Plaintiff expressly admitted to MLA representative Tubbs that the accommodations provided by Defendant were "working fine."  (Dkt. No. 29, at ⁋ 118.)  A "[r]easonable accommodation may take many forms, but it must be effective."  *Noll*, 787 F.3d at 95 (citing *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 400 [2002]).  Although Plaintiff argues that the implementation of the Flex Agreements effectively denied her the ability to utilize the accommodations, this admission undermines her argument.  Additionally, the requests for advance notice and accurate timekeeping when Plaintiff would not be in the office (or working remotely) are entirely reasonable.  By providing advance notice to her supervisors, Plaintiff's supervisors would be able to prepare for her absence from the office, ensure that time-sensitive work would be able to be completed, among various other reasons.  The need for accurate timekeeping is self-explanatory, in particular for an employee such as Plaintiff, who was paid on an hourly basis.  The Court further notes that Defendant's requests did not limit Plaintiff's ability to take advantage of the Flex Agreements or enjoy the equal benefits and privileges of employment.

Because the undisputed record evidence demonstrates that Defendant afforded reasonable accommodations to Plaintiff, and that she was actually able to utilize the accommodations provided to her, the Court finds that Defendant must be granted summary judgment on Plaintiff's reasonable accommodation claims under the ADA and NYSHRL.

**E.     Whether Plaintiff Has Established a Genuine Dispute of Material Fact to Preclude Summary Judgment on Her Retaliation Claims**

After carefully considering the matter, the Court answers this question in the negative for the reasons stated in Defendant's memoranda of law.  (Dkt. No. 24, Attach. 53; Dkt. No. 33.)  To those reasons, the Court adds the following analysis, which is intended to supplement, and not supplant, Defendant's reasons.

In this case, drawing all reasonable inferences in Plaintiff's favor, the Court finds that Plaintiff has demonstrated a *prima facie* case for (at most) three of the four required elements for her retaliation claims under the ADA and the NYSHRL.  First, Plaintiff does not dispute Defendant's characterization of the potential protected activities that she engaged in.  A protected activity "refers to action taken to protest or oppose statutorily prohibited discrimination."  *Maioriello v N.Y. State Office for People with Dev.'l Disabilities*, 14-CV-0214, 2015 WL 5749879, at *13 (N.D.N.Y. Sept. 30, 2015) (Suddaby, C.J.) (quoting *Smiley v. Cassano*, 10-CV-3866, 2012 WL 967436, at *5 [S.D.N.Y. Mar. 21, 2012]).  Interpreting the record evidence in Plaintiff's favor, her protected activity includes formal complaints to the EEOC, as well as other actions taken to protect from or oppose the "statutorily prohibited discrimination."  *Maioriello*, 2015 WL 5749879, at *13.  This includes Plaintiff's internal complaints regarding the lack of accommodations provided by Defendant.  Based on the current record, and Plaintiff's failure to provide alternative protected activities, the Court finds that Plaintiff's protected activities include her informal inquiry to the EEOC in August 2017, and her complaints to HR and management before and during the processing of her formal accommodation request about how best to implement the accommodations (which ended by September 2017).  (Dkt. No. 24, Attach. 53, at 34.)   Additionally, the record clearly indicates

that Defendant was aware of Plaintiff's "protected activity" through its participation in the Flex

Agreement implementation.  With respect to Plaintiff's alleged adverse employment actions, the

Court finds that Plaintiff's layoff, and Defendant's subsequent decisions to not rehire her are the

only adverse employment actions at issue.[5]  Accordingly, the Court finds that Plaintiff has

established a *prima facie* case for the first three elements of a retaliation claim under the ADA

and NYSHRL.

However, Plaintiff fails to establish a causal connection between her protected activity

and alleged retaliation.  "A causal connection in retaliation claims can be shown either '(1)

indirectly, by showing that the protected activity was followed closely by discriminatory

treatment, or through other circumstantial evidence such as disparate treatment of fellow

employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory

animus directed against the plaintiff by the defendant.'"  *Littlejohn v. City of New York*, 795 F.3d

297, 319 [2d Cir. 2015) (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 [2d Cir.

2000]); *Natofsky*, 921 F.3d at 353.  Because Plaintiff cannot proffer any direct evidence of a

retaliatory animus and she has failed to establish a disparate treatment among fellow employees,

the Court focuses on the temporal proximity between the protected activity and the adverse

employment action.  Although the Second Circuit has not created a bright line rule to define the

---

[5]      Although Defendant states a third potential adverse employment action (Plaintiff's pay
scale being at the lower end of Band E), the Court agrees with Defendant that this action took
place well before Plaintiff engaged in any protected activity.  (Dkt. No. 24, Attach. 53, at 36.)
Although Plaintiff argues that Defendant's failure to promote to a higher pay band could qualify
as an adverse employment action, she nevertheless fails to cite to any case law in support of her
position that the repeated confirmations constituted a discriminatory act.  (Dkt. No. 30, at 27.)
For these reasons, the Court focuses its analysis on Plaintiff's layoff and Defendant's subsequent
decisions to not rehire her as her adverse employment actions.

outer limits of when courts can infer a causal connection from a temporal relationship, *Gormon-Bakos v. Cornell Co-op Extension of Schenectady Cty.*, 252 F.3d 545, 554-55 (2d Cir. 2002), courts within this circuit have generally found that "the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation.'" *Barton v. Warren Cty.*, 19-CV-1061, 2020 WL 4569465, at *14 (N.D.N.Y. Aug. 7, 2020) (Suddaby, C.J.) (quoting *Choi v. Ferrellgas, Inc.*, 17-CV-3518, 2020 WL 122976, at *8 [E.D.N.Y. Jan. 10, 2020]).  Even if Plaintiff's burden to establish a causal connection is a "light one," *Raniola v. Bratton*, 243 F.3d 610, 624 (2d Cir. 2001), the Court nevertheless finds that she has failed to demonstrate a causal connection between the protected activities and Plaintiff's termination (or Defendant's subsequent decisions to not rehire her) because the adverse employment actions took place approximately six months after she engaged in the protected activities.

Moreover, even if the Court were to find that Plaintiff established a *prima facie* case of retaliation, the Court would find that Defendant has proffered numerous legitimate, non-retaliatory reasons for each of her alleged adverse actions.  Instead of analyzing Defendant's reasons in a retaliation context, Plaintiff merely points the Court to her pretext analysis for her failure to accommodate claim.  (Dkt. No. 30, at 29.)  However, the Court has already found that Plaintiff has failed to demonstrate Defendant's reasons were pretextual.  *See*, *supra*, Part III.D. of this Decision and Order.

For all of these reasons, the Court finds that Defendant is entitled to summary judgment on Plaintiff's retaliation claims under the ADA and the NYSHRL.[6]

---

[6]      Because the Court finds that no claim survives Defendant's motion for summary

**ACCORDINGLY,** it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 24) is

**<u>GRANTED</u>**; and it is further

**ORDERED** that Plaintiff's Complaint is **<u>DISMISSED</u>**.

Dated: January 5, 2021
         Syracuse, New York

Glenn T. Suddaby
Chief U.S. District Judge

---

judgment, the Court does not address Defendant's argument that Plaintiff has not and cannot establish damages other than minimal lost wages.

44